# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | | |
|---|---|---|
| JASON DOUGLAS, individually and on behalf of all others similarly situated, | ) ) ) | Case No. 14-cv-1741 |
| Plaintiff, | ) ) | Hon. Gary Feinerman |
| v. | ) ) | Hon. Jeffrey Cole |
| THE WESTERN UNION COMPANY, a Delaware corporation, | ) ) ) ) | |
| Defendant. | ) | |

## PLAINTIFF'S MOTION FOR
## ATTORNEYS' FEES, COSTS, AND INCENTIVE AWARD

Submitted by:

Joseph J. Siprut
*jsiprut@siprut.com*
Ismael T. Salam
*isalam@siprut.com*
**SIPRUT PC**
17 N. State Street
Suite 1600
Chicago, Illinois 60602
Phone: 312.236.0000
Fax: 312.241.1260
**www.siprut.com**

*Counsel for Plaintiff and the Settlement Class*

# TABLE OF CONTENTS

INTRODUCTION ..................................................................................................................1

PROCEDURAL HISTORY ...................................................................................................1

ARGUMENT .........................................................................................................................5

I. Class Counsel Overcame Substantial
Defenses And Hurdles To Achieve This Settlement ...................................................5

    A. Western Union Had Significant Defenses Which,
If Successful, Would Have Resulted In Nothing For The Class ....................5

    B. Class Counsel Performed Substantial Work On Behalf Of The Class ...........6

II. The Percentage Of The Fund Method Is
Appropriate To Award Attorneys' Fees Here..............................................................8

    A. The Seventh Circuit Not Only Permits
But Favors The Percentage-Of-Fund Methodology ......................................8

    B. Class Counsel Requests 35% Of The
Common Benefit Provided To The Class. ...................................................10

    C. This Court Need Not Use A "Sliding Scale" To Award Fees ......................11

        1. The "Sliding Scale" Is Not Mandatory,
But Rather One Of Many Potential Tools That Can
Be Employed To Ensure Market Rate Compensation ......................11

        2. Class Counsel Should Be Awarded 35%,
Not The 30% Suggested By The Sliding Scale ................................13

III. The Requested Fees Are Also Appropriate Under The Lodestar Method................14

IV. The Requested Incentive Award To The Representative Plaintiff Is Proper............16

CONCLUSION....................................................................................................................17

Pursuant to Fed. R. Civ. P. 23 and this Court's November 10, 2015 Preliminary Approval Order (Dkt. No. 57), Plaintiff Jason Douglas ("Plaintiff"), by his counsel, respectfully submits the following Motion for Attorneys' Fees, Costs, and Incentive Award.

## **INTRODUCTION**

Class Counsel seeks the Court's approval of an award of attorneys' fees and expenses based on a percentage of the all-in, non-reversionary **$8,500,000** fund (the "Settlement Fund") achieved through Class Counsel's work. The fee request comprises 35% of the Settlement Fund *after* the Settlement Administrator's costs and Plaintiff's incentive award are first deducted (the "Class Fund"), precisely as the Seventh Circuit dictates,[1] plus unreimbursed litigation costs.

Class Counsel's request is well within both the market price for representation in complex litigation on a contingency-fee basis and the range for attorneys' fees that the Seventh Circuit has indicated is presumptively reasonable. *See Pearson v. NBTY, Inc.*, 772 F.3d 778, 782 (7th Cir. 2014) (stating that in consumer class actions attorneys' fees should not exceed 50% of the money going to class members and their counsel). The fee request is also consistent with attorneys' fees awarded in similar cases, including particularly by courts in this District. The reasonableness of the fee request is further bolstered given the enormous risks and investment required to develop and prosecute a case of this nature, and the excellent result achieved for the Class here.

Although the Court need not consider lodestar in approving the fee request here—the law permits and indeed encourages the percentage-of-the-fund analysis alone—a lodestar cross-check serves only to support the fee request. As detailed below, multiple attorneys have spent thousands of hours over a two-year period to bring this case to its current posture. A standard

---

[1] Unless otherwise stated herein, capitalized terms shall have the same meaning as provided in the Parties' Settlement Agreement, attached as Exhibit 1 to Dkt. No. 63.

lodestar multiplier is sufficient to approximate the amount of fees under the percentage-of-the-fund methodology.

Class Counsel also requests that the Court award Plaintiff a modest, routine incentive award in the amount of $5,000 for his work on behalf of the Class. For these reasons and those discussed below, Plaintiff respectfully requests that his motion be granted.

## PROCEDURAL HISTORY

On March 12, 2014, Plaintiff filed his Class Action Complaint against Defendant The Western Union Company ("Western Union") (Plaintiff and Western Union are, collectively, the "Parties) seeking to represent a proposed class of all individuals or entities who allegedly received unsolicited text messages to their wireless telephones from or on behalf of Western Union. (Dkt. No. 1.)

After effecting service on Western Union, this Court set an initial status hearing for May 7, 2014 and required the Parties to file an initial status report by April 30, 2014. (Dkt. No. 9.) On April 3, 2014, Western Union moved for an extension of time to answer or otherwise plead. (Dkt. No. 14.)

