# EXHIBIT 1

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| JASON DOUGLAS, individually and on behalf of all others similarly situated, | ) ) ) | Case No. 14-cv-1741 |
| Plaintiff, | ) ) | Hon. Gary Feinerman |
| v. | ) ) | Hon. Jeffrey Cole |
| THE WESTERN UNION COMPANY, a Delaware corporation, | ) ) ) | |
| Defendant. | ) ) | |

**AFFIDAVIT OF JOSEPH J. SIPRUT**

I, Joseph J. Siprut, declare:

1.      I am an attorney admitted to practice before this Court, and am the managing partner of the law firm of Siprut PC (herein "Siprut PC" or "Class Counsel").  I am one of the attorneys for Plaintiff Jason Douglas ("Plaintiff") and the Settlement Class, and I make this declaration in support of Plaintiff's Motion In Support Attorneys' Fees, Costs, And Incentive Award. If called as a witness, I would and could testify to the following:

***Background on the Litigation***

2.      I have personally participated in the prosecution of this Class Action prior to filing the Complaint on March 12, 2014, through the present. At the inception of this case, Plaintiff signed a retention agreement with my firm, agreeing that my firm's rate was contingent in nature.

3.      Plaintiff has contributed substantially to this litigation and has invested considerable time, at his own expense, to do so. Plaintiff aided our initial investigation of the claims, and worked to provide a variety of documentation to support the asserted claim for violations of the Telephone Consumer Protection Act, 47 U.S.C. § 227, *et seq.* ("TCPA").

Plaintiff's agents also spent several hours with us on the phone discussing the case, and the scope of the settlement eventually achieved.

4.      On March 14, 2014, Plaintiff's process server effected service on Western Union. (Dkt. No. 10.) That same day, this Court set an initial status hearing for May 7, 2014 and required the Parties to file an initial status report by April 30, 2014. (Dkt. No. 9.) On April 3, 2014, Western Union moved for an extension of time to answer or otherwise plead. (Dkt. No. 14.) This Court granted Western Union's motion for extension of time and required it to answer or otherwise plead to the complaint by May 5, 2014. (Dkt. No. 16.)

5.      On April 30, 2014, the Parties filed a Joint Initial Status Report (the "Initial Report"). (Dkt No. 20.) During the Parties' scheduling conference and in the Initial Report, Western Union represented that Plaintiff's claims may be subject to an arbitration agreement. (*Id.* at ¶5.) Western Union stated that absent an agreement to submit the claim to arbitration, Western Union would move to compel arbitration. (*Id.*) On May 5, 2014 this Court issued a Minute Entry stating that if Western Union intended to file a motion to compel arbitration, it should notice the motion for presentment at the initial status hearing. (Dkt. No. 21.) That same day, however, Western Union filed its Answer, denying the substance of the allegations and raising 30 affirmative defenses. (Dkt. No. 22.)

6.      At the initial status hearing on May 7, 2014, Western Union indicated that it remained interested in filing a motion to compel arbitration. (Dkt. No. 23.) Per an agreement by the Parties, this Court stayed discovery until 14 days after the Court's ruling on the forthcoming motion to compel arbitration. (*Id.*)

7.      On May 27, 2014, Plaintiff filed his Motion To Strike Western Union's Affirmative Defenses. (Dkt. No. 24.) Pursuant to Rule 12(f) of the Federal Rules of Civil

Procedure, Plaintiff sought to strike each of Western Union's 30 affirmative defenses. At the presentment hearing on Plaintiff's motion to strike on June 12, 2014, the Parties reported that they intended to engage in private mediation. (Dkt. No. 26.) Accordingly, Plaintiff agreed to withdraw his motion without prejudice. (*Id.*) This Court ordered discovery to remain stayed pending further order. (*Id.*)

8.     Between June and September 2014, the Parties engaged in back-and-forth negotiations over the selection of a mediator. At the status hearing on September 9, 2014, the Parties reported that a mediation was scheduled for early October. (Dkt No. 27.) On October 9, 2014, the Parties, as well as a representative from Western Union's insurer, CNA, attended a mediation at JAMS Resolution Center with Judge Andersen (Rt.) serving as the Parties' mediator. (Dkt. No. 28.) The Parties conducted negotiations for a full day, but were unable to reach a resolution. (*Id.*) Nevertheless, the Parties made progress and agreed to continue negotiations at a later date to be determined.

9.     Between October 2014 and February 2015, the Parties continued productive, informal settlement discussions. Western Union also was working through various coverage issues with its insurer. (Dkt. No. 30.) On February 27, 2015, the Parties engaged in another full-day session of mediation in New York with Judge Andersen presiding. (Dkt. No. 36.) The Parties continued their vigorous settlement negotiations for another three months. During that time, Plaintiff refiled his pending Motion For Class Certification, pursuant to the Court's instruction. (Dkt. Nos. 34, 35, 37.)

10.     On April 22, 2015, the Parties reported that they had reached an agreement in principle, resolving Plaintiff's claims on a class-wide basis. (Dkt. No. 39.) The Parties then spent four more months exchanging drafts of a final, written settlement agreement. After many

exchanges of edits, the Parties were finally able to agree to the form and content of a settlement agreement in late July 2015. (Dkt. No. 52-1 (the "Agreement").)

11.     In the Agreement, Plaintiff negotiated confirmatory discovery given that the Court had previously stayed formal discovery. (Agreement ¶VII; Dkt. No. 26.) The Parties held several conference calls regarding the scope of confirmatory discovery following the execution of the Agreement. In addition, the Parties stipulated to an Agreed Confidentiality Order, entered by the Court on August 28, 2015. (Dkt. No. 46.)

12.     Thereafter, Western Union produced thousands of pages of documents, including lists of potential Settlement Class Members. After conducting a comprehensive review of the documents, Plaintiff determined that the size of the Settlement Class is at most 823,472. Plaintiff has the names and last known addresses and mobile numbers for each Settlement Class Member. (*Id.*) In addition, Plaintiff has the last known email addresses for a subset of the Settlement Class. (*Id.*) Plaintiff also determined the manner in which the text messages were sent, including the involvement of third parties and the equipment used to send the text messages.

13.     As a result of the above-described mediation sessions and conferences steered by Judge Anderson, the Parties reached the Settlement. On October 28, 2015, Plaintiff filed his Motion For Preliminary Approval Of Class Action Settlement (the "Preliminary Approval Motion") (Dkt. No. 52), which this Court approved on November 10, 2015. (Dkt. No. 58.) In the Court's Preliminary Approval Order, Plaintiff is required to file a petition for the award of attorneys' fees by February 8, 2016. (*Id.* ¶25.) A Fairness Hearing is scheduled for April 8, 2016, at 10:00 a.m. (*Id.* ¶22.)

14. The Settlement is designed to afford each Class Member the opportunity to receive a pro rata share of the $8,500,000 Settlement Fund after the deduction of: (a) notice and administration costs; (b) attorneys' fees and costs; and (c) an incentive award.

15. Documents obtained suggest that 741,197 individuals or entities were sent text messages from Western Union.

16. Class Counsel should receive attorneys' fees and expenses in an amount not to exceed 35% of the Settlement Fund, after notice and administration expenses and Plaintiff's incentive award are deducted, resulting in a fee award of approximately $2,801,675.10.

***Siprut PC Rates and Lodestar Time***

17. Siprut PC has expended a significant amount of time and effort in prosecuting this action and achieving substantial benefits for the Class. This fee is reasonable and appropriate based on the risk of the litigation, its complexity, Class Counsel's refusal of alternative employment opportunities with guaranteed payment, and the substantial benefit obtained for the Class. Specifically, my firm took on this representation with no guarantee of success and with no guarantee that we would recover fees. We invested substantial resources (both in terms of attorney time and costs) in the prosecution of this case.

18. Attorneys at my firm keep regular records of their time. In computing the total compensable time, attorneys at my firm exercised their billing judgment by reducing or eliminating time entries that we deemed redundant.

19. I have spent 1,187.3 hours prosecuting this case to date. I bill at the rate of $650 per hour. My rate closely reflects the fair market rate for attorneys of similar experience, skill, and reputation engaged in similar type practice in the Chicago legal market and comparable markets nationwide.

20.     Gregg M. Barbakoff, a fourth-year attorney at my firm at all relevant times, spent 503.2 hours prosecuting this case to date. Mr. Barbakoff billed at a rate of $350 per hour.  Mr. Barbakoff's rate closely reflects the fair market rate for attorneys of similar experience, skill, and reputation engaged in similar type practice in the Chicago legal market and comparable markets nationwide.

21.     Ismael T. Salam, a third-year attorney with my firm, has spent 432.7 hours prosecuting this case to date. Mr. Salam bills at a rate of $325 per hour. Mr. Salam's rate closely reflects the fair market rate for attorneys of similar experience, skill, and reputation engaged in similar type of practice in the Chicago legal market and comparable markets nationwide.

22.     Kristina Pearson, a sixth-year legal assistant at my firm, has spent 2.6 hours assisting in the prosecution of this case to date. Ms. Pearson bills at a rate of $150 per hour.  Ms. Pearson's rate closely reflects the fair market rate for legal assistants of similar experience.

23.     Anaël Hadji, a first year law clerk at my firm, has spent 38.6 hours assisting in the prosecution of this case to date. Mr. Hadji bills at a rate of $150 per hour.  Mr. Hadji's rate closely reflects the fair market rate for law clerks of similar experience.

24.     Collectively, my firm has spent 2,164.4 hours prosecuting this case to date. A summary of the actions on which this time was spent is attached hereto as Exhibit R. My firm's total base lodestar amount is thus $1,105,490.00 *See*, Ex. R.

25.     Additionally, my firm has spent $17,232.31 in un-reimbursed expenses incurred in connection with this case to date. A summary of the costs incurred is attached hereto as Exhibit S. The costs and expenses were necessary for the prosecution of this case and should be awarded.

26.     Siprut PC has received its requested rates from paying clients within the past year. For example, Richard Ehrenreich, principal owner and managing partner of Schaumburg Professional Baseball, LLC and Grand Slam Sports and Entertainment, LLC, has retained Mr. Siprut in 2013 at a rate of $585/hour and paid that rate to him. (*See* Decl. of Richard Ehrenreich at ¶¶ 2-4, Nov. 6, 2013, at Ex. H). Similarly, Thomas Finnegan, Vice President of Thillens, Inc. ("Thillens"), a regional company that provides armored car services throughout Illinois and Wisconsin, has paid Mr. Siprut to represent Thillens in 2013 at a rate of $585/hour. (*See* Decl. of Thomas Finnegan at ¶¶ 2-3, Nov. 6, 2013, at Ex. I.) Furthermore, Siprut PC has received its requested rates from several other clients.

27.     In addition, numerous courts have approved Siprut PC's hourly rates. For example, in *AL And PO Corp. v. Quality Medical Products, LLC*, Case No. 14-cv-1243, Dkt. No. 73 (N.D. Ill.), a court in this District recently approved Mr. Siprut's requested rate of $650/hour. See also *Bruce Packaging, Inc. v. Helpfulcard, LLC*, Case No. 15-cv-9096, Dkt. 13 (N.D. Ill. Dec. 24, 2015). In addition, in *Goodman v. Casting360, LLC*, No. 12 cv 09851 (N.D. Ill. March 6, 2013), a class action involving claims under the Telephone Consumer Protection Act ("TCPA"), another court in this district approved $585/hour for Mr. Siprut. Similarly, in *Foos v. Ann, Inc.*, which involved allegations that the defendant unlawfully obtained and retained consumers' zip code information, the court approved $585/hour for Mr. Siprut, after finding Class Counsel "displayed skill" in prosecuting claims on behalf of the Class. *See* Order Granting Plaintiff's Motion for Attorneys' Fees at 7, *Foos v. Ann, Inc.*, No. 11 cv 02794, 2013 WL 5352969 (S.D. Cal. Sept. 24, 2013), at Ex. J. *See also In re Energizer Sunscreen Litigation*, (Case No. 13-cv-00131, N.D. Ill.) (awarded requested rate); *Illinois Nut & Candy Home of Fantasia Confections, LLC v. Grubhub, Inc., et al.* (Case No. 14-cv-00949, N.D. Ill.) (same); *Padilla v. DISH Network*

*LLC* (Case No. 12-cv-07350, N.D. Ill.) (same); *In Re Prescription Pads TCPA Litigation* (Case No. 13-cv-06897, N.D. Ill) (same); *see also* Order and Siprut Declaration, *In Re: Imprelis Herbicide Marketing, Sales Practices, & Products Liability Litig.*, Case No. 2:11-md-2284-GP MDL No. 2284 (E.D. Pa. Oct. 17, 2013), at Ex. K, L.)

      28.    Additionally, Siprut PC's rates are consistent with the rates of attorneys at comparable consumer class action firms litigating similar cases. An examination of these more analogous cases confirms that numerous courts presiding over consumer class action cases have approved of hourly rates that are comparable to (or exceed) Siprut PC's rates. Some recent representative examples include the following:

| Firm name | Case Name and No. | Range of Rates Approved | |
|---|---|---|---|
| | | Associates | Partners |
| Edelson McGuire LLC | *In re Kentucky Grilled Chicken Coupon Marketing & Sales Practice Litig.*[1] MDL 2103 1:09-cv-7960 (N.D. Ill.) | $295 | $450-$600 |
| Edelson McGuire LLC | *Miller v. Red Bull N. Am., Inc.*[2] 12-cv-04961 (N.D. Ill.) | $215-$425 | $550-$675 |
| Edelson McGuire LLC | *In re Netflix Privacy Litig.*[3] 5:11-cv-00379-EJD (N.D. Cal.) | $250-$395 | $500-$630 |
| Neblett, Beard & Arsenault | *In re Imprelis Herbicide Marketing, Sales Practices & Products Liability Litig.*[4] MDL No. 2284 2:11-MD-02284_GP (E.D. Pa.) | $450-$595 | $750 |
| Wolf Haldenstein Adler Freeman & Herz LLP | *In re Imprelis Herbicide Marketing, Sales Practices & Products Liability Litig.*[5] | $355-$445 | $505-$890 |

[1] Decl. of M. McMorrow at ¶ 19, at Ex. M; Order at 9, Dec. 6, 2011, at Ex. N.
[2] Decl. of J. Edelson at ¶ 22, at Ex. O; Order, Aug. 12, 2013, at Ex P.
[3] See Decl. of J. Edleson at ¶ 69, at Ex. Q; Order, Mar. 18, 2013, at Ex. R.
[4] Decl. of R. Arsenault, at Ex. S; Order, Oct. 17, 2013, at Ex. K.
[5] Decl. of F. Isquith , at Ex. T; Order, Oct. 17, 2013, at Ex. K

| | MDL No. 2284<br>2:11-MD-02284_GP<br>(E.D. Pa.) | | |
| --- | --- | --- | --- |
| Wolf Haldenstein Adler Freeman & Herz LLP | *In re Michaels Stores Pin Pad Litig.*[6]<br>No. 1:1 -cv-03350<br>(N.D. Ill.) | $395 | $505-$890 |
| Faruqi & Faruqi, LLP | *In re Michaels Stores Pin Pad Litig.*[7]<br>No. 1:1 -cv-03350<br>(N.D. Ill.) | $375-$535 | $650-$850 |

29.     Significantly, attorneys with comparable experience command the same rates. Gene Stonebarger, a 2000 graduate of the University of San Diego School of Law, founded his own consumer class action law firm, Stonebarger Law, APC, in 2010. (*See* Declaration of Gene Stonebarger at ¶ 3, *Amelia Foos v. Ann, Inc.*, Case No. 3:11-cv-2794-L-MDD (S.D. Cal. Jan. 7, 2013), at Ex. Y.) Like Siprut PC, Stonebarger Law has served as Lead or Co-Lead Class Counsel in numerous class actions throughout the country. (*Id.* at ¶ 5.) In a recent declaration filed in another case, Mr. Stonebarger stated that his hourly rate of $650/hour was approved in at least nine cases during 2012, and his mid-level associates' rate of $500/hour was approved in five of those cases. (*Id.* at ¶¶ 7-8.) Similarly, Jay Edelson, managing partner of Edelson LLC in Chicago, Illinois, commands rates of up to $675 per hour, while his partner, Rafey Balabanian, with seven years of experience, commands $550 per hour. (*See* Declaration of Jay Edelson at ¶ 22, *Miller v. Red Bull N. Am., Inc.*, Case No. 12-cv-04961 (N.D. Ill. June 14, 2013), at Ex. O.)

30.     As illustrated in the chart below, the aforementioned data demonstrate that Siprut PC's requested rates are in fact *lower* than the relevant market for consumer class action litigation:

---

[6] Decl. of F. Isquith, at Ex. U; Order, Apr. 17, 2013, at Ex. V.
[7] Decl. of A. Vizzolo at ¶ 9, at Ex. W; Order, Apr. 17, 2013, at Ex. V.

**Siprut PC's Requested Hourly Rates v. Peer Firms' Hourly Rates
(from selected representative cases)**



31.     In addition, the National Law Journal's survey of billing rates shows that our billing rates are less than the rates charged by the defense firms we litigate against. *See, e.g.*, *Minor v. Christie's, Inc.*, 2011 WL 902235 at *7-8 (N.D. Cal. 2011) (approving partner rates of $700 and $600 an hour after taking into account the National Law Journal's report).

| National Law Journal 2012 Billing Survey:[8] | | | | |
|---|---|---|---|---|
| | Partner Billing Rate High | Partner Billing Rate Average | Associate Billing Rate High | Associate Billing Rate Average |
| DLA Piper | $1120 | $775 | $760 | $585 |
| Locke Lord | $950 | $660 | $600 | $400 |
| Bryan Cave | $795 | $553 | $550 | $373 |
| Perkins Coie | $910 | $560 | $605 | $365 |
| Brinks Hofer Gilson & Lione | $835 | $560 | $450 | $325 |

---

[8] THE NATIONAL LAW BULLETIN, *The 2012 Law Firm Billing Survey* (Dec. 17, 2012) available at http://www.law.com/jsp/nlj/PubArticleNLJ.jsp?germane=1202581351631&id=1202581266427&interactive=true.

| The Wall Street Journal:[9] | |
|---|---|
| **Firm** | **Partner Billing Rate High** |
| Kirkland Ellis | $1,250 |
| Paul Hastings | $1,021 |
| Jones Dav | $1,075 |
| Latham Watkins | $1,025 |

32.     My firm, Siprut PC, substantially concentrates its practice in the prosecution of class actions. Attorneys at my firm have been appointed as Lead Class Counsel in numerous class actions, which are highlighted in the firm's resume, attached hereto as Exhibit T.

33.     As of February 8, 2016, I estimate that the Settlement Administrator's costs will at least be $490,214.00 based on the 36,360 claims that have been received so far.

I declare under penalty of perjury under the laws of the State of Illinois that the foregoing is true and correct.

Executed on February 8, 2016 in Chicago, Illinois.

_____/s/ Joseph J. Siprut_____

4816-6907-7036, v. 1

---

[9] THE WALL STREET JOURNAL, *Top Billers* (Feb. 23, 2011), *available at* http://online.wsj.com/public/resources/documents/st_TOPRATE0222_20110223.html.

## TABLE OF EXHIBITS

Ex. A          Declaration of Richard Ehrenreich……………………………………….......1 Pages

Ex. B          Declaration of Thomas Finnegan……………………..……………….....1 Pages

Ex C           Order Granting Plaintiff's Motion for Attorneys' Fees
               *Foos v. Ann Inc.*, No. 11 CV 2794, 2013 WL 5352969
               (S.D. Cal. Sept. 24, 2013)…………………………………………………..8 Pages

Ex. D          October 17, 2013 Order, *In Re: Imprelis Herbicide*
               *Mktg. Sales Practices and Prod. Liab. Litig.,* Case
               No. 2:11-md-2284-GP MDL No. 2284 (E.D. Pa.) ……………………….5 Pages

Ex. E          Declaration in Support of Motion for Attorneys'
               Feesand Reimbursement of Expenses, *In Re:*
               *Imprelis Herbicide Mktg. Sales Practices and*
               *Prod. Liab. Litig.,* Case No.
               2:11-md-2284-GP MDL No. 2284 (E.D. Pa.) ………………….....……6 Pages

Ex. F          Declaration of Michael J. McMorrow, *In Re: Kentucky*
               *Grilled Chicken Coupon Mktg. &Sales Practices Litig.,*
               MDL 2103 1:09-cv-7960 (N.D.Ill.)…………..……….…………….8 Pages

Ex. G          Final Judgement Order, *In Re: Kentucky Grilled Chicken*
               *Coupon Mktg. & Sales Practices Litig.,* MDL 2103
               1:09-cv-7960 (N.D. Ill.) …………………….....……..…………….11 Pages

Ex. H          Declaration of Jay Edelson, *Miller v. Red Bull N. Am., Inc.,*
               12-cv-04961 (N.D.Ill.) …………….....……………………………….6 Pages

Ex. I          Final Judgment Order, *Miller v. Red Bull N. Am., Inc.,*
               12-cv-04961 (N.D.Ill.) …………………….………..……...…….10 Pages

Ex. J          Declaration of Jay Edelson in Support of Plaintiffs'
               Motion for  Final Approval of Settlement and Award
               of Attorneys' Fees, Expenses and Incentive Awards,
               *In re Netflix Privacy Litig.*, No 11 cv 00379, 2013 WL 1120801
               (N.D. Cal. Oct. 31, 2012) …………………………………………20 Pages

Ex. K          Order Granting Final Approval of Class Action Settlement;
               Approval of Cy Pres Awards; Award of Attorneys' Fees and
               Expenses and Incentive Award, *In re Netflix Privacy Litig.*,
               No 11 cv 00379, 2013 WL 1120801 (N.D. Cal. Oct. 31, 2012)  ……….....23 Pages

Ex. L      Declaration in Support of Motion for Attorneys' Fees and
           Reimbursement of Expenses, *In Re: Imprelis Herbicide
           Mktg. Sales Practices and Prod. Liab. Litig.,* Case No.
           2:11-md-2284-GP MDL No. 2284 (E.D. Pa.)  ………..……...…………….5 Pages

Ex. M      Declaration of Fred T. Isquith in Support of an Award of
           Attorney's Fees and Costs, and Award of Incentive Fees
           to Named Plaintiffs, *In Re: Imprelis Herbicide Mktg. Sales
           Practices and Prod. Liab. Litig.,* Case No. 2:11-md-2284-GP
           MDL No. 2284 (E.D. Pa.) …………………………………...………7 Pages

Ex. N      Declaration of Fred T. Isquith in Support of an Award of
           Attorney's Fees and Costs, and Award of Incentive Fees to
           Named Plaintiffs, *In Re: Michaels Stores Pin Pad Litig.,*
           No. 1:1-cv-03350 (N.D. Ill). …………………………………...………6 Pages

Ex. O      Order Approving Settlement, *In Re: Michaels Stores
           Pin Pad Litig.,*No. 1:1-cv-03350 (N.D. Ill). ………………………...………8 Pages

Ex. P      Declaration of Antonio Vozzolo in Support of Final Settlement
           Approval Award of Attorney's Fees and Costs, and Award of
           Incentive Fees to Named Plaintiffs, *In Re: Michaels Stores Pin Pad
           Litig.,*No. 1:1-cv-03350 (N.D. Ill)………………….……………..…4 Pages

Ex. Q      Declaration of Gene Stonebarger, *Foos v. Ann Inc.,*
           No. 11 CV 2794, 2013 WL 5352969 (S.D. Cal.
           Sept. 24, 2013)……………………………………………………...6 Pages

Ex. R      Table of Actions………………………………………………...1 Pages

Ex. S      Cost Summary………………………………………………...1 Pages

Ex. T      Siprut PC Firm Resume………………………………………5 Pages

# EXHIBIT A

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| *In re Southwest Airlines Voucher* | ) | No. 11-CV-8176 |
| *Litigation* | ) | |
| | ) | Hon. Matthew Kennelly |
| | ) | |

<u>**DECLARATION OF RICHARD EHRENREICH**</u>

I, Richard Ehrenreich, declare and state as follows:

1.      I am over the age of eighteen and am fully competent to make this declaration.  I make this declaration based upon personal knowledge unless otherwise indicated.

2.      I am the principal owner and managing partner of both Schaumburg Professional Baseball, LLC and Grand Slam Sports and Entertainment, LLC. I am also a member of the board of directors for the Northern League of Professional Baseball Teams. I also serve as general counsel for Miles Technology, LLC, a company that develops mobile, web, and desktop-based solutions in biometrics, data storage, data security, and performance analytics.

3.      Within the past year, I have hired Joseph J. Siprut on an hourly basis to represent me in various legal matters.

4.      Throughout the course of this representation, I paid Mr. Siprut an hourly rate of $585.00.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Dated, November 6, 2013.


_____/s/ Richard Ehrenreich_____

# EXHIBIT B

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| *In re Southwest Airlines Voucher* | ) | No. 11-CV-8176 |
| *Litigation* | ) | |
| | ) | Hon. Matthew Kennelly |
| | ) | |

## <u>DECLARATION OF THOMAS FINNEGAN</u>

I, Thomas Finnegan, declare and state as follows:

1.      I am over the age of eighteen and am fully competent to make this declaration. I make this declaration based upon personal knowledge unless otherwise indicated.

2.      I am the Vice President of Thillens, Inc. ("Thillens"), a regional company that provides armored car services throughout Illinois and Wisconsin.

3.      Within the past year, I have hired Joseph J. Siprut on an hourly basis to represent Thillens in various legal matters. Throughout the course of this representation, Thillens paid Mr. Siprut an hourly rate of $585.00.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Dated, November 6, 2013.


                                     /s/      Thomas Finnegan

# EXHIBIT C

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| AMELIA FOOS, individually and on behalf of all others similarly situated, | ) ) ) | Civil No. 11cv2794 L (MDD) |
| Plaintiff, | ) ) | **ORDER GRANTING PLAINTIFF'S MOTION FOR ATTORNEYS' FEES** |
| v. | ) ) ) | **[doc. #46]** |
| ANN, INC., a Delaware corporation doing business as Ann Taylor Retail, Inc., | ) ) ) | |
| Defendant. | ) ) ) | |

## I.     Procedural Background

Prior to the final fairness hearing concerning the settlement of this class action, plaintiff's counsel filed a motion for attorneys' fees. [doc. #29] On November 20, 2012, Sarah McDonald filed an Ojection to the Settlement Agreement. After considering McDonald's Objection, the Court concluded, on balance, the relevant factors weighed in favor of a finding that the settlement was fair, reasonable and adequate. The Court further held that plaintiffs' counsel was entitled to attorneys' fees but did not award a specific amount because of the lack of documentation for the fees. [doc. #39] By agreement, defendant did not oppose the full amount of attorneys' fees sought by plaintiff, $192,00.00. On January 7, 2013, plaintiffs' counsel provided supplemental information concerning the requested attorneys' fees and costs, [doc. #46] to which Objector McDonald filed a response. [doc. #55]

McDonald then filed an ex parte motion seeking disclosure of claims rate data which the Court granted. [doc. #71] The Court entered an Order requiring supplemental briefing by the parties concerning whether the Settlement Agreement in this action is a "coupon settlement" within the meaning of CAFA, [doc. #81] which the parties provided.

## II. Discussion

### A. Whether the Settlement Agreement is a Coupon Settlement Under CAFA

The terms of the Settlement Agreement provide, *inter alia*, that class members would receive the choice of a voucher for either $15.00 in Ann Taylor merchandise with no minimum purchase required or a "voucher" for 20% off any merchandise purchase over $100.00, with no cap. Each class member would receive one, single-use, transferable voucher, regardless of the number of alleged violations, which would be valid for six months after issuance.

If a class member elected the $15.00 voucher, because there was no minimum purchase requirement, the class member would receive a monetary benefit under this settlement without needing to provide any money out-of pocket; however, if the purchase price was less than $15.00, no refund of the difference would be offered.

Whether this action is considered a "coupon" settlement rather than one that provides for what both plaintiff and defendant contend is a "voucher" settlement, became a significant issue while plaintiff's motion for attorneys' fees was pending. The Ninth Circuit Court of Appeals addressed the calculation of attorneys' fees in the context of a coupon settlement under CAFA, which was an issue of first impression. *See In re HP Inkjet Printer Litigation*, 716 F.3d 1173 (9th Cir. 2013). In *HP Inkjet*, objectors contended that the attorneys' fees award violated CAFA, specifically 28 U.S.C. § 1712(a)-(c), which controls the calculation of attorneys' fees when the settlement contains an award of coupons to class members or injunctive relief or equitable relief or both. *Id.* at 1179. Although the district court found the settlement was fair, reasonable and adequate, and by separate order, awarded attorneys' fees by applying the loadstar method to an estimated "ultimate value" of the settlement, the Court of Appeals reversed.

///

///

The *HP Inkjet* case noted that in the usual class action case,

> courts try to ensure faithful representation by tying together the interests of class members and class counsel. That is, courts aim to tether the value of an attorneys' fees award to the value of the class recovery. . . .Where both the class and its attorneys are paid in cash, this task is fairly effortless. . . . But where class counsel is paid in cash, and the class is paid in some other way, for example, with coupons, comparing the value of the fees with the value of the recovery is substantially more difficult. Unlike a cash settlement, coupon settlements involve variables that make their value difficult to appraise, such as redemption rates and restrictions.

*Id.* at 1179. (citations omitted.)

Although CAFA defines various other terms, it does not define what constitutes a "coupon." *See* 28 U.S.C. § 1711. Courts have often blurred the distinction between "coupons" and "vouchers" and have considered, at times, that the terms are equivalent. They are not.[1]

The distinction between a coupon and a voucher is that a coupon is a *discount* on merchandise or services offered by the defendant and a voucher provides for *free* merchandise or services. In the present case, class members could choose between 20% off a future purchase at Ann Taylor or a voucher in the amount of $15.00 for merchandise which allows class members to select items for free. In their Settlement Agreement, plaintiff and defendant call the 20% off a future purchase at Ann Taylor a voucher, when actually it is a coupon. A coupon requires a class member to purchase a product or services and pay the difference between the full price and the coupon discount. In the case of coupons, CAFA requires a heightened level of scrutiny to determine if the value of the coupon settlement is reasonable in relation to the value of the claims surrendered. A class action coupon settlement requires that attorneys' fees "attributable to the award of coupons" must be calculated using the redemption value of the coupons. § 1712(a). In contrast, a voucher is more like a gift card or cash where there is an actual cash value, is freely transferable and does not require class members to spend additional money in order to realize the benefits of the settlement. There is no heightened level of scrutiny requirement for vouchers.

Plaintiff contends that the present settlements is not a coupon settlement like *HP Inkjet*,

---

[1] The *HP Inkjet* case noted that the label placed on non-monetary relief is not dispositive of whether something is a "coupon". 716 F.3d at 1176.

3

because the merchandise vouchers provide for free products. But plaintiff fails to address that the other option available to class members which provides for a discounts on products, *i.e.,* coupons for 20% off the purchase merchandise. (Plf's Supp. Br. at 1-6.) Rather than discuss how or why the 20% discount is not a coupon, plaintiff argues that even if this is a coupon settlement under CAFA, the Court may still use the lodestar method for determining attorneys' fees. (*Id.* at 6.)

Defendant Ann Taylor notes the distinction between vouchers and coupon discussed above but argues that the Settlement Agreement here is not a coupon settlement within the meaning of CAFA. The Court concurs that the class members' ability to obtain $15.00 of free merchandise is a  voucher because "class members who opt for the $15 off merchandise certificate will have the opportunity to receive *free* merchandise, as opposed to merely *discounted* merchandise," (Dft's Supp. Br. at 7.) but the Settlement Agreement also provides for a 20% off *discount* on a purchase of $100.00 or more, *i.e.,* a coupon. Defendant contends that "[t]he key here is that the class members have the choice. Class members who wish to obtain free merchandise, can do so." (*Id.* at 8). However, merely having a choice does not transform the coupon into a voucher.

Similarly, having a coupon *option* does not necessarily transform a class action settlement into a coupon settlement under CAFA. Like the term "coupon", "coupon settlement" is not defined in CAFA.  Although the class members here have the option of receiving a coupon instead of obtaining a voucher, the Court has not found any case law to suggest that such an option *requires* the class action to be deemed a coupon settlement as described in 28 U.S.C. § 1712. If this is not a coupon settlement, and the Court believes it is not, no part of  §1712 is applicable to the award of attorneys' fees. The attorneys' fees award would then be based on the application of the lodestar methodology.

The *HP Inkjet* case noted that § 1712(b) applies in situations where a coupon settlement

also provides for non-coupon relief, such as equitable or injunctive relief:[2] "the language of §

1712(b) is not permissive – if class counsel wants to be paid "any" fees, and the "recovery of the

coupons is not used to determine" those fees, the entirety of the payment "shall be" calculated

"based upon the amount of time class counsel reasonably expended working on the action," i.e.,

using the lodestar method. 716 F.3d at 1183. But in the present case, class members also have

the option of obtaining non-coupon relief in the form of a voucher – which again is more akin to

cash or a gift card – and injunctive relief. The voucher cannot be considered as equitable relief

and therefore, is not covered by § 1712(b)'s language of "non-coupon relief, such as equitable"

relief. Nevertheless, the Court could, under this subsection, use the lodestar method to calculate

plaintiff's attorneys' fees based on the vouchers and injunctive relief.

As discussed above, the Court does not view this settlement as a "coupon settlement"

requiring the application of 28 U.S.C. §1712. Accordingly, the Court will review plaintiff's

request for attorneys' fees under the lodestar method.

**B.     Calculation of Attorneys' Fees**

The Settlement Agreement provided that the amount of attorneys' fees and expenses was

agreed upon by the parties only after reaching agreement on all other material terms of this

settlement. Therefore, after the parties entered into the Settlement Agreement, they agreed that

Class Counsel would seek, without opposition, $192,000.00 in attorneys' fees and costs.

Rule 23(h) of the Federal Rules of Civil Procedure provides that "[i]n a certified class

action, the court may award reasonable attorney's fees and nontaxable costs that are authorized

by law or by the parties' agreement." Attorneys' fees provisions included in proposed class action

agreements must be "fundamentally fair, adequate and reasonable." *In re Bluetooth Headset

Products Liab. Litig.*, 654 F.3d 935, 941 (9th Cir. 2011). The court is not bound by the parties'

settlement agreement as to the amount of attorneys' fees. *Id.*, 654 F.3d at 943.

Under the Settlement Agreement, plaintiff's counsel requests an award in the amount of

---

[2]     The Settlement Agreement in this case provides for injunctive relief in addition to the choice of a coupon or a voucher. The voucher, being in the nature of cash or gift card which provides for free merchandise or services, is not equitable relief.

5                                                                    11cv2794

1   $192,000.00, which defendant Ann Taylor has agreed not to oppose.  As previously noted, the

2   amount of attorneys' fees was negotiated only after an agreement was reached on all class

3   compensation and notice terms. At the request of the Court, plaintiff's counsel has provided

4   additional information for determination of whether the amount sought is reasonable.

5       In class actions that provide for injunctive relief, courts frequently use a lodestar

6   calculation because there is no way to gauge the net value or any percentage of the settlement. In

7   response to plaintiff's motion, Objector McDonald, contends, *inter alia,* that the injunctive relief

8   offered in the present settlement provides no meaningful relief to the class members and is

9   therefore illusory. As a result, the Court should not award attorneys' fees in connection with

10  work performed in obtaining the injunctive relief. The Court disagrees. While of limited

11  monetary value perhaps, the injunction entered requires defendant's  continued compliance with

12  California law, specifically Civil Code Section 1747.08, a consumer protection statute. The

13  Court will include counsel's time spent in obtaining injunctive relief.

14       Reasonable attorney's fees must be calculated using the "lodestar" method. "The

15  'lodestar' is calculated by multiplying the number of hours the prevailing party reasonably

16  expended on the litigation by a reasonable hourly rate." *Morales v. City of San Rafael*, 96 F.3d

17  359, 363 (9th Cir.1996); *see also Blum v. Stenson*, 465 U.S. 886, 897 (1984)(The lodestar

18  calculation begins with the multiplication of the number of hours reasonably expended by a

19  reasonable hourly rate.). After computing the "lodestar," the district court may then adjust the

20  figure upward or downward taking into consideration twelve "reasonableness" factors: (1) the

21  time and labor required, (2) the novelty and difficulty of the questions involved, (3) the skill

22  requisite to perform the legal service properly, (4) the preclusion of other employment by the

23  attorney due to acceptance of the case, (5) the customary fee, (6) whether the fee is fixed or

24  contingent, (7) time limitations imposed by the client or the circumstances, (8) the amount

25  involved and the results obtained, (9) the experience, reputation, and ability of the attorneys, (10)

26  the "undesirability" of the case, (11) the nature and length of the professional relationship with

27  the client, and (12) awards in similar cases. *Morales*, 96 F.3d at 363 n. 8 (quoting *Kerr v. Screen*

28  *Extras Guild, Inc.*, 526 F.2d 67, 70 (9th Cir. 1975)).

