# EXHIBIT 4

```
                     IN THE UNITED STATES DISTRICT COURT
 1                  FOR THE NORTHERN DISTRICT OF ILLINOIS
                                EASTERN DIVISION
 2

 3
    JASON DOUGLAS,                      )
 4                                      )
                         Plaintiff,     )
 5                                      )
    -vs-                                )   Case No. 14 C 1741
 6                                      )
    THE WESTERN UNION COMPANY,          )   Chicago, Illinois
 7                                      )   November 10, 2015
                         Defendant.     )   9:15 a.m.
 8

 9                          TRANSCRIPT OF PROCEEDINGS
                     BEFORE THE HONORABLE GARY FEINERMAN
10

11  APPEARANCES:

12  For the Plaintiff:         SIPRUT, PC
                               BY:  MR. JOSEPH J. SIPRUT
13                                  MR. ISMAEL T. SALAM
                               17 North State Street
14                             Suite 1600
                               Chicago, Illinois   60602
15                             (312) 236-0000

16

17  For the Defendant:         LATHAM   WATKINS, LLP
                               BY:  MS. KATHLEEN P. LALLY
18                             330 North Wabash Avenue
                               Suite 2800
19                             Chicago, Illinois   60611
                               (312) 876-7700
20

21
    Court Reporter:
22
                       CHARLES R. ZANDI, CSR, RPR, FCRR
23                           Official Court Reporter
                           United States District Court
24               219 South Dearborn Street, Suite 2128
                             Chicago, Illinois   60604
25                       Telephone:   (312) 435-5387
                   email:  Charles_zandi@ilnd.uscourts.gov
```

1      (Proceedings heard in open court:)
2              THE CLERK:  14 C 1741, Douglas versus The Western
3   Union Company.
4              MR. SIPRUT:  Good morning, your Honor.  Joe Siprut
5   and my colleague Ismael Salam on behalf of the class.
6              MS. LALLY:  Good morning, your Honor.  Kathleen Lally
7   on behalf of the defendant.
8              THE COURT:  Good morning.  We're here on the
9   plaintiff's motion for preliminary approval of a class action
10  settlement.  I know what the answer is, but I want to say it
11  on the record.  Is there anybody here, any putative class
12  member or any potential objector, even though there's been no
13  preliminary approval, here to address the motion?
14             There's nobody in the courtroom.  Nobody's responded.
15  The Court has not received any communication from anybody, any
16  possible stakeholder who could have something to say about the
17  motion, so we'll proceed.
18             I've reviewed the motion, and let me just ask just a
19  few questions that occurred to me as I was going through the
20  materials.
21             The recovery for the claimants is a per-person
22  recovery.  It's, I guess, at least theoretically possible to
23  have done a per-call recovery.  So, what went in to the
24  decision to make it a per-person recovery as opposed to a
25  per-call recovery?  So, for example, somebody who got five

1 calls or five texts would have -- would get more than somebody
2 who got only one.
3     MR. SIPRUT: Sure. One of the principal driving
4 points was the fact that we were trying to work off of an
5 all-in, non-reversionary cash framework as a starting point,
6 which of course is one of the huge gulfs -- what was the word
7 the other lawyer used a moment ago -- chasm in settlement
8 negotiations. So, we pushed very hard for the all-in, cash,
9 non-reversionary framework.
10     Once we got to that point after, you know, best
11 efforts, that sort of helped everything else fall into place,
12 the all-in cash framework, the pro rata based on the number of
13 claims filed is basically almost a given.
14     There might have been a way to structure it so that
15 mathematically people could say they got X number of texts or
16 establish that they got X number of texts; but the point is
17 that in order to be able to tell people, "This is the amount
18 we think is going to be available. This is the amount that we
19 think you're going to get," this was all really made possible
20 only if you accept the premise that you have an all-in number
21 and after all the claims are in, it's divvied up.
22     THE COURT: But couldn't you say -- instead of just
23 having the denominator being the number of people, couldn't
24 you have had the denominator being the number of calls, and
25 then the claimants put in for a particular number of calls?