Meanwhile, on April 30, 2014, the Parties filed a Joint Initial Status Report (the "Initial Report"). (Dkt No. 20.) During the Parties' scheduling conference and in the Initial Report, Western Union contended that Plaintiff's claims are be subject to an arbitration agreement. (*Id.* at ¶5.) Western Union stated that absent an agreement to submit the claim to arbitration, Western Union would move to compel arbitration. (*Id.*) On May 5, 2014 this Court issued a Minute Entry stating that if Western Union intended to file a motion to compel arbitration, it should notice the motion for presentment at the initial status hearing. (Dkt. No. 21.) That same day, however, Western Union filed its Answer, denying the substance of the allegations and raising 30

affirmative defenses. (Dkt. No. 22.) At the initial status hearing on May 7, 2014, this Court stayed discovery until 14 days after the Court's ruling on the forthcoming motion to compel arbitration. (*Id.*)

On May 27, 2014, Plaintiff filed his Motion To Strike Western Union's Affirmative Defenses. (Dkt. No. 24.) Pursuant to Rule 12(f) of the Federal Rules of Civil Procedure, Plaintiff sought to strike each of Western Union's 30 affirmative defenses. During this time, the Parties had numerous communications and exchanges, and discussed potential mediation tracks. At the presentment hearing on Plaintiff's motion to strike on June 12, 2014, the Parties reported that they intended to engage in private mediation. (Dkt. No. 26.) Accordingly, Plaintiff agreed to withdraw his pending motion to strike without prejudice. (*Id.*) This Court ordered formal discovery to remain stayed pending further order. (*Id.*)

Between June and September 2014, the Parties continued to exchange information and worked on selecting an appropriate mediator. (Affidavit of Joseph J. Siprut (the "Siprut Aff."), attached hereto as Exhibit 1, ¶8.) At the status hearing on September 9, 2014, the Parties reported that a mediation was scheduled for early October. (Dkt No. 27.) On October 9, 2014, the Parties, as well as a representative from Western Union's insurer, CNA, attended a mediation at JAMS Resolution Center with Judge Andersen (Rt.) serving as the Parties' mediator. (Dkt. No. 28.) After multiple submissions to the mediator and still more information exchange, the Parties conducted negotiations for a full day, but were unable to reach a resolution. (*Id.*) Nevertheless, the Parties agreed to continue negotiations with Judge Andersen.

Between October 2014 and February 2015, the Parties continued numerous discussions on a tri-lateral basis, as Western Union's insurer continued to play a role. (Dkt. No. 30.) On February 27, 2015, the Parties engaged in *another* full-day session of mediation in New York

with Judge Andersen presiding. (Dkt. No. 36.) That session again concluded with no agreement. The Parties continued their negotiations, and Plaintiff meanwhile refiled his pending Motion For Class Certification, pursuant to the Court's instruction. (Dkt. Nos. 34, 35, 37.)

On April 22, 2015, the Parties reported that they had reached an agreement in principle, resolving Plaintiff's claims on a class-wide basis. (Dkt. No. 39.) The Parties then spent four more months exchanging drafts of a final, written settlement agreement. (*See* Siprut Aff. ¶10.) After many exchanges of edits, the Parties were finally able to agree to the form and content of a settlement agreement in late July 2015. (Dkt. No. 52-1 (the "Agreement").)

In the Agreement, Plaintiff negotiated additional confirmatory discovery given that the Court had previously stayed formal discovery. (Agreement ¶VII; Dkt. No. 26.) In addition, the Parties stipulated to an Agreed Confidentiality Order, entered by the Court on August 28, 2015. (Dkt. No. 46.) Thereafter, Western Union produced thousands of pages of documents, including lists of potential Settlement Class Members. (Siprut Aff. ¶12.) After conducting a comprehensive review of the documents, Plaintiff confirmed that the size of the Settlement Class is at most 823,472. Plaintiff has the names and last known addresses and mobile numbers for each Settlement Class Member. (*Id.*) In addition, Plaintiff has the last known email addresses for a subset of the Settlement Class. (*Id.*) Plaintiff also confirmed the manner in which the text messages were sent, including the involvement of third parties and the equipment used to send the text messages.

On October 28, 2015, Plaintiff filed his Motion For Preliminary Approval Of Class Action Settlement (the "Preliminary Approval Motion") (Dkt. No. 52), which this Court approved on November 10, 2015. (Dkt. No. 58.) The Fairness Hearing is scheduled for April 8, 2016, at 10:00 a.m. (*Id.* ¶22.)

# ARGUMENT

I. **Class Counsel Overcame Substantial Defenses And Hurdles To Achieve This Settlement.**

   A. **Western Union Had Significant Defenses Which, If Successful, Would Have Resulted In Nothing For The Class.**

Class Counsel expended substantial effort in achieving this Settlement on behalf of Class Members. That is not mere rhetoric. The amount of work necessary to settle this case at this level, and the *risk* Counsel had to bear in order to do so, can only be appreciated in context given Western Union's defenses.