The hours expended and the rate should be supported by adequate documentation and other evidence; thus, attorneys working on cases where a lodestar may be employed should keep records and time sheets documenting their work and time spent. *Hensley v. Eckerhart*, 103 S. Ct. 1933, 1939 (1983). But as the Supreme Court recently noted, trial courts may use "rough" estimations, so long as they apply the correct standard. *Fox v. Vice*, 131 S. Ct. 2205, 2216 (2011).[3]

Here, plaintiff's counsel calculated their lodestar using current billing rates for the three attorneys who worked on this case: $585.00 per hour for Joseph J. Siprut; $425.00 per hour for Todd C. Atkins; and $325.00 per hour for Aleksandra M.S. Vold. Plaintiff asserts the requested rates are reasonable and supports this contention by providing both local and national averages for class action litigators. Having reviewed the evidentiary materials plaintiff has provided, the Court finds that the requested hourly rates charged are reasonable.

Counsel also contends that their hours are supported with declarations and detailed time records setting forth the hours expended, categories of the hours expended, and the dates on which the time was expended. (*See* Plf's Exh. 4.) Plaintiff has not provided detailed time records but instead time summaries. Although much more vague than time records, the summaries and declarations provide a sufficient showing of the hours counsel performed on this case.  As of January 7, 2013, class counsel have spent 288.4 hours in prosecuting this action, for a total lodestar amount of $133,146.00. (Siprut Decl. ¶11.)

As previously noted, courts may enhance the lodestar figure with a multiplier. Having considered the factors for enhancing the lodestar in this action, the Court finds counsel has displayed skill in presenting the claims; bore some risks in bringing this action given the

---

[3]    "We emphasize, as we have before, that the determination of fees 'should not result in a second major litigation.' The fee applicant ... must, of course, submit appropriate documentation to meet 'the burden of establishing entitlement to an award.' But trial courts need not, and indeed should not, become green-eye-shade accountants. The essential goal in shifting fees ... is to do rough justice, not to achieve auditing perfection. So trial courts may take into account their overall sense of a suit, and may use estimates in calculating and allocating an attorney's time. And appellate courts must give substantial deference to these determinations, in light of 'the district court's superior understanding of the litigation.' We can hardly think of a sphere of judicial decisionmaking in which appellate micromanagement has less to recommend it." *Fox*, 131 S. Ct. at 2216 (citations omitted)).

1  uncertainty in whether the claim asserted was within the statute; the class received benefits

2  because of the action; and the requested fee will not reduce the class members' recovery. For

3  these reasons, the Court will enhance the lodestar figure with a multiplier of 1.42.

4  Plaintiff also seeks out-of-pocket expenses in addition to attorneys' fees in the amount of

5  $2,761.98, which has been supported with sufficient documentation. (Siprut Decl. ¶12.) The

6  $192,000 in attorneys' fees sought includes the reimbursement of costs and expenses.

7  **III.  Conclusion**

8  Upon review of the motion briefing, supplemental papers, the objection of McDonald,

9  declarations, including billing summaries and summary of costs and expenses for plaintiff's

10 counsel filed in support of the motion and considering that the class counsel achieved a

11 substantial result for the class, the Court finds that a $192,000.00 award for class counsel's fees,

12 costs and expenses of litigation is reasonable.

13 Based on the foregoing, **IT IS ORDERED** plaintiff's motion for attorneys' fees and costs

14 in the amount of $192,000.00 is **GRANTED**.

15 **IT IS SO ORDERED.**

16 DATED:  September 23, 2013

17 _____

18 M. James Lorenz
   United States District Court Judge

19

20 COPY TO:

21 HON. MITCHELL D. DEMBIN
22 UNITED STATES MAGISTRATE JUDGE

23 ALL PARTIES/COUNSEL

24

25

26

27

28

8

11cv2794

# EXHIBIT D

# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

IN RE: IMPRELIS HERBICIDE MARKETING,      :
SALES PRACTICES AND PRODUCTS LIABILITY    :
LITIGATION                                   :      MDL No. 2284
                                            :      11-md-02284
_____:
                                            :
THIS DOCUMENT APPLIES TO:                    :
ALL ACTIONS                                    :

## <u>ORDER</u>

**AND NOW,** this _____ day of October, 2013, upon consideration of the Motion for Final

Approval of Class Action Settlement (Docket Nos. 186, 187, 188), Plaintiffs' Motion for

Attorneys' Fees (Docket Nos. 189, 191), various objections (Docket Nos. 197-208, 215-217,

220-234, 239), Plaintiffs' replies and supplements (Docket Nos. 213-214, 241-242), the

Kipphorn Objectors' Motion for Discovery and Evidentiary Hearing (Docket No. 236), and

Plaintiffs' Opposition (Docket No. 237-238), and following a Final Fairness Hearing on

September 27, 2013, it is hereby **ORDERED** that Plaintiffs' Motions (Docket Nos. 186-89, 191)

are **GRANTED**, and the Kipphorns' Motion (Docket No. 236) is **DENIED**. Furthermore, the

Court makes the following findings, as more fully outlined in the accompanying memorandum of

law:

      1.        The Court has jurisdiction over the subject matter of this action.

      2.        Terms used in this Order that are defined in the Settlement Agreement, unless

otherwise defined herein, have the same meanings in this Order as in the Settlement Agreement.

      3.        For purposes of settlement only, pursuant to Federal Rules of Civil Procedure

23(a) and 23(b)(3), the following nationwide classes are certified:

Property Owner Class (Class 1):

All persons or entities who (a) own or owned property in the United States to which Imprelis was applied from August 31, 2010 through August 21, 2011, or (b) own or owned property in the United States adjacent to property to which Imprelis was applied from August 31, 2010 through August 21, 2011 and whose trees show damage from Imprelis on or before the date of entry of the Preliminary Approval Order ("Adjacent Property Owner"). Excluded from Class 1 are (1) any Judges to whom this Action is assigned and any members of their immediate families and (2) any property owners whose properties were used for the testing of Imprelis or developmental formulations containing the same active ingredient.

Applicator Class (Class 2):

All persons or entities that, from August 31, 2010 through August 21, 2011, purchased Imprelis (and/or received Imprelis directly or indirectly from a purchaser) and applied it to property in the United States as part of their normal business, other than property that they own or owned ("Applicators"). Excluded from Class 2 are any Judges to whom this Action is assigned and any members of their immediate family.

Golf Courses and Other Self Applicators Class (Class 3):

All persons or entities that, from August 31, 2010 through August 21, 2011, purchased Imprelis (and/or received Imprelis directly or indirectly from a purchaser) and applied it to properties in the United States that they own or owned ("Self Applicators"). Excluded from Class 3 are any Judges to whom this Action is assigned and any members of their immediate family.

4.      The Settlement Classes fully comply with the requirements of Federal Rule of

Civil Procedure 23, in that "(1) the [Settlement Classes are] so numerous that joinder of all

members is impracticable; (2) there are questions of law or fact common to the [Settlement

Classes]; (3) the claims or defenses of the representative parties are typical of the claims or

defenses of the [Settlement Classes]; and (4) the representative parties will fairly and adequately

protect the interests of the [Settlement Classes]." Fed R. Civ. P. 23(a). In addition, "the court

finds that the questions of law or fact common to class members predominate over any questions

affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3).

5. The Court finds that the Settlement is entitled to an initial presumption of fairness because the settlement negotiations were undertaken at arms' length by experienced counsel after substantial discovery.

6. Upon consideration of the factors outlined by the Third Circuit Court of Appeals in *Girsh v. Jepson*, 521 F.2d 153, 156 (3d Cir. 1975) and pursuant to Federal Rule of Civil Procedure 23(e), the Court finds that the Settlement is fair, reasonable, and adequate.

7. The Court has considered the oral and written objections and finds that these objections are all overruled.

8. Notice of the Settlement Agreement to the Settlement Classes has been provided in accordance with the Court's Order granting preliminary approval. Such notice constitutes the best notice practicable under the circumstances and satisfies the requirements of Federal Rule of Civil Procedure 23(e) and due process.

9. Defendants have filed notification of this Settlement with the appropriate federal and state officials pursuant to the Class Action Fairness Act of 2005 ("CAFA"), 28 U.S.C. § 1715. No objections or requests for hearings have been made by any federal or state official within 90 days from the date on which Defendant fulfilled its obligations under CAFA.

10. The Settlement Agreement is finally approved pursuant to Federal Rule of Civil Procedure 23(e) as fair, reasonable, and adequate, and the parties are directed to consummate the Settlement Agreement in accordance with its terms.

11. The United States District Court for the Eastern District of Pennsylvania shall retain jurisdiction over the implementation, enforcement, and performance of this Settlement

Agreement, and shall have exclusive jurisdiction over any suit, action, motion, proceeding, or dispute arising out of or relating to this Settlement Agreement or the applicability of this Settlement Agreement that cannot be resolved by negotiation and agreement by Plaintiffs and DuPont. This shall include resolution of any matters which may arise related to the allocation and distribution of attorneys' fees, expenses, and incentive awards. This Settlement Agreement shall be governed by and interpreted according to the substantive laws of the State of Delaware without regard to its choice of law or conflict of laws principles. DuPont submits to jurisdiction in the Eastern District of Pennsylvania only for the purposes of this Settlement Agreement and the implementation, enforcement, and performance thereof. DuPont otherwise retains all defenses to the Court's exercise of personal jurisdiction over it.

12.     The individuals and entities listed on Exhibit A of Plaintiffs' Supplemental Exhibits (Docket No. 241) submitted timely requests for exclusion from the Classes in accordance with the requirements set forth in this Court's February 11, 2013, or will, by agreement of the parties, be permitted to opt out of the Classes, despite untimely or incomplete requests for exclusion. They will not receive any benefits under the Settlement but will not be bound by any determinations of judgments entered in this Action.

13.     Counsel for Plaintiffs are awarded attorneys' fees in the amount of $6,500,000 and costs in the amount of $500,000.

14.     Incentive awards for settlement class representatives are awarded in the amount of $63,000 (22 individual property owners shall receive an incentive award of $1,500, and 12 multi-residential or commercial property owners, golf courses, and lawn care operators shall each receive an incentive award of $2,500).

15.    Settlement Class Counsel are responsible for allocating and distributing attorneys' fees and expenses among Counsel for Plaintiffs.  Settlement Class Counsel are also responsible for allocating and distributing the incentive awards among settlement class representatives.

BY THE COURT:

S/Gene E.K. Pratter
GENE E.K. PRATTER
UNITED STATES DISTRICT JUDGE

# EXHIBIT E

# IN THE UNITED STATES DISTRICT COURT

# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| IN RE: IMPRELIS HERBICIDE MARKETING, SALES PRACTICES AND PRODUCTS LIABILITY LITIGATION | 2:11-MD-02284-GP <br><br> MDL NO. 2284 |
| THIS DOCUMENT RELATES TO <br><br> ALL ACTIONS | **DECLARATION IN SUPPORT OF MOTION FOR ATTORNEYS' FEES AND REIMBURSEMENT OF EXPENSES** |

I, Joseph J. Siprut, declare as follows:

1.       I am the managing partner of the law firm of **Siprut PC.**  I am submitting this declaration in support of Co-Lead Counsels' petition for an award of attorneys' fees and expenses in connection with services rendered in the above-captioned action.

2.       My firm has acted as counsel for Plaintiff **Carole Meader** and the Classes in this action.

3.       During the course of this litigation, my firm has been involved in the following activities on behalf of the Class at the request or under the direction of Co-Lead Counsel or Liaison Counsel: reviewing individual complaints consolidated in this action; drafting and revising the facts section for the master consolidated complaint; compiling, reviewing, and inserting exhibits from individual complaints into master consolidated complaint; and reviewing pleadings and memoranda filed in this action.

4.       During the litigation, my firm kept contemporaneous time and expense records. At the request of Co-Lead Counsel and Liaison Counsel, we regularly submitted time and expense reports based on these records to Labaton Sucharow, LLP.

5.       The schedule attached as **Exhibit 1** is a detailed summary indicating the amount of time—by category—spent by the partners, attorneys, and other professional support staff of my firm who were involved in the work described above undertaken at the request or under the direction of Co-Lead Counsel and Liaison Counsel in this litigation, and the lodestar calculation based on my firm's current billing rates from inception of the case through June 30, 2013, as well as the status of the billing person (partner, associate, or paralegal) and number of years admitted to the bar (or its equivalent).   The schedule was prepared from contemporaneous, daily time records regularly prepared and maintained by my firm, which have been provided to Co-Lead Counsel and Liaison Counsel for review.   The lodestar

calculations exclude time for any work related to this case unless such work was authorized by Co-Lead or Liaison Counsel. The hourly rates for the partners, attorneys, and professional support staff in my firm included in **Exhibit 1** are the same as the usual and customary hourly rates currently charged for their services in similar complex class action litigation matters.

6.     The total number of hours expended on this litigation by my firm from inception through June 30, 2013 on the work described above is 79.3 hours. The total lodestar expended on this litigation by my firm from inception through June 30, 2013 on the work described above is $32,170.50.

7.     My firm's lodestar figures are based on the firm's current billing rates, which do not include charges for expense items. Expense items are billed separately, and such charges are not duplicated in my firm's billing rates.

8.     As detailed in **Exhibit 2**, my firm has incurred a total of $155.80 in unreimbursed expenses incurred from the inception of this litigation through June 30, 2013 in connection with its performance of work in this litigation as described above.

9.     The expenses incurred by my firm in this action are reflected on the books and records of my firm. These books and records were prepared from expense vouchers, check records, and other similar source materials and represent an accurate recordation of the expenses incurred.

I declare under penalty of perjury under that the foregoing statements are true and correct.

Executed on this 15th day of July 2013 at <u>Chicago, Illinois.</u>

s/ Joseph J. Siprut
Joseph J. Siprut

Exhibit 1

In re Imprelis Herbicide Marketing, Sales Practices, and Products Liability Litigation

**TIME REPORT**

FIRM NAME: Siprut PC
REPORTING PERIOD: Dec 11 - July 13

(1) Investigations      (5) Settlement
(2) Discovery      (6) Class Certification
(3) Pleadings, Briefs      (7) Trial & Preparation
(4) Court Appearances & Preparation      (8) Case Management & Litigation Strategy

| Name | Status / Number of Years Admitted | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | Current Hourly Rate | Total Hours This Period | Lodestar This Period | Cumulative Hours |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Gregg M. Barbakoff | (A) / (1.5) | | | 47.4 | | | | | | $285.00 | 47.4 | $13,509.00 | 47.4 |
| Joseph J. Siprut | (P) / (11) | | | 18.3 | | 13.6 | | | | $585.00 | 31.9 | $18,661.50 | 31.9 |
| | | | | | | | | | | | 0.0 | $0.00 | 0.0 |
| | | | | | | | | | | | 0.0 | $0.00 | 0.0 |
| | | | | | | | | | | | 0.0 | $0.00 | 0.0 |
| | | | | | | | | | | | 0.0 | $0.00 | 0.0 |
| | | | | | | | | | | | 0.0 | $0.00 | 0.0 |
| | | | | | | | | | | | 0.0 | $0.00 | 0.0 |
| | | | | | | | | | | | 0.0 | $0.00 | 0.0 |
| | | | | | | | | | | | 0.0 | $0.00 | 0.0 |
| | | | | | | | | | | | 0.0 | $0.00 | 0.0 |
| | | | | | | | | | | | 0.0 | $0.00 | 0.0 |
| | | | | | | | | | | | 0.0 | $0.00 | 0.0 |
| | | | | | | | | | | | 0.0 | $0.00 | 0.0 |
| | | | | | | | | | | | 0.0 | $0.00 | 0.0 |
| TOTAL | | 0.0 | 0.0 | 65.7 | 0.0 | 13.6 | 0.0 | 0.0 | 0.0 | | 79.3 | $32,170.50 | 79.3 |

Status
Partner (P)
Associate (A)
Paralegal (PL)

Number of Years Admitted

| Cumulative Lodestar |
|---|
| $13,509.00 |
| $18,661.50 |
| $0.00 |
| $0.00 |
| $0.00 |
| $0.00 |
| $0.00 |
| $0.00 |
| $0.00 |
| $0.00 |
| $0.00 |
| $0.00 |
| $0.00 |
| $0.00 |
| $0.00 |
| $0.00 |
| $32,170.50 |

Exhibit 2

**In re Imprelis Herbicide Marketing, Sales Practices, and Products Liability Litigation**

**EXPENSE REPORT**

FIRM NAME:                        Siprut PC
REPORTING PERIOD:        Dec 11 - July 13

| | | |
|---|---|---|
| Duplicating | $0.00 | $0.00 |
| Postage | $0.00 | $0.00 |
| Telephone/Fax | $0.00 | $0.00 |
| Word Processing/Secretarial OT | $0.00 | $0.00 |
| Transportation/Meals/Lodging | $0.00 | $0.00 |
| Expert Fees | $0.00 | $0.00 |
| Messengers | $0.00 | $0.00 |
| Filing Fees | $100.00 | $100.00 |
| Service Fees | $0.00 | $0.00 |
| Computer Research | $55.80 | $55.80 |
| Disclosure/Docutrieval | $0.00 | $0.00 |
| Federal Express | $0.00 | $0.00 |
| Contribution to Litigation Fund | $0.00 | $0.00 |
| Research Items | $0.00 | $0.00 |
| Court Reporter Service/Transcript Fees | $0.00 | $0.00 |
| | | |
| TOTAL | $155.80 | $155.80 |

# EXHIBIT F

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS,
EASTERN DIVISION

|  |  |
|---|---|
| *In re Kentucky Grilled Chicken Coupon Marketing & Sales Practices Litigation,*<br><br>THIS DOCUMENT RELATES TO ALL CLASS ACTIONS | MDL 2103<br><br>Case No. 1:09-cv-7670<br><br>Hon. James F. Holderman |

## <u>DECLARATION OF MICHAEL J. MCMORROW</u>

Pursuant to 28 U.S.C. § 1746, I, Michael J. McMorrow, hereby declare and state as follows:

1.      I am an attorney admitted to practice in the State of Illinois and in the United States District Court for the Northern District of Illinois.  I am entering this declaration in support of Plaintiff's Motion & Memorandum for Final Approval of Class Action Settlement, Approval of Attorneys' Fees and Incentive Award.  I am fully competent to make this declaration.  This declaration is based upon my personal knowledge, except where expressly noted otherwise.

2.      I am a partner in the law firm of Edelson McGuire LLC and have been named Class Counsel in this matter, along with Jay Edelson, the managing partner of my firm.

3.      I, as well as other members of Edelson McGuire LLC that were actively involved in the litigation of this matter, have regularly engaged in major complex litigation, and have had experience in prosecuting consumer class action lawsuits of similar size and complexity.  (*See* Firm Resume of Edelson McGuire LLC, a true and accurate copy of which is attached as Exhibit 1).

4.      Based on my experience as a class action attorney, and through Edelson McGuire LLC's investigation, litigation, mediation, and settlement process, I personally have gained an intimate understanding of the instant litigation and believe the settlement to more than exceed the "fair, adequate, and reasonable" standard required for the Court's approval.

5.      I believe that the Plaintiffs' claims in this case are strong, based on this Court's opinion denying Defendants' Motion to Dismiss and the uniform actions of the Defendants giving rise to the claims in this case. But I am also aware that Defendants have raised several affirmative defenses and factual issues during the litigation of this case and during the settlement conferences, any of which, if successful, would result in the Settlement Class receiving no relief whatsoever. Defendants are also represented by experienced and highly-skilled counsel, and further litigation may result in this Court or the Seventh Circuit finding no liability in this matter.

6.      In the absence of settlement, I believe that the expense, duration and complexity of the resulting protracted litigation would be substantial. I believe that evidence and witnesses from across the country would have to be assembled for such litigation. In my experience, given the complexity of the factual and legal issues, as well as the amount in controversy, the defeated party or parties would likely appeal both the certification decision and the merits of any decision. As such, I believe that the immediate relief provided to the Settlement Class under the Settlement Agreement supports final approval.

7.      Both Plaintiffs and Defendants undertook significant discovery in this matter both prior to, and subsequent to, the two settlement conferences presided over by Magistrate Judge Maria Valdez of this Court on September 3, 2010 and October 18, 2010. In addition to written responses to discovery by Defendants and all five Plaintiffs, including dozens of written discovery requests, Defendants produced over 15,000 pages of documents, and I took the deposition of KFC's Chief Operations Officer, Larry Roberts, in January 2011. Additional depositions of Plaintiffs and other officers of Yum, KFC, and various third parties were contemplated, but the instant settlement obviated the need for such depositions.

8.      The formal and informal discovery exchanged in this case both before and after the two court-ordered settlement conferences with Hon. Maria Valdez was sufficient to allow Plaintiffs to effectively negotiate and engage in informed negotiations for relief on behalf of the Settlement Class.

9.      At the Court's suggestion, the parties engaged in two settlement conferences with Judge Valdez on September 3, 2010 and October 18, 2010. I attended these conferences along with Mr.

Declaration of Michael J. McMorrow

Edelson, and both outside and in-house counsel represented Defendants at the settlement conferences. Judge Valdez was instrumental in advising both sides of the relative strengths of their cases and the advisability of compromise. After several rounds of arms-length negotiations with the assistance of Judge Valdez, the parties were at an impasse in their settlement discussions, and decided to move forward with litigation and discovery.

10.     Discovery resumed shortly after the latter settlement conference, and continued until the parties reached the instant settlement. The principal terms of the settlement were negotiated over the course of approximately one week, through several phone conferences that began immediately after the deposition of Mr. Roberts.

11.     Despite reaching an agreement in principal, my firm negotiated the specific terms of the Settlement Agreement with counsel for the Defendants over the next several months. Furthermore, on July 12, 2011, I attended an additional settlement conference with counsel for the Defendants and the Court. The Court questioned all counsel about the terms and effect of the Settlement Agreement in great detail over several hours, leading to additional revisions to the Settlement Agreement.

12.     After publication of the summary notice of the settlement in *Parade* on September 11, 2011, I contacted by email each potential Settlement Class member for whom I had such information and provided a copy of the summary notice. None of the Settlement Class members I corresponded with objected to the terms of the Settlement Agreement. News of the settlement was also independently reported in several online sites, including: www.consumerist.com; www.classactionsettlementnews.com; http://www.moxiebird.com; http://www.topclassactions.com; and http://jennstrathman.com.

13.     My office received no negative comments or opposition to the settlement from any state or federal entity in response to the notice provided by Defendants pursuant to the class Action Fairness Act. The Tennessee Attorney General's Office contacted me by phone to discuss the terms of the settlement, but raised no concerns or objection.

14.     My firm's billable rates and the hours of each attorney who worked on this matter are incorporated in the chart below. The attorneys' expenditure of time has been reasonable and necessary. Although several lawyers were involved in the litigation of this matter, each made conscious effort to

Declaration of Michael J. McMorrow

minimize the duplication of work and I have reviewed the hours, submitted and adjusted for time I deemed to be unnecessary or duplicative. Our representation of the Plaintiffs in this case was undertaken entirely on a contingency basis, and the Plaintiffs retained by my firm agreed that a fair award of attorneys' fees from a fund recovered for the class would be one-third of the total recovery plus reimbursement of all costs and expenses with interest. By taking this case on a contingency basis and not being paid by the hour, we had an incentive to conduct our efforts efficiently. So too, being responsible for advancing all expenses, we had an incentive not to expend funds unnecessarily.

15. Class Counsel assumed a significant risk of non-payment in initiating and prosecuting this case given the complexity of legal issues involved and the vigorous defense that Defendants and their highly-skilled counsel raised in the Motion to Dismiss and in discovery, and were prepared to continue to raise in this litigation. Given this, Class counsel would not have prosecuted this case without the prospect of obtaining a percentage of the common fund or applying a reasonable multiplier to our costs and fees.

16. Class Counsel was required to conduct substantial investigation into the claims in this case, to respond to a Motion to Transfer before the Judicial Panel on Multidistrict Litigation, to respond to the Motion to Dismiss, to engage in adequate discovery and further litigation in this case, to prepare for and attend the two settlement conferences with Judge Valdez, to prepare a comprehensive settlement agreement, to prepare preliminary approval papers and accompanying exhibits, including the Class Notices and several declarations, and to prepare the instant final approval papers. All of this work was done on behalf of the Plaintiffs and the Settlement Class without compensation and requiring that other work be foregone.

17. As is the general practice of most law firms, each of the attorneys and law clerks at Edelson McGuire LLC are responsible for keeping track of their billable time. The majority of these records are centralized in a billing management software program to which all employees have access, known as "BigTime."

18. Based on my experience doing plaintiff's class action work (in addition to nine years doing complex commercial litigation and regulatory litigation) and my knowledge of the billing rates of

Declaration of Michael J. McMorrow

other firms that pursue complex consumer class action litigation, I believe that the attorneys performing work on this litigation are billed at rates that correlate to their respective experience, that are reasonable in the Chicago, New York, Florida, Michigan, and California legal markets and are at or below average for attorneys of similar backgrounds and experience.  Additionally, state and federal courts in other consumer class action settlements have approved rates substantially similar to these.

19.     I have reviewed the hours of the attorneys' and law clerks' listed below for work performed on this case and their respective hours and billing rates. The hours submitted were reviewed and any unnecessary hours or duplicative hours have been adjusted.  The rates listed are the same rates we use for hourly clients, which comprise a material part of our firm's revenues.  The hours, rates, and experience of the particular attorneys involved in this matter are provided in the chart below:

| ATTORNEY (position) | YEARS OF PRACTICE | HOURS | HOURLY RATE | TOTAL |
|---|---|---|---|---|
| J. Edelson (Managing Partner:  Edelson McGuire) | 15 years | 57.3 | $600 | $34,380.00 |
| M. McGuire (Partner: Edelson McGuire) | 10 years | 27.2 | $550 | $14,960.00 |
| M. McMorrow (Partner: Edelson McGuire) | 11 years | 595.5 | $470 | $279,885.00 |
| R. Andrews (Partner: Edelson McGuire) | 6 years | 7.0 | $450 | $3,150.00 |
| S. Teppler (Partner: Edelson McGuire) | 31 years | 71.7 | $600 | $43,120.00 |
| Steven L. Woodrow (Partner: Edelson McGuire) | 6 years | 85.0 | $450 | $38,250.00 |
| Ben Richman (Associate Edelson McGuire) | 2 years | 24.10 | $295 | $7,109.00 |
| Edelson McGuire Law | N/A | 38.5 | $210 | $8,085.00 |

Declaration of Michael J. McMorrow

| Clerks | | | | |
|--------|--|--|--|--|
| **TOTAL** | | **906.3** | | **$428,939.00** |

20.     In addition, my law firm incurred costs during this case totaling $6,202.05.  This amount includes charges for filing, mediation, travel, transportation, meals, and expert consultants.  My firm does not generally charge for small copying charges, long distance telephone calls, Westlaw research charges or other incidental costs.  As such, these amounts are not included.

21.     Edelson McGuire LLC will certainly incur future time and expense after the date of final approval, including attending the final fairness hearing, communicating with counsel, and helping to resolve any disputes over claims submitted by members of the class.  I expect Edelson McGuire LLC's lodestar to increase by an additional $10,000.

22.     In addition, named Plaintiffs James Asanuma, Daleen Brown, Christine Doering, Veronica Mora, and Kay Ready brought this matter and their continued attentive involvement was critical to the ultimate successful resolution of this matter to the benefit of the class.  The Plaintiffs showed a strong commitment to the Class and this action by assisting Class Counsel in investigation, and in reviewing and commenting on draft discovery responses.  The Plaintiffs aided in preparation for the settlement conferences that preceded this settlement, and remained active and engaged in the litigation throughout.  I believe that but for the participation of the named Plaintiffs, the substantial benefit to the class available through the settlement would not have resulted.

23.     Given their involvement and willingness to participate and undertake the responsibilities and risks attendant with bringing a representative action, and their continued attention to this matter, we request that the Court approve the incentive award.  Prior to the settlement conferences, the parties never discussed incentive awards of any type, and there was no pre-agreement concerning any award for being a Class Representative.

24.     After receiving a copy of the Objection filed by attorney Sam P. Cannata on behalf of Jill K. Cannata in this matter, I checked on the federal courts' PACER document retrieval service for

records of attorney Cannata's other litigation. According to PACER, Mr. Cannata has appeared in ten cases in federal courts, one of which was a class action filed by him. The remaining nine cases were class action settlements to which Mr. Cannata objected, either as a class member or as an attorney representing, in most instances, an apparent family member. All of the objections were filed in 2010 or 2011. The federal cases in which Mr. Cannata has filed objections are as follows:

- *Marsikyan v. Mercedes-Benz, USA, LLC*, No. 08-04876 (C.D. Cal. 2010);

- *Hartless v. Clorox Co*., No. 06-02705 (S.D. Cal. 2011);

- *In re Quantcast Adv. Cookie Litig*., No. 10-5484 (C.D. Cal., 2011);

- *In re Vytorin/Zetia Mktg. Sales Practices*, No. 08-285, MDL No. 1938 (D. N.J. 2010);

- *In re HP Inkjet Printer Litig*., No. 05-03580 (N.D. Cal. 2011);

- *Masters v. Lowe's Home Centers, Inc*., No. 09-0255 (S.D. Ill. 2011);

- *Schulte v. Fifth Third Bank*, No. 09-06655 (N.D. Ill. 2011);

- *Trombley v. National City Bank*, No. 10-00232 (D. D.C. 2011); and

- *Gemelas v. Dannon*, No. 08-00236 (N.D. Ohio 2010).

(True and correct copies of Mr. Cannata's objections in these cases are attached hereto as Group Exhibit 2.) The objection in *Masters v. Lowe's* was ostensibly filed pro se by Grace Cannata. In several of these cases, e.g., *In re HP Inkjet Printer*, *In re Vytorin/Zetia*, and *Marsikyan v. Mercedes-Benz*, Mr. Cannata later withdrew those objections. (True and correct copies of Mr. Cannata's withdrawals in these cases are attached hereto as Group Exhibit 3.) In *In re Vytorin/Zetia,* class counsel agreed to pay Mr. Cannata and a group of other attorneys $55,000 from class counsel's fees and expenses. (*See* Group Exhibit 2.) Based on my review of the dockets of these cases, it appears that none of Mr. Cannata's objections in these cases was sustained by the court. (True and correct copies of the court opinions overruling Mr. Cannata's objections are attached hereto as Group Exhibit 4.)

25. In *Marsikyan v. Mercedes-Benz*, Mr. Cannata lists his home address as 14944 Hillbrook Drive, Hunting Valley, Ohio 44022. (*See* Group Exhibit 3.) The address listed for Jill K. Cannata in the Objection in this case lists her address as 14944 Hillbrook Drive, Cleveland, Ohio 44022.

Declaration of Michael J. McMorrow

26.     I discovered that Mr. Cannata is a principal in the law firm of Cannata Phillips LPA, the offices of which are at 9555 Vista Way, Suite 200, Cleveland, Ohio 44125.  (A true and correct copy of the Cannata Phillips website, printed on November 16, 2011, is attached hereto as Exhibit 5.)

27.     I searched the online records of the Ohio Secretary of State for Cannata Phillips LPA and for the Law Offices of Sam P. Cannata.  Cannata Phillips is registered with the office of the Ohio Secretary of State, and the firm appears on the Secretary of State's website as of November 16, 2011.  The Law Offices of Sam P. Cannata does not appear on the Ohio Secretary of State's website as of November 16, 2011.

28.     In addition, I searched the online records of the Ohio Bar Association for Cannata Phillips LPA and for the Law Offices of Sam P. Cannata.  The Law Offices of Sam P. Cannata does not appear on that website.  Cannata Phillips LPA appears as the registered address and firm of Mr. Cannata as of November 16, 2011.

29.     Edelson McGuire has no affiliation with Feeding America.  I am aware of no affiliation between Feeding America and either Defendants or their counsel.  My firm selected Feeding America as an appropriate *cy pres* recipient due to its commitment to feeding the hungry, its national scope, and its excellent reputation.

30.     True and correct copies of the Declarations of Seth Safier, David Parisi and Mark Freedman, all members of Plaintiffs' Steering Committee, are attached hereto as Exhibits 6, 7, and 8, respectively. The Declaration of Craig Borison is attached hereto as Exhibit 9.

31.     A true and correct copy of the Declaration of Kim Schmidt, Senior Vice President of Rust Consulting, Inc., is attached hereto as Exhibit 10.


I declare under penalty of perjury that the foregoing is true and correct.


Executed this 16th day of November, 2011.

  /s/  Michael J. McMorrow
        Michael J. McMorrow

# EXHIBIT G

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS,
EASTERN DIVISION**

|  |  |
|---|---|
| *In re Kentucky Grilled Chicken Coupon Marketing & Sales Practices Litigation,*<br><br>THIS DOCUMENT RELATES TO ALL CLASS ACTIONS | MDL 2103<br><br>Case No. 1:09-cv-7670<br><br>Hon. James F. Holderman |

## FINAL JUDGMENT ORDER

The Court, having considered Plaintiffs' Motion and Memorandum in Support of Final Approval of Class Action Settlement and Approval of Attorneys' Fees and Incentive Awards (the "Motion") of the settlement (the "Settlement") of the above-captioned case ("the Litigation") with KFC Corporation ("KFC") and YUM! Brands, Inc. ("YUM!") (collectively, "Defendants" ) pursuant to the Settlement Agreement, As Amended, between Plaintiffs James Asanuma, Daleen Brown, Christine Doering, Veronica Mora, and Kay Ready (collectively, the "Plaintiffs") and Defendants (the "Settlement Agreement"), having considered all of the submissions and arguments with respect to the Motion, and having held a Fairness Hearing on November 30, 2011, due and adequate notice having been given to the Settlement Class, and the Court having been fully advised in the premises, **it is HEREBY ORDERED, ADJUDGED and DECREED as follows**:

1.      Unless defined herein, all capitalized terms in this Order shall have the respective meanings as the same terms in the Settlement Agreement.

2.     This Court has jurisdiction over the subject matter of this Litigation and over all Parties to the Litigation, including all Settlement Class members.

3.     On August 16, 2011, this Court granted preliminary approval of the Settlement Agreement and certified the Settlement Class consisting of:

> all persons who (a) downloaded an Original or PDF Coupon between May 5, 2009 at 9 a.m. central time and May 6, 2009 at 11:59 p.m. central time from Oprah.com or unthinkfc.com, and (b) did not receive (i) the KGC Free Meal pursuant to the Original Coupon, the PDF Coupon, or the Raincheck Coupon, (ii) a "Chicken Check" or other compensation from KFC in response to a complaint concerning the Oprah Promotion, or (iii) a free meal or other consideration at a restaurant unaffiliated with Defendants that agreed to accept the KGC Coupons.

(the "Preliminary Approval Order"). Excluded from the Settlement Class are those persons who have submitted valid and timely requests for exclusion pursuant to the Preliminary Approval Order and the Notice to the Settlement Class. Valid and timely requests for exclusion were received from Tim Brown and Ed Klar, as noted by the Settlement Adminstrator. Mr. Brown and Mr. Klar are found to have validly excluded themselves from the Settlement in accordance with the provisions of the Preliminary Approval Order, and are not bound by this Judgment or the Release herein.