1  MR. SIPRUT: Again, not to say that that's
2 theoretically impossible, but one of the issues in dispute was
3 all the various subclasses. When we got into the heart of
4 this case, it became apparent that when you peel away the
5 layers, there were four or five different subclasses, as to
6 which there were numerous defenses and arguments that each of
7 the various subclasses was subjected to.
8  So, in the end, whether some of those messages would
9 have been even actionable or not was one of the issues in
10 dispute. And ultimately, once we got to the price that sort
11 of built in all of those issues, we went for the broadest
12 settlement class possible, which is anyone who has, you know,
13 a potential claim is in.
14  But the sort of drawback to that -- not drawback, but
15 the other side to that is that maybe that person only gets one
16 remedy instead of zero, as opposed to the other theoretical
17 alternative, which is that they get five.
18  So, I guess the short way of summing all that up is
19 it was all priced into the settlement fund.
20  THE COURT: What -- do you have any thoughts on that?
21  MS. LALLY: Yeah. Your Honor, just briefly, I also
22 believe looking at least initially at the class list that we
23 put together, the vast majority of these are going to be one
24 call to one number because there were opt-in text messages
25 that the plaintiffs received. It was very unlikely, it

1  doesn't seem that it occurred very often to have multiple
2  calls to that same number.
3          MR. SIPRUT: That's a good point. There have been
4  some robo-call settlements that have come through here where
5  these poor people get 14 calls while they're eating dinner and
6  they're really upset. This was not really that kind of
7  situation, so that was a factor, too.
8          THE COURT: I see. So, I'll just incorporate -- I'll
9  say it now, and I'll incorporate it into my ruling. I'm
10 satisfied that having a -- at least at this point at the
11 preliminary stage, that having a per-person recovery is
12 acceptable, as opposed to having a per-call recovery because
13 the vast majority of the claimants will have had only one
14 call; and then even if there were some who had more than one
15 call, administratively, the game wouldn't be worth the candle
16 in terms of hashing all of that out.
17         The second question I have is: What do you expect
18 based on your experience the claim rate to be? What
19 percentage of the class do you anticipate filing claims?
20         MR. SIPRUT: Yeah. I think in our papers, we
21 estimated it at around 5 percent? I'm looking at my colleague
22 because he's the notice expert around here, but we had a range
23 of possibilities based on historical take rates and
24 particularly settlements of this size, because obviously the
25 take rate is going to be higher when there's more money

1  available and people are motivated when they might get $100 as
2  opposed to 10.  So, pricing all that in, I think the range we
3  came up with was around 5 percent?
4              MR. SALAM:  Yes, your Honor, we reached out to the
5  administrator and tried to figure out levels at 1, 3, and 5
6  percent.  Those were estimated take rates.
7              THE COURT:  I see.  And because this settlement is
8  just a bit richer than some of the others, you would expect a
9  higher take rate?
10             MR. SIPRUT:  Hopefully, yes.
11             THE COURT:  Do you have any thoughts on this?
12             MS. LALLY:  I -- after speaking with the
13 administrator, we did present the 1, which we think would be
14 low, 3 middle, 5 on the higher end..  Though I will say the
15 administrator has indicated based on other settlements that
16 there -- it's not unusual to see a 7 or a 9 percent,
17 particularly in this case where we will have the ability to do
18 some -- mostly, I think, direct notice to the class, you do
19 sometimes get a higher take rate there, and they wouldn't be
20 shocked to see something in the 7 to 9 percent range.
21             THE COURT:  All right.  Speaking of notice, is it --
22 e-mail was mentioned and U.S. Mail was mentioned.  Is
23 U.S. Mail used only if e-mail fails, or are both used for
24 everybody?
25             MR. SALAM:  Yes, your Honor.  So, the majority --

1         THE COURT: I'm looking at the notice expert.

2         MR. SALAM: The majority of the class -- for the
3 majority of the class, we have actual mailing physical
4 addresses. So, after talking with the administrator, we
5 decided that we would issue direct notice via U.S. Mail to
6 those for whom we have physical mailing addresses.