In many TCPA cases, defendants are alleged to have made calls or sent text messages without having any prior contact with the recipients of the unwanted communications. Usually, the defendants (or someone acting on their behalf) obtain a list of phone numbers from a third party or some external source) before making calls or sending the text messages.[2] Western Union, however, retrieved the contact information from its own customers and principally obtained phone numbers through its website. When Class Members created accounts, they arguably (on Western Union's view) agreed to arbitrate any claims arising from the provision of Western Union's services. *See Andermann v. Sprint Spectrum L.P.*, 785 F.3d 1157, 1159 (7th Cir. 2015) (requiring plaintiffs alleging violations of the TCPA to arbitrate claims). The

---

[2] *See generally Hofer v. Synchrony Bank*, No. 4:14 CV 1865 CDP, 2015 WL 2374696, at *1 (E.D. Mo. May 18, 2015) ("[I]t was Synchrony's practice to obtain telephone numbers from credit reports and other sources independent from the persons being called. Synchrony would then compile lists of these telephone numbers, which would be loaded into an autodialer or predictive dialer."); *Kramer v. Autobytel, Inc.*, 759 F. Supp. 2d 1165, 1168 (N.D. Cal. 2010) ("Defendant B2Mobile contracted with third parties to acquire lists of phone numbers for the sole purpose of sending spam text messages on behalf of advertisers for its own monetary gain."); *see also St. Louis Heart Ctr., Inc. v. Vein Centers For Excellence, Inc.*, No. 4:12 CV 174 CDP, 2013 WL 6498245, at *4 (E.D. Mo. Dec. 11, 2013) ("Vein Centers purchased some lists in Excel spreadsheet form, and she was able to sort the numbers by doctor name in order to remove Vein Centers' current clients"). *But see Salmon v. CRST Expedited, Inc.*, No. 14-CV-0265-CVE-TLW, 2015 WL 1395237, at *1 (N.D. Okla. Mar. 25, 2015) ("The parties do not dispute that the only ways CRST obtains a phone number for a prospective driver is from an inquiry to the CRST website, a multi-company recruiting website, or from a CRST recruiter.").

arbitration agreements also included a class action waiver, which (if enforced) would extinguish any possibility of a class-wide recovery. *See AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 343-45 (2011) (upholding arbitration provisions with class action waivers).

If Western Union was successful in invoking arbitration, individual Class Members would likely never receive any relief at all, because the cost of pursuing individual claims under the TCPA (with statutory damages ranging from $500 to $1500) in arbitration is cost prohibitive, especially given that the TCPA is not a fee-shifting statute. *See Andermann*, 785 F.3d at 1160 ("If the Andermanns' claims have to be arbitrated all by themselves, they probably won't be brought at all, because the Andermanns if they prevail will be entitled only to modest statutory damages.").[3]

In addition, the terms and conditions on Western Union's website provide an argument for Western Union that Class Members provided consent for Western Union to send them text messages. If Western Union succeeded with a consent defense, this alone would defeat Class Members' claims.

Though Class Counsel has maintained that these defenses can and would be overcome on a contested basis, the risk presented by these defenses is obvious. The Settlement balances the risks faced by the Class, Class Counsel, and Western Union.

**B. Class Counsel Performed Substantial Work On Behalf Of The Class.**

The hours Class Counsel expended in battling Western Union total 2,164.4 hours (Siprut Aff. ¶24) and include the following:

---

[3] *See also* Consumer Financial Protection Bureau, Study Finds That Arbitration Agreements Limit Relief For Consumers 1 (Mar. 10, 2015) (finding "very few consumers individually seek relief through arbitration and the courts, while millions of consumers obtain relief each year through class action settlements"); Daniel Higginbotham, Buyer Beware: Why The Class Arbitration Waiver Clause Presents Gloomy Future For Consumers, 58 Duke L.R. 103 (2008) ("'If [mandatory arbitration] catches on, it could wipe out years of progress in consumer protection.'").

- **Pre-Complaint Factual Investigation**. Class Counsel began conducting a factual and legal investigation in 2014, starting with an analysis of the text message advertisement sent on Western Union's behalf.

- **Legal Investigation**. With the initial factual investigation ongoing, Class Counsel investigated the litigation landscape. In addition, Class Counsel researched: (1) choice of law issues; (2) the appropriate venue and potentially applicable statutes, regulations, and common law claims under Illinois and various other states' laws; and (3) the elements and potential defenses for each of the proposed claims. Once the initial factual and legal research had been completed, Class Counsel began: (1) formulating the TCPA claims; (2) drafting, preparing, and filing the Complaint; and (3) engaging in correspondence with clients regarding the complaint and the case in general.

- **Motion Practice and Discovery**. After appearing in this case, Western Union threatened to file a motion to compel arbitration of Plaintiff's claims. While considering whether to file its motion, Western Union filed an answer to Plaintiff's complaint. Plaintiff moved to strike several of Western Union's affirmative defenses arguing that Western Union's purported affirmative defenses failed the pleading standard and were legally insufficient. Shortly thereafter, Class Counsel and Western Union engaged in private mediation. Prior to the mediation, the Parties exchanged informal discovery on the nature of their claims and defenses. For example, Western Union provided information on how Class Members purportedly agreed to arbitrate their claims against Western Union and provided consent to receive text messages from Western Union. The Parties also exchanged robust settlement position statements provided detailed analyses of issues surrounding the nature of the text messages, arbitrability, consent, and class certification. Class Counsel significantly researched class certification issues (and potential Western Union defenses to class certification), given that class certification would have been the "make or break" point for a case of this nature.