4     Notice to the Settlement Class has been provided in accordance with the Preliminary Approval Order, and the substance of and dissemination program for the Notice fully complied with the requirements of Fed. R. Civ. P. 23 and due process, constituted the best notice practicable under the circumstances, and provided due and sufficient notice to all persons entitled to notice of the settlement of this Litigation.

5.     The Defendants properly and timely notified the appropriate state and federal officials of the Settlement Agreement, pursuant to the Class Action Fairness Act of 2005

("CAFA"), 28 U.S.C. § 1715. The Court has reviewed the substance of Defendants' notices and accompanying materials, and finds that they complied with all applicable requirements of CAFA.

6.      The Settlement Agreement was arrived at as a result of arm's-length negotiations conducted in good faith by counsel for the parties, including two settlement conferences presided over by a Magistrate Judge of this Court, and is supported by Plaintiffs and Class Counsel.

7.      The Settlement as set forth in the Settlement Agreement is fair, reasonable, adequate, and in the best interests of the Settlement Class in light of the complexity, expense, and duration of litigation and the risks involved in establishing liability and damages and in maintaining the class action through trial and appeal.

8.      The settlement consideration provided under the Settlement Agreement constitutes fair value given in exchange for the release of the Released Claims against the Released Parties. The Court finds that the consideration to be paid to members of the Settlement Class is reasonable, considering the facts and circumstances of the numerous types of claims and affirmative defenses asserted in the Litigation, and the potential risks and likelihood of success of alternatively pursuing trials on the merits.

9.      The Settlement Agreement is finally approved as fair, reasonable, adequate, and in the best interests of the Settlement Class, for the reasons set forth herein and in the "Final Approval of Class Action Settlement" issued by the Court on November 30, 2011 [Dkt. 113] (the "Final Approval Order"). The Plaintiffs and Class Counsel adequately represented the Settlement Class for purposes of entering into and implementing the Settlement

3

Agreement. Accordingly, the Settlement Agreement is hereby finally approved in all respects, and the Parties are hereby directed to perform its terms. The Parties and Settlement Class members who did not timely exclude themselves from the Settlement Class are bound by the terms and conditions of the Settlement Agreement.

10. The Settlement Class described in Paragraph 3 above is hereby finally certified, solely for purposes of effectuating the Settlement and this Order.

11. The requirements of Rule 23(a) and (b)(3) have been satisfied for settlement purposes, for the reasons set forth herein and in the for the reasons set forth herein and in the "Final Approval of Class Certification" issued by the Court on November 30, 2011 [Dkt. 112] (the "Final Class Certification Order"). The Settlement Class is so numerous that joinder of all members is impracticable; there are at least some questions of law or fact common to the class; the claims of the Plaintiffs are typical of the claims of the Settlement Class; the Plaintiffs will fairly and adequately protect the interests of the class; the questions of law or fact common to class members predominate over any questions affecting only individual members; and a class action is superior to other available methods for fairly and efficiently adjudicating the controversy between Plaintiffs and Defendants.

12. The preliminary appointment of the following as Class Counsel is hereby confirmed:

Jay Edelson

Michael J. McMorrow

Edelson McGuire LLC

350 North LaSalle

4

Suite 1300

Chicago, IL 60654

1.

The preliminary appointment of the following as Plaintiffs' Steering Committee is hereby confirmed:

Seth Safier
Adam Gutride
Gutride Safier, LLP
835 Douglass Street
San Francisco, CA 94114

David C. Parisi,
Parisi & Havens LLP
15233 Valleyheart Drive
Sherman Oaks, CA 91403

Mark H. Freedman
Law Offices of Freedman & Freedman, PLC
24725 West Twelve Mile Road
Suite 220
Southfield, MI 48034

Class Counsel and Plaintiffs' Steering Committee are experienced in class litigation, including litigation of similar claims in other cases, and have fairly and adequately represented the interests of the Settlement Class in the Litigation and the Settlement Agreement.

13.     The Litigation is hereby dismissed without costs or fees, except as otherwise provided in the Settlement Agreement and this Order.  This judgment has been entered without any admission by Defendants as to the merits of any of the allegations in the complaint.

14.     The Parties are directed to distribute the consideration to the Settlement Class pursuant to Paragraph 5 of the Settlement Agreement.

15. The Releasing Parties and their Affiliated Parties release and forever discharge the Released Parties and their Affiliated Parties from the Released Claims.

A. As used in this Order, the "Releasing Parties" shall mean Plaintiffs and each Settlement Class member (except a person who has obtained proper and timely exclusion from the Settlement Class pursuant to Paragraph 13 of the Settlement Agreement), on her/his own behalf and on behalf of her/his spouse.

B. As used in this Order, the "Released Parties" shall mean (i) KFC and YUM!; (ii) any KFC franchisee or the National Council and Advertising Cooperative, Inc. ("NCAC"); (iii) any person or entity in the chain of distribution of any goods or services for YUM!, KFC, or KFC franchisees, including but not limited to the Unified FoodService Purchasing Co-Op, LLC ("UFPC"), suppliers, and distributors; and (iv) any person or entity connected in any way, directly or indirectly, with the Oprah Promotion, the KGC Free Meal, the KGC Coupons, or the sales, marketing, or advertising of Kentucky Grilled Chicken®, including but not limited to Ms. Oprah Winfrey, Harpo Productions, Inc., The Oprah Winfrey Show, Draft FCB, Coupons, Inc., Gomez, Rackspace, and Fulfillment Concepts, Inc.

C. As used in this Order, the "Affiliated Parties" shall mean

(i) In the case of a natural person, her/his current or former spouse, children, or any relative who may claim an interest in the Released Claims, as well as the present, former, and future respective administrators, agents, assigns, attorneys, executors, heirs, partners, predecessors-in-interest, and successors of any of the foregoing.

6

(ii)　　In the case of an entity such as a partnership, corporation, or limited liability company, its present, former, and future direct and indirect parent companies, affiliates, agents, divisions, predecessors-in-interest, subsidiaries, and successors and all of the aforementioneds' respective present, former, and future officers, directors, partners, employees, shareholders, members, agents, assigns, and attorneys.

D.　　As used in this Order, the "Released Claims" shall mean any and all rights, duties, obligations, claims, actions, causes of action, or liabilities, whether arising under local, state, or federal law, whether by statute, contract, common law, or equity, whether known or unknown, suspected or unsuspected, asserted or unasserted, foreseen or unforeseen, actual or contingent, liquidated or unliquidated that arise out of or relate in any way to: (i) claims that were or could have been asserted in the Litigation; (ii) the Oprah Promotion, the KGC Free Meal, or the KGC Coupons, or any representation, misrepresentation, promise, communication, act, or omission regarding the same; (iii) any matters alleged, argued, raised, or asserted in any pleading or court filing in the Underlying Actions or the Litigation; or (iv) any representation, misrepresentation, promises, communication, act, or omission regarding the topical seasonings for Kentucky Grilled Chicken®.

16.　　The release in Paragraph 15 includes claims that are currently unknown to the Releasing Parties. The release in this Order and the Settlement Agreement fully, finally, and forever discharges all Released Claims, whether now asserted or unasserted, known or unknown, suspected or unsuspected, which now exist, or heretofore existed or may hereafter exist, which if known, might have affected their decision to enter into this release. Each Releasing Party shall be deemed to waive any and all provisions, rights, and benefits conferred by any law of the

7

United States, any state or territory of the United States, or any state or territory of any other country, or principle of common law or equity, which governs or limits a person's release of unknown claims. The Releasing Parties understand and acknowledge that they may hereafter discover facts in addition to or different from those that are currently known or believed to be true with respect to the subject matter of this release, but have agreed that they have taken that possibility into account in reaching this Settlement Agreement and that, notwithstanding the discovery or existence of any such additional or different facts, as to which the Releasing Parties expressly assume the risk, they fully, finally, and forever settle and release any and all Released Claims, known or unknown, suspected or unsuspected, which now exist, or heretofore existed, or may hereafter exist, and without regard to the subsequent discovery or existence of such additional or different facts. The foregoing waiver includes, without limitation, an express waiver, to the fullest extent not prohibited by law, by Plaintiffs, the Settlement Class members, and all Releasing Parties, of any and all rights under California Civil Code Section 1542, which provides:

> **A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS WHICH THE CREDITOR DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE, WHICH IF KNOWN BY HIM OR HER MUST HAVE MATERIALLY AFFECTED HIS OR HER SETTLEMENT WITH THE DEBTOR.**

In addition, Plaintiffs, Settlement Class members, and all Releasing Parties also expressly waive any and all provisions, rights, and benefits conferred by any law or principle of common law or equity, that are similar, comparable, or equivalent, in whole or in part, to California Civil Code Section 1542.

17. Plaintiffs, Settlement Class members, and the Releasing Parties are permanently enjoined and barred from commencing or prosecuting any action asserting any of

the Released Claims, either directly, representatively, derivatively, or in any other capacity, whether by a complaint, counterclaim, defense, or otherwise, in any local, state, or federal court, or in any agency, or other authority or forum wherever located.  Any person or entity who knowingly violates such injunction shall pay the attorneys' fees and costs incurred by Defendants or any other Released Party or their Affiliated Parties as a result of such violation.

18.     The Court approves the agreed-upon Fee Award to Class Counsel in the amount of $515,000.00, which the Court finds to be fair and reasonable for the reasons set forth in the Final Approval Order.  Defendants shall pay the Fee Award pursuant to and in the manner provided by the terms of the Settlement Agreement.

19.     The Court approves the payment by Defendants of $25,000.00  in the aggregate to the Plaintiffs as an incentive award for taking on the risks of litigation and helping achieve the results to be made available to the Settlement Class.  Such payment shall be made by Defendants pursuant to and in the manner provided by the terms of the Settlement Agreement.

20.     Without affecting the finality of this judgment, the Court also retains exclusive jurisdiction over Defendants, Plaintiffs, and Settlement Class members regarding the Settlement including without limitation the Settlement Agreement and this Final Judgment Order.  Defendants, Plaintiffs, and Settlement Class members are hereby deemed to have submitted irrevocably to the exclusive jurisdiction of this Court for any suit, action, proceeding, or dispute arising out of or relating to the Released Claims, this Order, or the Settlement Agreement, including but not limited to the applicability of the Released Claims, the Settlement Agreement, or this Order.

21.     The Settlement Agreement and the proceedings taken and statements made pursuant to the Settlement Agreement or papers filed seeking approval of the Settlement

Agreement, and this Order, are not and shall not in any event be construed as, offered in evidence as, received in evidence as, and/or deemed to be evidence of a presumption, concession, or an admission of any kind by any of the Parties of (i) the truth of any fact alleged or the validity of any claim or defense that has been, could have been, or in the future might be asserted in the Litigation, any other litigation, court of law or equity, proceeding, arbitration, tribunal, investigation, government action, administrative proceeding, or other forum, or (ii) any liability, responsibility, fault, wrongdoing, or otherwise of Defendants. Defendants have denied and continue to deny the claims asserted by Plaintiffs. Nothing contained herein shall be construed to prevent a party from offering the Settlement Agreement into evidence for the purposes of enforcement of the Settlement Agreement. Subject to the terms and conditions of the Settlement Agreement, this Court hereby dismisses the Litigation without prejudice. This dismissal without prejudice shall not allow the Parties or any members of the Class to litigate or otherwise reopen issues resolved by this judgment, or included within the Released Claims, but is "without prejudice" so as to allow the Court to supervise the implementation and administration of the Settlement.

22. For the reasons set forth in the Final Approval Order and the Final Class Certification Order, the objection of Jill K. Cannata is overruled in its entirety.

23. Based upon the Court's finding that there is no just reason for delay of enforcement or appeal of this Order notwithstanding the Court's retention of jurisdiction to oversee implementation and enforcement of the Settlement Agreement, the Court directs the Clerk to enter final judgment pursuant to Rule 54(b).

BY THE COURT:

Dated: December 6, 2011        _James F. Holderman_____

The Honorable James F. Holderman
Chief Judge, United States District Court

# EXHIBIT H

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION**

| | |
|---|---|
| THI MILLER, individually and on behalf of all others similarly situated, | |
| *Plaintiff*, | Case No. 12-cv-04961 |
| *v.* | |
| RED BULL NORTH AMERICA, INC., a California corporation, | [Hon. Judge St. Eve] |
| *Defendant*. | |

## <u>DECLARATION OF JAY EDELSON</u>

Pursuant to 28 U.S.C. § 1746, I Jay Edelson, hereby declare and state as follows:

1.      I am over the age of eighteen and am fully competent to make this declaration. I make this declaration based upon personal knowledge unless otherwise indicated.  If called upon to testify, I could and would competently do so.

2.      I am an attorney admitted to practice in the State of Illinois and in the United States District Court for the Northern District of Illinois, and other federal district courts. I am making this declaration in support of Plaintiff's Uncontested Motion for Approval of Attorney's Fees, Expenses, and Incentive Award.

3.      I am the Managing Partner of the law firm Edelson LLC. Edelson LLC was retained by Plaintiff Thi Miller for the purpose of bringing this litigation and I, along with other members of my firm, have been appointed Class Counsel in this case.

4.      My firm has extensive experience prosecuting class actions and other complex litigation of similar nature, scope, and complexity, and also has intimate knowledge of the law in the field of cellular telephony and has been a pioneer in the field of consumer class actions involving the transmission unauthorized text messages under the TCPA. The first federal Circuit Court opinion authorizing consumer suits for unauthorized text messages was litigated by the

predecessor firm to Edelson LLC, and subsequent reported opinions in federal courts in California, Illinois, and other federal districts around the country have also been secured by the attorneys at Edelson LLC. Edelson LLC and its predecessors have litigated and settled several substantial text message class actions under the TCPA, including: *Weinstein v. The Timberland; Co., et al.* (N.D. Ill. 2008); *Satterfield v. Simon & Schuster* (N.D. Cal. 2010); *Lozano v. Twentieth Century Fox* (N.D. Ill. 2011); *Kramer v. Autobytel* (N.D. Cal. 2011); and *Rojas v. Career Education Corporation* (N.D. Ill. 2012).

5.     A true and accurate copy of the Edelson LLC Firm Resume is attached hereto as Exhibit 1-A.

6.     At the time of filing this case, I was aware that my firm would spend hundreds, if not thousands, of hours on attorney time in contested litigation with no guarantee of success.

7.     Defendant Red Bull North America, Inc. ("Red Bull") retained the law firm of Kirkland & Ellis LLP, a national law firm, to represent them in this case.

8.     Over the past year, members of my firm have spent over 877 hours representing the Plaintiff and the Settlement Class without any compensation. Performing work on this case required my firm to forgo other potential matters and employment.

9.     Following their Rule 26(f) conference, the Parties exchanged initial disclosures, and Plaintiff propounded discovery on Defendant and other third parties. It was at this juncture that the Parties agreed to attempt to resolve this litigation through private mediation. In the weeks leading up to mediation, the Parties informally exchanged certain documents and other information that would be needed to effectively engage in the mediation process.

10.     On November 6-7, 2012, the Parties met for a formal mediation with former District Judge Wayne Andersen. After two days of mediation, additional exchanges of

information, and several rounds of arm's-length negotiations—all with the assistance of Judge Andersen—the Parties made a great deal of progress toward a classwide settlement, but were still unable to come to terms. Certain issues remained unresolved, and while the Parties agreed to continue talking, they did not commit to any further mediation sessions.

11.     After several additional rounds of negotiations (all at arm's-length and presided over by Judge Andersen) that took place over the course of the next two months, the Parties agreed to another in-person mediation session, which took place on January 10, 2013. Although the Parties were able to agree on the principal terms of class relief at that time, they reached an impasse on remaining issues.

12.     Judge Andersen convened another mediation session on February 25, 2013. With Judge Andersen's assistance, the Parties were able to resolve all remaining issues. Notably, however, the Parties did not agree—much less even discuss— any amount of attorneys' fees payable to Class Counsel. Rather, Class Counsel—determined to not delay the relief to the Class with continued negotiations over attorneys' fees— agreed to simply file a fee petition with the Court and committed to not seek more than $2,000,000 in attorneys' fees and costs.

13.     On June 13, 2013—the deadline to file their fee petition—and again with Judge Andersen's assistance through separate telephone conferences, the Parties finally came to an agreement on attorneys' fees and costs in the amount of $1,275,000.00, subject to Court approval.

14.     Class Counsel's requested fee award represents only 21% of the $6,000,000 made available to fund the Settlement.

15.     Awarding fees based on a percentage of the overall fund made available to the Class is supported by Plaintiff's retainer agreement with Class Counsel, as well as fee awards in

similar class actions within this District. A true and accurate copy of Plaintiff Miller's executed retention letter with Edelson LLC is attached hereto as Exhibit 1-B.

16.     By taking this case on a contingency basis and not being paid by the hour, my firm had an incentive to conduct our efforts efficiently. So too, being responsible for advancing all expenses, we had an incentive not to expend funds unnecessarily.

17.     The retainer agreement between Class Counsel and Plaintiff contains a contingency fee arrangement whereby Plaintiff previously agreed that a "fair award of attorneys' fees from a fund recovered for the class would be one-third of the total recovery plus reimbursement of all costs." (*See* Ex. B.)

18.     I believe that my firm assumed a significant risk of non-payment in initiating and prosecuting this case given the novelty of the legal issues involved and the vigorous defense that Defendant and its highly skilled counsel were prepared to mount should the litigation have proceeded on.

19.     Class Counsel was also threatened with the possibility that Red Bull would ultimately prevail on its "direct relationship" argument—i.e., that each Class Member consented to receive future text messages when they voluntarily provided Red Bull with their cell phone numbers. Further, Class Counsel's fronting of attorney time and the costs of litigation in this case on a fully contingent basis was especially risky because the issue of whether the TCPA applies to text messages has yet to be presented to the Seventh Circuit. Equally untested is whether the type of equipment used to transmit *en masse* text messages falls within the TCPA's statutory definition of "automatic telephone dialing system."

20.     As is the general practice of most law firms, each of the attorneys and law clerks at Edelson LLC are responsible for keeping track of their billable time. The majority of these

records are centralized in a billing management software program, to which all employees have access, known as "Freshbooks."

21.     The attorney rates listed are the same as those Class Counsel charges to their hourly clients, and are comparable to (or less than) those charged by attorneys in Chicago with similar background or experience. Moreover, these rates have been approved as reasonable by several judges in this District, as well as in other federal courts throughout the country, in both TCPA cases and other class action litigation.

22.     The rates charged for our attorneys are the same rates we use for hourly clients, which comprise a material part of the firm's revenues.  The hours, rates, and experience of the particular attorneys from my firm involved in this matter are provided in the chart below:

| ATTORNEY (Position) | YEARS OF PRACTICE | HOURS | RATE | TOTAL |
|---|---|---|---|---|
| Jay Edelson (Managing Partner) | 16 | 114.7 | $675.00 | $77,422.50 |
| Rafey S. Balabanian (Partner) | 7 | 96.1 | $550.00 | $52,855.00 |
| Ari J. Scharg (Associate) | 4 | 308.5 | $425.00 | $131,112.50 |
| Eve-Lynn Rapp (Associate) | 3 | 80.8 | $390.00 | $31,512.00 |
| Megan Lindsey (Associate) | 1 | 57.1 | $335.00 | $19,128.50 |
| Amir Missaghi (Incoming Associate) | N/A | 220.0 | $215.00 | $47,300.00 |
| Estimated Time Remaining | | | | $80,000.00 |
| **TOTAL** | | | | **$439,330.50** |

23.     Based on my experience, I anticipate that approximately 200 hours equaling about $80,000.00 of additional attorney and non-attorney time will be required through final approval and administration of the settlement, should it be approved by the Court. The attorneys handling this matter must still draft a final approval motion, prepare and attend the final fairness hearing, contend with any potential objectors, continue to communicate with Class Members, and handle various issues related to claims administration.

24.     In addition to this amount, Edelson LLC has also incurred $16,480.02 in unreimbursed costs and expenses, which includes costs related to the initial filing, discovery, subpoena production, mediation, transportation, and large copying jobs.  A true and accurate copy of my firm's expense records are attached as Exhibit 1-C.  My firm does not typically charge for such things as Westlaw or LexisNexis research, which we adhered to in this case.

25.     Until the settlement was reached, there was no pre-existing agreement or discussion concerning an award or the potential for an award in exchange for the Class Representative's involvement in the case.

26.     Nonetheless, Ms. Miller contributed her own time and effort in pursuing both her individual claim as well as the class claims, exhibiting a willingness to participate and undertake the responsibilities and risks attendant with bringing a representative action. Early in the case, Ms. Miller even relinquished control of her personal cell phone (which received the text messages at issue) so that Class Counsel could create a mirror image of its hard drive and preserve relevant evidence.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on June 13, 2013, at Chicago, Illinois,

_____
Jay Edelson

# EXHIBIT I

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION

THI MILLER, individually and on behalf of
all others similarly situated,

       *Plaintiff*,

    *v.*

RED BULL NORTH AMERICA, INC., a
California corporation,

       *Defendant*.

Case No. 12-cv-04961

Hon. Judge St. Eve

## **<u>FINAL JUDGMENT ORDER</u>**

WHEREAS, a class action is pending before the Court entitled *Miller v. Red Bull North America, Inc.,* Case No. 12-cv-04961;

WHEREAS, Plaintiff and Defendant have entered into a Settlement Agreement dated March 11, 2013, which, together with the exhibits attached thereto, sets forth the terms and conditions for a proposed settlement and dismissal of the Action with prejudice as to Defendant upon the terms and conditions set forth therein (the "Settlement Agreement");

WHEREAS, on March 14, 2013, this Court preliminarily approved the Settlement Agreement and certified, for settlement purposes, the Settlement Class consisting of:

> All persons in the United States and its territories who received one or more unauthorized text messages from or on behalf of the Defendant as a result of a Non-Compliant Campaign. Excluded from the Settlement Class are (1) any Persons that have previously provided consent in response to a Compliant Campaign; (2) any Judge or Magistrate presiding over this action and members of their families; (3) the Defendant, the Defendant's subsidiaries, parent companies, successors, predecessors, and any entity in which the Defendant or its parents have a controlling interest and their current or former officers, directors, and employees; (4) any third-party vendor that sent text messages on behalf of the Defendant, and its subsidiaries, parent companies, successors, predecessors, and their current or former officers, directors, and employees; (5) persons who properly execute and file a timely request for exclusion from the class; (6) all Persons whose claims against the Defendant have been fully and finally

adjudicated and/or released; and (7) the legal representatives, successors or assigns of any such excluded persons;

WHEREAS, pending before the Court are Plaintiff's Motion for Final Approval of Class Action Settlement (Dkt. 56) and Plaintiff's Corrected Motion for Award of Attorneys' Fees, Expenses and Incentive Award (Dkt. 53) (collectively, the "Motions"); and

WHEREAS, the Court, having read and considered the Motions and the Settlement Agreement, and having heard the parties and being fully advised in the premises, hereby GRANTS final approval of the Settlement Agreement in its entirety.

**IT IS HEREBY ORDERED, DECREED, AND ADJUDGED AS FOLLOWS:**

1.      Terms and phrases in this Order shall have the same meaning as ascribed to them in the Settlement Agreement.

2.      This Court has jurisdiction over the subject matter of the Action and over all Parties to the Action, including all Settlement Class members.

3.      The Court finds that the Settlement Agreement is fair, reasonable, adequate, and in the best interests of the Settlement Class. The Court further finds that the Settlement Agreement substantially fulfills the purposes and objectives of the class action, and provides substantial relief to the class without the risks, burdens, costs, or delay associated with continued litigation, trial, and/or appeal. The Court also finds that the Settlement Agreement: (a) is the result of arms' length negotiations between experienced attorneys assisted by the Hon. Wayne R. Andersen (ret.) of JAMS; (b) meets all applicable requirements of law, including Federal Rule of Civil Procedure 23, and the Class Action Fairness Act ("CAFA"), 28 U.S.C. § 1715; and (c) is not a finding or admission of liability, damages or any other issues for purposes of litigation, by the Defendant or any other parties.

4.      The Court finds that the Notice and the Notice Plan implemented pursuant to the Settlement Agreement and the Court's Preliminary Approval Order, consisting of individual notice via first-class U.S. Mail postcard and email, internet publication on the interactive Settlement Website, publication in *People* and *Game Informer* magazines, CAFA notice to the Attorneys General of each state, as well as the Attorney General of the United States, and a toll-free phone number to field inquires by Settlement Class Members, has been successfully implemented and was the best notice practicable under the circumstances and: (1) constituted notice that was reasonably calculated, under the circumstances, to apprise the Settlement Class Members of the pendency of the Action, their right to object to or to exclude themselves from the Settlement Agreement, and their right to appear at the Final Approval Hearing; (2) was reasonable and constituted due, adequate, and sufficient notice to all persons entitled to receive notice; and (3) met all applicable requirements of the Federal Rules of Civil Procedure, the Due Process Clause, and the rules of the Court.

5.      The following preliminary appointments are hereby confirmed: (a) Jay Edelson and Rafey S. Balabanian of Edelson LLC as Class Counsel for the Settlement Class; and (b) Thi Miller as Class Representative.

6.      The following Settlement Class is hereby finally certified, solely for purposes of this settlement, pursuant to Federal Rule of Civil Procedure 23(b)(3):

> All persons in the United States and its territories who received one or more unauthorized text messages from or on behalf of the Defendant as a result of a Non-Compliant Campaign. Excluded from the Settlement Class are (1) any Persons that have previously provided consent in response to a Compliant Campaign; (2) any Judge or Magistrate presiding over this action and members of their families; (3) the Defendant, the Defendant's subsidiaries, parent companies, successors, predecessors, and any entity in which the Defendant or its parents have a controlling interest and their current or former officers, directors, and employees; (4) any third-party vendor that sent text messages on behalf of the Defendant, and its subsidiaries, parent companies, successors, predecessors, and

their current or former officers, directors, and employees; (5) persons who properly execute and file a timely request for exclusion from the class; (6) all Persons whose claims against the Defendant have been fully and finally adjudicated and/or released; and (7) the legal representatives, successors or assigns of any such excluded persons.

7.     The Court finds that the Settlement Agreement is fundamentally fair, adequate, and reasonable, and, solely within the context of and for the purposes of settlement only, that the Class satisfies the requirements of Rule 23 of the Federal Rules of Civil Procedure, specifically, that: the Class of approximately 86,000 persons is so numerous that joinder of all members is impracticable; there are common questions of law (i.e., whether Defendant violated the Telephone Consumer Protection Act, 47 U.S.C. § 227, by sending the Text Messages in question, and whether the Class members are entitled to statutory damages as a result of Defendant's alleged conduct) and fact (i.e., whether Defendant sent the Text Messages in question using equipment that had the capacity to store or produce telephone numbers to be called using a random or sequential number generator, and whether Defendant obtained the Class members' prior express consent to send the Text Messages); the claims of the Class Representative are typical of the claims of the Class members; the Class Representative has fairly and adequately protected the interests of the Class; common questions of law and fact predominate over questions affecting individual members; and a class action is a superior method for fairly and efficiently adjudicating this Action.

8.     The Action is hereby dismissed with prejudice and without costs. This dismissal shall not allow the Parties or any members of the Settlement Class to litigate or otherwise reopen issues resolved by this judgment, or included within the Released Claims, but allows the Court to supervise the implementation and administration of the settlement. This judgment has been entered without any admission by the Defendant or any other parties concerning liability, damages, or any other issues for purposes of litigation, including as to the merits of any of the

allegations in the Complaint.

9.      The Parties are directed to pay Valid Approved Claims to the Settlement Class in accordance with the Settlement Agreement.

10.     The Releasing Parties release and forever discharge the Released Parties from the Released Claims as provided in the Settlement Agreement.

A.      As used in this Order and in the Settlement Agreement, the "Releasing Parties" means Plaintiff as well as all Settlement Class Members (whether or not such a Person submits a Claim Form), except for those who properly execute and file a timely request for exclusion from the Settlement Class.   To the extent the Settlement Class Member is not an individual, "Releasing Parties" includes all of the Settlement Class Member's present, former, and future direct and indirect parent companies, affiliates, subsidiaries, divisions, agents, franchisees, successors, predecessors-in-interest, and all of the aforementioned's present, former, and future officers, directors, employees, shareholders, attorneys, agents, independent contractors; and, to the extent the Settlement Class Member is an individual, "Releasing Parties" includes all of the Settlement Class Member's present, former, and future spouses, as well as the present, former, and future heirs, executors, administrators, representatives, agents, attorneys, partners, successors, predecessors-in-interest, and assigns of each of them.

B.      As used in this Order and in the Settlement Agreement, the "Released Parties" means Defendant Red Bull North America, Inc. and any and all of its present or past heirs, executors, estates, administrators, predecessors, successors, assigns, parents, subsidiaries, associates, employers, consultants, independent contractors, insurers, directors, managing directors, officers, partners, principals, members, attorneys,

accountants, financial and other advisors, investment bankers, underwriters, shareholders, lenders, auditors, investment advisors, legal representatives, successors in interest, and other assigns; as well as all Persons, firms, trusts, corporations, officers, directors, or other individuals or entities in which the Defendant has a controlling interest or which are affiliated with any of them; as well as any employees, agents or other representatives of any of the foregoing.

      C.     As used in this Order and in the Settlement Agreement, the "Released Claims" shall mean any and all actual, potential, filed, known or unknown, fixed or contingent, claimed or unclaimed, suspected or unsuspected, claims, demands, liabilities, rights, causes of action, contracts or agreements, extracontractual claims, damages, punitive, exemplary or multiplied damages, expenses, costs, attorneys' fees and or obligations (including "Unknown Claims" as defined below), whether in law or in equity, accrued or unaccrued, direct, individual or representative, of every nature and description whatsoever, whether based on the TCPA or other federal, state, local, statutory or common law, any other law, rule or regulation, including the law of any jurisdiction outside the United States, or any other legal or equitable theory or cause of action, against the Released Parties, or any of them, arising out of or relating to the facts, transactions, events, matters, occurrences, acts, disclosures, statements, misrepresentations, omissions or failures to act relating to unauthorized Text Messages as a result of a Non-Compliant Campaign, or that were or could have been alleged or asserted in the Action relating to unauthorized Text Messages as a result of a Non-Compliant Campaign—including Released Claims belonging to any and all Plaintiffs and their respective present or past heirs, executors, estates, administrators, predecessors, successors, assigns, parents,

subsidiaries, associates, affiliates, employers, employees, agents, consultants, independent contractors, insurers, directors, managing directors, officers, partners, principals, members, attorneys, accountants, financial and other advisors, investment bankers, underwriters, lenders, and any other representatives of any of these Persons and entities. Nothing herein is intended to release any claims any governmental agency or governmental actor has against the Defendant.

11.     The release in Paragraph 10 includes the release of all Unknown Claims. As used in this Order and in the Settlement Agreement, "Unknown Claims" means claims that could have been raised in this litigation and that the Plaintiffs or any or all other Persons and entities whose claims are being released, or any of them, do not know or suspect to exist, which, if known by him, her or it, might affect his, her or its agreement to release the Released Parties or the Released Claims or might affect his, her or its decision to agree, object or not to object to the Settlement. Upon the Effective Date, Plaintiffs and all other Persons and entities whose claims are being released shall be deemed to have, and shall have, expressly waived and relinquished, to the fullest extent permitted by law, the provisions, rights and benefits of § 1542 of the California Civil Code, which provides as follows:

**"A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS WHICH THE CREDITOR DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE, WHICH IF KNOWN BY HIM OR HER MUST HAVE MATERIALLY AFFECTED HIS OR HER SETTLEMENT WITH THE DEBTOR."**

Upon the Effective Date, Plaintiffs and all other Persons and entities whose claims are being released shall be deemed to have, and shall have, waived any and all provisions, rights and benefits conferred by any law of any state, the District of Columbia or territory of the United States, by federal law, or principle of common law, or the law of any jurisdiction outside of the United States, which is similar, comparable or equivalent to § 1542 of the California Civil Code.

Plaintiffs acknowledge that they may discover facts in addition to or different from those that they now know or believe to be true with respect to the subject matter of the Release, but that it is their intention to finally and forever to settle and release the Released Claims, notwithstanding any Unknown Claims they may have, as that term is defined in this Paragraph.

12.     The Court awards to Settlement Class Counsel U.S. $1,275,000, which shall include all attorneys' fees and reimbursement of expenses associated with the Action.

13.     The Court awards to Plaintiffs U.S. $5,000, as an Incentive Award for her time and effort serving as the Class Representative in this Action.

14.     Without affecting the finality of this judgment, the Court retains exclusive jurisdiction of this Settlement, including without limitation, issues concerning its administration and consummation. The Court also retains exclusive jurisdiction over Defendant, Plaintiff, and Settlement Class members regarding the Settlement Agreement and this Final Judgment Order. Defendant, Plaintiff, and Settlement Class Members are hereby deemed to have submitted irrevocably to the exclusive jurisdiction of this Court for any suit, action, proceeding, or dispute arising out of or relating to the Released Claims, this Order, and the Settlement Agreement, including but not limited to the applicability of the Released Claims, the Settlement Agreement, or this Order. Without limiting the generality of the foregoing, any dispute concerning the Settlement Agreement, including, but not limited to, any suit, action, arbitration, or other proceeding by a Settlement Class Member in which the provisions of the Settlement Agreement are asserted as a defense in whole or in part to any claim or cause of action or otherwise raised as an objection, shall constitute a suit, action, or proceeding arising out of or relating to this Order. Solely for purposes of such suit, action, or proceeding, to the fullest extent possible under applicable law, the parties hereto and all Settlement Class Members are hereby deemed to have

irrevocably waived and agreed not to assert, by way of motion, as a defense or otherwise, any claim or objection that they are not subject to the jurisdiction of this Court, or that this Court is, in any way, an improper venue or an inconvenient forum.

15. The Settlement Agreement and the proceedings and statements made pursuant to the Settlement Agreement or papers filed relating to the Settlement Agreement, and this Order, are not and shall not in any event be deemed, used, offered or received against the Released Parties, or each or any of them, as an admission, concession or evidence of, the validity of any Released Claims, the truth of any fact alleged by the Plaintiff, the deficiency of any defense that has been or could have been asserted in the Action, the violation of any law or statute, the reasonableness of the settlement amount or the fee award (if the Settlement does not become final for any reason), the propriety of class certification for purposes of litigation, or of any alleged fault, wrongdoing, liability, or responsibility for damages by the Released Parties, or any of them—whether in this litigation or in any civil, criminal or administrative proceeding in any court, administrative agency, or tribunal.

16. The certification of the Settlement Class shall be binding only with respect to the settlement of the Action. In the event that the Settlement Agreement is terminated pursuant to its terms or the Court's approval of the Settlement is reversed, vacated, or modified in any material respect by this or any other Court, the certification of the Settlement Class shall be deemed vacated, the Action shall proceed as if the Settlement Class had never been certified (and the Defendant shall retain the right to oppose any subsequent motion for class certification), and no reference to or consideration of the Settlement Class, the Settlement Agreement, or any documents, communications, or negotiations related in any way thereto shall be made for any purpose.

17.   Based upon the Court's finding that there is no just reason for delay of enforcement or appeal of this Order notwithstanding the Court's retention of jurisdiction to oversee implementation and enforcement of the Settlement Agreement, the Court directs the Clerk to enter final judgment pursuant to Federal Rule of Civil Procedure 54(b).

It is so ordered, this 12 day of August, 2013.