7         Now, however, there are a decent amount of class
8 members who we do not have physical mailing addresses in our
9 class list; however, we do have e-mail addresses. So, for
10 those individuals, we're going to send e-mail notices.

11         THE COURT: And for the people -- for the folks for
12 whom you have physical addresses, are you also going to send
13 them e-mail?

14         MR. SALAM: No, your Honor. We're going to be
15 sending just U.S. Mail.

16         THE COURT: Okay. And why shouldn't we use a belt
17 and suspenders for the people that you have mailing addresses
18 and e-mail addresses?

19         MR. SALAM: There's no reason I don't think that I
20 could articulate that would explain why we shouldn't
21 necessarily go belt and suspenders, but given our
22 communications with the settlement administrator, we didn't
23 think it was necessary to use both e-mail and mail notice.

24         MR. SIPRUT: Yeah, and I'll just add to that. I'm
25 open to it. I've done it either way in the past. Sometimes

1  we cover the gamut, and certain people get blitzed from three
2  different angles, belt and suspenders. Other people -- in
3  other settlements, we've done it more like we've proposed
4  here.
5      It's a tough call. I think the down side to doing
6  the e-mail in addition to the U.S. Mail, aside from maybe an
7  incrementally higher cost, which wouldn't be the only reason
8  not to do it, but aside from that, I think it can be confusing
9  sometimes. If people get the postcard and the mail -- or the
10 e-mail, it can be confusing. People think, "Wait, isn't this
11 the same thing? Didn't I already do this? Why am I getting
12 this again?"
13     As to what percentage of people are deterred because
14 of that confusion, it's hard to say; but I've gotten
15 recommendations on both arguments, so, I can go either way on
16 this one. And ultimately, although we proposed it this way
17 after talking to the administrator, if the Court felt more
18 comfortable with the other approach, I don't think any of us
19 would try to resist that.
20     MS. LALLY: We would have no objection to doing both.
21 We would note that there would be an incremental increase in
22 settlement costs which obviously comes with it. I don't think
23 we totally priced that out, so I'm not sure what that increase
24 is off the top of my head.
25     MR. SALAM: No, your Honor, we have not spoken

1 about --

2 THE COURT: Right now, it's $240,000. Would you
3 imagine that it would add more than $100,000?

4 MR. SIPRUT: No, it would probably be less than that,
5 almost certainly less than that. So, we know standing here
6 right now generally what that incremental cost would be; and
7 if that were the only issue, I'd say we can do it. It's more
8 just the sort of judgment call as to whether it's really
9 better or not.

10 MS. LALLY: I do think, your Honor, to -- again,
11 Mr. Siprut's point, there is a risk, I think, of duplicative
12 claims being filed, which obviously will then take time for
13 the administrator to also sort out, could lead to some class
14 member dissatisfaction thinking that they aren't getting what
15 they think they were due. But we would have -- we obviously
16 want to provide it as robust as possible, so we are open to --

17 THE COURT: Okay. I understand there are two sides
18 to the coin. I'd prefer that if there are physical addresses
19 and e-mail addresses, that notice go out both ways to each
20 person. Perhaps you could add some language to the class
21 notice saying, "You may be getting notice by e-mail and by
22 postcard. You can only make one claim." I think that would
23 be simple enough.

24 And I'm kind of extrapolating from my own experience
25 from before I was a judge. I have to imagine that for many

1  people when you get something in the mail, it looks like junk
2  mail, and you just throw it out. And sending it by e-mail as
3  well might get more people's attention, so I think the notice
4  would be better.
5       And that's not based on any scientific research I've
6  done. The sample size is very small from what I'm
7  extrapolating, but I think -- I'd prefer that.
8       MR. SIPRUT: Sure.
9       THE COURT: And since you aren't objecting, I'm going
10 to ask you to do that.
11      And then finally -- well, we'll talk about the
12 attorney fees later.
13      So, I'm going to grant the motion for preliminary
14 approval. The settlement is within the range of fairness and
15 reasonableness. It's an $8.5 million all-in fund, so it's not
16 a reversionary fund. The per-claimant recovery is sufficient.
17 If everybody makes a claim, which isn't going to happen, it
18 would be $10.00 per person. If 10 percent make a claim, which
19 is really high, it will be around $100 per person. That's
20 almost certainly not going to happen. So, we're looking at a
21 per-claimant recovery of over $100, which is very robust.
22      And I know that statutory damages could be higher
23 than that, but the defense -- the plaintiff, the named
24 plaintiff and the class would face several defenses in
25 attempting to litigate this case. There's -- they could --