- **Interactions With Clients and the Members of the Class**. Class Counsel has received various inquiries from Settlement Class Members which has required Class Counsel to take the time to communicate with each individual, collect data, and keep consumers apprised of any progress in the case.

- **Settlement**. Class Counsel conducted substantial and protracted settlement negotiations with Western Union. Class Counsel researched and drafted memoranda regarding potential settlement structures, analyzed settlements in similar cases, reviewed materials obtained through settlement discussions and confirmatory discovery, and regularly engaged in telephonic conferences and email exchanges. Class Counsel also engaged in two full days of mediation with Retired Judge Wayne Andersen, along with numerous e-mail exchanges with counsel of record. After nearly seven months of negotiations and only with Judge Andersen's assistance were the Parties able to reach the Settlement here which provides immediate and direct benefits to the Class.

## II. The Percentage Of The Fund Method Is Appropriate To Award Attorneys' Fees Here.

### A. The Seventh Circuit Not Only Permits But Favors The Percentage-Of-Fund Methodology.

The Seventh Circuit has strongly (and historically) endorsed the percentage of the recovery benefit method as the best means for calculating attorneys' fees in common fund cases.[4] *See In re Synthroid Mktg. Litig.*, 264 F.3d 712, 718 (7th Cir. 2001) ("*Synthroid I*") (instructing district courts to "do their best to award counsel the market price for legal services, in light of the risk of nonpayment and the normal rate of compensation in the market at the time") (collecting cases).[5] This long-standing maxim was reaffirmed by the Seventh Circuit just a few months ago.

---

[4] The Seventh Circuit's decisions in *Eubank v. Pella Corp.*, 753 F.3d 718 (7th Cir. 2004), *Redman v. RadioShack Corp.*, 768 F.3d 622 (7th Cir. 2014), and *Pearson v. NBTY, Inc.*, 772 F.3d 778 (7th Cir. 2014) are not to the contrary. In each of those cases, the courts endorsed basing attorneys' fees off a percentage to of the money going to them and the class, so long as the percentage was no more than 50%. *E.g.*, *NBTY*, 772 F.3d 778, 781 (7th Cir. 2014) (reversing attorneys' fee award where it represented 69% of the money going to the class and their counsel); *RadioShack*, 768 F.3d at 622 (reversing fee award where class counsel sought over 55% of the money going to the class and their counsel); *Pella*, 753 F.3d at 726 (reversing fee award where counsel sought 56% of the money going to the class and their counsel).

[5] *Gaskill v. Gordon*, 160 F.3d 361, 362 (7th Cir. 1998) ("When a class suit produces a fund for the class, it is commonplace to award the lawyers for the class a percentage of the fund . . . in recognition of the fact that most suits for damages in this country are handled on the plaintiff's side on a contingent-fee basis.") (internal citations omitted); *Matter of Cont'l Illinois Sec. Litig.*, 962 F.2d 566, 572 (7th Cir. 1992), *as amended on denial of reh'g* (May 22, 1992) ("The class counsel are entitled to the fee they would have received had they handled a similar suit on a contingent fee basis, with a similar outcome, for a paying client. . . . [I]n large commercial litigation with prospects of multimillion dollar recoveries the percentage frequently is tapered—it might be 33 percent of the first million, 25 percent of the next million, and so on down."); *In re Capital One Tel. Consumer Prot. Act Litig.*, 80 F. Supp. 3d 781, 795 (N.D. Ill. 2015) (percentage of the fund method is "more likely to yield an accurate approximation of the market rate"); *McCue v. MB Fin., Inc.*, No. 15 CV 988, 2015 WL 4522564, at *3 (N.D. Ill. July 23, 2015) ("Awarding attorneys' fees through a percentage of a common fund is consistent with the need to incentivize lawyers to resolve cases early and to avoid over-litigating them in order to recover a larger fee."); *Beesley v. Int'l Paper Co.*, No. 3:06-CV-703-DRH-CJP, 2014 WL 375432, at *2 (S.D. Ill. Jan. 31, 2014) ("When determining a reasonable fee, the Seventh Circuit Court of Appeals uses the percentage basis rather than a lodestar or other basis."); *Will v. Gen. Dynamics Corp.*, No. CIV. 06-698-GPM, 2010 WL 4818174, at *3 (S.D. Ill. Nov. 22, 2010) ("The use of a lodestar cross-check in a common fund case is unnecessary, arbitrary, and potentially counterproductive."). "Given the issues likely to arise in computing a lodestar, courts across the country, both federal and state, are retreating from a lodestar analysis in favor of setting common benefit fees at a percentage of the benefit secured . . . ." *In re Bayou Sorrel Class Action*, 6:04-cv-1101, 2006 WL 3230771, at *3 (W.D. La. Oct. 31, 2006) (collecting cases).

*In re Sw. Airlines Voucher Litig.*, 799 F.3d 701, 708 (7th Cir. 2015) ("Under the 'common fund' doctrine, an attorney who recovers a common fund for the benefit of a class is entitled to a reasonable portion" of the fund) (citing *Boeing Co. v. Van Gemert*, 444 U.S. 472, 478 (1980)).