_____
HONORABLE AMY J. ST. EVE
UNITED STATES DISTRICT JUDGE

# EXHIBIT J

SEAN P. REIS (sreis@edelson.com) – SBN 184044
EDELSON MCGUIRE LLP
30021 Tomas Street, Suite 300
Rancho Santa Margarita, California 92688
Phone: 949.459.2124
Fax:    949.459.2123

JAY EDELSON (jedelson@edelson.com)*
RAFEY S. BALABANIAN (rbalabanian@edelson.com)*
ARI J. SCHARG (ascharg@edelson.com)*
CHANDLER R. GIVENS (cgivens@edelson.com)*
EDELSON MCGUIRE LLC
350 North LaSalle Drive, Suite 1300
Chicago, Illinois 60654
Phone: 312.589.6370
Fax:    312.589.6378
*Admitted *pro hac vice*

*Attorneys for Plaintiffs and the Putative Class*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN JOSE DIVISION

| | |
|---|---|
| *IN RE: NETFLIX PRIVACY LITIGATION* | ) Case No. 5:11-cv-00379-EJD |
| | ) |
| | ) **DECLARATION OF JAY EDELSON IN** |
| | ) **SUPPORT OF PLAINTIFFS'** |
| | ) **MOTION FOR FINAL APPROVAL OF** |
| | ) **SETTLEMENT AND AWARD OF** |
| | ) **ATTORNEYS' FEES, EXPENSES, AND** |
| | ) **INCENTIVE AWARD** |

Pursuant to 28 U.S.C. § 1746, I hereby declare and state as follows:

1.  I am over the age of eighteen and am fully competent to make this declaration. I make this declaration based upon personal knowledge unless otherwise indicated.

2.  I am an attorney admitted to practice in the State of Illinois and in the United States District Court for the Northern District of Illinois, and other federal district courts. I make this declaration in support of Plaintiffs' Motion for Final Approval of Class Action Settlement and Award of Attorneys' Fees, Expenses, and Incentive Award.

3.      I am the managing partner at the law firm of Edelson McGuire LLC, which has been appointed lead counsel in this matter, Jeff Milans and Peter Comstock ("Plaintiffs").

4.      Attached as Exhibit 1 to this Declaration is a true and accurate copy of the firm resume of Edelson McGuire, LLC. All capitalized terms have the same meaning set forth in the simultaneously filed Brief in Support of the Motion for Final Approval of Class Action Settlement and Award of Attorneys' Fees, Expenses, and Incentive Award.

***Pre-Suit Investigation and Underlying Allegations.***

5.      The Complaint alleges Defendant Netflix, Inc. ("Netflix" or "Defendant") is the largest provider of Internet streaming media services in the United States, with over 25 million current paid subscribers. Plaintiffs are former subscribers to Netflix's services, who voluntarily cancelled their Netflix subscriptions.

6.      At the time they became Netflix subscribers, both Plaintiffs were required to provide Netflix with personal information, including their names and billing/shipping information.

7.      Netflix subscribers can access and "stream" a large library of online media through Netflix's website and other applications or, alternatively, rent physical media (*e.g.*, DVDs and Blu-ray discs) from Netflix, with such media being delivered and returned using the United States Postal Service.

8.      Over the course of their subscriptions, both Plaintiffs' media viewing histories (including material each "streamed" online and received through the mail) were stored and associated with their accounts, and Netflix suggested other videos based upon each Plaintiff's individual viewing history using a proprietary algorithm.

9.      After cancelling their Netflix subscriptions, Plaintiffs continued to periodically receive e-mails from Netflix encouraging them to re-activate their account memberships. From these e-mails, it became apparent that Netflix retained its former customers' personal contact information.

10.     Furthermore, prior to the commencement of this lawsuit and as shown by my firm's pre-suit investigation, former Netflix customers who logged back into their cancelled accounts were able to view all of the video materials that they formerly watched through Netflix's services.

11.     In light of the findings described above, it became evident that, in addition to contact information, Netflix also maintained its former customers' video programming selections.

12.     As a result of Netflix's indefinite retention of its customers' video programming selections, Plaintiff Milans filed a lawsuit against Defendant alleging, among other things, violations of the Video Privacy Protection Act, 18 U.S.C. § 2710. His lawsuit is believed to be the first class action filed specifically for violation of the VPPA's unlawful retention provision, 18 U.S.C. § 2710(e).

13.     Several other plaintiffs filed similar actions against Netflix—each arising from the same alleged indefinite retention of its customers' PII—in the United States District Court for the Northern District of California. The Court ultimately related each of these cases to *Milans*, and a leadership fight ensued between the various plaintiffs' attorneys seeking to be appointed interim class counsel. After briefing, the Court appointed me and my firm, Edelson McGuire LLC, to serve as interim lead class counsel.

14.     Before filing an amended complaint for the consolidated cases, and based on an investigation into common practices within the entertainment media industry, my firm additionally concluded that Netflix was, in all likelihood, sharing its own current and former customers' PII (including their individual viewing histories) to analytic companies in order to use and refine its own movie-recommendation algorithm, and to other third-parties who performed services on Netflix's behalf.

15.     That belief was bolstered by information on Netflix's website. In particular, Netflix's privacy policy stated that Netflix used "[third parties to] analyze and enhance data, including users' interaction with our website." Likewise, Netflix made certain changes to its privacy policy after the onset of this litigation, which further suggested disclosures had in fact been made to third parties providing various services to Netflix.

16.     After Plaintiffs filed their Consolidated Amended Class Action Complaint (Dkt. No. 61), the Parties engaged in the discovery planning conference required by Federal Rule of Civil Procedure 26.

17.     Subsequently, Plaintiffs propounded, and Netflix responded to, discovery related to

class and merits issues—including both Interrogatories and Requests for the Production of Documents.

18.     As the case moved forward, the status and strength of Plaintiffs' VPPA claim was clarified and analyzed on an on-going basis. For Plaintiffs' retention theory (*i.e.*, under 18 U.S.C. § 2710(e)), the main questions were whether a private right of action existed for a violation of subsection (e) and whether Plaintiffs' PII was still "necessary" to Netflix despite Plaintiffs' cancelled subscriptions. Plaintiffs' disclosure theory (*i.e.*, under 18 U.S.C. § 2710(b)), in comparison, was premised on the allegation that Netflix was selling its customers' PII to third-party analytic companies so as to use and refine its recommendation algorithm.

19.     During the course of the litigation, we learned that Netflix did not (and does not) sell its customers' PII for profit, or share that PII to data analytic companies in connection with its recommendation algorithm. Rather, we learned that Netflix handles all of its data analytic needs in-house and has a policy of not selling customer PII for profit. We subsequently confirmed these informational findings through the informal deposition of two Netflix executives—its Vice President of Product Engineering and its Vice President of Marketing and Analytics.

***Mediation before Judge Phillips and Execution of the Settlement Agreement.***

20.     After participating in the Court's ADR program, the Parties proceeded to private mediation and selected former District Judge Layn R. Phillips (ret.) of Irell & Manella, LLP, to serve as a mediator.

21.     On February 1, 2012, we met with Netflix's in-house and outside counsel in Santa Ana, California for the formal mediation. Among other productive discussions, the mediation involved explorations of the relative strength of Plaintiffs' claims, Netflix's defenses, and exchanges of information.

22.     As for the mediation, after a full day of arm's-length negotiations facilitated by Judge Phillips, the Parties were able to reach an agreement as to the principle terms of a settlement, which was formalized in a signed Memorandum of Understanding. The Parties did not begin to discuss attorneys' fees or incentive awards until after all relief for the Class was established and settled. Additionally, when fees were discussed, it was insisted that fees be calculated as a

percentage of the common fund, such that attorneys' fees would be inextricably linked to the recovery for the Class.

23. After executing the Memorandum of Understanding, the Parties continued to negotiate regarding the precise wording of the Settlement Agreement. To that end, my firm and counsel for Netflix exchanged many drafts of proposed settlement agreements over the following three months before ultimately executing the finalized Class Action Settlement Agreement on April 30, 2012.

24. As a part finalizing the Settlement Agreement, both Parties solicited notice proposals from class action settlement administrators and ultimately selected Kinsella Media/Rust Consulting ("Rust"), an administrator with extensive experience in providing proper notice in national class action settlements. Before selecting Rust, the Parties considered both estimates of the number of class members each solicited proposal would notify, along with an accompanying cost estimate. Rusts' plan included (1) direct notice to Class members via email, (2) publication notice, (3) a joint press release, (4) creation of a settlement website, and (5) notice to relevant government agencies.

25. The final Settlement Agreement was executed on April 30, 2012.

*Notice to the Class Members and Solicitation of* Cy Pres *Applications.*

26. Beginning on July 25, 2012, Netflix, through Rust and in accordance with the terms set out in the Settlement Agreement, caused Notice to be disseminated to the members of the Settlement Class. As detailed in the Wheatman Declaration, such notice included, among other efforts, individual emails sent directly to potential Class Members (with 62,039,868 individual emails sent on July 25, 2012), publication notice through an ad placed in *People* magazine and Internet advertising on Facebook.com from August 1, 2012 through October 14, 2012, and publication of the Settlement Website (www.VideoPrivacyClass.com) on July 24, 2012. The direct email notice, the publication notice, and the CAFA notice all contained a functioning hyperlink to, or website address for, the Settlement Website.

27. After notice was sent, my firm received over 1,000 telephonic inquires from Settlement Class Members regarding the underlying lawsuits and the Settlement itself. Our firm's practice is to try to respond to all class member inquiries, if at all possible, within 2 business days.

1   We believe we were successful in living up that standard in virtually all instances. I personally

2   spoke with over 100 Class Members who had questions about the settlement.

3          28.    In addition to the received telephone calls, we received numerous written requests

4   (mostly via email) from Settlement Class Members requesting information on the Settlement. As

5   with the telephone inquiries, we promptly responded to all written communications. Going forward,

6   our firm will continue to respond to all inquiries and provide comprehensive assistance to the Class

7   Members.

8          29.    Additionally, pursuant to the terms of the Settlement Agreement, my firm received

9   and reviewed over 40 proposals from not-for-profit entities and programs that focus on educating

10  users, regulators, and enterprises regarding issues relating to the protection of privacy, identity, and

11  personal information through user control, and to protect users from online threats. My firm also

12  responded to inquiries from entities requesting *cy pres* distributions, in order to ensure the highest

13  quality of proposals, and thus the best *cy pres* plan and ultimate result for the Class.

14         30.    In soliciting the *cy pres* proposals, the Parties suggested that applicants provide the

15  following information, to allow the Parties to make the most informed decision possible in the

16  selection process: the organization's name and address; a description of current programs relating to

17  technology, law, and privacy; how the program benefits the Class; the organization's annual

18  operating budget and the budgets of its relevant programs; the total *cy pres* distribution requested;

19  disclosure of connections between the applicant and the Parties, their counsel, Supporting Counsel,

20  or the Court; and disclosure of any amounts received from the Parties or their counsel in 2011.

21         31.    Our exhaustive review process included both a thorough review of each individual

22  application and an overall analysis of the body of applications received, so as to best determine an

23  appropriate percentage distribution among selected recipients and ensure that an ultimate *cy pres*

24  distribution would provide maximum benefit for the Class.

25         32.    Following review of the *cy pres* applications, my firm worked in conjunction with

26  counsel from Netflix to select the final proposed recipients of the Settlement's *cy pres* distribution

27  and, in accordance with the terms of the Settlement, posted a list of those proposed recipients to the

28  Settlement website on October 31, 2012.

33.     Additionally, my firm confirmed that none of the other law firms involved with the consolidated cases is affiliated with or has any nexus with the identified *cy pres* recipients. Likewise, my firm similarly does not share any affiliation or nexus with any identified *cy pres* recipients.

34.     As for the *cy pres* recipients, no organization reported a material connection between itself and the Parties, their counsel, Supporting Counsel, or the Court. Indeed, the only connections identified were:

a.      The Berkeley Center for Law & Technology ("CLT") reported that the law firm of Wilson Sonsini Goodrich & Rosati is one of over thirty (30) law firm sponsors of CLT;

b.      The Center for Democracy and Technology ("CDT") reported that it received money from a *cy pres* award in *Standiford v. Palm, Inc.*, No. 09-CV-05719-LHK (C.D. Cal. 2012), a case where Edelson McGuire, LLC was class counsel. In that case, Edelson McGuire, LLC had no contact with CDT until after the *cy pres* award was approved by the court;

c.      The International Association of Privacy Professionals ("IAPP"), reported that two Netflix employees are current IAPP members and that other employees, both past and present, of Netflix and the law firms representing the Parties in this case may have attended IAPP conferences or other forums;

d.      The Markkula Center for Applied Ethics reported that Netflix CEO Reid Hastings once attended a three-day Aspen Institute seminar taught by Kirk Hanson, the Executive Director of the Markkula Center for Applied Ethics;

e.      The Privacy Project at UC Hastings reported that Judge Davila is a 1979 alumnus of UC Hastings; Judge Davila's wife, the Honorable Judge Mary J. Greenwood, is a 1981 alumna of UC Hastings; and in May of 2012, Judges Davila and Greenwood made a $250.00 cash gift to the La Raza Law Student Organization at UC Hastings;

f.      The Stanford Center for Internet and Society ("CIS") reported that its Director of Civil Liberties was an attorney at a law firm representing the defendant in

*Deacon v. Pandora Media, Inc.*, Case No. 11-CV04674-SBA (N.D. Cal. 2011)—a privacy case brought by Edelson McGuire, LLC. Additionally, CIS reported that Judge Davila taught trial advocacy at Stanford Law School before his appointment as a federal judge.

35.     In Class Counsel's view, if the Settlement receives final approval, the selected *cy pres* recipients will provide real, tangible, and immediate benefits to the Class by educating the public and raising awareness of privacy issues, working with businesses to ensure compliance with best privacy practices, and developing new technologies to give consumers control over their information privacy.

***Class Counsel's Analysis of the Class's Claims.***

36.     Before agreeing to settle—and since settling—Plaintiffs' claims under the VPPA, my firm was careful to analyze the likelihood of certifying an adversarial VPPA class using both unlawful disclosure and retention theories, winning at trial or via summary judgment under both theories, and what relief the Class might expect through continued litigation and at what additional cost.

37.     If the litigation were to proceed, in my opinion Netflix would raise several colorable defenses to Plaintiffs' claims—many of which would be create issues of first impression within this Circuit. Specifically, Netflix would likely argue that it retained Plaintiffs' PII for one of the purposes for which it was collected—maintaining their viewing histories and preferences in the event they renewed their subscriptions—that Plaintiffs lacked a private right of action to sue for unlawful retention under the VPPA, and that Plaintiffs lacked Article III standing to sue.

38.     Netflix would likely also raise several other weaker arguments that would be, in my opinion, virtually certain to fail, including that Plaintiffs consented to the ongoing retention and disclosure of their data by agreeing to the Netflix privacy policy when they created their accounts, that the statute of limitations had run, and that the VPPA is unconstitutional.  By my estimate, the chance of any of these weaker defenses succeeding is less than ten percent (10%).

*Plaintiffs' Unlawful Disclosure Theory.*

39.     Considering the information provided by Netflix at the February 1, 2012 mediation, my firm estimated the likelihood of succeeding on the merits under a theory of unlawful disclosure

at less than five percent (5%). That determination considered that while Netflix's affirmative defenses stood little chance of success, in light the above-discussed facts and the inherent uncertainties in litigation, Plaintiffs would struggle to establish a case on the merits.

40. In terms of certification under a disclosure theory, the key issues germane to the Class were all common ones (*i.e.*, whether Netflix disclosed PII and if so, how, why, to whom, for what purpose, and whether it obtained consent to do so), and we believed that the remaining requirements of Federal Rule of Civil Procedure 23 would not pose undue difficulties. That said, because of the always-present uncertainties of litigation, and lack of any direct, controlling authority on point, we estimated our likelihood of achieving adversarial class certification at eighty percent (80%).

41. Further, if a certified unlawful disclosure class were to succeed at trial, that class would theoretically be entitled to a more than $150 billion judgment pursuant to 18 U.S.C. § 2710(c)—but my firm believed that such a judgment would be unobtainable. Simply put, such an award would force Netflix out of business and the Class would be left with no relief.

42. Additionally, constitutional concerns make it extremely unlikely that a court would permit such a large recovery in light of the actual damages suffered by the Class—calculated either by Netflix's benefit from the disclosures (the factual information received in the Parties' mediation suggests that such disclosures did not happen, and the number would be zero) or actual harm to the Class members (a small to trifling amount, if any).

43. Accordingly, Class Counsel believe that a best-case recovery under Plaintiffs' unlawful disclosure theory may recover at or under $3 million for the Class, plus attorneys' fees.

*Plaintiffs' Unlawful Retention Theory.*

44. As for Plaintiffs' unlawful retention theory under the VPPA, my firm was acutely aware that Netflix was going to argue that all of the collected PII was still necessary for the purpose for which it was collected (which is a defense under the VPPA). That is, we anticipated that Netflix would argue that the PII was collected for purposes of improving its algorithm, and thus remains perpetually necessary to keep. We also anticipated that Netflix would claim that the PII was collected and kept for other valid reasons, like accounting and tax treatment. We also expected

challenges to the statute on constitutional grounds, including that the pertinent language was unconstitutionally vague. Finally, we anticipated that Netflix would claim that the VPPA did not apply to it. We believed that we would ultimately defeat each and every defense Netflix mounted. Nevertheless, in recognition of the novel issues presented by our case, we estimated the likelihood of succeeding on the merits at just better than a coin-flip; i.e., fifty-five percent (55%).

45.     In terms of certification under a retention theory, once again all the key issues are common ones: the purposes for which Netflix collected its subscribers' PII, whether and for how long retention of that PII was "necessary," and whether Netflix continued to retain such PII after it was no longer necessary to do so. Accordingly, as with Plaintiffs' disclosure theory, we were confident in Plaintiffs' chances at adversarial certification proceedings and estimated the likelihood of achieving adversarial class certification under an unlawful retention theory at eighty percent (80%).

46.     In terms of a possible recovery at trial, Plaintiffs' unlawful retention theory carries many of the same risks as the unlawful disclosure theory—except that, in addition, federal courts considering the issue have thus far held that the VPPA's statutory damages do not apply to claims brought under subsection (e). Accordingly, Class Counsel believe that any recovery would be tied to actual damages suffered by the Class.

47.     In any event, and as supported by the report of Dr. Serge Egelman (attached to Plaintiffs' Plaintiffs' Motion for Final Approval of Class Action Settlement and Award of Attorneys' Fees, Expenses, and Incentive Award as Exhibit B-2), Class Counsel estimated that a chance of recovering at least the actual damages of those Class members who overpaid for their subscriptions (*i.e.*, the difference between the charges they did pay, on the one hand, and the amount they would have been willing to pay had they known that Netflix was going to violate the VPPA's unlawful retention provision, on the other) was around fifty-five percent (55%), and that actual damages were no more than $4.65 million. In my view, if Plaintiffs pursued an unlawful retention claim based upon actual damages alone, they would not be foreclosed by the recent court decisions regarding the VPPA's private right of action, because they could bring damages claims under state consumer protection laws.

48.     While Dr. Egelman based his aggregate damages figure on publicly available data about Netflix subscribers, Class Counsel, because of confidential information obtained through discovery regarding the Class composition, recognizes that Dr. Egelman over-estimates the number of Class members who are former Netflix subscribers. Nonetheless, for purposes of analyzing harm to the class and potential recoveries at trial, we assume the damages figures calculated by Dr. Egelman in our calculations.

49.     If Plaintiffs pursued statutory-damages on their unlawful retention claims, they would, as described above, face an uphill battle based on recent case law. Nonetheless, I believe that the one (now-reversed) opinion to find statutory damages available for unlawful retention claims was well-reasoned, and that Plaintiffs stand a one-in-four chance (25%) of ultimately convincing the court that statutory damages are available for VPPA retention claims.

50.     If Plaintiffs were able to recover statutory damages for their unlawful retention claims, I believe that those damages would again be limited by due process principles to a single-digit multiplier of actual damages. Thus, in my opinion, Plaintiffs could not recover at trial more than $46,500,000 in statutory damages, plus fees, on claims of unlawful retention.

*Other Considerations.*

51.     In addition to the above analysis, Class Counsel have estimated that if Settlement had not been reached, obtaining a final judgment for the Class would take at a minimum, an additional three years.

52.     Finally, Class Counsel believe that—had litigation proceeded to and beyond trial—Plaintiffs' stood a forty-four percent (44%) chance (*i.e.*, fifty-five percent (55%) chance of winning on the merits multiplied by an eighty percent (80%) of obtaining and keeping adversarial class certification) of obtaining injunctive relief similar to that obtained by the Settlement.

### Class Counsel's Opinion of the Settlement Agreement

53.     In Class Counsel's view, this litigation has brought exceptional relief to Class Members, culminating in this benchmark settlement. Notably, the Settlement is the first, comprehensive nationwide VPPA settlement of its kind.

54.     First, throughout this case, Class Counsel and Plaintiffs maintained that any class

settlement agreement would need to include injunctive measures to ensure that the Settlement Class Members' information is not retained in a personally-identifiable format longer than necessary, without the explicit opt-in consent of the individual Settlement Class Member. This Settlement Agreement accomplishes this goal.

55.     This injunctive relief offers industry-leading privacy protection and will help prevent the intentional and unintentional use and disclosure of the Settlement Class Members' highly personal Entertainment Content Viewing Histories—the very thing the VPPA was put in place to protect. And the injunctive relief does more than merely repeating Netflix's VPPA duties; rather, it subjects Netflix to contempt of court proceedings if Netflix fails to meet the highly particularized requirements of the Settlement Agreement.

56.     Among the risks prevented by the Settlement is any desire by a company acquiring Netflix to monetize the information retained for longer than necessary. For instance, by forcing Netflix to de-couple PII upon cancellation, a company like Microsoft (which has been rumored as a potential purchaser of Netflix, *see* Eric Savitz, *Netflix Spikes on Rumors of Possible Microsoft Bid*, Forbes.com (Oct. 26, 2012), http://www.forbes.com/sites/ericsavitz/2012/10/26/netflix-spikes-on-rumors-of-possible-microsoft-bid/), would be unable to unlawfully disclose former subscribers' PII, since it could not come into possession of such information in the first place.

57.     Second, given the size of the Settlement Class (an approximated 62 million individuals) any realistically obtainable monetary award would have resulted in payments to Class Members that were negligible on an individual level, to the extent any such payments could be dispersed after factoring in related administrative costs. But rather than obtain negligible payouts, the terms of the Settlement guarantees that the Settlement Class will, instead, benefit from millions of dollars in donations to qualified organizations that educate users, regulators, and enterprises regarding issues relating to protection of privacy, identity, and personal information.

58.     Further, continued litigation would result in significant costs being expended by both Parties, including expert expenses and myriad other costs that accompany trial of a nationwide class action. Additionally, through its communications with Class Counsel, Netflix has made it clear that absent the Settlement, it would vigorously oppose adversarial certification.

59.     In light of all the risks discussed above, the significant costs that would be incurred from proceeding to trial, and from Class Counsel's perspective, the combination of the obtained injunctive and *cy pres* relief for the Settlement Class represents the best possible recovery under the circumstances of this case, and thus more than exceeds what is fair, reasonable, and adequate. As confirmation of the Settlement's more than adequate relief, all seven Plaintiffs' firms involved in this litigation—including several who were engaged in a very heated class leadership fight—unanimously agreed that the relief obtained is far beyond the fair, reasonable, and adequate standard. Together, the relief obtained ensures the Settlement Class enjoys a real benefit that is, importantly, entirely in-line with the focus of Plaintiffs' lawsuit and the goals of the VPPA's unlawful retention provision.

*Netflix's Position.*

60.     At all times, Netflix has denied and continues to deny any wrongdoing whatsoever, and denies that it committed or attempted to commit any wrongful acts or violations of law or duty, including, but not limited to, those alleged in the underlying complaints filed in this case and the Related Actions.

***Class Counsel's Experience.***

61.     Class Counsel have regularly engaged in major complex litigation on behalf of consumers, and have extensive experience in consumer class action lawsuits that are similar in size and complexity to the present case. As shown in the Firm Resume attached here as Exhibit 1, our firm has also been appointed as class counsel in numerous complex consumer class actions.

62.     Our firm also has specific experience in consumer class action litigation involving the VPPA. To that end, we are currently seeking final approval of a class of current and former Blockbuster LLC customers in the District of Minnesota (*see Missaghi v. Blockbuster, LLC*, Case No. 11-cv-2559-JRT (D. Minn.)), and are additionally litigating VPPA claims against Redbox Automated Retail, LLC (*see Sterk, et. al v. Redbox Automated Retail, LLC*, Case No. 11-cv-01729-MFK (N.D. Ill.)), and certain Sony defendants (*see Rodriguez v. Sony Computer Entertainment America LLC, et. al*, Case No. 11-cv-4084-PJH (N.D. Cal.) (currently on appeal to the Ninth Circuit)). These cases, which we have been aggressively litigating at both district and appellate

court levels for nearly two years, all deal with similar issues as in the instant one—*i.e.*, retention and disclosure claims under the VPPA.

***Class Counsel's Contribution to the Case***

63.     From the outset, Class Counsel—along with each of the other law firms involved in the consolidated cases—anticipated spending hundreds of hours litigating these claims with no guarantee of success, knew that prosecution of this case would require that other work be forgone, understood that there was substantial uncertainty surrounding the applicable legal and factual issues (particularly in this case, with Plaintiffs' untested class claims under the VPPA), and continued to prosecute the cases in the face of a substantial opposition. In total, all of the law firms involved in this case have cumulatively spent over 3,100 hours of time.

64.     The work my firm has committed to this case has been substantial. Among other efforts, my firm has:

a.  Conducted extensive pre-suit investigations, including identification and early legal analysis of the alleged business practices challenged by this case;

b.  Interviewed dozens of current and former Netflix subscribers, analyzed those customers' common experiences in light of Netflix's information retention practices, and shared—both on a formal and informal basis—information with other law firms and technology experts;

c.  Drafted and filed Plaintiff Milan's original complaint;

d.  Communicated early and often with Netflix's counsel, so as to open and maintain a dialogue regarding the Parties' respective views of the relevant facts, law, and overall direction of the litigation, along with advising Netflix of its duty to preserve all electronic data relevant to Plaintiffs' claims;

e.  Coordinated and prepared for an in-person meeting with Netflix's counsel on March 7, 2011 at JAMS in Los Angeles, California, during which the Parties discussed the factual matters at issue (e.g., the type of customer information retained by Netflix and the advanced algorithms used to collect that information) and possibilities for resolving the lawsuit;

f.  Briefed and responded to motions seeking appointment as interim class counsel;

g.  Facilitated collaboration between all attorneys providing representation in the cases that were ultimately consolidated, so as to discuss views regarding the claims and facts at issue and coordinate efforts;

h.  Drafted and filed the operative Amended Consolidated Class Action Complaint (Dkt. No. 61);

i.  Prepared Rule 26(a)(1) disclosures and reviewed and analyzed those filed by Netflix;

j.  Propounded/reviewed discovery on/from Netflix, including twenty-five (25) interrogatories and fifty-nine (59) requests for the production of documents;

k.  Participated in Court-ordered telephonic ADR conferences on October 27 and November 29, 2011, which resulted in a stipulation to attend private mediation;

l.  Prepared a mediation brief, which fully presented Plaintiffs' factual contentions and legal theories and responded to Netflix's defenses;

m.  Participated in a full-day mediation with Netflix on February 2, 2012 in Santa Ana, California, resulting in the drafting of a Memorandum of Understanding outlining the underlying settlement structure;

n.  Engaged in continued communication, negotiations, and the exchange of settlement drafts with Netflix's counsel, which resulted in the drafting and execution of the finalized Settlement Agreement;

o.  Successfully briefed and moved for preliminary approval of the Settlement;

p.  Pursuant to the terms of the Settlement, effectuated notice to class members and hired additional staff to help respond to Class Member inquires via telephone and email;

q.  Solicited, received, and reviewed applications from over 40 potential *cy pres* recipients in conjunction with Netflix's counsel, and ultimately selected proposed recipients;

r.  Took actions to protect the class from attorneys who attempted to improperly interfere with the *cy pres* process for their own personal gains; and

s.  Began researching and drafting responses to objections that have already been raised in response to the Settlement, along with those that Class Counsel anticipate will be raised.

65.     Our firm's billable rates and the hours of each attorney who worked on these matters are incorporated in the chart below. In my opinion, the expenditure of time by the attorneys and Edelson McGuire staff that worked on these cases was reasonable and necessary. Our firm's practice generally, which we followed in this case, is to use a collaborative effort in the drafting of all major court filings, exhibits and other important documents. Although several lawyers were involved in the litigation of this matter, each made a conscious effort to minimize the duplication of work and I have reviewed the hours submitted, and subtracted time that I deemed to be unnecessary or duplicative. Additionally, in recognition that complete efficiency cannot always be achieved, we have reduced our base lodestar to account for any unintended inefficiencies.  Accordingly, the above attorney time is adjusted inasmuch as we exercised billing judgment, resulting in reduction of our lodestar by five percent (5%).  Nevertheless, taking these cases on a contingency basis and not being paid by the hour, we had an incentive to conduct our efforts efficiently. So too, being responsible for advancing all expenses, we had an incentive not to expend funds unnecessarily.

66.     I believe that our firm, Edelson McGuire, assumed a significant risk of non-payment in initiating and prosecuting these case given the novelty of legal issues involved and the vigorous defense that Defendant did and was prepared to raise in litigation had the Parties' settlement efforts failed.

67.     As is the general practice of most law firms, each of the attorneys and law clerks at Edelson McGuire are responsible for keeping track of their billable time. The majority of these records were centralized in a billing management software program to which all employees had access, known as "BigTime." Some attorneys used legacy systems to track their billable time, which have the ability to later be uploaded into "BigTime." On February 13, 2012, Edelson McGuire implemented a new billing management software program, known as "FreshBooks," which was used by almost all of our attorneys to track their time from that point forward.

68.     Based on my experience doing plaintiff's class action work and my knowledge of the billing rates of other firms that pursue complex consumer class action litigation, I believe that the attorneys performing work on this litigation—including those attorneys employed at the law firms involved in all of the consolidated cases—are billed at rates that correlate to their respective experience, that are reasonable in the Chicago and California legal markets, and are at or below the average rates of attorneys with similar backgrounds and experience. Additionally, state and federal courts have approved our prevailing hourly billing rates in substantially similar litigation.

69.     The rates listed are the same rates we use for hourly clients, which comprise a material part of our firm's revenues. The hours, rates, and experience of the particular attorneys involved in this matter are provided in the chart below:

| Attorney (position) | Hours | Hourly Rate | Total |
|---|---|---|---|
| Jay Edelson Managing Partner Edelson McGuire LLC | 573.3 | $630 | $361,179.00 |
| Rafey S. Balabanian Partner Edelson McGuire LLC | 608.7 | $500 | $304,350.00 |
| Steven Lezell Woodrow | 50.6 | $500 | $25,300.00 |

| Attorney (position) | Hours | Hourly Rate | Total |
|---|---|---|---|
| Partner Edelson McGuire LLC | | | |
| Steven Teppler Former of counsel Edelson McGuire LLP | 10.5 | $600 | $6,300.00 |
| William Gray Former Associate Edelson McGuire LLC | 67.4 | $395 | $26,623.00 |
| Ari J. Scharg Associate Edelson McGuire LLC | 296.0 | $365 | $108,040.00 |
| Ben Richman Associate Edelson McGuire LLC . | 48.2 | $345 | $16,629.00 |
| Chandler Givens Associate Edelson McGuire LLC | 317 | $295 | $93,515.00 |
| Ben Thomassen Associate Edelson McGuire LLC | 132.90 | $295 | $39,205.50 |
| David Dale Incoming Associate (admission pending) Edelson McGuire LLC | 5.5 | $250 | $1,375.00 |
| Alicia Hwang Incoming Associate (admission pending) Edelson McGuire LLC | 8.25 | $250 | $2,062.50 |
| Nick Larry Incoming Associate (admission pending) Edelson McGuire LLC | 132.94 | $250 | $33,235.00 |
| David Mindell Incoming Associate (admission pending) Edelson McGuire LLC | 4.4 | $250 | $1,100.00 |
| Jordan Savage Contract Associate (admission pending) Edelson McGuire LLC | 77 | $250 | $19,250.00 |
| Daniel Spector Contract Associate (admission pending) Edelson McGuire LLC | 14.1 | $250 | $3,525.00 |
| Law Clerks | 77.4 | $215 | $16,641.00 |

| Attorney (position) | Hours | Hourly Rate | Total |
|---|---|---|---|
| Edelson McGuire LLC | | | |
| **Total Current Lodestar** | **2,424.19** | | **$1,058,330.00** |
| **5% Reduction** | | | **$52,916.50** |
| **Total Current Adjusted Lodestar** | **2,424.19** | | **$1,005,413.50** |

70. Based on my experience, I anticipate that our firm will expend at least an additional $100,000 in attorney time over the next several weeks. To that end, we must still attend the final approval hearing, respond to objectors, and remain involved with the Settlement as it is implemented. In addition, our firm remains committed to the Class Members, and will continue to provide comprehensive assistance by responding to all Class Members' inquiries regarding the Settlement and advising them on how to proceed.

71. Given that Class Counsel and Supporting Counsel have billed $1,352,025.00 and are requesting $2.25 million in attorneys' fees in this case, Class Counsel are requesting a lodestar multiplier of 1.66, which is entirely appropriate given the substantial risks faced in prosecuting this litigation. Class Counsel's fee request also comports with the Ninth Circuit's benchmark 25% award in common fund cases, and, when the value of the injunctive relief is considered, equals only 16.5% of the value recovered.

72. In addition to this amount, Class Counsel have expended $40,404.92 in reimbursable expenses, such as filing fees, expert fees, appearance fees, mediation fees, mailing, travel, lodging, copying, and case administration, with more expenses yet to come. Every effort was made to keep these expenses at a minimum. Additionally, the fact that Class Counsel agreed to limit reimbursable costs to only $25,000, while total expenses for all seven Plaintiffs' firms is $47,502.56, further demonstrates the Settlement's absolute reasonableness.

***Class Representatives' Contribution to the Case***

73. As with our firm, from the onset each of the Class Representatives and named-Plaintiffs in the Related Actions have been involved in this litigation and have admirably stood up to Netflix—a huge, popular corporation with vast resources and a strong legal team. This is

especially true with regard to Milans and Comstock, who have been mentioned countless times in the many media reports that have covered this lawsuit.

74.    As confirmed by my own communications with supporting counsel, none of the named-Plaintiffs in the Related Actions were promised they would receive an award of any kind or that Class Counsel would seek any specific award on their behalf. Rather, the requested incentive award only seeks to compensate the Class Representatives and named-Plaintiffs for their time, effort, and contributions to this case.

75.    To that end, throughout the course of this litigation, the Class Representatives and named-Plaintiffs have remained committed to the Classes, have contributed their own time and expended effort toward the litigation of these matters, and are thus deserving of the proposed incentive award.

***The Class's Reaction to the Settlement***

76.    At the time of filing for final approval, the opt-out and objection deadline in this case is still two weeks away. Nonetheless, given the reaction of the Class thus far, I anticipate that the total number of opt-outs and objections will demonstrate the Class's overwhelmingly positive reaction to the Settlement.

77.    To date, 2,157 class members have excluded themselves (0.003% of the Class) from the Settlement, and 97 have objected (0.00016% of the Class), all of whom filed *pro se*. Additionally, thus far, no federal or state official has objected to the Settlement.

78.    Class Counsel anticipate that because of the publicity associated with this suit, the size of the Class, and the size of the Settlement, there will be further objections, particularly from professional objectors delaying their filings as long as possible in order to increase their leverage.

79.    To date, Class Counsel have already witnessed particularly concerning behavior from would-be professional objectors. One California law firm appeared to have fabricated imaginary client-objectors in an attempt to gain access to privileged information, while a Chicago-based firm went so far as to solicit a public interest organization to object to, rather than participate in, the *cy pres* application process.