1  their claims could be subject to arbitration.  There's a
2  consent defense.  And then there's a defense on the merits as
3  to whether Western Union used an ETDS.
4 　　　　　So, given the possible defenses and the various ways
5  that this case can go south for the plaintiffs, the recovery
6  is reasonable.  And I'm saying that preliminarily and not
7  based on the full record that I'm going to have at the final
8  approval hearing.
9 　　　　　And class counsel did undertake enough discovery to
10 evaluate the strengths and the weaknesses and make an informed
11 decision.
12 　　　　　The incentive award of $5,000 is reasonable.  The
13 amount allocated for notice and administrative expenses, which
14 right now is $240,000 and it's going to go up because of my
15 request on e-mailing and mailing, U.S. mailing, but still,
16 it's going to be in the low 300s, probably; and for an
17 $8-1/2-million fund, that's very reasonable.
18 　　　　　For the attorney fees, I'm not deciding the attorney
19 fees right now.  When counsel files the motion to approve the
20 attorney fees, make whatever arguments you're going to make.
21 I also would like to have the information if I decide that I
22 want to do a lodestar cross check.  I'm not going to make it a
23 lodestar -- I actually have the discretion to make it a
24 lodestar recovery under the Seventh Circuit authority.  I
25 think it's very unlikely that I'm going to base the attorney

1  fee recovery on lodestar, but I do -- I would like to do a
2  lodestar cross check just as part of the mix in deciding what
3  the attorney fees ought to be.
4      And if you could also address in your -- and you
5  can -- give me the information on the lodestar, and then make
6  your argument as to why I ought not to consider it.  And I may
7  agree with you on that, or I may disagree with you on that.
8  If I disagree with you on that legal point, then at least I'll
9  have the information to be able to consider it.  Or if you
10 don't mind me considering the lodestar cross check, just
11 submit it and don't make an argument that I shouldn't
12 consider it.
13     And if you could also address the declining
14 percentage method that at least some of my colleagues have
15 effected in other recent settlements, I believe Judge St. Eve,
16 and there may be a couple of others.  I'm putting it on the
17 table, and if you want to argue against it, that's fine.  Tell
18 me why it's inappropriate, either generally or in this -- in
19 this particular case; or if you think it would be an
20 appropriate way of going, give me a proposal as to what you
21 think would be appropriate.
22     The class certification is appropriate in this case.
23 There's just over 800,000 class members.  All of the
24 requirements of 23(a) have been satisfied.  There's
25 numerosity, typicality, adequacy, and common questions.  And

1    23(b)(3) has been satisfied as well, as the common issues
2    predominate over -- at least in the settlement context, the
3    common issues predominate over the individual issues, and a
4    class action is by far the superior method of processing this
5    case.
6        The notice is sufficient as well, particularly given
7    the modification that I've asked for. I think it's -- it's --
8    there's going to be direct notice for everybody for whom the
9    parties have a physical address, and there's going to be
10   e-mail notice for everybody for whom the parties have an
11   e-mail address.
12       There's a settlement website. There's a toll-free
13   number. The question -- the Q & A that's going to go with the
14   notice is very clear. Even I was able to understand it. And
15   the claims form is very simple and easily understood and
16   easily filled out. It's not the kind of claims form that the
17   Seventh Circuit has said is -- would tend to lead to a
18   depressed claims rate. There's no incentive for either side
19   to want that because it's not a reversionary fund. And just
20   looking at it -- even if there were an incentive, I'd say,
21   "Well, they fought the incentive," because this is a very
22   clear and clean claims form.
23       So, for those reasons, I'm going to grant the motion
24   for preliminary approval. We need to set a date, and you
25   wanted five months from today?