District courts throughout the Seventh Circuit (but particularly here in the Northern District) have consistently and repeatedly approved fee awards in class settlements using a percentage of the fund achieved – including for TCPA class actions, such as our Settlement here. *E.g.*, *In re Capital One Tel. Consumer Prot. Act Litig.*, 80 F. Supp. 3d 781, 809 (N.D. Ill. 2015) (Holderman, J.) (awarding tiered percentages as attorneys' fees); *City of Greenville v. Syngenta Crop Prot., Inc.*, 904 F. Supp. 2d 902, 908 (S.D. Ill. 2012) ("[A] contingent fee of one-third of any recovery after the reimbursement of costs and expenses reflects the market price for legal services for a case of similar risk."); *Kolinek v. Walgreen Co.*, No. 13 C 4806, 2015 WL 7450759, at *17 (N.D. Ill. Nov. 23, 2015) (Kennelly, J.) (awarding 36% of the settlement as attorneys' fees); *McCue v. MB Fin., Inc.*, No. 15 CV 988, 2015 WL 4522564, at *3 (N.D. Ill. July 23, 2015) (Coleman, J.) (awarding one-third of the settlement fund in attorneys' fees, plus costs of litigation); *Abbott v. Lockheed Martin Corp.*, Case No. 06-cv-701-MJR-DGW, 2015 WL 4398475, at *2 (S.D. Ill. July 17, 2015) (awarding 33.33% of the fund plus costs); *Zolkos v. Scriptfleet, Inc.*, No. 12 Civ. 8230 (GF), 2015 WL 4275540, at *3 (N.D. Ill. July 13, 2015) (Feinerman, J.) (awarding 33.33% of the fund plus expenses); *Prena v. BMO Fin. Corp.*, No. 15 C 09175, 2015 WL 2344949, at *1 (N.D. Ill. May 15, 2015) (Chang, J.) (awarding 33.5% of the fund after deducting notice expenses); *Bickel v. Sheriff of Whitley Cnty*, No. 1:08-cv-102-TLS, 2015 WL 1402018, at *6 (N.D. Ind. March 26, 2015) (awarding 43.7% of the fund); *Craftwood Lumber Co. v. Interline Brands, Inc.*, No. 11-CV-4462, 2015 WL 1399367, at *5 (N.D. Ill. Mar. 23, 2015) (St. Eve, J.) (awarding tiered percentages as attorneys' fees) *mot. to amend judgment*

*denied,* 2015 WL 2147679 (May 6, 2015); *In re Dairy Farmers of Am., Inc.*, No. 09-cv-3690, MDL No. 2031, 2015 WL 753946, at *16 (N.D. Ill. Feb. 20, 2015) (Dow, J.) (awarding 33.33% of the fund); *Chapa IV v. Trugreen, Inc.*, No. 13-cv-3957, Dkt. No. 50 (N.D. Ill. Jan. 27, 2015) (Leinenweber, J.) (awarding one-third of the settlement fund as attorneys' fees).[6]

### B. Class Counsel Requests 35% Of The Common Benefit Provided To The Class.

With still another two weeks left for Class Members to submit claims, the Settlement Administrator has already received 36,360 claims. (Siprut Aff. ¶33.) This represents a 5% claims-rate, which is above Class Counsel's expectations and the "predictions" offered at the preliminary approval hearing before this Court.

---

[6] *See also Martin v. Dun & Bradstreet, Inc.*, No. 12-cv-00215, Dkt. 66 (N.D. Ill. Jan. 16, 2014) (Martin, J.) (awarding one third fee payment of distributed fund); *Cummings v Sallie Mae*, No. 12-cv-9984, Dkt. 91 (N.D. Ill. May 30, 2014) (Gottschall, J.) (awarding one-third of the common fund for fees); *Hanley v. Fifth Third Bank*, No. 12-cv-01612, Dkt. No. 86 (N.D. Ill. Dec. 23, 2013) (Castillo, J.) (awarding one third of common fund); *Desai v. ADT Sec. Servs., Inc.*, No. 11-cv-01925, Dkt. 243 (N.D. Ill. June 21, 2013) (Bucklo, J.) (approving payment of one-third of common fund); *Paldo Sign & Display Co. v. Topsail Sportswear, Inc.*, No. 08-cv-05959, Dkt. 116 (N.D. Ill. Dec. 21, 2011 (Kennelly, J.) (approving one-third of the settlement fund plus expenses); *CE Design Ltd. v. Cy's Crab House N., Inc.*, No. 07-cv-05456, Dkt. 424 (N.D. Ill. Oct. 27, 2011) (Kennelly, J.) (same); *Saf-TGard Int'l, Inc., v. Seiko Corp. of Am.*, No. 09-cv-00776, Dkt. No. 100 (N.D. Ill. Jan. 14, 2011) (Bucklo, J.) (same); *G.M. Sign, Inc. v. Finish Thompson, Inc.*, No. 07-cv-05953, Dkt. No. 146 (N.D. Ill. Nov. 1, 2010) (Kendall, J.) (same); *Hinman v. M & M Rental Ctr., Inc.*, No. 06-cv-01156, Dkt. No. 225 (N.D. Ill. Oct. 6, 2009) (Bucklo, J.) (same); *Holtzman v. CCH*, No. 07-cv-07033, Dkt. 33 (N.D. Ill. Sept. 30, 2009) (Nordberg, J.) (same); *CE Design, Ltd. v. Exterior Sys., Inc.*, No. 07-cv-00066, Dkt. No. 39 (N.D. Ill. Dec. 6, 2007) (Darrah, J.) (same); *Will v. Gen. Dynamics Corp.*, 06-698-GPM, 2010 WL 4818174, at *2 (S.D. Ill. Nov. 22, 2010) (stating that, where the market for legal services in a class action is only for contingency fee agreements, and there is a substantial risk of nonpayment for the attorneys, "the normal rate of compensation in the market" is "33.33% of the common fund recovered"); *Berger v. Xerox Corp. Ret. Income Guarantee Plan*, 00-584-DRH, 2004 WL 287902, at *2 (S.D. Ill. Jan. 22, 2004) (finding that 29% of the gross settlement is a reasonable fee award); *Gaskill*, 160 F.3d at 362-3 (noting that typical contingency fees are between 33% and 40% and that "[s]ome courts have suggested 25% as a benchmark figure for a contingent-fee award in a class action"); *Meyenburg v. Exxon Mobil Corp.*, 3:05-cv-15-DGW, 2006 WL 2191422, at *2 (S.D. Ill. July 31, 2006) ("33 1/3% to 40% (plus the cost of litigation) is the standard contingent fee percentages in this legal marketplace for comparable commercial litigation."); *Summers v. UAL Corp. ESOP Comm.*, 03-cv-1537, 2005 WL 3159450, at *2 (N.D. Ill. Nov. 22, 2005) (finding that attorneys' fees amounting to 16% of the gross settlement "is clearly within the range of what has been deemed reasonable by the Seventh Circuit").