80.     The conduct of the Chicago-based firm, Krislov Law, warrants further discussion. Specifically, it is our understanding that the Krislov Law firm, led by John Orellana—a yet to be licensed member of the bar—took affirmative steps to locate and contact one or more not-for-profit organizations that were in the process of submitting *cy pres* applications pursuant to the Court's preliminary approval order.  When he contacted the applicant(s), Orellana specifically targeted non-attorneys, even though he knew (or should have known) that the applicant(s) had in house attorneys and/or retained outside firms.  Orellana's and the Krislov firm's goal was to discourage the applicant(s) from participating in the settlement and instead retain the Krislov firm to represent the applicant(s) in filing an objection to the settlement.  In short, they cynically attempted to damage the Class's benefits under the Settlement in order to then manufacture a client and an objection that the Settlement was deficient[1].

81.     Class Counsel will continue investigating the extent of Orellana's and the Krislov firm's interference with the *cy pres* process and take necessary actions to protect the interests of the class.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on October 31, 2012 at Chicago, Illinois.

                        /s/ Jay Edelson
                        Jay Edelson

---

[1]     Indeed, the only stake a *Cy Pres* Organization would have in objecting would be if the process were set up to unfairly exclude them.

# EXHIBIT K

1
2
3
4
5
6
7
8

UNITED STATES DISTRICT COURT

9

NORTHERN DISTRICT OF CALIFORNIA

10

SAN JOSE DIVISION

11

| | | |
|---|---|---|
| IN RE: NETFLIX PRIVACY LITIGATION | ) | Case No.: 5:11-CV-00379 EJD |
| | ) | |
| | ) | **ORDER GRANTING FINAL** |
| | ) | **APPROVAL OF CLASS ACTION** |
| | ) | **SETTLEMENT; APPROVAL OF** |
| | ) | **CY PRES AWARDS; AWARD OF** |
| | ) | **ATTORNEYS' FEES AND** |
| | ) | **EXPENSES AND INCENTIVE** |
| | ) | **AWARD** |
| | ) | |
| | ) | |
| | ) | **[Re: Docket No. 191]** |

18
19
20

The instant case is a putative class action suit brought by former Netflix subscribers Jeff

Milans and Peter Comstock (collectively "Plaintiffs") against Defendant Netflix, Inc. ("Netflix").

Presently before the Court is the Motion for Final Approval of Class Action Settlement and Award

of Attorneys' Fees ("Final Approval Motion"). See Docket Item No. 191. Having reviewed the

Settlement Agreement and the parties' and objectors' arguments and papers, the Court has

determined that the present Motion will be GRANTED for the reasons set forth below.

21
22
23
24
25
26
27
28

Case No.: 5:11-CV-00379 EJD
ORDER GRANTING FINAL APPROVAL OF CLASS ACTION SETTLEMENT; APPROVAL
OF CY PRES AWARDS; AWARD OF ATTORNEYS' FEES AND EXPENSES AND
INCENTIVE AWARD

United States District Court
For the Northern District of California

## I.    Background

On January 26, 2011, Plaintiff Milans initiated this class action, claiming that Netflix unlawfully retained and disclosed his Entertainment Content Viewing History and other personally identifiable information ("PII") located on Netflix's website and that of thousands of other Netflix customers. See Docket Item No. 1. Among other claims, Milans alleged violations of the Video Privacy Protection Act ("VPPA"), 18 U.S.C. § 2710. Id. A wave of similar suits followed, and on August 12, 2011, the Court consolidated six cases, granted Plaintiffs leave to file an Amended and Consolidated Class Complaint, and appointed Jay Edelson of Edelson McGuire, LLC as interim lead Class Counsel. See Docket Item No. 59.

After a mediation overseen by retired United States District Court Judge Layn R. Phillips, the parties reached a settlement agreement ("Settlement Agreement"). The parties notified the Court of settlement on February 10, 2012. See Docket Item No. 10. The full Settlement Agreement is attached as Exhibit A to Plaintiff's Final Approval Motion. See Docket Item No. 191 Ex. A. The Court will summarize the key terms of the Settlement Agreement for the purposes of the present Final Approval Motion:

- Class Definition. The class was defined as follows: "[A]ll Subscribers as of the date of entry of Preliminary Approval. Excluded from the Settlement Class are the following: (i) the Settlement Administrator, (ii) the Mediator, (iii) any respective parent, subsidiary, affiliate or control person of the Defendant or its officers, directors, agents, servants, or employees as of the date of filing of the Action, (iv) any judge presiding over the Action and the immediate family members of any such person(s), (v) persons who execute and submit a timely request for exclusion, and (vi) all persons who have had their claims against Defendant fully and finally adjudicated or otherwise released." Settlement Agreement § 1.38. The size of the class amounts to approximately 62 million individuals.

Case No.: 5:11-CV-00379 EJD
ORDER GRANTING FINAL APPROVAL OF CLASS ACTION SETTLEMENT; APPROVAL OF CY PRES AWARDS; AWARD OF ATTORNEYS' FEES AND EXPENSES AND INCENTIVE AWARD

- **Injunctive Relief**. The Settlement Agreement requires Netflix to decouple Entertainment Content Viewing Histories from customers' identification and payment methods within one year of the Effective Date of Settlement.  <u>Id.</u> § 2.1.

- **Settlement Fund**. Netflix has agreed to pay a total amount of $9,000,000.00 into a Settlement Fund. <u>Id.</u> § 2.3. The Fund will be used for payment of Settlement Administration Expenses, a fee award to Class Counsel, and incentive award to the Class Representatives and Named Plaintiffs. <u>Id.</u> § 2.3. The balance of the Fund will be distributed to <u>cy pres</u> recipients. <u>Id.</u>

- **Settlement Administration Expenses**. Plaintiffs have calculated these costs to be $114,570.58 with additional expected costs of $35,000.00. <u>See</u> Final Approval Motion at 24.

- **Fee Award to Class Counsel**. Netflix has agreed to pay Class Counsel a fee award of up to 25% of the amount of Settlement Fund—$2,250,000.00—plus reimbursement of up to $25,000.00 of costs and expenses. <u>Id.</u> at 24.

- **Incentive Award to Class Representatives**. Netflix has agreed to pay Class Representatives Milans and Comstock as well as the named-plaintiffs in the Related Actions, a collective incentive award in the amount of $30,000.00. <u>See</u> Settlement Agreement § 9.2.

- **Cy Pres Distribution**. The parties have agreed to distribute the balance of the Settlement Fund to not-for-profit organizations, institutions, and programs for the purpose of educating "users, regulators, and enterprises regarding issues relating to protection of privacy, identity, and personal information through user control, and to protect users from online threats." <u>Id.</u> § 2.4.1. The parties have selected twenty such organizations which will "spend the funds solely on privacy protection and education efforts." Final Approval Motion at 23. A list of the twenty proposed <u>cy pres</u> recipients and explanation

Case No.: 5:11-CV-00379 EJD
ORDER GRANTING FINAL APPROVAL OF CLASS ACTION SETTLEMENT; APPROVAL
OF <u>CY PRES</u> AWARDS; AWARD OF ATTORNEYS' FEES AND EXPENSES AND
INCENTIVE AWARD

of how they intend to use the funds is provided in the Final Approval Motion as well as posted on the litigation website (www.videoprivacyclass.com). The precise disbursement from the Settlement Fund to each of these organizations was filed with the Court. <u>See</u> Notice of Proposed Cy Pres Award Recipients, Docket Item No. 193.

- <u>Release of Claims</u>. In exchange for the relief explained above, the Settlement Agreement provides that Netflix and each of its related affiliates and entities will be released from any claims arising out of, relating to, or regarding the alleged retention and disclosure of Plaintiffs' and the Settlement Class's personally identifiable information, Video Rental History, and other information, including but not limited to all claims that were brought, alleged, argued, raised, or asserted in any pleading or court filing in the Action. <u>See</u> Settlement Agreement §§ 1.31, 1.32, 1.33, 1.42, 3.

Plaintiffs moved the Court to preliminarily approve the settlement on May 25, 2012. <u>See</u> Docket Item No. 76. The Court granted this motion on July 5, 2012. <u>See</u> Am. Order Grant'g Mot. for Prelim. Approval of Class Action Settlement ("Preliminary Approval Order"), Docket Item No. 80. Pursuant to the Preliminary Approval Order, Class Notice, including notice of the hearing on the final approval of the class action settlement, was sent to the Class. The Court received over 100 Objections to the settlement.

A hearing on the final approval of the settlement was held on December 5, 2012 where the Court heard arguments of counsel as well as that of individual class member objectors. <u>See</u> Minute Entry, Docket Item No. 233. Plaintiffs filed the present Final Approval Motion on October 31, 2012. <u>See</u> Docket Item No. 191. In addition, Plaintiffs and Defendant each filed responses addressing the procedural and substantive issues raised by the objections. <u>See</u> Pls.' Reply Memo. in Supp. of Final Approval Mot., Docket Item No. 226; Def.'s Response to Objections to Class Action Settlement, Docket Item No. 225.

Case No.: 5:11-CV-00379 EJD
ORDER GRANTING FINAL APPROVAL OF CLASS ACTION SETTLEMENT; APPROVAL OF <u>CY PRES</u> AWARDS; AWARD OF ATTORNEYS' FEES AND EXPENSES AND INCENTIVE AWARD

## II.     Legal Standard

A class action may not be settled without court approval. Fed. R. Civ. P. 23(e). "If the proposal would bind class members, the court may approve it only after a hearing and on finding that it is fair, reasonable, and adequate." Id. When the parties to a putative class action reach a settlement agreement prior to class certification, "courts must peruse the proposed compromise to ratify both the propriety of the certification and the fairness of the settlement." Staton v. Boeing Co., 327 F.3d 938, 952 (9th Cir. 2003). "[J]udges have the responsibility of ensuring fairness to all members of the class presented for certification." Id.

The law favors the compromise and settlement of class action suits. See, e.g., Churchill Village, LLC. v. Gen. Elec., 361 F.3d 566, 576 (9th Cir. 2004); Class Plaintiffs v. City of Seattle, 955 F.2d 1268, 1276 (9th Cir. 1992); Officers for Justice v. Civil Serv. Comm'n, 688 F.2d 615, 625 (9th Cir. 1982). "[T]he decision to approve or reject a settlement is committed to the sound discretion of the trial judge because he is exposed to the litigants and their strategies, positions, and proof." Hanlon v. Chrysler Corp., 150 F.3d 1011, 1026 (9th Cir. 1998).

First, the district court must assess whether a class exists under Federal Rule of Civil Procedure 23(a) and (b). "Such attention is of vital importance, for a court asked to certify a settlement class will lack the opportunity, present when a case is litigated, to adjust the class, informed by the proceedings as they unfold." Amchem Prods. Inc. v. Windsor, 521 U.S. 591, 620 (1997). Second, the district court must carefully consider "whether a proposed settlement is fundamentally fair, adequate, and reasonable," pursuant to Federal Rule of Civil Procedure 23(e); recognizing that "[i]t is the settlement taken as a whole, rather than the individual component parts, that must be examined for overall fairness." Hanlon, 150 F.3d at 1026 (citations omitted).

Case No.: 5:11-CV-00379 EJD
ORDER GRANTING FINAL APPROVAL OF CLASS ACTION SETTLEMENT; APPROVAL OF CY PRES AWARDS; AWARD OF ATTORNEYS' FEES AND EXPENSES AND INCENTIVE AWARD

### III. The Settlement Agreement

The Court reasserts its conclusion in the Preliminary Approval Order that the Settlement Agreement "appears fair, non-collusive and within range of possible final approval" and "was a product of arm's length negotiation before a mediator and does not appear to benefit those who participated in the mediation at the expense of any other parties." Preliminary Approval Order at 4. The Court also iterates the following: "In light of the minimal monetary recovery that would be realistically recoverable by individual Settlement Class members and the immediate benefits offered to the Class by the injunctive relief and cy pres donations, the Settlement Agreement is deserving of preliminary approval." Id.

### A. Class Certification

In accordance with first step for approving a class action settlement agreement, see Windsor, 521 U.S. at 620, the Court notes that class certification is appropriate for this litigation under Federal Rule of Civil Procedure 23. Because the Objections do not appear to raise a viable challenge to that conclusion, the Court will rely on the rationale for class certification as explained in the Preliminary Approval Order. See Preliminary Approval Order at 4–6.

### B. Reasonableness of the Settlement Agreement

The Court now turns to the question of whether the Settlement Agreement is "fair, adequate, and reasonable" as prescribed under Federal Rule of Civil Procedure 23(e). In answering this question, district courts have been instructed to balance several factors: (1) the strength of the plaintiffs' case; (2) the risk, expense, complexity, and likely duration of further litigation; (3) the risk of maintaining class action status throughout the trial; (4) the amount offered in settlement; (5) the extent of discovery completed and the stage of the proceedings; (6) the experience and views of

Case No.: 5:11-CV-00379 EJD
ORDER GRANTING FINAL APPROVAL OF CLASS ACTION SETTLEMENT; APPROVAL OF CY PRES AWARDS; AWARD OF ATTORNEYS' FEES AND EXPENSES AND INCENTIVE AWARD

United States District Court
For the Northern District of California

1    counsel; (7) the presence of a governmental participant; and (8) the reaction of the class members

2    to the proposed settlement. <u>Hanlon</u>, 150 F.3d at 1026; <u>Churchill</u>, 361 F.3d at 575.

3         Courts have afforded a presumption of fairness and reasonableness of a settlement

4    agreement where that agreement was the product of non-collusive, arms' length negotiations

5    conducted by capable and experienced counsel. <u>See, e.g.</u>, <u>Garner v. State Farm Mut. Auto. Ins. Co.</u>,

6    No. 08-CV-1365-CW, 2010 WL 1687832, at *13 (N.D. Cal. Apr. 22, 2010). Because this Court

7    has concluded that the settlement negotiations were conducted free of collusion, <u>see</u> Preliminary

8    Approval Order at 4, and the Objections do not raise a viable challenge to this notion, the Court

9    will evaluate each of eight <u>Hanlon</u> approval factors under the presumption of fairness and

10   reasonableness.

11

12        **1. Strength of Plaintiff's Case**

13        In determining the probability and likelihood of a plaintiff's success on the merits of a class

14   action litigation, "the district court's determination is nothing more than an amalgam of delicate

15   balancing, gross approximations and rough justice." <u>Officers for Justice</u>, 688 F.2d at 625 (internal

16   quotation marks omitted). There is no "particular formula by which that outcome must be tested."

17   <u>Rodriguez v. West Publ'g Corp.</u>, 563 F.3d 948, 965 (9th Cir. 2009). The court may "presume that

18   through negotiation, the Parties, counsel, and mediator arrived at a reasonable range of settlement

19   by considering Plaintiff's likelihood of recovery." <u>Garner</u>, No. 08-CV-1365-CW, 2010 WL

20   1687832, at *9 (citing <u>Rodriguez v. West</u>, 563 F.3d at 965).

21        Plaintiffs have suggested that they intended to bring two theories in support of their VPPA

22   violation claims which underlie the class action. The first of these theories is that Netflix had

23   unlawfully disclosed customers' PII by providing that information to third-party analytics

24   companies working to improve Netflix's recommendation algorithm or for other purposes.

25   However, after the commencement of formal and informal discovery, Plaintiffs determined that

26

27                                         7

28   Case No.: 5:11-CV-00379 EJD
     ORDER GRANTING FINAL APPROVAL OF CLASS ACTION SETTLEMENT; APPROVAL
     OF <u>CY PRES</u> AWARDS; AWARD OF ATTORNEYS' FEES AND EXPENSES AND
     INCENTIVE AWARD

**United States District Court**
For the Northern District of California

1    Netflix had not been disclosing Netflix customers' PII to third parties. In addition, Plaintiffs

2    concluded that the third-party services theory would be unlikely to succeed given the broad

3    interpretation of the VPPA's "ordinary course of business" exception courts in this district have

4    been employing. See, e.g., Rodriguez v. Sony Computer Entm't of Am. LLC, No. 11-CV-4084-

5    PJH (N.D. Cal. Apr. 20, 2012) (granting defendant's motion to dismiss plaintiff's unlawful

6    disclosure VPPA claim for this reason). With that, and other possible defenses Netflix might have

7    raised—such as lack of Article III standing—Class Counsel has estimated that the "unlawful

8    disclosure" claims would have a 5% chance of success on the merits.

9        The second of Plaintiffs' theories of the case was that Netflix had been unlawfully retaining

10   customers' PII in violation of the VPPA. One particularly potent defense Netflix could bring in

11   response to this theory is that numerous courts have found that Congress only intended for litigants

12   suing under the VPPA to receive injunctive relief and not monetary damages. See, e.g., Rodriguez

13   v. Sony Computer Entm't of Am. LLC, No. 11-CV-4084-PJH, 2012 WL 4464563 (N.D. Cal. Sept.

14   25, 2012) (dismissing with prejudice plaintiff's unlawful retention VPPA claims for this reason);

15   Sterk v. Redbox Automated Retail, LLC, 672. F.3d 535 (7th Cir. 2012) (finding no private right of

16   action for statutory damages for a violation of 18 U.S.C. § 2710(e), VPPA's unlawful retention

17   prong); Daniel v. Cantrell, 375 F.3d 377 (6th Cir. 2004) (same). While this defense might have

18   prevented a monetary damage award under the VPPA, Class Counsel still intended to bring suit

19   under the "unlawful" prong of California's Unfair Competition Law, Cal. Bus. & Prof. Code

20   § 17200, which could have provided for monetary damages. Taking into consideration other

21   potential defenses—such as, again, lack of Article III standing—Class Counsel estimated a 55%

22   change of succeeding on the merits under the "unlawful retention" theory.

23       Class Counsel has placed a net value of the case at $6,398,667 plus fees. See Final

24   Approval Motion § III (outlining in detail the arrival at this figure). The calculation first estimates

25   the amount of recovery in the event of success on the merits after surmounting all procedural and

26

27                                           8

28   Case No.: 5:11-CV-00379 EJD
     ORDER GRANTING FINAL APPROVAL OF CLASS ACTION SETTLEMENT; APPROVAL
     OF CY PRES AWARDS; AWARD OF ATTORNEYS' FEES AND EXPENSES AND
     INCENTIVE AWARD

United States District Court
For the Northern District of California

substantive obstacles of litigation as well as takes into account various costs and fees. The calculation then takes into account the time value of money at the appropriate discount rate. The Court has concluded that this figure, derived in the course of the settlement negotiations, is reasonable for the purposes of this factor of settlement approval. Because this figure is lower than the Settlement Fund disbursement (even after the deduction of attorneys' awards and fees, incentive awards, and other costs)—not to mention the value of the injunctive relief—this factor weighs strongly in favor of approval.

### 2. Risk of Continuing Litigation

Proceeding in this litigation in the absence of settlement poses various risks such as dismissal upon a dispositive motion, potentially potent defenses, increased costs and fees, and expiration of a substantial amount of time. Such considerations have been found to weigh heavily in favor of settlement. See Rodriguez v. West, 563 F.3d at 966; Curtis-Bauer v. Morgan Stanley & Co., Inc., No. 06-C-3903 TEH, 2008 WL 4667090, at *4 (N.D. Cal. Oct. 22, 2008) ("Settlement avoids the complexity, delay, risk and expense of continuing with the litigation and will produce a prompt, certain, and substantial recovery for the Plaintiff class."). This is especially true here after taking into consideration the potential pitfalls of Plaintiffs' case, massive size of the Class, and substantial costs that would have to be incurred in order to disburse any de minimis monetary payments to Class members in the event of a litigation victory. As such, this factor weighs in favor of approval.

### 3. Risk of Maintaining Class Action Status

The notion that a district court could decertify a class at any time, Gen. Tel. Co. of Sw. v. Falcon, 457 U.S. 147, 160 (1982), is one that weighs in favor of settlement. Rodriguez v. West, 563 F.3d at 966. While this Court certified the Class in the Preliminary Approval Order—and is

9

Case No.: 5:11-CV-00379 EJD
ORDER GRANTING FINAL APPROVAL OF CLASS ACTION SETTLEMENT; APPROVAL OF CY PRES AWARDS; AWARD OF ATTORNEYS' FEES AND EXPENSES AND INCENTIVE AWARD

United States District Court
For the Northern District of California

reaffirming that certification in this Order—this certification was for settlement purposes only. In the absence of settlement, Netflix would likely vigorously oppose class certification and challenge it before or during trial as well as on appeal. As such, the risk of losing class status in the absence of settlement weighs in favor of approval.

### 4. Amount Offered in Settlement

The amount offered to the Settlement Fund for distribution totals $9,000,000.00 plus the agreed-upon injunctive relief that seeks to undo and prevent the harm Plaintiffs have sought to vindicate in bringing this class action suit. Class Counsel has valued the injunctive relief at approximately $4,650,000.00. See Final Approval Motion at 19, 32 (explaining the arrival at this figure). As noted, the value of the Settlement Agreement exceeds Class Counsel's total valuation of the case in the absence of settlement, even after accounting for the requested fee awards.

The method of distribution of the cash settlement is pursuant to cy pres remedy of distributing the funds to various institutions and organizations for the purposes of furthering privacy research, protections, and education efforts. A cy pres remedy is a settlement structure wherein class members receive an indirect benefit (usually defendant donations to a third party) rather than a direct monetary payment." Lane v. Facebook, Inc., 696 F.3d 811, 819 (9th Cir. 2012). The cy pres doctrine "allows a court to distribute unclaimed or non-distributable portions of a class action settlement fund to the next best class of beneficiaries." Nachshin v. AOL, LLC, 663 F.3d 1034, 1036 (9th Cir. 2011) (internal quotation marks omitted). Cy Pres is employed where "proof of individual claims would be burdensome or distribution of damages costly." Six Mexican Workers v. Ariz. Citrus Growers, 904 F.2d 1301, 1305 (9th Cir. 1990)). A cy pres distribution is reasonable where it "account[s] for the nature of the plaintiffs' lawsuit, the objectives of the underlying statutes, and the interests of the silent class members . . . ." Nachshin, 663 F.3d at 1036.

Case No.: 5:11-CV-00379 EJD
ORDER GRANTING FINAL APPROVAL OF CLASS ACTION SETTLEMENT; APPROVAL OF CY PRES AWARDS; AWARD OF ATTORNEYS' FEES AND EXPENSES AND INCENTIVE AWARD

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

1        In <u>Lane v. Facebook</u>, the Ninth Circuit affirmed the approval of a <u>cy pres</u> settlement

2  distribution similar to the one presently before this Court. That case, brought on behalf of a class of

3  millions, involved claims of violations of the VPPA and other privacy statutes based on allegations

4  that defendant Facebook had been gathering and disseminating the personal information of its

5  members. 696 F.3d 811. The settlement agreement included a $9.5 million cash payout to a

6  settlement fund which, after subtracting attorneys' fees and other awards and costs, would be used

7  by Facebook to set up a new charity organization whose stated purpose would be to "fund and

8  sponsor programs designed to educate users, regulators[,] and enterprises regarding critical issues

9  relating to protection of identity and personal information online through user control, and the

10  protection of users from online threats." <u>Id.</u> at 817. The Ninth Circuit concluded that this settlement

11  warranted approval because, in addition to the $9.5 million pay-out being a "substantial" sum for

12  this type of class action, "it would be burdensome and inefficient to pay the $6.5 million in <u>cy pres</u>

13  funds that remain after costs directly to the class because each class member's recovery under a

14  direct distribution would be <u>de minimis</u>." <u>Id.</u> at 824–25 (internal quotation marks omitted). The

15  <u>Lane</u> court also noted that the injunctive relief provided for under the settlement—which would

16  terminate the complained-of activity—would provide reasonable and fair relief when coupled with

17  the <u>cy pres</u> distribution. <u>Id.</u> at 825.

18        In <u>In re Google Buzz Privacy Litigation</u>, a court in this district approved a similar

19  settlement agreement in a similar privacy-related putative class action. No. 10-00672-JW, 2011

20  WL 7460099 (N.D. Cal. June 2, 2011). That case, brought on behalf of a class estimated to be in

21  the tens of millions, included allegations that defendant Google Inc. had disseminated the private

22  and personal information of users of its Google Buzz program in violation of federal privacy-

23  related and stored communications statutes. <u>Id.</u> The settlement agreement in that case included an

24  $8.5 million payout to be distributed to third-party <u>cy pres</u> recipients for the purpose of furthering

25  consumer privacy protection and security efforts. <u>Id.</u> In approving the agreement, the <u>Google Buzz</u>

26

27

28

11

Case No.: 5:11-CV-00379 EJD
ORDER GRANTING FINAL APPROVAL OF CLASS ACTION SETTLEMENT; APPROVAL
OF <u>CY PRES</u> AWARDS; AWARD OF ATTORNEYS' FEES AND EXPENSES AND
INCENTIVE AWARD

court found that the <u>cy pres</u> distribution would "provide[] an indirect benefit to the Class Members consistent with the Class Members' claims herein." <u>Id.</u> at *4.

Like in both <u>Lane</u> and <u>Google Buzz</u>, the present class action contains a very sizeable class amount. Given the sheer size of the Class (over 62 million Netflix members) each Class member would receive a <u>de minimis</u> payment in the event of a direct class cash payout. This amount would likely prove to be nullified by distribution costs. <u>See</u> <u>Lane</u>, 696 F.3d at 825. Unlike <u>Lane</u>, which essentially returned the <u>cy pres</u> funds back to the defendant for the purpose of having the defendant of set up a privacy-related organization, the present Settlement Agreement provides for distribution to already-existing third-party organizations.[1] <u>See</u> Notice of Proposed Cy Pres Award Recipients. The list of the <u>cy pres</u> recipient organizations—which the Court notes is similar to that of the <u>Google Buzz</u> <u>cy pres</u> distribution, <u>see</u> No. 10-00672-JW, 2011 WL 7460099, at *3—includes leading consumer and privacy advocacy groups and academic institutions. The organizations are located throughout the country so as to best benefit the far-reaching Class through outreach and education programs, litigation and public advocacy, development of privacy-protecting tools, and other methods.

Accordingly, the Court finds that the settlement amount—which includes the size of the cash distribution, the <u>cy pres</u> method of distribution, and the injunctive relief—to be a factor that weighs in favor of approval.

---

[1] Several judges on the Ninth Circuit have expresses disapproval of the <u>Lane</u> settlement, albeit in dissenting opinions. One of the reasons these judges took issue with that settlement involves that fact that the <u>cy pres</u> funds were to be used in part by the defendant to set up an organization to educate users about issues related to privacy and protection of their PII. <u>See</u> <u>Lane v. Facebook, Inc.</u>, No. 10-16380, No. 10-16398, 2013 U.S. App. LEXIS 3935, at *4 (9th Cir. Feb. 26, 2013), <u>denying petition for reh'g en banc</u> 696 F.3d 811 (9th Cir. 2012) (Smith, J., dissenting) ("The 'charity' is simply a bespoke creation of this settlement."); <u>Lane</u>, 696 F.3d at 832 (Kleinfeld, J., dissenting) ("Every nickel of the remainder of the $9,500,000 . . . goes not to the victims, but to an entity partially controlled by Facebook and class counsel). The <u>cy pres</u> recipients in this case, unlike the settlement in <u>Lane</u>, are already-existing charitable organizations that provide educational as well as legal services related to online privacy issues and concerns.

12

Case No.: 5:11-CV-00379 EJD
ORDER GRANTING FINAL APPROVAL OF CLASS ACTION SETTLEMENT; APPROVAL OF <u>CY PRES</u> AWARDS; AWARD OF ATTORNEYS' FEES AND EXPENSES AND INCENTIVE AWARD

United States District Court
For the Northern District of California

**5.  Extent of Discovery**

Before settlement, discovery was on-going. Plaintiffs have propounded, and Netflix responded to, formal written discovery questions including interrogatories and requests for the production of documents. <u>See</u> Final Approval Motion Ex. C, Declaration of Jay Edelson ¶¶ 64. Class Counsel also engaged in informal discovery with Netflix's Vice President of Product Engineering and its Vice President of Marketing and Analytics. <u>Id.</u> These discovery efforts allowed Plaintiff's counsel to accurately valuate by compiling information ranging from the extent to which Netflix compiled and collected PII to the number of members that might fall into the Class. <u>Id.</u> ¶¶ 62–64. While formal discovery had not been completed, Class Counsel has established that they had acquired sufficient information to make an informed decision about the valuation of the case, potential obstacles and pitfalls, and likelihood of success so to as effectively engage in settlement negotiations. As such, this factor weighs in favor of settlement. <u>See</u> <u>In re Mego Fin. Corp. Sec. Litig.</u>, 213 F.3d 454, 459 (9th Cir. 2000) ("[F]ormal discovery is not a necessary ticket to the bargaining table where the parties have sufficient information to make an informed decision about settlement.").

**6.  Experience and Views of Counsel**

The next factor the Court will consider is the experience and opinion of counsel. In evaluating this factor, the Court notes that "[p]arties represented by competent counsel are better positioned than courts to produce a settlement that fairly reflects each party's expected outcome in litigation." <u>Rodriguez v. West</u>, 563 F.3d at 967 (citing <u>In re Pac. Enters. Sec. Litig.</u>, 47 F.3d 373, 378 (9th Cir. 1995)). Moreover, "[t]he recommendations of plaintiffs' counsel should be given a presumption of reasonableness." (<u>In re Omnivision Techns., Inc.</u>, 559 F. Supp. 2d 1036, 1043 (N.D. Cal. 2009) (quoting <u>Boyd v. Bechtel Corp.</u>, 485 F. Supp. 610, 622 (N.D. Cal. 1979)). This factor weighs in favor of approval in light of Class Counsel's experience with these types of class

Case No.: 5:11-CV-00379 EJD
ORDER GRANTING FINAL APPROVAL OF CLASS ACTION SETTLEMENT; APPROVAL OF <u>CY PRES</u> AWARDS; AWARD OF ATTORNEYS' FEES AND EXPENSES AND INCENTIVE AWARD

United States District Court
For the Northern District of California

action cases rooted in issues involving online technology and consumer privacy. <u>See</u> Final Approval Motion at 36–37. The Court also notes that Class Counsel was appointed as such by this Court after a leadership fight among the seven plaintiffs' firms involved in this litigation. <u>See</u> Order Appointing Interim Class Counsel, Docket Item No. 59.

### 7. Presence of a Government Participant

Although no government entity was or is a party to this action, Netflix complied with the notice requirement of the Class Action Fairness Act (CAFA), 28 U.S.C. § 1715 and provided the requisite notice to government officials. <u>See</u> Pls.' Final Approval Mot. Ex. H. "Although CAFA does not create an affirmative duty for either state or federal officials to take any action in response to a class action settlement, CAFA presumes that, once put on notice, state or federal officials will raise any concerns that they may have during the normal course of the class action settlement procedures." <u>Garner</u>, No. 08-CV-1365-CW, 2010 WL 1687832, at *14. The Court notes that the Office Attorney General of the Texas sent a letter dated July 9, 2012, which expressed concerns regarding the proposed settlement. <u>See</u> Letter from Wade Phillips, Assistant Attorney General of Texas, to Hon. Edward J. Davila, Judge, Northern District of California (July 9, 2012) (on file with the United States District Court, Northern District of California). This letter urged the Court not to approve the settlement for similar reasons as do many of the class member Objections.[2] The Court will address—and ultimately overrule—these Objections that contain such reasoning in Part IV of this Order below.

---

[2] The letter expresses concerns with the <u>cy pres</u> nature of distribution, the fact that the individual class members do not receive monetary compensation, and that Class Counsel receives 25% of the $9,000,000.00 Settlement Fund as an award.

14

Case No.: 5:11-CV-00379 EJD
ORDER GRANTING FINAL APPROVAL OF CLASS ACTION SETTLEMENT; APPROVAL OF <u>CY PRES</u> AWARDS; AWARD OF ATTORNEYS' FEES AND EXPENSES AND INCENTIVE AWARD

United States District Court
For the Northern District of California

## 8. Reaction of Class Members

The next factor the Court must consider is the reaction of the class to the proposed settlement. Hanlon 150 F.3d at 1026. The Settlement Class consists of some 62 million members. As of November 27, 2012, 2508 class members opted out of the settlement—approximately one in every 24,800 class members. See Exclusion List, Affidavit of Tore Hodne Ex. A. Approximately 110 class members filed objections with the Court[3]—approximately one in every 560,000 class members. Courts have considered relatively low numbers of objectors compared to the class size to weigh in favor of settlement. See, e.g., Churchill, 361 F.3d at 577 (affirming approval of class action settlement with 45 objections from a 90,000-person class); Hanlon, 150 F.3d at 1027 ("[T]he fact that the overwhelming majority of the class willingly approved the offer and stayed in the class presents at least some objective positive commentary as to its fairness"); In re TD Ameritrade Acc't Holder Litig., Nos. C 07–2852 SBA, C 07–4903 SBA, 2011 WL 4079226, at *7 (N.D. Cal. Sept. 13, 2011) (finding that reaction of a class was "positive" where there were "only 23 [objections] and less than 200 [opt-outs]" out of six million class members receiving notice); Browning v. Yahoo! Inc., No. 04-C-01463-HRL, 2007 WL 4105971, at *12 (N.D. Cal. Nov. 16, 2007) (concluding that a ratio of one objector for every 100,720 class members to be a "low" objection rate "even compared to objection rates in other, similar class action settlements"); Nat'l Rural Telecomms. Coop. v. DIRECTV, Inc., 221 F.R.D. 523, 529 (C.D. Cal 2004) ("[T]he absence of a large number of objections to a proposed class action settlement raises a strong presumption that the terms of a proposed class settlement action are favorable to the class members."). The Court agrees and concludes that this factor weighs in favor of settlement. See Lane, 696 F.3d 811; Google Buzz, No. 10-00672-JW, 2011 WL 7560099. Nevertheless, the Court will still consider and

---

[3] The properness of the filing of several objections is disputed by Plaintiffs. See Pls.' Reply Memo. in Supp. of Final Approval Mot. 1 n.1. For the purposes of this Order the Court has considered the substantive arguments of all objections, even those whose properness of filing is under dispute.

Case No.: 5:11-CV-00379 EJD
ORDER GRANTING FINAL APPROVAL OF CLASS ACTION SETTLEMENT; APPROVAL OF CY PRES AWARDS; AWARD OF ATTORNEYS' FEES AND EXPENSES AND INCENTIVE AWARD

1    address the substantive arguments raised by the Objections to the Settlement Agreement in Part IV

2    of this Order below.

3

4        **C.  Notice**

5        Under Federal Rule of Civil Procedure 23(c), the parties need only provide notice

6    "reasonably certain to inform the absent members of the plaintiff class[.]" <u>Silber v. Mabon</u>, 18 F.3d

7    1449, 1454 (9th Cir. 1994) (internal quotation marks omitted). The notice need only "generally

8    describe[ ] the terms of the settlement in sufficient detail to alert those with adverse viewpoints to

9    investigate and to come forward and be heard." <u>Churchill</u>, 361 F.3d at 575 (internal quotation

10   marks omitted); <u>see also</u> <u>Mendoza v. Tucson Sch. Dist. No. 1</u>, 623 F.2d 1338, 1351 (9th Cir. 1980)

11   ("Notice in a class suit may consist of a very general description of the proposed settlement.").

12       In this case the parties created and agreed to perform a Notice Plan, which was outlined in

13   the Preliminary Approval Order. <u>See</u> Settlement Agreement § 4; Preliminary Approval Order at 6–

14   8. This plan included providing class members with notice via email, creating and maintaining a

15   settlement website containing pertinent and detailed information regarding the settlement, and

16   notification via print and online publication. The Court finds that this plan has met the

17   requirements of Rule 23 and due process and that it has been fully and properly implemented by

18   the parties and the Settlement Administrator. Additionally, as noted, the Court has found that

19   notice had been properly given to the appropriate federal and state government officials in

20   accordance with CAFA.

21

22       **D.  Attorneys' Fees**

23       Under the Settlement Agreement, Netflix has agreed to pay Class Counsel a fee award of up

24   25% of the Settlement Fund plus reimbursement of up to $25,000.00 of costs and expenses.