1   MR. SIPRUT:  Well, we have a schedule -- and thank
2 you, by the way, your Honor, for granting the motion.  Your
3 points are all very well taken in terms of what we should be
4 on the lookout for to address with our subsequent filings, and
5 we'll do that.
6   And before I address your Honor's question about the
7 schedule, I can't help myself, I just want to put one thing on
8 the record, which is that further underscoring the Court's
9 findings, which is we're pretty proud of the settlement
10 because as our research indicates, to our knowledge, it's the
11 best TCPA settlement in the country in terms of relief
12 relative to class size.
13   So, I think we used the term apples-to-apples basis
14 in our brief.  If you just look at other large TCPA
15 settlements, cash funds non-reversionary like this, and you
16 calculate the amount of money per class member, ours is in
17 first place in the United States; and frankly, second place
18 is a distant second place.  So, we're pretty proud of that,
19 and we're grateful that the Court has granted preliminary
20 approval.
21   With respect to the schedule, yeah, the schedule that
22 we put together in conjunction with the notice plan that we
23 have in mind gives us a timeline that would put the final
24 approval hearing at around April -- early April, April 7th, to
25 the day, although, subject to the Court's schedule and

1 availability.

2 But it was a -- I would say, you know, not a super
3 aggressive schedule in terms of how fast we're trying to rush
4 to get things done; but by the same point, it's not terribly,
5 you know, elongated, either. It's probably right in the
6 middle, from what I've seen for a case of this nature with
7 this kind of notice plan.

8 THE COURT: Okay. So, we'll set a date, and I'm
9 going to want the motion for final approval and the motion for
10 attorney's fees to be submitted sufficiently in advance of the
11 final approval hearing where if there are objectors, they have
12 a target to shoot at.

13 MR. SIPRUT: Yeah, we -- our proposed schedule
14 proposes on that point that our fee motion be filed no later
15 than 14 days prior to the objection deadline, which is not
16 only well in advance of the final approval hearing, but it's
17 still 14 days prior to when objectors can still be filing
18 things. And that's consistent with some of the recent Seventh
19 Circuit decisions that have expressed concern about that
20 particular point.

21 So, this way, if we file our motion for attorney's
22 fees 14 days before the objection deadline, objectors, if
23 there are any, can say what they're going to say; and then
24 when we subsequently file our motion for final approval, we
25 can then respond to the objections.

1  THE COURT: Okay. And those dates are all in the
2  proposed order?
3  MR. SIPRUT: Yes, your Honor.
4  MS. LALLY: Yes, they are.
5  THE COURT: All right. Good. Jackie?
6  THE CLERK: April -- how much time do we need?
7  THE COURT: Well, it will depend on how many
8  objectors we get, if any.
9  MR. SIPRUT: Fingers crossed.
10 THE COURT: As far as you're concerned. I don't care
11 how many objectors there are. Why don't we -- do we have
12 trial that week?
13 THE CLERK: Yes.
14 THE COURT: And the next week?
15 THE CLERK: Yes.
16 THE COURT: And the next week?
17 THE CLERK: Yes, yes.
18 THE COURT: How about Friday the 8th; and we'll just
19 count on that trial lasting only four days, and I don't think
20 it will last any more than three. And I'll give you all day.
21 We'll start at 10:00 o'clock, and maybe we'll be done by
22 11:00. Maybe we'll be done by noon. We'll see.
23 MR. SIPRUT: Sounds good.
24 MS. LALLY: Thank you, your Honor.
25 MR. SIPRUT: Thank you, your Honor.

1    THE COURT: Anything else? Thank you.
2    (Which were all the proceedings heard.)
3                    CERTIFICATE
4    I certify that the foregoing is a correct transcript from
5    the record of proceedings in the above-entitled matter.
6
7    */s/Charles R. Zandi*          *November 13, 2015*
8    Charles R. Zandi               Date
     Official Court Reporter
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25