Because the claims process is ongoing, however, the Settlement Administrator's costs are not yet finalized. Based on current projections, the Administrator's costs will be $490,214.00. At that number, the $8.5 Million Settlement Fund will thus net $8,004,786.00 after notice and administration expenses. Plaintiff respectfully requests that the Court award Class Counsel attorneys' fees in the amount of 35% of that net figure (well within Seventh Circuit guidelines, as discussed above), or $2,801,675.10. (At the final approval stage, Plaintiff will provide an updated figure on final administration costs.) Plaintiff additionally seeks the reimbursement of out-of-pocket litigation costs, in the amount of $17,232.31. (Siprut Aff. ¶25.) *See City of Greenville*, 904 F. Supp. 2d at 908 (awarding fees *and costs*); *McCue*, 2015 WL 4522564, at *3 (same); *Abbott v. Lockheed Martin Corp.*, 2015 WL 4398475, at *2 (same).

### C. This Court Need Not Use A "Sliding Scale" To Award Fees.

#### 1. The "Sliding Scale" Is Not Mandatory, But Rather One Of Many Potential Tools That Can Be Employed To Ensure Market Rate Compensation.

As this Court noted during the November 10, 2015 hearing on Plaintiff's Preliminary Approval Motion, at least two judges in this District have recently employed a "sliding scale" methodology in assessing proposed fee requests in Class settlements. *In re Capital One Tel. Consumer Prot. Act Litig.*, 80 F. Supp. 3d 781 (N.D. Ill. 2015) (Holderman, J.); *Craftwood Lumber Co. v. Interline Brands, Inc.*, No. 11-CV-4462, 2015 WL 1399367 (N.D. Ill. Mar. 23, 2015) (St. Eve, J.) *mot. to amend judgment denied,* 2015 WL 2147679 (May 6, 2015); *Wilkins v. HSBC Bank Nevada, N.A.*, No. 14 C 190, 2015 WL 890566, at *10 (N.D. Ill. Feb. 27, 2015) (Holderman, J.).

In those cases, the courts relied on the sliding scale used in *In re Synthroid Mktg. Litig.*, 325 F.3d 974, 980 (7th Cir. 2003) ("*Synthroid II*"), deemed the "Modified *Synthroid II*

Structure," in which the benchmark percentage of an award of fees from a common fund is: (a) 30% for the first $10 million; (b) 25% of the next $10 million; (c) 20% of the next $20-40 million; and (d) 15% of any amount in excess of $45 million. *In re Capital One*, 80 F. Supp. 3d at 804; *Craftwood*, 2015 WL 2147679, at *1.

To be clear, this Court is not ***required*** to apply a sliding scale when awarding attorneys' fees. *Heekin v. Anthem, Inc.*, No. 1:05-CV-01908-TWP, 2012 WL 5878032, at *3 (S.D. Ind. Nov. 20, 2012) ("[The objector] argues *Synthroid II* mandates a sliding scale fee award. The Court flatly rejects this argument."). While the Seventh Circuit permitted the use of such scale in *Synthroid II* and *Silverman v. Motorola Sols., Inc.*, 739 F.3d 956 (7th Cir. 2013), the scale was offered as simply one of many tools to calculate market rates and incentivize class counsel to achieve the best result possible for the class they represent. The Seventh Circuit has indicated that these goals can also be achieved by: (a) comparing actual market rates of other counsel; and (b) measuring the strength of a case against the settlement. *See Synthroid I*, 264 F.3d at 719 (discussing the "guides" available to courts for determining appropriate market rates, including comparing billable rates of attorneys); *see also Wong v. Accretive Health, Inc.*, 773 F.3d 859, 864 (7th Cir. 2014) ("The most important factor relevant to the fairness of a class action settlement is the strength of plaintiff's case on the merits balanced against the amount offered in the settlement.").