25   Settlement Agreement § 9.1. Accordingly, Class Counsel seeks attorneys' fees of $2,250,000.00

26

27

28

Case No.: 5:11-CV-00379 EJD
ORDER GRANTING FINAL APPROVAL OF CLASS ACTION SETTLEMENT; APPROVAL
OF <u>CY PRES</u> AWARDS; AWARD OF ATTORNEYS' FEES AND EXPENSES AND
INCENTIVE AWARD

**United States District Court**
For the Northern District of California

plus the $25,000.00 in costs and expenses. Final Approval Motion at 41. Class Counsel contends that this fee request is appropriate under the percentage-of-the-fund analysis with the lodestar cross-check.

### 1. Percentage-of-the-Fund

For common fund settlements, like the one before the Court, the Ninth Circuit has set a "benchmark" fee award at 25% of the recovery obtained. Vizcaino v. Microsoft Corp., 290 F.3d 1043 (9th Cir. 2002); In re Bluetooth Headset Prods. Liab. Litig., 645 F.3d 935 (9th Cir. 2011). A district court may depart from this benchmark after providing adequate explanation of "special circumstances" so justifying. Id. at 942. "The Ninth Circuit has set forth a non-exhaustive list of factors which may be relevant to the district court's determination of the percentage ultimately awarded: (1) the results achieved; (2) the risk of litigation; (3) the skill required and quality of work; (4) the contingent nature of the fee and the financial burden carried by the plaintiffs; and (5) awards made in similar cases." Tarlecki v. bebe Stores, Inc., No. C 05-1777 MHP, 2009 WL 3720872, at *4 (N.D. Cal. Nov. 3, 2009) (citing Vizcaino, 290 F.3d at 1048–50).

The Court finds that Class Counsel's request for $2,250,000.00 meets the Ninth Circuit's benchmark test and is appropriate under the present circumstances. The Court has taken into account the complexity of this litigation, the novelty and risk of the claims and Plaintiffs' theory of the case, potential potent defenses and weaknesses of the case, the favorable result Class Counsel has achieved on behalf of Plaintiffs and the Class, and other factors in finding that no departure from this benchmark is warranted. The Court also notes that this attorneys' award is similar to that of similar settlements involving cy pres distribution. See, e.g., Google Buzz, No. 10-00672-JW, 2011 WL 7560099; Lane v. Facebook, Inc., No. C 08-3845 RS, 2010 WL 2076916 (N.D. Cal. May 24, 2010).

17

Case No.: 5:11-CV-00379 EJD
ORDER GRANTING FINAL APPROVAL OF CLASS ACTION SETTLEMENT; APPROVAL
OF CY PRES AWARDS; AWARD OF ATTORNEYS' FEES AND EXPENSES AND
INCENTIVE AWARD

### 2. Lodestar Comparison

"[W]hile the primary basis of the fee award remains the percentage method, the lodestar [method] may provide a useful perspective on the reasonableness of a given percentage award." Vizcaino, 290 F.3d at 1050. The "lodestar method" of calculating attorneys' fees "involves multiplying the number of hours the prevailing party reasonably expended on the litigation by a reasonably hourly rate." Staton, 327 F.3d at 965 (internal quotation marks omitted). The lodestar method is merely a "cross-check" to test the percentage figure's reasonableness under the circumstances of the case; the lodestar method's limitations lie in its creating a possible incentive for counsel to expend more hours than is necessary on a litigation or to delay settlement. Vizcaino, 290 F.3d at 1050 n.5.

Here, Class Counsel calculates attorneys' fees under the lodestar method to be $1,352,025 plus costs of $47,502.56. Final Approval Motion at 50. Counsel provides sufficient support for this calculation considering reasonable hours and rates. See id. at 50–52. Moreover, the Court agrees with Class Counsel's suggested lodestar multiplier of 1.66 which would equate attorneys' fees with the amount calculated under the percentage method. This multiplier figure is comparable to other multipliers in similar approved settlements. See, e.g., Google Buzz, No. 10-00672-JW, 2011 WL 7560099; Lane, No. C 08-3845 RS, 2010 WL 2076916. As such, the Court finds that the lodestar method of fee calculation confirms the reasonableness of the percentage-based calculation.

### E. Incentive Awards

"[N]amed plaintiffs, as opposed to designated class members who are not named plaintiffs, are eligible for reasonable incentive payments." Staton, 327 F.3d at 977. In judging the appropriateness of incentive awards a district court should use "relevant factors includ[ing] the actions the plaintiff has taken to protect the interests of the class, the degree to which the class has benefitted from those actions . . . the amount of time and effort the plaintiff expended in pursuing

Case No.: 5:11-CV-00379 EJD
ORDER GRANTING FINAL APPROVAL OF CLASS ACTION SETTLEMENT; APPROVAL OF CY PRES AWARDS; AWARD OF ATTORNEYS' FEES AND EXPENSES AND INCENTIVE AWARD

United States District Court
For the Northern District of California

the litigation . . . and reasonabl[e] fear[s of] workplace retaliation." <u>Id.</u> (internal quotation marks omitted).

The Settlement Agreement provides that the Class Representatives and named Plaintiffs in the Related Actions shall receive a total Incentive Award of $30,000 from the Settlement Fund. Settlement Agreement § 9.2. The Agreement designates that "Class Counsel shall have the sole responsibility of ensuring that the collective Incentive Award is distributed appropriately . . . ." <u>Id.</u>§ 9.2. Class Counsel requests dividing this award as follows: $6000 to each of the four Class Representatives and $3000 to each of the two named Plaintiffs in the Related Actions. Final Approval Motion at 55. The Class Representatives and named Plaintiffs in this case assumed the responsibilities and burdens of acting as representatives in this lawsuit, including expending time participating in the litigation of the case with Class Counsel as well as facing public scrutiny through media coverage of this high profile suit. Accordingly, the Court finds the incentive award to be reasonable in light of the incentive award eligibility factors set forth in <u>Staton</u>.

## IV.    Objections to the Settlement Agreement and Awards

The Court now turns to the substance of the Objections to the Settlement Agreement. The Objectors bear the burden of proving any assertions they raise challenging the reasonableness of a class action settlement. <u>United States v. Oregon</u>, 913 F.2d 576, 581 (9th Cir. 1990). The Court iterates that the proper standard for approval of the settlement is whether it is fair, reasonable, adequate, and free from collusion—not whether the class members could have received a better deal in exchange for the release of their claims. <u>See</u> <u>Hanlon</u> 150 F.3d at 1027 ("Settlement is the offspring of compromise; the question we address is not whether the final product could be prettier, smarter or snazzier, but whether it is fair, adequate and free from collusion."). The Court also reasserts that the proper notice procedures were followed in this case which allowed class members

Case No.: 5:11-CV-00379 EJD
ORDER GRANTING FINAL APPROVAL OF CLASS ACTION SETTLEMENT; APPROVAL OF <u>CY PRES</u> AWARDS; AWARD OF ATTORNEYS' FEES AND EXPENSES AND INCENTIVE AWARD

to opt out of the Settlement Agreement and preserve their potential claims if they were unhappy with the results of the Agreement.

After reviewing the Objections the Court has determined that they are to be overruled.[4] The Court will provide an explanation of this determination with regard to some of the meritorious arguments raised in the Objections.

## A. Objections to the Cy Pres Nature of Funds Distribution

A majority of the Objections criticize the Settlement's use of the cy pres method of distribution of the Settlement Fund. Many of these Objections present philosophical and generalized attacks on the law providing for cy pres distribution in class action settlements. Similar Objections express disapproval that the charitable cy pres organizations, and not the class members, receive the monetary settlement funds. Objections of this nature find no support in the law; as the Court has explained, cy pres distribution has been found to be an appropriate relief mechanism. See, e.g., Lane, 696 F.3d at 819; Nachshin, 663 F.3d at 1036. Further, as noted, Plaintiffs have made a sufficient showing that the cost of distributing the settlement to the 62 million individual class members would exceed the size of the fund, thus making such a remedy cost-prohibitive and infeasible.

Other objections take issue with the process by which the cy pres recipients were selected, arguing that the individual class members should have been the ones making such decisions. Again, the law in this Circuit rejects this notion: "We do not require as part of that doctrine that settling parties select a cy pres recipient that the court or class members would find ideal. On the contrary, such an intrusion into the private parties' negotiations would be improper and disruptive

---

[4] Shortly before and after the Final Fairness hearing, there have been several requests to file and strike additional briefings in this matter. See Docket Item Nos. 231, 239, 243, 246, 253. Netflix's Motion to Strike, Docket Item No. 231, is GRANTED. Class Member Tanner's Motion for Leave to File Supplementary Memorandum, Docket Item No. 239, is DENIED. Netflix's Motion to file a Surreply, Docket Item No. 243, is DENIED. Netflix's Motion to Strike, Docket Item No. 246, is GRANTED. Class Counsel's Motion for Leave to File Instanter, Docket Item No. 253, is DENIED.

20

Case No.: 5:11-CV-00379 EJD
ORDER GRANTING FINAL APPROVAL OF CLASS ACTION SETTLEMENT; APPROVAL OF CY PRES AWARDS; AWARD OF ATTORNEYS' FEES AND EXPENSES AND INCENTIVE AWARD

United States District Court
For the Northern District of California

to the settlement process." <u>Lane</u>, 696 F.3d at 820–21; <u>see also</u> <u>Hanlon</u>, 150 F.3d at 1027. In fact, contrary to the contentions of these types of Objections, Class Counsel set up an application system which included fielding input and suggestions from Class Members as to which organizations should be named as <u>cy pres</u> recipients.

A next line of argument raised by some of these Objections challenge the types of organizations selected as <u>cy pres</u> recipients. Some suggest that funds should be distributed to other charities for the purposes of helping the poor or needy. This argument does not take into account Ninth Circuit precedent, which requires that "[c]y pres distributions account for the nature of the plaintiffs' lawsuit, the objectives of the underlying statutes, and the interests of the silent class members, including their geographic diversity." <u>Nachshin</u>, 663 F.3d at 1036. On the opposite end of the spectrum, other Objections suggest there is not a sufficient nexus between the recipients and the claims alleged in this litigation. The Court rejects these arguments having found the <u>cy pres</u> recipients to be sufficiently related to the issues that form the core of this lawsuit. As noted, the organizations provide an array of consumer advocacy, protection, and education services in the field of online privacy. As such, the Court overrules these Objections.

**B. Objections Suggesting an "In-Kind" Form Relief**

Several Objections suggest an alternative "in-kind" form of relief such as, among others, a reduction in Netflix member dues or a free month of Netflix services. These Objections have many flaws some of which include failing to demonstrate the economic feasibility of such a form of relief or failing to take into account class members who are no longer Netflix customers. But notwithstanding the weaknesses of these suggestions, the Court notes that these Objections merely suggest a different or arguably better settlement award rather than sufficiently calling into question the fairness or adequacy of the Agreement. <u>Hanlon</u>, 150 F.3d at 1027 ("Of course it is possible, as many of the objectors' affidavits imply, that the settlement could have been better. But this

21

possibility does not mean the settlement presented was not fair, reasonable or adequate.").

Accordingly, these types of Objections are overruled.

### C.  Objections to the Amount of the Settlement Fund

Several Objections call into question the amount of the Settlement Fund, claiming it is too small. As explained above, the Court has found that the amount of the cash settlement to be fair and adequate considering the strength of Plaintiffs' case, potential defenses, experience and opinion of counsel, the settlement amount of similar class action litigations, and other factors. Again, the Court has been instructed not to substitute its own judgment for that of the parties who were the ones actually engaging in the negotiations. See Pac. Enterprises Sec. Litig., 47 F.3d at 378 ("Parties represented by competent counsel are better positioned than courts to produce a settlement that fairly reflects each party's expected outcome in litigation.").

### D.  Objections to the Injunctive Relief

Another group of Objections takes issue with the injunctive relief provided for as part of the Settlement Agreement. These Objections argue that the decoupling of information is reversible or unconnected to the wrongs for which Plaintiffs sought relief in bringing this suit. Like with many of the others, these Objections do not sufficiently show that the injunctive relief is inherently unfair so as to disapprove of the Settlement Agreement. To the contrary, the injunctive relief seeks to prevent Netflix from engaging in precisely the activity which underlies this class action. In Lane, the Ninth Circuit approved of this type of injunctive relief despite objections suggesting that the complained-of activity have already been ceased by the defendant in that case. See Lane 696 F.3d at 825 (approving an injunction that required defendant Facebook to terminate the complained-of Beacon program over objections that Beacon had already been terminated). As for the Objections' suggestions that the decoupling is reversible, the Court notes that if it reversed the decoupling,

Case No.: 5:11-CV-00379 EJD
ORDER GRANTING FINAL APPROVAL OF CLASS ACTION SETTLEMENT; APPROVAL OF CY PRES AWARDS; AWARD OF ATTORNEYS' FEES AND EXPENSES AND INCENTIVE AWARD

United States District Court
For the Northern District of California

Netflix would be violating the Court-approved Settlement Agreement. As such, these Objections are overruled.

### E. Objections to Attorneys' Fees and Incentive Wards

A sizeable group number of Objections challenge the Settlement Agreement's provisions with regard to attorneys' fees for Class Counsel and incentive awards to the Named Plaintiffs and Class Representatives. These objections amount to generalized quarrels with the law regarding such fees and awards in class action settlements, the processes used to calculate such fees, and whether the fees and awards are justified in light of Settlement Agreement. These arguments ignore the well-established Ninth Circuit law regarding attorneys' fees and incentive awards, which have been addressed above. Because the Court has found that the fees and awards are reasonable and proper under the law, these objections are rejected.

## V. Conclusion and Order

For the foregoing reasons, the Court finds that the Settlement Agreement including the Award of Attorneys' Fees, Expenses, and Incentive Award, is fair, adequate, and reasonable; that it satisfies Federal Rule of Civil Procedure 23(e) and the fairness and adequacy factors of this Circuit; and that it should be approved and implemented as set out in this Court's Final Order and Judgment. The Final Approval Motion is therefore GRANTED.

Since this Order effectively disposes of the entire case, the Clerk shall close this file upon entry of Judgment.

**IT IS SO ORDERED.**

Dated: March 18, 2013

_____
EDWARD J. DAVILA
United States District Judge

23

Case No.: 5:11-CV-00379 EJD
ORDER GRANTING FINAL APPROVAL OF CLASS ACTION SETTLEMENT; APPROVAL
OF <u>CY PRES</u> AWARDS; AWARD OF ATTORNEYS' FEES AND EXPENSES AND
INCENTIVE AWARD

United States District Court
For the Northern District of California

# EXHIBIT L

# IN THE UNITED STATES DISTRICT COURT

# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| IN RE: IMPRELIS HERBICIDE MARKETING, SALES PRACTICES AND PRODUCTS LIABILITY LITIGATION | 2:11-MD-02284-GP<br><br>MDL NO. 2284 |
| THIS DOCUMENT RELATES TO<br><br>    ALL ACTIONS | **DECLARATION IN SUPPORT OF MOTION FOR ATTORNEYS' FEES AND REIMBURSEMENT OF EXPENSES** |

I, RICHARD J. ARSENAULT, declare as follows:

1.    I am a member of the law firm of NEBLETT, BEARD & ARSENAULT.  I am submitting this declaration in support of Co-Lead Counsels' petition for an award of attorneys' fees and expenses in connection with services rendered in the above-captioned action.

2.    My firm has acted as counsel for Plaintiff(s) Charles Huffman and the Classes in this action.

3.    During the course of this litigation, my firm has been involved in the following activities on behalf of the Class at the request of my fellow Co-Lead Counsel or Liaison Counsel in addition to the other activities inherent in my full, active participation in all aspects of the litigation in my role as Co-Lead Counsel:

- coordinated and managed Settlement Class Counsel's expert team, which included leading academic and industry experts from a  variety of disciplines;

- took sworn statement  at defense counsel's office in Chicago of Jon Claus, DuPont's Global Technical Product Manager, regarding issues associated with latency and the biodegradation process;

- active participation in the lengthy settlement negotiations and the associated due diligence and drafting various generations of settlement agreement from inception to final agreement;

- assisted in responding to hundreds of inquiries from Class Members and Class Members' attorneys; provided status reports, details regarding the proposed Settlement and answered associated questions;

- document review and analysis of evidence uncovered during the discovery process;

- preparation and attendance at all court hearings and conferences;

- preparation and participation in weekly (or as needed) Co-Lead Counsel conference calls;

- provided litigation updates as needed to fellow Settlement Class Counsel; and

- active participation in pleadings, motion practice and associated research.

4. During the litigation, my firm kept contemporaneous time and expense records. At the request of Co-Lead Counsel and Liaison Counsel, we regularly submitted time and expense reports based on these records to Labaton Sucharow, LLP.

5. The schedule attached as **Exhibit 1** is a detailed summary indicating the amount of time—by category—spent by the partners, attorneys, and other professional support staff of my firm who were involved in the work described above undertaken at the request or under the direction of Co-Lead Counsel and Liaison Counsel in this litigation, and the lodestar calculation based on my firm's current billing rates from inception of the case through June 30, 2013, as well as the status of the billing person (partner, associate, or paralegal) and number of years admitted to the bar (or its equivalent). The schedule was prepared from contemporaneous, daily time records regularly prepared and maintained by my firm, which have been provided to Co-Lead Counsel and Liaison Counsel for review. The lodestar calculations exclude time for any work related to this case unless such work was authorized by

2

Co-Lead or Liaison Counsel.  The hourly rates for the partners, attorneys, and professional

support staff in my firm included in **Exhibit 1** are the same as the usual and customary hourly

rates currently charged for their services in similar complex class action litigation matters.

      6.      The total number of hours expended on this litigation by my firm from inception

through June 30, 2013 on the work described above is **1,771.75** hours.  The total lodestar

expended on this litigation by my firm from inception through June 30, 2013 on the work

described above is **$1,120,588.50**.

      7.      My firm's lodestar figures are based on the firm's current billing rates, which do

not include charges for expense items.  Expense items are billed separately, and such charges

are not duplicated in my firm's billing rates.

      8.      As detailed in **Exhibit 2**, my firm has incurred a total of **$52,526.72** in

unreimbursed expenses incurred from the inception of this litigation through June 30, 2013 in

connection with its performance of work in this litigation as described above.

      9.      The expenses incurred by my firm in this action are reflected on the books and

records of my firm.  These books and records were prepared from expense vouchers, check

records, and other similar source materials and represent an accurate recordation of the

expenses incurred.

      I declare under penalty of perjury under that the foregoing statements are true and

correct.

      Executed on this 5th day of August 2013 at Alexandria, Louisiana.

                      /s/ Richard J. Arsenault
                      **RICHARD J. ARSENAULT**

Exhibit 1

<span style="color:red">**EXHIBIT 1**</span>

**In re Imprelis Herbicide Marketing, Sales Practices, and Products Liability Litigation**

**TIME REPORT**

FIRM NAME:      **Neblett, Beard & Arsenault**
REPORTING PERIOD:   **Inception through June 30, 2013**

(1) Investigations
(2) Discovery
(3) Pleadings, Briefs
(4) Court Appearances & Preparation

(5) Settlement
(6) Class Certification
(7) Trial & Preparation
(8) Case Management & Litigation Strategy

| Name | Status / Number of Years Admitted | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | Current Hourly Rate | Total Hours This Period | Lodestar This Period | Cumulative Hours | Cumulative Lodestar |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Richard J. Arsenault | P/33 | 97.65 | 95.95 | 95.20 | 47.50 | 180.20 | 0.10 | 21.60 | 522.65 | 750.00 | 1,060.85 | 795,637.50 | 1,060.85 | 795,637.50 |
| LaToya Burrell | A/4 | | 1.50 | | | | | | | 450.00 | 1.50 | 675.00 | 1.50 | 675.00 |
| Jennifer Hoekstra | A/6 | 5.55 | 3.45 | 9.40 | | 6.05 | | | 10.35 | 595.00 | 34.80 | 20,706.00 | 34.80 | 20,706.00 |
| Laura Singletary | A/4 | | | 18.60 | | | | | 13.80 | 450.00 | 32.40 | 14,580.00 | 32.40 | 14,580.00 |
| Mary Nell Bennett | A/4 | 2.00 | | | | | | | | 450.00 | 2.00 | 900.00 | 2.00 | 900.00 |
| Douglas Rushton | A/2 | 86.25 | 76.35 | 88.00 | 48.00 | 60.75 | | 3.50 | 276.60 | 450.00 | 639.45 | 287,752.50 | 639.45 | 287,752.50 |
| Todd Campbell | A/6 | | | | | | | | 0.75 | 450.00 | 0.75 | 337.50 | 0.75 | 337.50 |
| | | | | | | | | | | | - | - | - | - |
| | | | | | | | | | | | - | - | - | - |
| | | | | | | | | | | | - | - | - | - |
| | | | | | | | | | | | - | - | - | - |
| | | | | | | | | | | | - | - | - | - |
| | | | | | | | | | | | - | - | - | - |
| | | | | | | | | | | | - | - | - | - |
| | | | | | | | | | | | - | - | - | - |
| TOTAL | | 191.45 | 177.25 | 211.20 | 95.50 | 247.00 | 0.10 | 25.10 | 824.15 | | 1,771.75 | 1,120,588.50 | 1,771.75 | 1,120,588.50 |

Status
Partner (P)
Associate (A)
Paralegal (PL)

Number of Years Admitted
The number of years admitted to the bar (for attorneys) or the number of years of law-related employment

[E.g., P / 15]

# EXHIBIT M

# IN THE UNITED STATES DISTRICT COURT

# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| IN RE: IMPRELIS HERBICIDE MARKETING, SALES PRACTICES AND PRODUCTS LIABILITY LITIGATION | 2:11-MD-02284-GP<br><br>MDL NO. 2284 |
| THIS DOCUMENT RELATES TO<br><br>ALL ACTIONS | **DECLARATION IN SUPPORT OF MOTION FOR ATTORNEYS' FEES AND REIMBURSEMENT OF EXPENSES** |

I, Fred Taylor Isquith, declare as follows:

1.     I am a member of the law firm of Wolf Haldenstein Adler Freeman & Herz LLP. I am submitting this declaration in support of Co-Lead Counsels' petition for an award of attorneys' fees and expenses in connection with services rendered in the above-captioned action.

2.     Until the resignation as a partner by Adam Levitt and his substitution as co-lead counsel in February, 2013, my Firm was co-lead counsel and was attorney of record for Plaintiff Suzanne Miller and the Classes in this action. Thereafter, my Firm has remained in the case as counsel.

3.     During the course of this litigation, my firm has been involved in the following activities on behalf of the Class and as co-lead counsel or, after February, 2013, at the request or under the direction of Co-Lead Counsel: conducted factual and legal research, drafted and filed pleadings, engaged in settlement negotiations, participated in discovery, reviewed expert materials and correspondence with experts, and all other aspects of prosecuting the case.

4.      During the litigation, my firm kept contemporaneous time and expense records. We regularly submitted time and expense reports based on these records to Labaton Sucharow, LLP.

5.      The schedule attached as **Exhibit 1** is a detailed summary indicating the amount of time—by category—spent by the partners, attorneys, and other professional support staff of my firm who were involved in the work described above undertaken as Co-Lead Counsel in this litigation, and the lodestar, calculation based on my firm's current billing rates from inception of the case through June 30, 2013, as well as the status of the billing person (partner, associate, or paralegal) and number of years admitted to the bar (or its equivalent).  As qualified by paragraph 4 hereof, the schedule was prepared from contemporaneous, daily time records regularly prepared and maintained by my firm, which have been provided to Co-Lead Counsel and Liaison Counsel for review.  The hourly rates for the partners, attorneys, and professional support staff in my firm included in **Exhibit 1** are the same as the usual and customary hourly rates currently charged for their services in similar complex class action litigation matters; and are charged to clients in non-contingency cases.

6.      As qualified by paragraph 4 hereof, the total number of hours expended on this litigation by my Firm from inception through June 30, 2013 on the work described above is 1562.9 hours.  The total lodestar expended on this litigation by my firm from inception through June 30, 2013 on the work described above is $944,710.00.

7.      My firm's lodestar figures are based on the firm's current billing rates, which do not include charges for expense items.  Expense items are billed separately, and such charges are not duplicated in my firm's billing rates.

8.      As detailed in **Exhibit 2**, my firm has incurred a total of $50,556.57 in unreimbursed expenses incurred from the inception of this litigation through June 30, 2013 in connection with its performance of work in this litigation as described above.

9.      The expenses incurred by my firm in this action are reflected on the books and records of my firm.  These books and records were prepared from expense vouchers, check records, and other similar source materials and represent an accurate recordation of the expenses incurred.

10.      I declare under penalty of perjury under that the foregoing statements are true and correct.

Executed on this 6th day of August 2013 at New York, NY.

_____
                Fred Taylor Isquith

/724254

Exhibit 1

EXHIBIT 1

**In re Imprelis Herbicide Marketing, Sales Practices, and Products Liability Litigation**

**TIME REPORT**

FIRM NAME: Wolf Haldenstein Adler Freeman & Herz LLP
REPORTING PERIOD: Inception - June 30, 2013

(1) Investigations
(2) Discovery
(3) Pleadings, Briefs
(4) Court Appearances & Preparation

(5) Settlement
(6) Class Certification
(7) Trial & Preparation
(8) Case Management & Litigation Strategy

| Name | Status / Number of Years Admitted | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | Current Hourly Rate | Total Hours This Period | Lodestar This Period | Cumulative Hours | Cumulative Lodestar |
|------|------|------|------|------|------|------|------|------|------|------|------|------|------|------|
| Daniel Krasner | P / 47 | | | | 2 | 4.1 | | | 3.9 | $890.00 | 10.0 | $8,900.00 | 10.0 | $8,900.00 |
| Fred T. Isquith | P / 41 | 0.4 | 2.5 | | 1.8 | 13.4 | | | 28.2 | $840.00 | 46.3 | $38,892.00 | 46.3 | $38,892.00 |
| Mark C. Silverstein | P / 29 | | | | | 1.3 | | | 3.6 | $505.00 | 4.9 | $2,474.50 | 4.9 | $2,474.50 |
| Mark C. Rifkin | P / 28 | | | | | | | | 0.3 | $765.00 | 0.3 | $229.50 | 0.3 | $229.50 |
| Stacey Kelly Breen | P / 12 | | | 1.2 | | | | | | $545.00 | 1.2 | $654.00 | 1.2 | $654.00 |
| Adam J. Levitt | P / 20 | 41.7 | 212.9 | 249.4 | 62.1 | 131 | 45.2 | | 246.7 | $710.00 | 989.0 | $702,190.00 | 989.0 | $702,190.00 |
| Beth A. Landes | A / 2 | | | 29 | | | | | | $355.00 | 29.0 | $10,295.00 | 29.0 | $10,295.00 |
| Lydia A. Keaney | A / 5 | 12.8 | 7.8 | 38.1 | | | | | | $385.00 | 58.7 | $22,599.50 | 58.7 | $22,599.50 |
| Edmund S. Aronowitz | A / 7 | 4 | 5.3 | 1 | | | | | | $395.00 | 10.3 | $4,068.50 | 10.3 | $4,068.50 |
| John E. Tangren | A / 10 | | 138.8 | 46.9 | | 28.7 | | | 35.5 | $445.00 | 249.9 | $111,205.50 | 249.9 | $111,205.50 |
| Joseph Weiss | PL / 20 | 30 | | | | | | | | $295.00 | 30.0 | $8,850.00 | 30.0 | $8,850.00 |
| Luis D. Caraballo | PL / 5 | | | | | | | | 33.5 | $195.00 | 33.5 | $6,532.50 | 33.5 | $6,532.50 |
| James A. Cirigliano | PL / 16 | 1 | | | | | | | 3.5 | $305.00 | 4.5 | $1,372.50 | 4.5 | $1,372.50 |
| Jillaine E. Gill | PL / 6 | | | | | | | | 10.6 | $255.00 | 10.6 | $2,703.00 | 10.6 | $2,703.00 |
| Tony Gjata | PL / 12 | | 8.5 | | | | | | | $415.00 | 8.5 | $3,527.50 | 8.5 | $3,527.50 |
| Sorah Kim | PL / 6 | 6.5 | 9.1 | 1.5 | | | 2 | | 54.8 | $265.00 | 73.9 | $19,583.50 | 73.9 | $19,583.50 |
| Derek Behnke | PL / 12 | 0.2 | | 2.1 | | | | | | $275.00 | 2.3 | $632.50 | 2.3 | $632.50 |
| TOTAL | | 96.6 | 384.9 | 369.2 | 65.9 | 178.5 | 47.2 | 0.0 | 420.6 | | 1562.9 | $944,710.00 | 1562.9 | $944,710.00 |

Status
Partner (P)
Associate (A)
Paralegal (PL)

Number of Years Admitted
The number of years admitted to the bar (for attorneys) or the number of years of law-related employment

/724087

# EXHIBIT N

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

IN RE MICHAELS STORES PIN PAD
LITIGATION

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

This Documents Relates to All Actions

Case No. 1:11-cv-03350

<u>CLASS ACTION</u>

Honorable Thomas M. Durkin

## DECLARATION OF FRED T. ISQUITH IN SUPPORT OF
## AN AWARD OF ATTORNEY'S FEES AND COSTS, AND
## <u>AWARD OF INCENTIVE FEES TO NAMED PLAINTIFFS</u>

I, Fred Taylor Isquith, being competent to testify, make the following declaration based on my own personal knowledge and the records of my law office.

1.      I am an attorney duly licensed to practice in the State of New York.  I am a partner of the law firm Wolf Haldenstein Adler Freeman & Herz LLP a New York limited liability partnership, as well as Wolf Haldenstein Adler Freeman & Herz, LLC, organized under the laws of Illinois ("Wolf Haldenstein").

2.      Wolf Haldenstein is a full-service law firm that has provided legal services to its clients since 1888.  Wolf Haldenstein's Litigation Group has been recognized by courts throughout the Country as effective and experienced in securities, consumer, ERISA and antitrust class actions and shareholder rights litigation.  Wolf Haldenstein has extensive experience in the litigation, trial and settlement of complex class actions.

3.      Attached hereto as Exhibit A is a current resume detailing Wolf Haldenstein's experience.

4.      This declaration is in support of plaintiffs' motions for final approval of the class action settlement, certification of a nationwide settlement class, an award of attorneys' fees and expenses, and awards of incentive fees to the named plaintiffs in connection with the proposed settlement.

## Matters Relating to Attorney's Fees and Costs

5. All of Wolf Haldenstein's work on this matter has been purely contingent in nature.

6. Wolf Haldenstein has maintained detailed and contemporaneous records of the time spent by its lawyers, law clerks, and paralegals on this action. I have carefully reviewed the time records and I believe them to be accurate. Attached hereto is a summary of the hours recorded in the electronic database of Wolf Haldenstein for the litigation of this matter and applicable rates. All of the time we are claiming was reasonably devoted to advancing and protecting the interests of our clients and the public in this case, and would have been billed to a fee-paying client. This time does not include any time spent on fee-related work.

7. Throughout my involvement in this case, I did my part in ensuring that the tasks necessary to prosecute this case were allocated among the attorneys in my offices, and were conducted efficiently, without undue duplication of effort, and at minimal expense. Not being paid by the hour, plaintiffs' counsel in this case had an incentive to conduct their efforts efficiently. So too, being responsible for advancing all expenses, plaintiffs' counsel had an incentive not to expend funds unnecessarily.

8. The hours expended reflect the distinct contributions of each timekeeper.

9. As of March 20, 2013, the total number of attorney hours spent on this case by my firm has been over 465.5 hours and the total number of paralegal hours spent on this case by my firm has been over 14.5 hours. A detailed accounting of the hours spent by each Wolf Haldenstein timekeeper and their hourly rate are reflected in Exhibit B attached hereto.

10. The total hours billed by our firm on this matter as of March 20, 2013, is 479.0 hours. The total lodestar based on our current rates is $236,668.50 as of that same date. The rates charged for all timekeepers are consistent with the rates charged in this forum for similar work performed by attorneys of comparable skill, experience, and reputation. The hourly rates of the partners listed in the attached Exhibit, as well as the associates, have been approved by

various courts. Expenses are accounted for and billed separately and are not duplicated in our professional billing rates.

11. Our full-detailed time records for professional services will be available at the final approval hearing or at any other time, should the Court wish to inspect it. It is not attached hereto due to concerns of waiver of privilege and/or attorney work product.

12. As of March 20, 2013, our firm expended a total of $11,498.00 in unreimbursed out-of-pocket costs and expenses in connection with the prosecution of this litigation. Detailed expenses are reflected in Exhibit C hereto.

13. The actual expenses incurred in the prosecution of this case are reflected on the computerized accounting records of my law office. Those accounting records are prepared by accounting staff from receipts and check records and accurately reflect all actual expenses incurred.

14. Upon request, we will provide the Court with copies of documentation for each of the costs listed above and itemized in the attached Exhibits.

15. During the course of this case, our firm was involved in communicating with the plaintiffs by telephone and email, in addition to various in-person meetings. Our firm has received feedback and direction from the Plaintiffs we represent at different times during the litigation, including during the negotiation process leading up to the pending settlement. Based on the effort that they devoted to this case, my experience with awards in other class actions, and my interpretation of federal case law, an award of compensation to them of $2,500 each for their time, effort, and perseverance in representing the interests of the class is justified and reasonable.

16. I believe the Settlement reached in this matter is an excellent result, I consider the Settlement Agreement to be fair, adequate and reasonable, and believe it to be in the best interest of the Class as a whole.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed this 20th day of March, 2013, at New York, New York.

_____
Fred T. Isquith

*In re Michaels Stores Pin Pad Litigation*

**FIRM:  Wolf Haldenstein Adler Freeman & Herz LLP**

**Inception through March 11, 2013**

| Timekeepers | Status | Hourly Rate* | Total Hours to Date | Total Lodestar to Date |
|---|---|---|---|---|
| Daniel W. Krasner | P | $890.00 | 4.50 | $4,005.00 |
| Fred T. Isquith | P | $840.00 | 2.00 | $1,680.00 |
| Mark C. Silverstein | P | $505.00 | 3.20 | $1,616.00 |
| Adam J. Levitt | P | $710.00 | 144.60 | $102,666.00 |
| Edmund S. Aronowitz | A | $395.00 | 310.20 | $122,529.00 |
| Joseph Weiss | PL | $295.00 | 11.00 | $3,245.00 |
| Sorah Kim | PL | $265.00 | 3.50 | $927.50 |
| **TOTALS** | | | **479.00** | **$236,668.50** |

*All hours billed at current rates.

/712300

**EXHIBIT B**

### *In re Michaels Stores Pin Pad Litigation*

Wolf Haldenstein Adler Freeman & Herz LLP
Expense Report
Inception through March 11, 2013

| DESCRIPTION | CUMULATIVE EXPENSES |
|---|---|
| Computer Research | $2,217.15 |
| Filing Fees | $350.00 |
| Internal Reproduction/Copies/Printing/Scanning | $848.55 |
| Litigation Fund Assessments | $5,000.00 |
| Postage/Express Delivery/Messenger | $364.82 |
| Service of Process | $55.00 |
| Telephone/Facsimile | $448.64 |
| Transcript Costs | $76.50 |
| Travel/Meals/Carfare | $2,137.34 |
| **TOTAL EXPENSES** | **$11,498.00** |

/712300

# EXHIBIT C

# EXHIBIT O

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

IN RE MICHAELS STORES PIN PAD
LITIGATION

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

This Documents Relates to All Actions

Case No. 1:11-cv-03350

CLASS ACTION

Honorable Thomas M. Durkin

## ORDER APPROVING SETTLEMENT

The Court has (1) reviewed and considered the terms and conditions of the proposed Settlement as set forth in the Stipulation of Settlement ("Stipulation") dated December 7, 2012; (2) reviewed and considered the application of Class Counsel for an award of attorneys' fees, costs, and expenses; (3) held a Fairness Hearing after being satisfied that notice to the Settlement Class has been provided in accordance with the Court's Order Granting Preliminary Approval to Proposed Class Settlement entered on December 19, 2012 (the "Preliminary Approval Order"); (4) taken into account any objections submitted prior to the Fairness Hearing in accordance with the Preliminary Approval Order, and the presentations and other proceedings at the Fairness Hearing; (5) considered the Settlement in the context of all prior proceedings had in this litigation. Accordingly, the Court enters the following **FINDINGS and CONCLUSIONS**:

A.      Capitalized terms used in this Order that are not otherwise defined herein shall have the meaning assigned to them in the Stipulation.