Moreover, the Seventh Circuit has recognized that "declining marginal percentages" are not always useful, because "[t]hey also create declining marginal returns to legal work, ensuring that at some point attorneys' opportunity cost will exceed the benefits of pushing for a larger recovery, even though extra work could benefit the client. This feature exacerbates the agency

costs inherent in any percentage-of-recovery system, just as the lodestar approach creates the opposite incentive to run up the billable hours." *Synthroid I*, 264 F.3d at 721.

### 2. Class Counsel Should Be Awarded 35%, Not The 30% Suggested By The Sliding Scale.

The Modified *Synthroid II* Structure calls for a class counsel to receive 30% of the first $10 million of the Class Fund. *In re Capital One*, 80 F. Supp. 3d at 804; *Craftwood*, 2015 WL 2147679, at *1. Given the $8.5 Million Settlement Fund here (or $8.0 Million after administration costs), if the Court adopted this methodology, the fee award here would be 30% of the Fund (rather than the 35% Class Counsel requests).

But as explained above, the Court is not constrained to use a sliding scale method. And even the sliding scale method itself allows for upward enhancements (from the suggested benchmark) based on risk factors. *See Kolinek*, No. 13 C 4806, 2015 WL 7450759, at *16 (awarding 30% as a benchmark percentage and an additional 6% as a risk adjustment); *In re Capital One*, 80 F. Supp. 3d at 806 (applying "Eisenberg and Miller's 6% premium" where case was only "slightly riskier" than average TCPA class action). "As the Seventh Circuit has explained, 'if the market-determined fee for a sure winner were $1 million the market-determined fee for handling a similar suit with only a 50 percent chance of a favorable outcome should be $2 million.'" *Kolinek*, 2015 WL 7450759, at *16 (quoting *In re Trans Union Corp. Privacy Litig.*, 629 F.3d 741, 746 (7th Cir. 2011)).

The risks in this case are substantial, given Western Union's defenses. (*See supra*, Part I.A.; Dkt. No. 52 at 9-13.) Indeed, the risks present in this case are even more significant than the risks presented in *In re Capital One*, when measured apples to apples. In *Capital* One, the cited risks included (a) the class members' alleged consent to be called; (b) Rule 23 manageability issues; and (c) potentially forthcoming FCC orders. *In re Capital One*, 80 F. Supp. 3d at 806.

Based on those risks, Judge Holderman awarded a 6% upward adjustment to the 30% benchmark. Here, in addition to these same risks being present in this case, Class Members also face the additional risk of: (a) litigating on an individual basis in arbitration; (b) Western Union being found not vicariously liable for the acts of third parties; and (c) not being able to prove that an autodialer was used.

Despite all of these additional risks, which Class Counsel bore entirely, the Court would still only need to use the same 6% premium as Judge Holderman to bump the 30% figure in the Sliding Scale up to 36%—or technically 5%, since we are only asking for 35%.

### III. The Requested Fees Are Also Appropriate Under The Lodestar Method.

The Seventh Circuit just recently made clear that when the Settlement constitutes a common fund, as here, using the lodestar method to award fees is "not warranted." *Craftwood*, 2015 WL 1399367, at *5 (citing *Americana Art China Co. v. Foxfire Printing & Packaging, Inc.*, 743 F.3d 243, 247 (7th Cir. 2014)); *Gress v. Premier Healthcare Exchange, Inc.*, No. 14-cv-501, Dkt. No. 94 (N.D. Ill. Sept. 11, 2015) (granting final approval and awarding fees under the percentage method, without requiring a lodestar cross-check). Even if considered here, however, a lodestar cross-check further supports the fee request.

To determine the reasonableness of attorneys' fees under the lodestar method, the first step is to calculate a base lodestar amount by "multiplying a reasonable hourly rate by the number of hours reasonably expended." *Gastineau v. Wright,* 592 F.3d 747, 748 (7th Cir. 2010) (citing *Hensley v. Eckhart*, 461 U.S. 424, 433-37 (1983)).[7] The base lodestar is typically adjusted using a multiplier to take into account various factors in the litigation that affect the reasonableness of the requested fees. *See, e.g., Cook v. Niedert,* 142 F.3d 1004, 1015 (7th Cir.

---
[7] The Supreme Court has explicitly held that "trial courts need not, and indeed should not, become green-eyeshade accountants" when reviewing time records. *Fox v. Vice*, 131 S. Ct. 2205, 2216 (2011) (internal quotations omitted).

1998); *Skelton v. Gen. Motors Corp.*, 860 F.2d 250, 255 (7th Cir. 1988). These factors include "the complexity of the legal issues involved, the degree of success obtained, and the public interest advanced by the litigation." *Gastineau*, 592 F.3d at 748. When applying a multiplier to the base lodestar amount, courts should also consider the risk plaintiff's counsel assumes in recovering nothing. *Harman v. Lyphomed, Inc.*, 945 F.2d 969, 975-76 (7th Cir. 1991) (remanding case for recalculation of attorneys' fees because the trial court failed to award a risk multiplier). Multipliers can range from 2 to 4 or even higher. *See In re Cenco, Inc. Sec. Litig.*, 519 F. Supp. 322 (N.D. Ill. 1981) (applying a lodestar multiplier of 4 to lead counsel's lodestar and 2 to other counsels' lodestar). "The standard is whether the fees are reasonable in relation to the difficulty, stakes, and outcome of the case." *Id.* (citing *Connolly v. Nat'l Sch. Bus. Serv., Inc.*, 177 F.3d 593, 597 (7th Cir.1999)).