B.      The Court has subject matter jurisdiction over this Lawsuit and all acts within this Lawsuit, and over all the parties to this Lawsuit, including all members of the Settlement Class.

C.     The Settlement Class conditionally certified in the Preliminary Approval Order has been appropriately certified for settlement purposes. Class Counsel and the Class Representatives have fairly and adequately represented the Settlement Class for purposes of entering into and implementing the Settlement.

D.     The notice to putative Settlement Class Members consisted of a quarter black and white page ad that ran on January 10, 2013 and January 14, 2013 in USA Today with circulation in the areas of the stores at which the Compromise occurred. The Settlement Administrator also created a website where potential Settlement Class Members could obtain a more detailed Settlement Notice and that provided a list of stores at which the Compromise occurred. Michaels provided a link on the front page of Michaels.com to the Settlement Administrator's website and posted notices in the eighty-six (86) affected stores. Michaels further provided notification on receipts in the eighty-six (86) affected stores during the Settlement Notice period. The Court finds that this notice (i) constituted the best notice practicable under the circumstances, (ii) constituted notice that was reasonably calculated, under the circumstances, to apprise the putative Settlement Class Members of the pendency of the Lawsuit, and of their right to object and to appear at the Fairness Hearing or to exclude themselves from the Settlement, (iii) was reasonable and constituted due, adequate, and sufficient notice to all persons entitled to be provided with notice, and (iv) fully complied with due process principles and Federal Rule of Civil Procedure 23.

E.     The Court has held a Fairness Hearing to consider the fairness, reasonableness, and adequacy of the Settlement and has been advised that no objections to the Settlement have been filed.

F.      The Settlement is the product of good faith, arm's length negotiations between the Plaintiffs and Class Counsel, on the one hand, and Michaels and its counsel, on the other hand.

G.      The Settlement, as provided for in the Stipulation, is in all respects fair, reasonable, adequate, and proper, and in the best interest of the Settlement Class. In reaching this conclusion, the Court considered a number of factors, including: (1) the strength of Plaintiffs' case compared to the amount of Michaels' settlement offer, (2) an assessment of the likely complexity, length and expense of the litigation, (3) an evaluation of the amount of opposition to settlement among affected parties, (4) the opinion of competent counsel, and (5) the stage of the proceedings and the amount of discovery completed at the time of settlement. *Synfuel Tech., Inc. v. DHL Express (USA), Inc.*, 463 F.3d 646, 653 (7th Cir. 2006).

H.      A list of those Settlement Class Members who have timely elected to opt out of the Settlement and the Settlement Class, and who are therefore not bound by the Settlement, the provisions of the Stipulation, this Order and the Final Judgment to be entered by the Clerk of the Court hereon, has been submitted to the Court in the Declaration of the Settlement Administrator (attached as Exhibit A to Plaintiffs' Memorandum of Law in Support of Joint Motion for Order Certifying Settlement Class and Final Approval of Settlement, hereinafter "Garcia Decl."), filed in advance of the Fairness Hearing. All Settlement Class Members (as permanently certified below) shall be subject to all of the provisions of the Settlement, the Stipulation, this Order, and Final Judgment to be entered by the Clerk of the Court.

On the basis of the foregoing findings and conclusions, as well as the submissions and proceedings referred to above, **NOW THEREFORE, IT IS HEREBY ORDERED, ADJUDGED, AND DECREED:**

## Certification of Class and Approval of Settlement

1.      The Settlement and the Stipulation are hereby approved as fair, reasonable, adequate, and in the best interests of the Settlement Class, and the requirements of due process and Federal Rule of Civil Procedure 23 have been satisfied. The parties are ordered and directed to comply with the terms and provisions of the Stipulation.

2.      The Court having found that each of the elements of Federal Rules of Civil Procedure 23(a) and 23(b)(3) are satisfied, for purposes of settlement only, the Settlement Class is permanently certified pursuant to Federal Rule of Civil Procedure 23, on behalf of the following persons:

> all customers who purchased items at a Michaels store location from January 1, 2011, to May 12, 2011, whose Payment Card was swiped on one of the Tampered PIN Pad Terminals.
>
> Excluded from the "Settlement Class," "Settlement Class Members," or "Class Members" are Defendant and its affiliates, parents, subsidiaries, employees, officers, agents, and directors. Also excluded is any judicial officer presiding over this matter and the members of their immediate families and judicial staff. Also excluded are any individuals or entities who "opt out" of the Settlement.

The putative Settlement Class Members identified on the list submitted to the Court as having timely and properly elected to opt out from the Settlement and the Settlement Class are hereby excluded from the Settlement Class and shall not be entitled to any of the benefits afforded to the Settlement Class Members under the Stipulation. The Court readopts and incorporates herein by reference its preliminary conclusions as to the satisfaction of Rules 23(a) and (b)(3) set forth in

the Preliminary Approval Order and notes again that because this certification of the Class is in connection with the Settlement rather than litigation, the Court need not address any issues of manageability that may be presented by certification of the nationwide class proposed in the Settlement.

3. For purposes of Settlement only, Plaintiffs are certified as representatives of the Settlement Class and Class Counsel is appointed counsel to the Settlement Class. The Court concludes that Settlement Class Counsel and the Settlement Class Representatives have fairly and adequately represented the Settlement Class with respect to the Settlement and the Stipulation.

4. Notwithstanding the certification of the foregoing Settlement Class and appointment of the Class Representatives for purposes of effecting the Settlement, if this Order is reversed on appeal or the Stipulation is terminated or is not consummated for any reason, the foregoing certification of the Settlement Class and appointment of the Class Representatives shall be void and of no further effect, and the parties to the proposed Settlement shall be returned to the status each occupied before entry of this Order without prejudice to any legal argument that any of the parties to the Stipulation might have asserted but for the Stipulation.

Release and Injunctions Against Released Claims

5. The Settlement Class and each member of that class, including Class Representatives (who shall not opt-out), jointly and severally, shall, and hereby do fully release and discharge Michaels and Released Parties from any and all claims, judgments, liens, losses, debts, liabilities, demands, obligations, guarantees, penalties, costs, expenses, attorneys' fees, damages, indemnities, actions, causes of action, and obligations of every kind and nature in law, equity or otherwise, known or unknown, suspected or unsuspected, disclosed or undisclosed,

contingent or accrued, arising out of or in any way relating to the Compromise, or any matter or event occurring up to the execution of this Stipulation, arising out of the dispute which is the subject of the Lawsuit or which could have been asserted in the Lawsuit based on the facts alleged, whether in contract, tort, local law, or violation of any state or federal statute, rule or regulation, arising out of, concerning, or in connection with any act or omission by or on the part of Released Parties, including, without limitation, claims for violation of the Stored Communications Act, 18 U.S.C. § 2702, *et seq.*, the Illinois Consumer Fraud and Deceptive Business Practices Act, 815 ICLS 505/1, *et seq.*, the New Jersey Consumer Fraud Act, N.J.S.A. § 56:8-19, any other consumer protection statutes under state or federal law, negligence, negligence *per se*, breach of contract, breach of implied contract, quasi-contract, or equitable claims, based on the facts alleged in the Lawsuits, and/or arising out of or in relation to the Compromise, from January 1, 2011, through the date of Final Approval of the settlement by the Court ("Released Claims"). Released Claims include any unknown claims that members of the Settlement Class do not know or suspect to exist in their favor, which if known by them, might have affected this Stipulation with Michaels and release of Released Parties.

6.     The Settlement Class Members are permanently enjoined from filing, commencing, prosecuting, intervening in, participating in as class members or otherwise, or receiving any benefits or other relief from, any other lawsuit in any state, territorial or federal court, or any arbitration or administrative or regulatory or other proceeding in any jurisdiction, which asserts claims based on or in any way related to the Released Claims. In addition, Settlement Class Members are enjoined from asserting as a defense, including as a set-off or for any other purpose, any argument that if raised as an independent claim would be a Released Claim.

## Applications for Attorneys' Fees, Costs, and Expenses

7. The Court has reviewed the application for an award of fees, costs, and expenses submitted by Class Counsel and the exhibits, memoranda of law, and other materials submitted in support of that application. The Court recognizes that Michaels has not opposed an award of attorneys' fees and costs of $1,200,000. This agreement is in addition to the other relief to be provided to Class Members under the Stipulation. On the basis of its review of the foregoing, the Court finds that Class Counsel's request for attorneys' fees and expenses is fair, reasonable, and appropriate and hereby awards fees and expenses to Class Counsel in the aggregate amount of $1,200,000, to be paid in accordance with the terms of the Stipulation. The Court further awards $55,565.26 in litigation expenses, as well as $2,500 to each of the ten named Plaintiffs as an incentive award, both the litigation expenses and incentive awards (totaling $80,565.26) to be paid from the fund to be created by Defendant pursuant to the terms of the Settlement.

## Other Provisions

8. Neither the Stipulation nor any provision therein, nor any negotiations, statements or proceedings in connection therewith shall be construed as, or be deemed to be evidence of, an admission or concession on the part of the Plaintiffs, and any Settlement Class Member, Michaels, or any other person of any liability or wrongdoing by them, or that the claims and defenses that have been, or could have been, asserted in the Lawsuit are or are not meritorious, and this Order, the Stipulation or any such communications shall not be offered or received in evidence in any action or proceeding, or be used in any way as an admission or concession or evidence of any liability or wrongdoing of any nature or that Plaintiffs, any Settlement Class Member, or any other person has suffered any damage; *provided, however*, that the Stipulation, this Order, and the Final Judgment to be entered thereon may be filed in any action by Michaels

or Settlement Class Members seeking to enforce the Stipulation or the Final Judgment by injunctive or other relief, or to assert defenses including, but not limited to, *res judicata*, collateral estoppel, release, good faith settlement, or any theory of claim preclusion or issue preclusion or similar defense or counterclaim. The Stipulation's terms shall be forever binding on, and shall have *res judicata* and preclusive effect in, all pending and future lawsuits or other proceedings as to Released Claims and other prohibitions set forth in this Order that are maintained by, or on behalf of, the Settlement Class Members or any other person subject to the provisions of this Order.

9.   In the event the Stipulation does not become effective or is canceled or terminated in accordance with the terms and provisions of the Stipulation, then this Order and the Final Judgment shall be rendered null and void and be vacated and all orders entered in connection therewith by this Court shall be rendered null and void.

<u>Entry of Judgment</u>

10.   The Clerk of the Court is directed to enter the Final Judgment in the form attached to this Order dismissing all Released Claims with prejudice as to Michaels.

**SO ORDERED** this ___17___ day of ___April___ 2013.

_____
HONORABLE THOMAS M. DURKIN
UNITED STATES DISTRICT JUDGE

# EXHIBIT P

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | |
|---|---|
| IN RE MICHAELS STORES PIN PAD LITIGATION | Case No. 1:11-cv-03350 |
| | CLASS ACTION |
| - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - | Honorable Thomas M. Durkin |
| This Documents Relates to All Actions | |

## DECLARATION OF ANTONIO VOZZOLO IN SUPPORT OF FINAL SETTLEMENT APPROVAL, AWARD OF ATTORNEY'S FEES AND COSTS, AND AWARD OF INCENTIVE FEES TO NAMED PLAINTIFFS

I, Antonio Vozzolo, being competent to testify, make the following declaration based on my own personal knowledge and the records of my law office.

1.  I am an attorney duly licensed to practice before all of the court of the State of New York and I am admitted *pro hac vice* in this Court.  I am a partner of the law firm of Faruqi & Faruqi, LLP ("Faruqi & Faruqi"), one of the Co-Lead Counsel appointed by this Court in its December 19, 2012 Order.

2.  Faruqi & Faruqi is a national law firm with offices in New York, Philadelphia, Ft. Lauderdale and Los Angeles.  Faruqi & Faruqi's practice focuses on complex and class action litigation involving consumer, antitrust, financial, corporate governance, and securities matters. Faruqi & Faruqi has extensive experience in the litigation, trial and settlement of complex class actions.

3.  Attached hereto as Exhibit A is a current resume detailing Faruqi & Faruqi's experience.

4.  This declaration is in support of plaintiffs' motion for final approval of the class action settlement, certification of a nationwide settlement class, an award of attorneys' fees and expenses, and awards of incentive fees to the named plaintiffs in connection with the proposed settlement.

### Matters Relating to Attorney's Fees and Costs of Faruqi & Faruqi

5.      All of Faruqi & Faruqi's work on this matter has been purely contingent in nature.

6.      Faruqi & Faruqi has maintained detailed and contemporaneous records of the time spent by its lawyers, law clerks, and paralegals on this action.  I have carefully reviewed the time records and I believe them to be accurate.  Listed below is a summary of the hours spent litigating this matter and applicable rates.  All of the time we are claiming was reasonably devoted to advancing and protecting the interests of our client and the public in this case, and would have been billed to a fee-paying client.  This time does not include any time spent on fee-related work.

7.      Throughout my involvement in this case, I did my part in ensuring that the tasks necessary to prosecute this case were allocated among the attorneys in my office and were conducted efficiently, without undue duplication of effort, and at minimal expenses.  Not being paid by the hour, plaintiffs' counsel in this case had an incentive to conduct their efforts efficiently.  So too, being responsible for advancing all expenses, plaintiffs' counsel had an incentive not to expend funds unnecessarily.

8.      The hours expended reflect the distinct contributions of each timekeeper.

9.      As of February 1, 2013, the total number of attorney hours spent on this case by my firm has been over 577.75 hours.  The following attorneys worked on this case:

| Attorney | Hours | Rate |
|---|---|---|
| Nadeem Faruqi (Partner) | 18.75 | $850.00 |
| Antonio Vozzolo (Partner) | 283.50 | $650.00 |
| Christopher Marlborough (Associate) | 169.75 | $535.00 |
| Courtney Maccarone (Associate) | 47.50 | $390.00 |
| Javier Hidalgo (Associate) | 58.25 | $375.00 |

10.      As of February 1, 2013, the total number of paralegal hours spent on this case by my firm has been 49 hours.  The following paralegals worked on this case:

| Paralegal | Hours | Rate |
|---|---|---|
| Teresa Maloney | 15.00 | $265.00 |
| Lilia Volynkova | 23.50 | $260.00 |
| Bryan Rodriguez | 5.50 | $235.00 |
| Danielle Serpica | 5.00 | $235.00 |

11.     The total hours billed as of February 1, 2013, is 626.75.  The total lodestar based on the law firm's current rates is $343,950.00 as of that same date.  The rates charged for all timekeepers are consistent with the rates charged in this forum for similar work performed by attorneys of comparable skill, experience, and reputation.  The hourly rates of the partner listed above, as well as the associates have been approved by various courts.  Expenses are accounted for and billed separately and are not duplicated in our professional billing rates.

12.     My law firm's full-detail invoice for professional services will be available at the final approval hearing or at any other time, should the Court wish to inspect it.  It is not attached hereto due to concerns of waiver of privilege and/or attorney work product.

13.     I expect my law firm to devote additional time and resources to this matter prior to final approval.

14.     As of February 1, 2013, my firm expended a total of $19,583.43 in unreimbursed out-of-pocket costs and expenses in connection with the prosecution of this litigation.  The expenses break down as follows:

| Category | Total |
|---|---|
| Commercial Copies | $482.16 |
| Computer & Other Research Fees (Lexis/Westlaw/Bloomberg) | $2,981.23 |
| Courier & Overnight Delivery Services | $156.00 |
| Court Filing/Service Fee(s) | $4,456.20 |
| Document Retrieval Service | $281.23 |
| Pre-Litigation Expert/Consult. | $1,800.00 |
| Litigation Fund Assessment | $5,000.00 |
| Postage | $121.20 |

| | |
|---|---|
| Reproduction (Internal) | $212.67 |
| Telephone/Fax | $314.20 |
| Travel Expenses (including hotels, meals & transportation) | $3,778.54 |
| Total | $19,583.43 |

15.     The actual expenses incurred in the prosecution of this case are reflected on the computerized accounting records of my law office.  Those accounting records are prepared by accounting staff from receipts and check records and accurately reflect all actual expenses incurred.

16.     Upon request, we will provide the Court with copies of documentation for each of the costs itemized above.

17.     During the course of this case, our firm was involved in communicating with the plaintiffs by telephone and email, in addition to various in-person meetings.  Our firm has received feedback and direction from the Plaintiffs we represent at different times during the litigation, including during the negotiation process leading up to the pending settlement.  Based on the effort that they devoted to this case, my experience with awards in other class actions, and my interpretation of federal case law, an award of compensation to them of $2,500 each for their time, effort, and perseverance in representing the interests of the class is justified and reasonable.

18.     I believe the Settlement reached in this matter is an excellent result, I consider the Settlement Agreement to be fair, adequate and reasonable, and believe it to be in the best interest of the Class as a whole.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed this 21st day of March, 2013, at New York, New York.

 /s/ Antonio Vozzolo
Antonio Vozzolo

# EXHIBIT Q

Joseph J. Siprut (admitted Pro Hac Vice)
jsiprut@siprut.com
Aleksandra M. S. Vold
avold@siprut.com
**SIPRUT** PC
17 N. State St.
Suite 1600
Chicago, Illinois 60602
Tel: 312.236.0000
Fax: 312.948.9196

Todd C. Atkins
tatkins@siprut.com
**SIPRUT** PC
701 B Street
Suite 1400
San Diego, California 92101
Tel: 619.255.2380
Fax: 619.231.4984

Attorneys for the Settlement Class

# IN THE UNITED STATES DISTRICT COURT

## FOR THE SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| AMELIA FOOS, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>ANN, INC., d/b/a Ann Taylor Retail, Inc., a Delaware corporation,<br><br>Defendant. | Case No. 3:11-cv-2794-L-MDD<br><br>Judge M. James Lorenz<br><br>Magistrate Judge Mitchell D. Dembin<br><br>**CLASS ACTION**<br><br>**DECLARATION OF GENE STONEBARGER** |

I, Gene J. Stonebarger, declare:

1.      I make this Declaration of my own personal knowledge, and if called to testify, I could and would testify competently to the matters stated.

2.      I am an attorney admitted to practice in the State of California, before all District courts in the State of California, the Fifth and Ninth Circuits, and the United States Supreme Court. I am the founder of Stonebarger Law, APC, a firm specializing in Class Action and Complex Business Litigation. My firm and I are particularly experienced with class actions based on violations of Song-Beverly Act.

3.      My background may be summarized as follows: I am a 2000 graduate of the University of San Diego School of Law. I began my legal career working at the Damrell law firm, where I handled complex civil litigation matters and Class Actions. In January, 2004, I founded Lindsay & Stonebarger, APC, with James Lindsay. I founded Stonebarger Law, APC in January, 2010.

4.      I recently received a 2012 California Lawyer Attorney of the Year Award (the "CLAY Award") from California Lawyer magazine for the significant impact my legal work made in the area of Consumer Rights in 2011. I argued the seminal privacy rights case entitled Pineda v. Williams-Sonoma Stores, Inc., 51 Cal. 4th 524 (2011), wherein the California Supreme Court issued a unanimous decision in favor of the Plaintiff protecting the privacy rights of California consumers under the Song-Beverly Act, reversing the decisions of the two lower Courts and remanding the case for further proceedings. As discussed below, these are the same claims asserted in the present case. I have served as lead or co-lead class counsel in numerous

Class Actions against large corporations for violations of Federal and State consumer protection statutes.

     5.      Attorneys at my firm have served as Lead or Co-Lead Class and have successfully recovered tens of millions of dollars in benefits for individuals across the country, including in the following cases:

- Matsuo v. American Golf Corporation, San Joaquin County Superior Court, Case No. CV024865;

- Buzby v. Best Buy Co., Inc., San Diego County Superior Court, Case No. GIN040241;

- *Children's* Place Cases, Stanislaus County Superior Court, J.C.C.P. No. 4418;

- Castaneda v. *Dillard's*, Inc., San Joaquin County Superior Court, Case No. CV026899;

- Barajas v. The Container Store, Inc., San Diego County Superior Court, Case No. GIN 041129;

- Ben Bridge Jeweler Cases, Sacramento County Superior Court, J.C.C.P. No. 4474;

- Mendez v. Carter's, Inc., Sacramento County Superior Court, Case No. 05AS005580;

- Dress Barn Credit Card Cases, Stanislaus County Superior Court, J.C.C.P. No. 4478;

- Hanley v. Boot World Incorporated, San Diego County Superior Court, Case No. GIC 876868;

- Thoms v. North American Kiosk, LLC, San Diego County Superior Court, Case No. GIC 871465;

- O'Keefe v. West Marine, Inc., San Diego County Superior Court, Case No. GIC 876869;

- Barajas v. Dixieline Lumber Co., San Diego County Superior Court, Case No. GIC 841991;

1    • Sheffrey v. Pat & Oscar's Franchise, Inc., San Diego County Superior Court, Case No, GIC 870504;

2

3    • Cost Plus Credit Card Cases, Sacramento County Superior Court, J.C.C.P. No. 4507;

4

5    • Wood v. Coach, Inc., Contra Costa County Superior Court, Case No. C-07-01146;

6    • Bell v. Genesco, Inc., San Diego County Superior Court, Case No. 37-2008-00081672-CU-BT-CTL;

7

8    • Lautenlager v. Sam Ash Music Corporation, San Diego County Superior Court, Case No. 37-2008-00088948-CU-BT-CLT;

9

10   • Negri v. Lindbergh Parking, Inc., San Diego County Superior Court, Case No. GIC 878391;

11   • Lewis v. Mothers Work, Inc., San Diego County Superior Court, Case No. 37-2007-00081536-CU-BT-CTL;

12

13   • Andonia v. The TJX Companies, Inc., San Diego County Superior Court, Case No. GIC875253;

14

15   • Burger v. J.C. Penney Company, Inc., San Diego County Superior Court, Case No. 37-2008-00083751-CU-BT-CTL;

16

17   • Cole v. Sport Chalet, Inc., San Diego County Superior Court, Case No. 37-2008-00081675-CU-BT-CTL;

18

19   • Cole v. The Sports Authority, Inc., San Diego County Superior Court, Case No. 37- 2008-00081686-CU-BT-CTL

20

21   • Johnson v. Lerner New York, San Diego County Superior Court, Case No. 37-2008-00080567-CU-BT-CTL;

22

23   • Anderson v. United Retail, San Diego County Superior Court, Case No. 37-2008-00089685-CU-BT-CTL;

24   6.   Because of my experience as lead counsel and co-lead counsel in similar class

25   actions, including specifically claims under the Song-Beverly Act, Plaintiff's counsel asked that I

26   submit this declaration.

27

28

DECLARATION OF GENE STONEBARGER

-4-

7.     My hourly rate for the year 2012 is $650 per hour.  My hourly rate has been previously approved by both California state and federal Courts, and these rates closely reflect the fair market rate for attorneys of similar experience engaged in similar type practice. Specifically, several courts in 2012 have expressly approved my hourly rate of $650, including the following cases: Vaughan, et al. v. Home Depot U.S.A., Inc., District Court for the Eastern District of California, Case No. 2:11-CV-1041 (2012); Swaney v. Lowe's HIW, Inc., District Court for the Northern District of California, Case No. CV-11-03231 (2012); Pabst v. Genesco, Inc., Court for the Northern District of California, Case No. CV-11-04881 (2012); Pompa v. Target Corporation, District Court for the Central District of California, Case No. CV-10-0634 (2012); Nordstrom, Inc. Song-Beverly Act Cases, Los Angeles County Superior Court, J.C.C.P. Case No. 4651; Sunseri v. Maidenform Brands, Inc., Napa County Superior Court, Case No. 26-52359 (2012); Giacometti v. True Religion Apparel, Inc., Placer County Superior Court, Case No. S-CV-0027951 (2012); LaMasa v. IndyMac Resources, Inc., Stanislaus County Superior Court, Case No. 626836 (2012); and Nelson v. Destination Maternity Corporation, San Francisco Superior Court, Case No. CGC-11-508949 (2012).

8.     Mid-level associates at my firm currently bill at $500 per hour. This was found to be reasonable in Pompa v. Target Corporation District Court for the Central District of California, Case No. CV-10-0634 (2012); Sunseri v. Maidenform Brands, Inc., Napa County Superior Court, Case No. 26-52359 (2012); Giacometti v. True Religion Apparel, Inc., Placer County Superior Court, Case No. S-CV-0027951 (2012); LaMasa v. IndyMac Resources, Inc., Stanislaus County Superior Court, Case No. 626836 (2012); and Nelson v. Destination Maternity Corporation, San Francisco Superior Court, Case No. CGC-11-508949 (2012).

9.      I have also reviewed the costs and expenses incurred by Plaintiff's counsel in litigating this case.   It is my opinion that the costs and expenses were necessary for the prosecution of this case and should be awarded.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed on January 7  2013 in Folsom          , California.

_____
Gene Stonebarger

4828-8834-2546, v. 2

# EXHIBIT R

| | HOURS SPENT | | | | |
|---|---|---|---|---|---|
| **ACTION** | **Joseph J. Siprut ($650/hr)** | **Gregg M. Barbakoff ($350/hr)** | **Ismael T. Salam ($350/hr)** | **Kristi Pearson ($150)** | **Anaël Hadji ($150)** |
| Pre-filing research, drafting, filing, coordinating service of process and client meetings: | 11.5 | 8.1 | 12.4 | 2.6 | 0.0 |
| Correspondence with client and counsel of record in this matter and Pandora Media, Inc. (*See* Case No. 14-cv-1315 (N.D. Ill.)) and review of documents and investigation of information provided by counsel for Pandora Media, Inc. | 366.1 | 221.6 | 95.1 | 0.0 | 6.6 |
| Review of filings, court orders, Western Union's motions for extensions, and answer: | 12.4 | 18.8 | 19.4 | 0.0 | 5.2 |

*Douglas v. The Western Union Company* ; Case No. 1:14-cv-1741

| | | | | |
|---|---|---|---|---|
| Drafting renewed motion for class certification: | 2.2 | 0.0 | 0.8 | 0.0 | 0.0 |
| Researching and Drafting: motion to strike affirmative defenses; joint 26(f) report; and additional status reports | 26.1 | 18.9 | 14.1 | 0.0 | 0.0 |
| Preparation for and attendance at hearings: | 12.2 | 4.6 | 8.2 | 0.0 | 0.0 |
| Drafting of mediation statement and attendance at multiple mediation sessions | 197.2 | 58.8 | 33.3 | 0.0 | 0.0 |
| Post-mediation communications and drafting settlement agreement | 264.8 | 71.2 | 49.5 | 0.0 | 0.0 |
| Confirmatory discovery: drafting requests; review of documents; and communications with counsel of | 68.2 | 54.4 | 37.6 | 0.0 | 26.8 |

| | | | | | |
|---|---|---|---|---|---|
| Researching and drafting motion for preliminary approval | 52.5 | 16.4 | 38.2 | 0.0 | 0.0 |
| Preparation for and attendance at preliminary approval hearing | 5.2 | 0.0 | 4.7 | 0.0 | 0.0 |
| Researching and drafting petition for attorneys' fees and incentive award; (Estimated) Objections: reviewing objections; reseaching issues; drafting responses | 96.4 | 28.1 | 55.2 | 0.0 | 0.0 |
| Rearching and drafting motion for final approval | 50.0 | 0.0 | 30.0 | 0.0 | 0.0 |
| Preparation for and attendance at final approval hearing | 10.0 | 0.0 | 10.0 | 0.0 | 0.0 |
| Communications with Class Members and Settlement Administration: | 12.5 | 2.3 | 24.2 | 0.0 | 0.0 |

| | | | | | |
|---|---|---|---|---|---|
| **Total Hours to date** | 1187.3 | 503.2 | 432.7 | 2.6 | 38.6 |
| **Total Billed** | $ 771,745.00 | $ 176,120.00 | $ 151,445.00 | $ 390.00 | $ 5,790.00 |
| **Total Hours Spent** | | | | | **2,164.4** |
| **Total Lodestar Fee** | $ | | | | **1,105,490.00** |

# EXHIBIT S

| Date | Description | Cost |
|------|-------------|------|
| 02/21/14 | NDIL Complaint Filing Fee | $400.00 |
| 02/24/14 | It's Your Serve - Service to Pandora Media | $195.00 |
| 03/12/14 | NDIL Complaint Filing Fee | $400.00 |
| 03/14/14 | It's Your Serve - Service to Western Union | $195.00 |
| 03/28/14 | PHV Fee - JJS | $305.00 |
| 03/28/14 | PHV Fee | $305.00 |
| 04/01/14 | WestLaw usage - March 2014 | $0.59 |
| 04/30/14 | Arrow Messenger - Siprut PC to Dirksen Federal | $6.90 |
| 05/01/14 | Pacer usage - April 2014 | $0.50 |
| 05/27/14 | Arrow Messenger - Siprut PC to Dirksen Federal | $6.90 |
| 06/01/14 | Pacer usage - May 2014 | $2.40 |
| 06/01/14 | Courtlink Usage - May 2014 | $15.82 |
| 06/01/14 | Westlaw Usage - May 2014 | $56.51 |
| 09/05/14 | JAMS Mediation Fee - Hon. Wayne Anderson | $5,075.00 |
| 10/01/14 | Courtlink Usage - September 2014 | $1.24 |
| 10/01/14 | Pacer Usage - September 2014 | $34.30 |
| 10/01/14 | Westlaw Usage - September 2014 | $48.16 |
| 10/07/14 | U.S. Messenger - Siprut PC to Judge Wayne Anderson | $72.61 |
| 10/27/14 | U.S. Messenger - Siprut PC to Dirksen Federal | $6.06 |
| 10/31/14 | JAMS Mediation Fee - Hon. Wayne Anderson | $900.00 |
| 11/01/14 | Courtlink Usage - October 2014 | $12.50 |
| 11/01/14 | Pacer Usage - October 2014 | $31.20 |
| 11/01/14 | Westlaw Usage - October 2014 | $13.23 |
| 11/16/14 | JAMS Mediation Fee - Hon. Wayne Anderson | $1,575.00 |
| 01/30/15 | JAMS Mediation Fee - Hon. Wayne Anderson | $300.00 |
| 02/01/15 | Pacer Usage - January 2015 | $0.30 |
| 02/13/15 | JAMS Mediation Fee - Hon. Wayne Anderson | $1,625.00 |
| 2/26/15-2/28/15 | Travel: JJS hotel and airfare for mediation | $1,831.68 |
| 2/26/15-2/28/15 | Travel:  JJS misc. travel costs for mediation | $634.33 |
| 03/03/15 | U.S. Messenger - Dirkson Federal Courthouse | $10.34 |
| 03/04/15 | U.S. Messenger - Dirkson Federal Courthouse | $6.06 |
| 03/19/15 | FedEx - Tony A. Trotta III | $15.88 |
| 03/19/15 | FedEx - Mark Mester, Esq. | $15.88 |
| 03/19/15 | FedEx - Liberty Intl. Underwriters | $24.44 |
| 03/19/15 | FedEx - Beazley Insurance Co. | $24.44 |
| 03/19/15 | FedEx - ACE Professional Risk | $24.44 |

| 03/19/15 | Attn: Claims Dept., XL Insurance | $36.94 |
| 04/01/15 | Pacer Usage - March 2015 | $0.30 |
| 04/22/15 | U.S. Messenger - Dirkson Federal Courthouse | $10.34 |
| 06/01/15 | JAMS Mediation Fee - Hon. Wayne Anderson | $2,757.33 |
| 06/01/15 | Pacer Usage - May 2015 | $0.90 |
| 06/01/15 | U.S. Messenger - Dirkson Federal Courthouse | $6.06 |
| 07/01/15 | Pacer Usage - June 2015 | $3.20 |
| 09/01/15 | Pacer Usage - August 2015 | $6.50 |
| 09/01/15 | Westlaw Usage - August 2015 | $1.92 |
| 09/15/15 | Expense reimbursement: IS MS JM late night dinner | $15.38 |
| 07/09/15 | Expense reimbursement: IS late night taxi | $12.75 |
| 09/29/15 | Expense reimbursement: IS late night taxi | $12.85 |
| 10/01/15 | Expense reimbursement: IS late night taxi | $11.42 |
| 10/02/15 | Expense reimbursement: IS MS late night dinner | $8.83 |
| 10/02/15 | Expense reimbursement: IS late night taxi | $13.83 |
| 11/01/15 | Westlaw Usage - October 2015 | $6.21 |
| 10/29/15 | U.S. Messenger - Dirkson Federal Courthouse | $9.50 |
| 11/01/15 | Courtlink Usage - October 2015 | $4.32 |
| 11/13/15 | Charles R. Zandi - Transcript of proceedings on 11/10/15 | $82.45 |
| 12/01/15 | Westlaw Usage - November 2015 | $11.92 |
| 11/04/15 | Expense reimbursement: IS taxi to courthouse | $28.00 |
| 11/04/15 | Expense reimbursement: IS late night taxi home | $19.65 |

**Total Disbursements**                                        **$17,232.31**

# EXHIBIT T

SIPRUT PC

<u>SIPRUT PC FIRM RESUME</u>

Siprut PC is a commercial litigation firm based in Chicago, with additional offices in San Diego, Boston, and Colorado Springs. The firm focuses its practice exclusively on complex litigation and pre-litigation counseling, encompassing a wide variety of areas and issues. The firm's primary litigation groups include plaintiffs' class action litigation (with an emphasis on consumer law issues); *qui tam* and whistleblower litigation; intellectual property and patent litigation; and business litigation.

Siprut PC and its attorneys have repeatedly been appointed as lead counsel in federal and state class action lawsuits across the country, and have recovered hundreds of millions of dollars for its clients. The firm has been prominently featured in the mainstream media for its successes and advocacy on behalf of consumers nationwide, and our attorneys are frequently invited to speak at seminars on consumer protection and class action issues.

<u>CLASS ACTION AND CONSUMER LITIGATION</u>

Siprut PC is an established leader in the class action arena. The firm has been recognized for its "high-stakes, high-profile cases against large defendants" (Chicago Daily Law Bulletin, September 2011). As federal courts have further recognized in appointing the firm and its attorneys as lead counsel in some of the most prominent class cases in the country, Siprut PC has "substantial class action experience [and has served] as lead counsel" in myriad class litigation. *In re National Collegiate Athletic Association Student-Athlete Concussion Injury Litigation*, Case No. MDL 13-cv-9116 (N.D. Ill. July 29, 2014). The firm's recent settlements and leadership appointments include the following:

- *In re Southwest Airlines Voucher Litigation* (Case No. 11-cv-8176, N.D. Ill.): Appointed lead counsel in nationwide class action relating to Southwest's unilateral cancellation of drink vouchers paid for by business select travelers. Settlement valued up to $58 Million granted final approval.

- *In re Energizer Sunscreen Litigation*, (Case No. 13-cv-00131, N.D. Ill.): Appointed lead counsel in nationwide class action relating to defective sunscreen nozzles manufactured by Energizer. Settlement valued up to $200 Million granted final approval.

- *In re National Collegiate Athletic Association Student-Athlete Concussion Injury Litigation* (Case No. MDL 13-cv-9116, N.D. Ill.): Appointed co-lead counsel in consolidated MDL litigation against the NCAA on behalf of current and former collegiate athletes related to concussions and head injuries. Landmark settlement of $75 million submitted for preliminary approval.

- *Illinois Nut & Candy Home of Fantasia Confections, LLC v. Grubhub, Inc., et al.* (Case No. 14-cv-00949, N.D. Ill.): Appointed lead counsel in nationwide class action relating to unsolicited facsimile transmissions by Grubhub, in violation of the Telephone Consumer Protection Act. Settlement of $2 million granted final approval.