As detailed in the Affidavit of Joseph Siprut, the hourly rates utilized by Siprut PC's attorneys and legal staff (1) have been previously approved by courts throughout the country and this district; (2) are the same hourly rates charged by Siprut PC to outside clients; and (3) are consistent with the median hourly rate in the legal market based on the hourly rates charged in other cases by attorneys with similar experience, skill and reputation. (*Id*. ¶¶26-32.) To date, three attorneys at Class Counsel's firm have spent 2,164.4 hours collectively in prosecuting this action for a total lodestar amount of $1,105,490.00 (Siprut Aff. ¶¶19-24.) In addition, Class Counsel has incurred $17,232.31 in unreimbursed costs to date. (*Id.* ¶25.) *See City of Greenville*, 904 F. Supp. 2d at 908 (awarding fees *and costs*); *McCue*, 2015 WL 4522564, at *3 (same); *Abbott v. Lockheed Martin Corp.*, 2015 WL 4398475, at *2 (same).

The differential between the $2,801,675.10 in fees requested here, on the one hand, and the base lodestar, on the other hand, is thus represented by a lodestar multiplier of 2.53. This

multiplier is certainly within the range of reasonableness considering the risk of non-recovery and the excellent result achieved, as detailed above. *See Harman*, 945 F.2d at 975 (noting "[a risk] multiplier is, within the court's discretion, appropriate when counsel assume a risk of non-payment in taking a suit" and "[m]ultipliers anywhere between one and four . . . have been approved"); *In re Cenco, Inc. Sec. Litig.*, 519 F. Supp. at 327 (applying a lodestar multiplier of 4 to lead counsel's lodestar and 2 to other counsels' lodestar); *In re Brand Name Prescription Drugs Antitrust Litig.*, 2000 WL 204112, (N.D. Ill. Feb. 9, 2000) (awarding $91 million above lodestar and noting that "[an] award of more than two times the lodestar calculation is believed to be fair and just in these circumstances").

## IV. The Requested Incentive Award To The Representative Plaintiff Is Proper.

Finally, Plaintiff requests that the named plaintiff and class representative receive an incentive award of $5,000, which was the result of a negotiated compromise. The rationale for awarding incentive payments to named plaintiffs is that they should be compensated for the expense or risk they have incurred in conferring a benefit on other members of the class. *In re Relafen Antitrust Litig.*, 231 F.R.D. 52, 82 (D. Mass. 2005). Incentive awards are appropriate "to encourage or induce an individual to participate" in a class action law suit. *Id.*

Moreover, and similar to the fee request, comparisons to incentive awards in other similar class action settlements further underscore that this amount is reasonable and fair. *See, e.g.*, *In re Sw. Airlines Voucher Litig.*, 2013 WL 5497275, at *1 (N.D. Ill. Oct. 3, 2013) (class representative received $15,000 incentive award) *amended on other grounds,* 2014 WL 2809016 (N.D. Ill. June 20, 2014); *Cook*, 142 F.3d at 1016 (awarding $25,000 incentive award); *Spicer v. Chi. Bd. Options Exch., Inc.*, 844 F. Supp. 1226, 1267-68 (N.D. Ill. 1993) ($30,000 awarded from settlement fund of $10 million).

In this case, Plaintiff has contributed substantially to this litigation and has invested considerable time, at his own expense, to do so. Plaintiff aided our initial investigation of the claims, and worked to provide a variety of documentation (initially at our request, and then additionally as the Parties exchanged information) to support the asserted claims on behalf of the Class. Plaintiff also spent substantial time with us on the phone discussing the case and its progress, and particularly the scope of the settlement eventually achieved. (Siprut Aff. ¶3.)

## CONCLUSION

For the reasons set forth above, Class Counsel respectfully suggests that attorneys' fees in the amount of 35% of the Class Fund (at most $2,801,675.10), the payment of costs in the amount of $17,232.31, and an incentive award to the class representative Plaintiff in the amount of $5,000 are fair, appropriate, and reasonable, and respectfully requests the Court enter an Order approving these amounts.

Dated: February 8, 2016

Respectfully submitted,

By: *s/ Joseph J. Siprut*

Joseph J. Siprut
*jsiprut@siprut.com*
Ismael T. Salam
*isalam@siprut.com*
**SIPRUT PC**
17 North State Street
Suite 1600
Chicago, Illinois 60602
Phone: 312.236.0000
Fax: 312.241.1260
**www.siprut.com**

*Counsel for Plaintiff*
*and the Settlement Class*

## CERTIFICATE OF SERVICE

The undersigned, an attorney, hereby certifies that a true and correct copy of the foregoing **Plaintiff's Motion For Attorneys' Fees, Costs And Incentive Award** was filed this 8th day of February 2016 via the electronic filing system of the Northern District of Illinois, which will automatically serve all counsel of record.

*/s/ Joseph J. Siprut*

4830-1372-3948, V. 3