-1-

- *Padilla v. DISH Network LLC* (Case No. 12-cv-07350, N.D. Ill.): Appointed lead counsel in nationwide class action relating to statutory violations of the Satellite Home Viewer Extension and Reauthorization Act of 2004 ("SHVERA"). Landmark settlement providing class-wide injunctive relief – the first class settlement under SHVERA ever – granted final approval.

- *In Re Prescription Pads TCPA Litigation* (Case No. 13-cv-06897, N.D. Ill): Appointed lead counsel in nationwide class action relating to unsolicited facsimile transmissions by Rx Security, in violation of the Telephone Consumer Protection Act. Settlement of $1 million granted final approval.

- *Lim, et al. v. Vendini* (Case No. 14-cv-561, Cal. Sup Ct.): Appointed co-lead counsel in nationwide class action relating to a security breach exposing the personal information of hundreds of thousands of consumers nationwide. Settlement of $3 million granted final approval.

- *Muir v. W.S. Badger Co.*, (Case No. 14-CH-5935, Cir. Ct. Cook County, Illinois): Appointed lead counsel in nationwide class action relating to recall of defective sunscreen products. Settlement providing class-wide injunctive relief granted final approval.

- *Windows Plus, Incorporated v. Door Control Services, Inc.* (Case No. 13-cv-07072, N.D. Ill): Appointed lead counsel in nationwide class action relating to unsolicited facsimile transmissions by Door Control, in violation of the Telephone Consumer Protection Act. Settlement valued at $1 million granted final approval.

- *Townsend v. Sterling* (Case No. 13-cv-3903, N.D. Ill): Appointed lead counsel in nationwide class action relating to violations of the Fair Credit Reporting Act in the employment context. Settlement granted final approval.

- *Dr. William P. Gress et al. v. Premier Healthcare Exchange West, Inc.* (Case No. 14-cv-501, N.D. Ill.): Appointed co-lead counsel in nationwide class action relating to unsolicited facsimile transmissions by Premier, in violation of the Telephone Consumer Protection Act. Settlement of $756,000 granted preliminary approval.

- *Stephan Zouras LLP v. American Registry LLC* (Case No. 14-cv-943, N.D. Ill.): Appointed co-lead counsel in nationwide class action relating to unsolicited facsimile transmissions by Premier, in violation of the Telephone Consumer Protection Act. Settlement of granted preliminary approval.

- *Foos v. Ann, Inc.* (Case No. 11-cv-02794-L-MDD, S.D. Cal.): Appointed lead counsel in class action on behalf of California consumers for violations of the Song-Beverly Act. Settlement valued at $2,323,500 granted final approval.

- *Lamb v. Bitech, Inc.* (Case No. 3:11-cv-05583-EDL, N.D. CA): Appointed lead counsel in class action on behalf of California consumers for violations of the Song-

Beverly Act. Class-wide settlement on behalf of 30,000 California residents granted final approval.

- *Golba v. Dick's Sporting Goods, Inc.* (Case No. 30-2011-00472227, CA Superior Ct.): Appointed lead counsel in class action on behalf of California consumers for violations of the Song-Beverly Act. Settlement valued at $1,150,000 granted final approval.

- *Pietrantonio v. Ann Inc. d/b/a Ann Taylor, Inc.* (Case No. 13-cv-12721-RGS, D. Mass.): Appointed lead counsel in class action on behalf of Massachusetts consumers for violations of Massachusetts law prohibiting the collection of personal information. Settlement valued in excess of $2 million received final approval.

- *Christensen v. Sur La Table, Inc.* (Case No. 13-cv-11357-GAO, D. Mass.): Appointed lead counsel in class action on behalf of Massachusetts consumers for violations of Massachusetts law prohibiting the collection of personal information. Settlement received final approval.

- *Monteferrante v. The Container Store, Inc.* (Case No. 13-cv-11362-RGS, D. Mass.): Appointed co-lead counsel in class action on behalf of Massachusetts consumers for violations of Massachusetts law prohibiting the collection of personal information. Settlement received final approval.

- *Alberts v. TSA Stores, Inc.* (Case No. MICV2014-01491, Mass. Sup. Ct.): Appointed lead counsel in class action on behalf of Massachusetts consumers for violations of Massachusetts law prohibiting the collection of personal information. Settlement valued at $2 million received final approval.

- *Miller v. J. Crew Group, Inc.*, (Case No. 13-cv-11487, D. Mass.): Appointed co-lead counsel in class action on behalf of Massachusetts consumers for violations of Massachusetts law prohibiting the collection of personal information. Settlement valued at $2 million received final approval.

- *Rich, et al. v Lowe's Home Centers Inc.* (Case No. 13-cv-30144-MGM, D. Mass.): Appointed co-lead counsel in class action on behalf of Massachusetts consumers for violations of Massachusetts law prohibiting the collection of personal information. Settlement received final approval.

- *Moyer v. Michaels* (Case No. 14-cv-561, N.D. Ill.): Appointed co-lead counsel in nationwide class action relating to a security breach exposing the personal information of hundreds of thousands of consumers nationwide.

- *Lewert v. P.F. Chang's China Bistro* (Case No. 14-cv-04787, N.D. Ill.): Appointed co-lead counsel in nationwide class action relating to a security breach exposing the personal information of hundreds of thousands of consumers nationwide.

- *Mednick v. Precor Inc.* (Case No. 14-cv-03624, N.D. Ill.): Appointed co-lead counsel in nationwide class action relating to false representations in the sale and marketing of Precor treadmills.

- *John McNamara, et al. v. Samsung Telecommunications America, LLC, et al.* (Case No. 14-cv-1676, N.D. Ill.): Appointed co-lead counsel in nationwide class action alleging false representations in connection with the performance of the Samsung 4G phone.

- *Belville et al v. Ford Motor Company* (Case No. 13-cv-06529, W.D. Va.): Appointed to Plaintiffs' Steering Committee in consolidated class litigation against Ford related to sudden acceleration in Ford model vehicles.

- *In re Ventra Card Litigation* (Case No. 13-cv-07294, N.D. Ill.): Appointed co-lead counsel in class litigation related to the Chicago Transit Authority Ventra payment card system.

- *In re Barnes & Noble Pin Pad Litigation* (Case No. 12-cv-8617, N.D. Ill.): Appointed co-lead counsel in nationwide class action relating to a security breach exposing the personal information of hundreds of thousands of consumers nationwide.

- *Goodman v. Casting360, LLC* (Case No. 12-cv-09851, N.D. Ill.): Appointed lead counsel in nationwide class action for violations of the federal Telephone Consumer Protection Act.

- *Kruse, et al. v. Citigroup, Inc.* (Case No. 11-cv-01003-AG-AN, C.D. CA): Appointed lead counsel in a nationwide class action against Citigroup for a massive data breach exposing the personal information of hundreds of thousands of consumers nationwide.

## BUSINESS LITIGATION

Siprut PC attorneys have substantial experience with emergency injunctive relief proceedings (representing both plaintiffs and defendants), restrictive covenant litigation, and large commercial contract disputes. Firm partners have contributed to the following matters:

- *NewSub Magazine Servs. LLC v Heartland Direct, Inc.* (Case No. 02-C-4949, N.D. Ill.): Pierced an entity's corporate veil to obtain a seven figure judgment against related corporations and individuals.

- *In re Estate of Edith-Marie Appleton* (Case No. 00-P-103, Cook County, IL): Successfully defended an estate, throughout a three-week jury trial, from a claim brought by Florida State University involving a $2,000,001 alleged charitable pledge.

- *Edison Mission Energy v Mirant Corp* (Case No. 02-CC-0059, Orange County, CA.): Defended and settled $750 million breach of contract case involving the purchase of a foreign power facility.

- *Johnson v. Sample & Cross Capital Mgmt.* (Case No. 07-L-929, Lake County, Ill): Secured dismissal with prejudice of counts brought against a hedge fund by eleven investors in three separate actions, including claims for violation of the Illinois Securities Law Act, violation of the Illinois Consumer Fraud Act, breach of fiduciary duty, and negligence.

- *American Insurance v. Ingram* (Cook Co., Ill.): Obtained preliminary and permanent injunctions against former employee who opened competing business and used previous employer's confidential information.

- *Veal v. James and 7-Eleven* (Cook Co., Ill.): Obtained judgment following bench trial in favor of employee accused of wrongful conduct.

- *Des Plaines Office Equipment Co. v. Nicolin et al.* (Cook Co. Ill.): Represented hiring company and former employee in lawsuit brought by prior employer to enjoin employee from working. Successfully opposed motions for TRO, preliminary and permanent injunctions.

- *In re Confidential Arbitration* (JAMS Chicago, IL): Following week-long trial before retired federal judge, successfully defended breach of fiduciary duty and shareholder dilution claims in excess of $7 million. Claims arose from issuance of capital call and allocation of distributions and management fees.

- *In re Confidential Arbitration* (AAA St. Louis, MO): Following trial before a three-member arbitration panel, recently obtained a $1.7 million award, including recovery of all attorneys' fees and costs. Claims arose from purchase of multiple nursing home facilities.

- *Delaware Superior Court and Illinois Chancery Court Litigation.* Defended industrial equipment company in case brought by hedge fund investor concerning hedge fund's investment in $75 million secured lending loan facility. Claims involved financing and dissolution of business issues.

- *Real estate arbitration* (AAA Minneapolis, MN). Obtained $100,000 award, including all attorneys' fees and costs, on behalf of commercial real estate buyer in breach of contract action with seller.

- *Trilegiant v. Sitel Corporation* (S.D.N.Y.). Represented Trilegiant in breach of contract action seeking $34 million in liquidated damages from vendor.

- *Confidential purchase price adjustment arbitration* (AAA Chicago). Represented plastics manufacturer in arbitration. The Panel found in Client's favor on claims for breach of asset purchase agreement entered into as part of reverse spin-off

transaction and public offering. In addition, the Panel denied the Opposing Party's counterclaim for breach of a related real estate sublease and awarded judgment to Client on its counterclaim concerning the same sublease.

- *Advertising Arbitration* (AAA Chicago). Arbitrated dispute on behalf of professional sports team relating to advertising sales and contracts; obtained favorable result.

- *Confidential arbitration for aviation company* (ICC Chicago). Represented aviation manufacturer in contract dispute arising from purchase of company. Following evidentiary hearings, obtained arbitration award in favor of client.

- *Lakeshore Drive Entertainment v. Prestige Films et al.* (Cook Co. Ill): Obtained dismissal of claims brought by movie production company over distribution rights.

## ANTITRUST, UNFAIR COMPETITION, AND RICO LITIGATION

Siprut PC attorneys have substantial experience handling antitrust and unfair competition litigation, including RICO claims, against some of the largest corporations in the world. Representative litigation includes:

- *Woolsey v. JP Morgan Chase & Co.* (S.D. Cal.). Representing putative class alleging JP Morgan Chase manipulated the price for electricity within the California electricity market through a series of deceptive bidding strategies, resulting in higher prices to consumers.

- *In re Sulfuric Acid* (N.D. Ill.) Represented sulfuric acid manufacturer in putative nationwide class action pending in federal court in Chicago and indirect purchaser class action pending in California state court. Plaintiff alleged industry-wide scheme to constrain the supply and inflate the price of sulfuric acid. After eight years of litigation, obtained summary judgment on all direct purchaser claims, which was subsequently affirmed by the Seventh Circuit.

- *In re Credit Swaps Default Litigation* (N.D. Ill.). Represented financial services company in putative class action alleging defendants conspired to restrict competition in the market for credit default swaps by monopolizing the sell-side of the CDS market and thereby maintaining anti-competitively wide bid-ask spreads.

- *Rasterex Holdings v Research in Motion, et al* (Fulton Co., Georgia). Represented RIM and co-defendants in trade secret dispute. Plaintiff alleged RIM misappropriated trade secrets and incorporated them into RIM's Blackberry handheld device. Following summary judgment motions, obtained settlement on eve of trial.

- *Safelite Glass Corp.* (E.D. Tex.). Obtained summary judgment on behalf of all defendants, and then won affirmance by U.S. Court of Appeals for the Fifth Circuit, defeating all claims in *Stewart Glass & Mirror, Inc. v. USA GLAS Corp.,* a suit by

Texas plaintiffs against national corporate competitors asserting conspiracy and monopolization in violation of federal antitrust laws.

## CIVIL RIGHTS AND CONSTITUTIONAL CLAIMS

Siprut PC attorneys have handled landmark, high-impact civil rights and constitutional claims against municipalities, state and government entities, and corporate employers. Representative litigation includes:

- *Doe II and Doe III , Does IV-VIII* (N.D. Ill.): Representing female victims of sexual assault for claims of civil rights and equal protection violations against The City of Harvey. We allege that Harvey has a custom, policy and practice of failing to adequately investigate claims by female rape victims, including in some instances failing to submit or process sexual assault evidence or rape kits.

- *Green v. Village of Winnetka* (Cook Co. Ill.): Representing putative class of Winnetka property owners who allege Village is violating the Illinois constitution by charging utility fees to fund a $42 million stormwater project that includes an eight mile tunnel to Lake Michigan.

- *People Who Care v. Rockford Board of Education* (Case No. 89-cv-20168, N.D. Ill.) Represented African American and Hispanic students in desegregation and educational equity class action lawsuit against one of the largest school districts in Illinois. Proved liability across most areas of school operations, including special education, school building conditions, transportation, and student assignment. Secured multi-year, comprehensive court-ordered remedies. Represented plaintiffs throughout 10 years of remedies implementation.

- *Johnson v. Board of Education of Champaign Unit School District* (Case No. 00-cv-1349, C.D. Ill.) Represented African American and Hispanic students in race discrimination and desegregation class action lawsuit. Secured comprehensive settlement affecting many areas of school district operations, including climate and discipline, upper level courses, student assignment, special education, and gifted programs. Represented plaintiff class throughout seven years of settlement monitoring.

- *McFadden v. Board. of Education School District U-46* (Case No. 05-cv-0760, N.D. Ill.) Represented minority students in educational equity suit against second largest school district in Illinois. Defendant found liable for intentionally segregating Hispanic students into separate gifted program.

- *Ramirez v. Ceisel Masonry* (N.D. Ill.): Represented Hispanic laborers who alleged they were being discriminated against on the job because of their race. Obtained favorable settlement on behalf of all plaintiffs.

## WHISTLEBLOWER AND FALSE CLAIMS ACT LITIGATION

Siprut PC attorneys have led litigation resulting in settlements in excess of $100 million, and we are actively prosecuting numerous False Claims Act lawsuits:

- *U.S. ex rel. Robinson v. Northrop-Grumman Corp.* (Case No. 89-cv-6111, N.D. Ill.) Qui tam action brought against Northrop-Grumman for fraud in connection with the B-1 bomber, the B-2 "Stealth" bomber, and the F-15 fighter. Sixteen years after the case was filed, it was settled prior to trial for a total recovery of $135 million.

- *U.S. ex rel. McGee v. IBM, Corp., et al.* (Case No. 11-cv-3482, N.D. Ill.) Currently pending, the case concerns a bid-rigging conspiracy in connection with a $50 million Homeland Security Project in Cook County. Successfully defeated IBM's motion to dismiss in its entirety.

- *U.S. ex rel. Solomon v. Lockheed Martin Corp.* (Case No. 3:12-DV-4495-D, N.D. Tx.) Currently pending, the case seeks more than $100 million in damages for fraud in connection with the F-35 Joint Strike Fighter, the most expensive weapons program ever.

- Currently under seal is a qui tam action for the submission of false claims by a facility performing Magnetic Resonance Imaging in violation of Medicare's Multiple Procedures Payment Reduction Policy.

- Currently under investigation is a potential Medicare *qui tam* action against a pharmaceutical manufacturer and its distributors for overcharging the government hundreds-of-millions of dollars through falsely reporting the Average Wholesale Price of its drugs.

- Currently under investigation is a potential Medicare/Medicaid *qui tam* action concerning fraud in connection with the efforts of a manufacturer of a defective medical implant device to obtain FDA approval of a the implant. Potential damages valued in excess of $100 million.

- Currently under investigation is a potential *qui tam* action in connection with hundreds-of-millions of dollars in false claims relating to mortgage foreclosures

## PATENT LITIGATION

Siprut PC and its attorneys have successfully represented public companies, mid-size businesses, small companies, and individuals in their patent disputes all over the United States and the world – from Chicago to San Francisco, from Russia to Cyprus. We have litigated cases in a variety of technological fields, including the life sciences (DNA amplification, screening, and sequencing), computer science (cloud computing, optical character recognition, and genome sequencing), and orthopedic fields (dental and hip implants). Siprut PC has recovered millions of dollars for our clients against some of the largest and most aggressive companies in the country.

## ATTORNEYS

**JOSEPH SIPRUT** is the founder and managing partner of Siprut PC. He was named a "Super Lawyer" in Illinois for Class Action Litigation, and holds an *AV Preeminent* rating by Martindale Hubble, the highest possible peer review rating. He has been called a "fearless game-changer in class actions" by the Chicago Daily Law Bulletin. Mr. Siprut was previously named one of the Top 40 attorneys in Illinois under the age of 40, and was also named one of the "Top 40 Under 40" in the country by the National Trial Lawyers Association. ALM Legal Leaders named Mr. Siprut one of "Chicago's Top Rated Lawyers of 2014." Mr. Siprut was also selected for membership in the Multi-Million Dollar Advocates forum, one of the most prestigious groups of trial lawyers in the United States. Membership is limited to attorneys who have won million and multi-million dollar verdicts and settlements, and fewer than 1% of U.S. lawyers are members.

Mr. Siprut has appeared in dozens of publications and television and radio broadcasts worldwide, including CBS Radio, NPR, ESPN, Bloomberg Law, Law360, the Chicago Tribune, and more. He has been deemed by the media as the "Friend of the Frequent Fliers" for his successful litigation crusades against the airline industry on behalf of airline customers, as well as a "Leading Sports Reformer" for his advocacy to combat the problem of concussions and head injuries in college sports.

Mr. Siprut frequently speaks at national class action and consumer litigation seminars. He has substantial first-chair trial experience, and previously served as an Adjunct Professor at Northwestern University School of Law in the Trial Advocacy program. He is also a frequent author and speaker, having published over 25 articles in the nation's leading law reviews and legal journals on topics including the right of privacy, copyright litigation, and contract doctrine, as well as litigation strategy and tactics. He was appointed as a member of the Illinois ARDC Hearing Board, and is also a member of the Advisory Board for the Fair Contracts Project, an initiative focused on counteracting the implications of fine print in standard form consumer contracts.

Mr. Siprut is a graduate of Northwestern University School of Law, where he served as the Managing Editor of the Northwestern Law Review and was selected to represent Northwestern in national competition as a member of its National Moot Court team. He was also awarded the Institute for Humane Studies Fellowship, a national fellowship competition for law and graduate study.

Prior to founding Siprut PC, Mr. Siprut spent his career practicing at some of the top corporate litigation firms in the country. Mr. Siprut has been recognized by the Law in Public Service Committee of the ABA for his dedication to pro bono work. He is admitted to practice in Illinois, the United States District Court for the Northern District of Illinois (including its Trial Bar), the Seventh Circuit Court of Appeals, the Eleventh Circuit Court of Appeals, and the United States Supreme Court. For over five years, Mr. Siprut served as an arbitrator in the Cook County Arbitration Program.

\*     \*     \*

**TODD MCLAWHORN** is a partner at Siprut PC. He has over twenty years of commercial litigation trial experience, most of that with three of the country's largest law firms. He has tried cases and appeared before courts in a variety of jurisdictions, literally spanning the country from coast to coast. Mr. McLawhorn has significant experience with complex business litigation, including matters involving contracts, consumer fraud allegations, shareholder disputes and valuations, commercial real estate, trade secret issues, deceptive trade practices claims, antitrust issues, and merger and acquisition issues. He has represented assorted clients in a wide array of industries, including those in the financial services, banking, health care, computer hardware and software, membership services, manufacturing and professional sports fields. In addition, Mr. McLawhorn has devoted a substantial portion of his practice to class action litigation, particularly with respect to antitrust and consumer fraud claims.

Mr. McLawhorn recently received an AV Preeminent Rating, the highest possible rating, in the Martindale-Hubbell Peer Review Ratings Program. Mr. McLawhorn was previously recognized by The Chicago Law Bulletin and The Chicago Lawyer as one of the Top 40 lawyers under 40 in Illinois. He has contributed to several publications, most recently as a Contributor to the World Banks Group Doing Business 2015, and to various bar association publications. He has also provided significant pro bono representation, including assisting individuals who flee their home countries and seek political asylum in the United States, and helping individuals involved in the Illinois Chancery Court's Foreclosure Mediation Program, in an effort to help homeowners who are in foreclosure retain their homes.

In addition to being admitted to practice in New York and Illinois, Mr. McLawhorn is also admitted to practice before the United States Courts of Appeals for the Seventh Circuit, Federal Circuit, Fifth Circuit, and Eleventh Circuit, as well as the United States District Courts for the Northern District of Illinois (Trial Bar), Southern District of Illinois, Central District of Illinois, Southern District of New York, Eastern District of Michigan, Eastern District of Wisconsin, and Western District of Wisconsin. He is also a member of the American Bar Association, and is part of the Antitrust, Business Law, and Litigation Sections. As part of the Litigation Section, he is also a member of the Class Action and Derivatives Suit Committee, the Commercial and Business Litigation Committee, and the Intellectual Property Committee. Closer to home, Mr. McLawhorn is a longtime member of the Chicago Bar Association and the Illinois State Bar Association. In connection with the Chicago Bar Association, he is a member of the Antitrust, Class Action, and Consumer Law Committees.

Mr. McLawhorn received his law degree, with honors, from the University of North Carolina at Chapel Hill. At the University of North Carolina, he was on both Law Review and the Holderness Moot Court Bench. Prior to attending law school, Mr. McLawhorn graduated from East Carolina University, magna cum laude, in three years with a Bachelor of Arts in Psychology. In 2011 Mr. McLawhorn was elected to the District 101 Board of Education, and serves on the Building, Finance, and Legislative Committees. He is a former President and Board Member of the Village Club of Western Springs, a social and service organization. He is also actively involved in coaching and supporting his children's sports teams, and has served on various boards in connection with those activities.

\*       \*       \*

**RICHARD L. MILLER II** is a partner at Siprut PC. Richard was previously in-house counsel at a private equity firm, and before that, a partner at Novack and Macey LLP, where he specialized in commercial litigation. While there, Richard advised clients and litigated disputes involving real estate, insurance coverage, creditors' rights, products liability, licenses, trademark, employment contract and corporate veil piercing claims, among others.

Richard is an Adjunct Professor at Northwestern University School of Law where he has served as a Trial Advocacy instructor since 2005 and Advanced Trial Advocacy instructor since 2013. He has been an American Arbitration Association arbitrator since 2010 and, prior to that, was an arbitrator for the Cook County Mandatory Arbitration Program for two years.

Richard served as a prosecutor for Champaign County, Illinois for two years. He litigated approximately 50 jury trials, as well as innumerable bench trials. He prosecuted four murder cases, two of which went to trial, resulting in sentences of 45 and 55 years.

Richard was named one of the "40 Illinois Attorneys Under 40 To Watch" by the Law Bulletin Publishing Company, publishers of the Chicago Lawyer and Chicago Daily Law Bulletin. Chicago Magazine has repeatedly recognized Richard as a "Super Lawyer," "Rising Star" and one of the Top Young Commercial Litigation Attorneys in Illinois.

Richard has published articles appearing in the Illinois Bar Journal on Expert Testimony, Emergency Temporary Restraining Orders, The Wage Payment Act, and Spoliation Claims. He has also served as an author for the Illinois Institute of Continuing Legal Education (IICLE) for many years, authoring guides for practitioners on: Pleading Under the Federal Rules, Federal Motion Practice, Preparing for Trial, and Preserving the Record During Trial. Richard has lectured at webinars for ICLE on Motion Practice, Negotiating Settlements and Cross Examinations.

Richard is a member of the Illinois State Bar Association, the American Bar Association, the Chicago Bar Association and the University Club of Chicago. He currently serves as the President of the University of Illinois Law Alumni Board.

\*      \*      \*

**BRUCE HOWARD** is a partner at Siprut PC. He was named National Trial Lawyer of the Year Finalist by the Trial Lawyers for Public Justice, and was named a "Super Lawyer" in Illinois for Class Action Litigation, Securities Litigation, and ERISA Class Action Litigation. He was also named as a one of the Top Attorneys in Illinois by Chicago Magazine.

Mr. Howard has over thirty years of commercial litigation trial experience. Mr. Howard has significant experience with complex business litigation, including matters involving antitrust issues, shareholder fraud and corporate derivative class action claims, ERISA class actions claims, mass tort issues, trademark matters, deceptive trade practices issues, insurance defense matters, actions under the Racketeer Influenced and Corrupt Organizations Act, issues arising under the Anticybersquatting Consumer Protection Act, and whistle blower actions under the False Claims Act. He was also appointed as a Special Assistant Attorney General for the State of Illinois for purposes of prosecuting eminent domain matters. In addition to having devoted a

substantial portion of his career to antitrust and securities fraud matters, for the last twenty years, Mr. Howard has devoted a substantial portion of his practice to whistle blower actions for Medicare, Medicaid, Homeland Security, and defense contractor fraud.

Mr. Howard's notable cases include: *Ohio-Sealy Mattress Mfg. Co. v. Sealy, Inc.,* an antitrust action in which he was involved in several Seventh Circuit appeals and litigation work-up, resulting in a $77 million jury verdict; *Morse v. Abbott Laboratories, Inc.,* a securities fraud class action which resulted in a $15.3 million jury verdict; *In re Chicago Flood Litigation*, in which he had a prominent role in the work-up of the case, which settled for more than $25 million; *Tyco International, Inc.,* a consolidated securities fraud class action that was jointly settled as part of a $3.2 billion global settlement – the third largest class action recovery ever; *Robinson v. Northrop Corporation,* a whistle blower action which, after 16 years of litigation, settled prior to trial for $134 million – the largest recovery in a False Claims Act case in this region at the time.

Mr. Howard received his law degree from Washington & Lee University School of Law.

\*      \*      \*

**MATTHEW WAWRZYN** is a partner at Siprut PC. He is a trial attorney with experience in many areas of law over 15 years. He has been lead counsel in various patent-infringement matters, both defending public companies and representing plaintiff companies of all sizes. Mr. Wawrzyn has also successfully defended businesses against allegations of fraud, breach of contract, white-collar crime, and has represented companies in accounting and insolvency cases in federal court and as part of federal regulatory proceedings.

In the last two years, Mr. Wawrzyn has acted as lead counsel on behalf of various inventors who seek to protect their patent portfolios from infringement by some of the largest companies in the world. Many of these cases were asserted against Fortune 100 companies and have since concluded favorably out of court.

Mr. Wawrzyn has argued before the Federal Circuit and five times before the Seventh Circuit Court of Appeals, and has drafted a petition for writ of certiorari on which the Supreme Court of the United States ordered a response. Mr. Wawrzyn began his career at Winston & Strawn in Chicago. His practice was largely devoted to representing major creditors in various large bankruptcy cases, including United Air Lines and Kmart. Mr. Wawrzyn also focused on white-collar crime and securities enforcement, including internal investigations and the defense of a large corporation in an investigation by the Securities Exchange Commission.

Mr. Wawrzyn subsequently joined Kirkland & Ellis in Chicago, where he continued to represent debtors in possession in large Chapter 11 cases at contested confirmation and Rule 9019 hearings. He also managed bankruptcy litigation on behalf of a private equity firm. In addition, Mr. Wawrzyn continued to devote his time to white-collar crime, securities enforcement, and general commercial litigation. Notably, Mr. Wawrzyn defended a "Big Four" accounting firm in one of the first investigations conducted by the Public Company Accounting Oversight Board, or PCAOB.

In early 2010, Mr. Wawrzyn founded a Chicago-based litigation boutique. Some of that firm's notable representations included the defense of the Russian software developer ABBYY against patent-infringement allegations of its chief competitor and the defense of the life sciences firm Illumina, again, against patent-infringement allegations of a chief competitor. The ABBYY case involved "optical character recognition" methods, and the Illumina case involved DNA amplification and sequencing techniques. Mr. Wawrzyn's litigation boutique merged with Siprut PC in 2015.

Mr. Wawrzyn graduated summa cum laude from DePaul University College of Law, where he was elected Order of the Coif and was a member of the DePaul Law Review. While at DePaul, Mr. Wawrzyn won 7 "CALI" awards for achieving the top grade in his class. He also published the following: Note, Constitutional Principles at Loggerheads with Community Action, 50 DePaul L. Rev. 371 (Fall 2000). Mr. Wawrzyn was named an Illinois "Super Lawyer -- Rising Star" in 2013 and again in 2014.

\* \* \*

**KATHLEEN MANGOLD-SPOTO** is Of Counsel at Siprut PC. She has over twenty years of class action litigation experience, primarily in the areas of consumer fraud, civil rights, and educational equity. She formerly was a partner at Futterman & Howard, Chtd., a premier civil rights, securities, and consumer fraud firm in Chicago. She has extensive experience as lead writer on trial and appellate briefs in complex federal cases, including on briefs to the United States Courts of Appeals for the Seventh and Second Circuits. She has been a conference presenter and college and law school guest lecturer on the topics of civil rights litigation under 42 U.S.C. Section 1983, education law, constitutional law, and the 50th Anniversary of *Brown v. Board of Education*.

Kathleen worked for six years as an elbow law clerk for federal judges in the Northern District of Illinois and the District of New Hampshire. She has many years' experience teaching legal writing and civil procedure at law schools in the Midwest and New England and has presented at regional, national, and international legal writing conferences. She recently served as a volunteer legal editor for the *Clearinghouse Review*, a publication of the Sargent Shriver National Center on Poverty Law. She is the author of *Third Party Challenges to Desegregation Remedies,* Ch.17, Civil Rights Litigation and Attorney Fees Annual Handbook, Vol. 15 (Dec. 1999), West Publishing.

Kathleen is a graduate of Loyola University Chicago School of Law, where she was a member of the Loyola Law Review. She received her undergraduate degree from the University of Illinois at Urbana-Champaign in English and Psychology.

\* \* \*

**MICHAEL L. SILVERMAN** is an attorney at Siprut PC. His practice is focused on complex and commercial litigation, with an emphasis on class action litigation involving antitrust, consumer protection, and contract law. Mr. Silverman has extensive experience in electronic discovery matters including electronic document preservation, spoliation, production, and

computer forensics. His efforts have assisted in the recovery of hundreds of millions of dollars for the class members he has represented.

Mr. Silverman received his Bachelors of Business Administration from the University of Wisconsin-Madison School of Business, where he concentrated his studies in Finance, Investments, and Banking. Mr. Silverman graduated *Cum Laude* from DePaul University College of Law, receiving his Juris Doctor degree in 2008. While in law school, Mr. Silverman served as an Editor for the Journal of Contemporary Moral Issues as well as a Legal Writing Teaching Assistant for first-year law students. He is admitted to the Illinois State Bar and United States District Court, Northern District of Illinois.

\* \* \*

JOHN MARRESSE is an attorney at Siprut PC. His practice focuses on complex commercial and class action litigation. Mr. Marrese has handled all phases of pre-trial litigation, including drafting and arguing dispositive and evidentiary motions, taking and defending depositions, developing and executing written discovery, and preparing fact and expert witnesses for deposition and trial. He has also assisted in several trials resulting in favorable verdicts and settlements for his clients.

Mr. Marrese graduated *cum laude* from The Ohio State University College of Law, where he was elected Chief Managing Editor of the Ohio State Journal of Criminal Law and as a member of the International Law Moot Court Team. Mr. Marrese achieved the top grade in his class in both Trial Practice and Appellate Advocacy, and clerked for the United States Attorney's Office for the Southern District of Ohio. He received his B.A. from Emory University in Atlanta.

Mr. Marrese is admitted to practice in Illinois, the United States District Court for the Northern District of Illinois, and the United States District Court for the Eastern District of Wisconsin.

\* \* \*

STEPHEN JARVIS is an attorney at Siprut PC. Mr. Jarvis has actively participated in over 20 patent litigations pending around the United States, including arguing and drafting an array of substantive motions and briefs in federal court. Mr. Jarvis has taken and defended depositions, including particularly expert witnesses.

Mr. Jarvis graduated summa cum laude from DePaul University College of Law, where he was elected Order of the Coif and was a member of the DePaul Law Review. While at DePaul, Mr. Jarvis won 4 "CALI" awards for achieving the top grade in his class. Mr. Jarvis also won the Scandaglia & Ryan Excellence in IP Legal Writing Award, and he published a Comment in the DePaul Law Review.

\* \* \*

**GREGG BARBAKOFF** is an attorney at Siprut PC. His practice encompasses a wide spectrum of litigation with an emphasis on commercial litigation and consumer class actions. Gregg serves on the Board of Directors for the American Constitution Society, a progressive legal organization dedicated to the core Constitutional values of civil liberties, open access to justice, and the rule of law.

Gregg is a graduate of the Chicago-Kent College of Law, where he served as an editor of the Seventh Circuit Review, in which he was also published. During law school, he was selected as a Member of the Chicago-Kent Moot Court Honor Society, where he won the award for Best Overall Oralist at the Appellate Lawyers Association Moot Court Competition. Gregg was selected for the Class of 1976 Honors Scholarship while attending Chicago-Kent. Gregg graduated from Chicago-Kent *magna cum laude*, and was recently inducted into the Order of the Coif. Gregg is admitted to practice in Illinois and in the United States District Court for the Northern District of Illinois.

\*      \*      \*

**ISMAEL SALAM** is an attorney at Siprut PC. His practice is focused principally on class action litigation, with an emphasis on consumer protection, data privacy and technology issues, and litigation under the Telephone Consumer Protection Act. Ismael is a graduate of Loyola University Chicago School of Law, where he served as Managing Editor of the Public Interest Law Reporter, in which he is also published. He also served as a junior member of the Loyola Law Journal, the law school's main publication. During law school, he was selected as a Student Fellow for Loyola's Institute for Consumer Antitrust Studies, where he drafted papers on price-fixing. He was also awarded the CALI for the highest grade in his Law and Economics course.

Prior to Siprut PC, Ismael interned with the U.S. Army Judicial Advocate General's Corps at Fort Carson, Colorado, U.S. Attorney's Office for the Northern District of Illinois, U.S. Court of Appeals for the Seventh Circuit, and U.S. District Court for the Northern District of Illinois.

\*      \*      \*

**MICHAEL OBERNESSER** is Of Counsel to Siprut PC. Michael graduated magna cum laude from Xavier University in Cincinnati, Ohio with a Bachelor's Degree in Philosophy in 1998. After graduation, Michael went on to receive his Juris Doctor at the Northwestern University School of Law in Chicago, Illinois in 2001. While attending Northwestern, Michael was a member of the Bluhm Legal Clinic, where he represented clients accused of a wide variety of criminal offenses, including drug and gun possession, assault and battery, and murder. After graduation, Michael went to work for some of the largest law firms in the nation, including Morgan, Lewis & Bockius LLP, and Howrey LLC, where he litigated complex matters on behalf of his clients.

\*      \*      \*

**TODD C. ATKINS** is Of Counsel at Siprut PC, and heads the Firm's California office. His litigation practice encompasses class actions, real estate and securities matters – representing

both brokers and plaintiffs. Todd is also a trained and experienced mediator, and received his certification from the National Conflict Resolution Center.

Todd is a graduate of the University of San Diego, School of Law. He is admitted to practice in California, the District of Columbia, and the United States District Court for the Southern District of California, and is also a licensed real estate broker

\*  \*  \*

**ALEXANDER SHAPOVAL** is Of Counsel at Siprut PC, and heads the Firm's Boston office. His practice encompasses all manner of civil litigation, including class actions and personal injury litigation. Alexander is an experienced trial lawyer, with substantial first-chair jury trial experience.

Alexander is a graduate of the Massachusetts School of Law. He is admitted to practice in Massachusetts and the United States District Court for the District of Massachusetts.

4821-5129-8057, v. 1