## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| JASON DOUGLAS, individually and on behalf of all others similarly situated, | ) ) ) | |
| Plaintiff, | ) ) | Case No. 14-cv-1741 |
| v. | ) ) | Hon. Gary Feinerman |
| THE WESTERN UNION COMPANY, a Delaware corporation, | ) ) ) ) | Magistrate Judge Jeffrey Cole |
| Defendant. | ) | |

---

### BETHANY CAROL PRICE'S CONSOLIDATED RESPONSE
### IN OPPOSITION TO (1) MOTION FOR FINAL APPROVAL [Doc. 96]
### AND (2) WESTERN UNION'S SUPPLEMENTAL SUBMISSION [Doc. 94]

---

Bethany Carol Price ("Ms. Price"), by and through her undersigned counsel, respectfully submits her Consolidated Response in Opposition to Motion for Final Approval [Doc. 96] and Western Union's Supplemental Submission [Doc. 94].

          W. Allen McDonald, Esq.
          **Lacy, Price & Wagner, PC**
          249 N. Peters Road, Suite 101
          Knoxville, TN 379234917
          Tel: 865-246-0800

          Lloyd C. Chatfield, II
          **Law Offices Of Lloyd C. Chatfield II**
          39W127 Bartelt Road
          Geneva, IL 60134
          Tel: 888-695-4535

          *Counsel for Bethany Carol Price*

# TABLE OF CONTENTS

I. PRELIMINARY STATEMENT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

II. LEGAL ARGUMENT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

      A.      The Parties' Suggestion That Ms. Price Lacks Standing to Object or Submit a Claim Is, at Best, Disingenuous, and at Worst, a Deliberate Effort to Mislead the Court.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

      B.      The Class Definition Is Demonstrably Vague, As the Parties Cannot Even Agree Upon Class Membership Eligibility. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

      C.      The Settlement Fund Fails to Meaningfully Compensate Class Members. . . . . . 10

      D.      Class Counsel Should Be Compensated Via the Lodestar Method and Awarded Reimbursable Expenses Only.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

III. CONCLUSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

CERTIFICATE OF SERVICE. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

I.      PRELIMINARY STATEMENT

Class Counsel implore the Court to rubber-stamp the parties' proposed settlement, fantastically characterizing it as "one of the best TCPA class action settlements ever." [Doc. 96, at Page ID#: 1083]. Class Counsel shamelessly disparage each and every objection made by Ms. Price[1] and other objectors, falsely suggesting their proposed settlement is an untouchable one, beyond the reach of criticism, attack, or impeachment. In doing so, Plaintiff and Class Counsel have feebly attempted to shut down Ms. Price's well-founded objections by proclaiming that she is not a Class member. As demonstrated below, if there is a Class, there is no doubt that Ms. Price is part of it.

Class Counsel have also concocted a fictional account of the settlement supported by error-laced arguments in which they casually discount and callously disregard the settlement's innumerable and insurmountable deficiencies, not the least of which is the fundamentally important class definition. In attempting to patch-up the inescapably vague definition, the parties have reached the point at which they cannot even agree who is eligible to be a Class member and who is not.

In addition, the settlement is also inadequate to fairly compensate Class members, as it fails to consider the differing injuries/damages of Class members who received multiple text messages and those who received only one. This discrepancy produces yet another obstacle to final approval: the legal remedies of certain Class members are sacrificed for the legal remedies of others, leading to a now irreparable intra-class conflict that sounds the death knell for the proposed settlement.

Similarly, Class Counsel support their request for fees by a motion padded with massive amounts of hours, billed at rates of $650 and $350 an hour, that are altogether unrelated to the case.

---

[1]Ms. Price has articulated her various objections to the proposed settlement (and defended her standing to submit a claim) in several filings. [Docs. 69, 84, and 90]. She reasserts and adopts each of those arguments herein by reference thereto.

Moreover, hundreds of hours by multiple attorneys billing at $650 and $350 per hour are listed for tasks so common and mundane as drafting rote motions that do not require substantial deviation from case to case. What is more, over half the hours purportedly spent working on the case are billed at the highest hourly rate ($650), totaling over $770,000, notwithstanding the firm's self-proclaimed experience in handling such matters. Finally, Class Counsel seek reimbursement of certain expenses that are clearly unrelated to this case and otherwise unrecoverable.

Respectfully, this settlement is fraught with myriad obstacles prohibiting final approval. Ms. Price would ask the Court to reject it and permit the parties to submit a modified settlement resolving the deficiencies of the one here presented.

## II. LEGAL ARGUMENT

### A. The Parties' Suggestion That Ms. Price Lacks Standing to Object or Submit a Claim Is, at Best, Disingenuous, and at Worst, a Deliberate Effort to Mislead the Court.

Clearly, Class Counsel is aggressively fighting Ms. Price's status as a Class member in order to silence her well-made objections. This tactic, they apparently believe, will protect Class Counsel's ill-fated and much-beleaguered attorneys' fee. It will certainly not protect the Class.

According to Plaintiff and Class Counsel, Ms. Price "lacks standing to object to this Settlement because she affirmatively authorized Western Union to send her text messages on multiple occasions." [Doc. 96, at Page ID#: 1107]. This is simply untrue.[2]

---

[2]During the March 17, 2016 hearing, Ms. Price's counsel requested a comparison between the consent allegedly given to Western Union by Ms. Price, on one hand, versus the circumstances that allegedly occurred in the case of the Plaintiff, Mr. Douglas, and other purported Class members. Not surprisingly, no such information has been provided to Ms. Price.

The general explanation of the parties is that if a person signed up for Western Union's "My WU" loyalty program, then that person was not supposed to be a member of the proposed Settlement Class. Indeed, Western Union has affirmatively stated that the Plaintiff, Mr. Douglas, did not sign up for the My WU loyalty program:

> The first such circumstance included customers like Plaintiff Jason Douglas ("Plaintiff"), who initiated transactions via Western Union's website, but did not sign up for Western Union's loyalty program.

[Doc. 94, at Page ID#: 1010].

However, it now appears that Mr. Douglas was a My WU member and account holder number and any representation that did not sign up as a My WU member is simply not the case. Specifically, the text message received by Mr. Douglas' wireless telephone from Western Union on or about February 13, 2014 clearly references a "My WU" account number (694624867). [Doc. 1, at ¶ 20, Page ID#: 4-5].[3] Indeed, a copy of the text message was also attached to Plaintiff's Complaint as an exhibit. [Doc. 1-1, at Page ID#: 12]. In direct contrast to the text message received by Mr. Douglas, which clearly signifies his membership in the My WU loyalty program along with

---

[3]The Complaint [*Id.*] reproduced the text message verbatim:

> WU: My WU # 694624867
> subject to T&Cs @bit.ly/
> lcOujel. Reply Y for
> periodic automated ad
> texts; Consent not
> required to purchase.
> STOP2stop;
> Msg&DataRatesApply

his nine-digit My WU account number,[4] the text message received by Ms. Price plainly signifies neither.[5]

Nevertheless, despite all of this, Western Union takes great pains to suggest that Ms. Price is not a Class member and that Mr. Douglas "did not sign up for My WU." [Doc. 94, at Page ID#: 1010].[6] That Ms. Price is a Class member is abundantly demonstrated by the following discussion of the issue of the propriety of the ever-illusive class definition.

### B.   The Class Definition Is Demonstrably Vague, As the Parties Cannot Even Agree Upon Class Membership Eligibility.[7]

Class Counsel and Western Union, minus Court-approval, have apparently agreed on a modification of the Class definition. Thus, only Class members who are purportedly included on

---

[4] Western Union's website provides that the My WU account number is a nine-digit number, the same as referenced on the text message received by Mr. Douglas. *See* http://westernunion.com/sites/ru/mywu/mywu-gold.page.

[5] *See* Screen-shot of text message, Exhibit 1.

[6] Even more curious is the fact that Mr. Siprut actually filed two lawsuits regarding the *same* text message received by Mr. Douglas. In addition to the case against Western Union, Mr. Siprut filed a second lawsuit against Pandora Media (an internet radio company). *See* Doc. 1, *Jason Douglas v. Pandora Media, Inc.*, No. 1:14-cv-01315 (N.D. Ill. Feb. 21, 2014) (Exhibit 2). Not only are the exhibits to the *Pandora Media* complaint and the Western Union one and the same, but at ¶ 19 of the *Pandora Media* Complaint, Mr. Siprut quotes the same text message received by Mr. Douglas from Western Union in this case (compare Western Union Complaint, at ¶ 20, with *Pandora Media* Complaint, at ¶ 19).

[7] The Settlement Class is defined as:

> All Persons in the United States who received one or more unsolicited text messages sent by or on behalf of Western Union between March 12, 2010 and the date of Preliminary Approval [November 10, 2015].

Notably, except for the addition of a class period, this is the exact class definition set forth in the Complaint. [Doc. 1, at ¶ 28, at Page ID#: 6]. This belies the assertion of Class Counsel, echoed by Western Union, that the Class eligibility was negotiated by the parties as part of the settlement.

a mysterious unfiled and unpublicized "list" are eligible for Class membership.[8] This newly-modified definition was never disseminated to Class members. Accordingly, the parties now ridiculously maintain that because Ms. Price's name does not appear on that list, she lacks standing. Because the undocumented agreement between Class Counsel and Western Union – which further limited the definition of the Class – was also not approved by the Court or included in the Class notice, any such "modification" is surely invalid with no practical effect.

Significantly, as Class Counsel point out [Doc. 96], the Seventh Circuit has identified three potential issues with class definitions: (1) vagueness, such that the court cannot identify who should receive notice and share in the recovery; (2) subjective criteria, such as a person's state of mind; and (3) fail-safe classes that depend on a defendant's liability. *Mullins v. Direct Digital, LLC*, 795 F.3d 654, 660 (7th Cir. 2015), *cert. denied*, No. 15-549, 2016 WL 763259 (U.S. Feb. 29, 2016). Tellingly, at this point, after settling this case, Class Counsel and Western Union cannot agree upon precisely how Western Union may have obtained consent from Class members (which, incidentally, may or may not be the same as an "unsolicited text message"). Consequently, how can a Class member be expected to know whether a text was "unsolicited" or not? It is inconceivable for a better instance of vagueness to exist than when the parties themselves cannot agree upon settlement terms.

Western Union's submission regarding Ms. Price's standing states:

> "Western Union maintains that none of the text messages it sent violated the TCPA, as the messages were single, opt-in messages that were not advertising or marketing and were sent only to those customers who otherwise provided their mobile phone numbers to Wester Union."

---

[8]As it turns out, Western Union enlisted the services of a now-defunct third-party to formulate the "list," which was allegedly produced to Class Counsel following execution of the settlement agreement during "confirmatory discovery."

[Doc. 94, fn 4]. Western Union's brief suggests that "Plaintiff and the members of the Settlement Class otherwise consented to receive text messages, barring them from recovering under the Telephone Consumer Protection Act ("TCPA")." [Doc. 95, at Page ID#: 1057].

In contrast, Class Counsel's brief declares,

> "Plaintiff does not concede that [an authorization to receive a text message from Western Union such as the authorization allegedly given by Ms. Price], even if obtained by Western Union, meets the legal requirements of 'prior express consent' or 'prior express written consent' within the meaning of the Telephone Consumer Protection Act, 47 U.S.C. § 227, and the corresponding regulations at 47 C.F.R. §64.1200."

[Doc. 93, fn 1; Doc. 96, at Page ID#: 1118].

From this, a subjective test results, based on who is to be believed: Class Counsel or Western Union. In other words, a Class member who takes Western Union's view of the facts and law will ultimately conclude that he or she was ineligible to submit a claim. On the other hand, a Class member who agrees with Class Counsel would decide that he or she is eligible to submit a claim.

If one looks to relevant definitions, the term "unsolicited" does not mean the same as the phrase, "without consent." Unfortunately, "unsolicited" was not defined in either the Settlement Agreement or the Class notice. Consequently, the ordinary meaning of the term should be applied. According to the Oxford English Dictionary, "unsolicited" means "not asked for; given or done voluntarily."[9] "Consent," on the other hand, means "permission for something to happen or agreement to do something."[10]

---

[9] http://www.oxforddictionaries.com/us/definition/american_english/unsolicited

[10] http://www.oxforddictionaries.com/us/definition/american_english/consent

Class Counsel agree that there is a fundamental distinction between "solicit" and "without consent," as the following representation by Class Counsel demonstrate:

> MR. SIPRUT: Well, the settlement class definition is people who received one or more unsolicited text messages from Western Union. And the way that we compiled the list for notice and for determining, you know, who should be considered a settlement class member are people who -- for example, my client provided his cell phone number at some point to Western Union, not in the context of saying, "***I want to receive text messages,*** " ***but he actually gave his cell phone number at some point in the process, like on the general form.***
>
> Now, Western Union, when the merits of this case were in play, back when the case was being litigated and still when the settlement was being negotiated, Western Union would say, well, that's a defense. You know, he consented by giving his cell phone number. We at that time said, no, that is not a defense. Just because someone gives you their cell phone number and fills out a form saying, "Here's my contact information. Here's my address. Here's my cell," that is not a consent to receive a text message within the meaning of the law. That was the issue when debating this class now – I mean this case.
>
> When the class settlement was worked out and when the case was settled, we included people who, like my client, provided their cell phone number, and there was some perhaps bona fide dispute about whether that was consent as a matter of law. ***However, it did not include people who, separate and apart from all of the foregoing, actually checked a box saying, "I want you to text me," which is essentially what happened with Ms. Price.***

[Transcript of Proceedings, March 17, 2016, at pp. 5-6] (emphasis added).

As is clearly demonstrated by Western Union's submission [Doc. 94], Ms. Price did not in any way indicate that she wanted Western Union to text her; rather, it appears that she simply checked a box that was required as part of a Western Union form. Class Counsel acknowledges that this does not disqualify a person from being a Class member.

What is more, even if, arguendo, the Court concludes that the terms "unsolicited" and "without consent" are synonymous, they are simply too vague and ambiguous for mere lay persons

to interpret. Just as they disagree about the definition of "unsolicited," Class Counsel and Western Union also disagree about what constitutes "valid consent."

In the last analysis, however, review of the alleged "consent" purportedly given by Ms. Price reveals that it did not even cover the text messages she received. To illustrate, Western Union claims Ms. Price voluntarily signed up for its My WU loyalty program, by agreeing to the following:

> By providing your mobile number with enrollment, you authorize us to send an automated text message to your mobile number with program materials and request consent to send future promotional texts.

[Doc. 94, at Page ID#: 1012]. In other words, Western Union maintains that it had Ms. Price's "consent" to send her a single text message regarding program materials. Yet, Western Union concedes that it actually sent Ms. Price two text messages.[11]

Western Union also asserts that it acquired consent from Ms. Price via a "To Send Money" form – although it is unsure exactly which form Ms. Price completed. One form stated:

> YOU WILL RECEIVE A TEXT WHEN MONEY IS PICKED UP.
>
> By completing, you authorize us to send you text message notification(s) about your money transfer status, including notifying you when the receiver picks up funds. Standard message and data rates may apply.
>
> By providing your mobile number in the Phone# or Mobile# field, you further authorize us to send you automated service-related text messages relating to you current and future transactions, including notifications when funds are received or when funds have not been picked up, and service restrictions. Msg& Data Rates Apply. Reply STOP to stop, HELP for help.

---

[11]The language concerning a "request consent to send future promotional texts" is unintelligible, but is inapplicable because Western Union does not claim that it sent Ms. Price "promotional texts."

[Doc. 94, at Page ID#: 1038]. The other form stated:

> TEXT ME and
>
> PROVIDE A MOBILE NUMBER ABOVE TO GET TEXT MESSAGE ALERTS ABOUT YOUR TRANSACTIONS.
>
> By providing your mobile number in the Phone# or Mobile# field, you further authorize us to send you automated service-related text messages relating to you current and future transactions, including notifications when funds are received or when funds have not been picked up, and service restrictions. Msg& Data Rates Apply. Reply STOP to stop, HELP for help.

[Doc. 94, at Page ID#: 1038].

Significantly, however, the text messages sent by Western Union were not notifications that funds had been "received" or "not picked up" at all. Rather, as part of its so-called "double opt-in process," Western Union sent Ms. Price a text message "asking her to opt-in if she wished to receive additional text messages regarding her [Western Union] transaction." [Doc. 94, at Page ID#: 1034].

Ultimately, the foregoing analysis makes it very clear that Ms. Price never provided Western Union "consent" of any sort to send her the text messages which she actually received. Instead, Western Union simply obtained her cell phone number from the forms she filled out – the same as it did for every other Class member.[12]

More than 39% (21,420 out of 54,316) of the claims were submitted without a unique identifying number; and do not match two criteria, *e.g.*, first name, last name, email address, address, zip code, phone number. [Doc. 93, 13]. Notwithstanding their acknowledgment that some improper claims may not qualify for payment (and in fact, may be fraudulent), Class Counsel has announced

---

[12] Class Counsel and Western Union failed to specifically describe the consents applicable to the Class representatives as the Court requested.

that "the Settlement Administrator and counsel for the Parties may elect to accept all of the claims." *Id*. [13] While Ms. Price's own claim did not contain a unique identifying number (because such a number was not provided to her), there has been no suggestion at all that the first name, last name, email address, address, zip code, phone number did not match perfectly. After all, Western Union was able to easily verify Ms. Price's transactions.

The parties' assertion that Ms. Price is not a Class member is grounded on their hope that by doing so, her objections will not be afforded any weight. Obviously, this desire is short-sighted, and wrong. The Court, on its own accord, has a fiduciary responsibility to absent Class members. *Mirfasihi v. Fleet Mortg. Corp.*, 450 F.3d 745, 748 (7th Cir. 2006) (a district court must act as a "fiduciary of the class" for the rights and interests of absent class members).

### C. The Settlement Fund Fails to Meaningfully Compensate Class Members.

Contrary to Class Counsel's suggestion, Ms. Price does not maintain that the Court should reject this proposed settlement "*solely* because it does not provide a complete victory to plaintiffs." [Doc. 96, at Page ID#: 1109] (emphasis added). Rather, Ms. Price has pointed to fundamental deficiencies in the proposed settlement that combine as insurmountable barriers to final approval. Not only is the Class definition (now reconstructed by the parties without Court approval) disastrously vague and fatally flawed, but the settlement fund and the plan of allocation fail to adequately and fairly compensate Class members for their injuries.

Class Counsel estimates that the Net Settlement Fund will be $5,209,007.64. Class Counsel says that 54,315 individuals submitted timely and valid claims and each will receive approximately

---

[13]Many of the 21,420 persons who submitted claims with a unique identifying number may have engaged in exactly the same type of transactions as Ms. Price. Ms. Price should have the same rights as those persons and thus have standing to pursue a claim and her objections.

$95.90. Class Counsel's analysis depends on the number of Class members. However, the number of actual Class members is unknown, since the only figures available are the number of people allegedly fitting the definition agreed to by Class Counsel and Western Union. There may be many more Class members, making the settlement much worse than is actually represented. In the end, not only will Class members receive substantially less than Class Counsel's previous low-end – $140 – estimate for valid claims, but as Ms. Price discussed in her original objection [Doc. 69, at Page ID#: 604-607], the settlement fund is woefully insufficient to provide meaningful benefits to Class members. This is particularly true in view of the Telephone Consumer Protection Act ("TCPA"), 47 U.S.C. §227(b)(3), which authorizes an award of actual damages, or $500 *per violation*, whichever is greater. These amounts are trebled to $1,500 for wilful violations. *See Soppet v. Enhanced Recovery Co., LLC*, 679 F.3d 637, 639 (7th Cir. Ill. 2012).

Moreover, the allocation of proposed settlement benefits is unfair on its face, as it plainly fails to compensate Class members based upon the number of unsolicited text messages they received, *i.e.*, Class members who received more than a single text message (like Ms. Price), receive the same amount of compensation as Class members who received a lone text message. [Doc. 52-1, at Page ID #:240] ("Settlement Class Members who received one or more unsolicited messages sent by or on behalf of Western Union and who submit a Valid Claim will be eligible to receive up to $250"]. And while Class Counsel ask the Court to rely upon the parties' previous representations regarding the number of text messages received by individual Class members,[14] the parties' past representations simply fail to engender such a level of trust.

---

[14][Doc. 96, at Page ID#: 1109] ("the vast majority of Class Members received only one text message").

Additionally, Class Counsel maintain that to determine how many text messages each Class member received would require "more time and money." [Doc. 96, at Page ID#: 1109]. However, this is an obligation they assumed when they filed the litigation and took on the responsibility of representing *all of the Class*, and not just *part of the Class*. By failing to consider the number of violations and differing damages of various Class members, Class Counsel have turned the proposed settlement into one rife with intra-class conflicts which not only demands sub-classing but also separate counsel, as a means to satisfy adequacy concerns.

To be sure, Plaintiff and Class Counsel cannot represent conflicting interests. Nor can they hold interests antagonistic to other Class members. As the Third Circuit astutely observed, "[o]ne sign that a settlement may not be fair is that some segments of the class are treated differently from others." *In re GMC Pick-Up Truck Fuel Tank Prods. Liability Litig.*, 55 F. 3d 768, 808 (3d Cir. 1995). This proposed settlement would sacrifice the remedies of one group of Class members, *i.e.*, those who received multiple text messages entitling them to greater damages, to benefit another group of Class members, *i.e.*, those who received single text messages. *See Amchem Products, Inc. v. Windsor*, 521 U.S. 591 (1997) (upholding Third Circuit's decision to vacate settlement class certification that aggregated into one settlement class subgroups with different interests); *Ortiz v. Fibreboard Corp.*, 527 U.S. 815 (1999) (Court rejected a settlement class that failed to distinguish between more valuable and less valuable claims).

> **D. Class Counsel Should Be Compensated Via the Lodestar Method and Awarded Reimbursable Expenses Only.**

Class Counsel's requested fee award is $2,804,850.27. They seek this extraordinary fee – 35% of the net settlement fund – notwithstanding the ever-diminishing benefits to Class members,

a settlement entered into so quickly that not a single adversarial motion of substance was litigated to decision, and a contemptibly small amount of work performed by Class Counsel. For all of this, Class Counsel's claim that they are entitled to such a fee based on a "risk premium" cannot be taken seriously. Ms. Price respectfully submits that the lodestar method will insure fair compensation.

Class Counsel attempt to substantiate their claimed fee, in part, by referencing their substantial time and effort spent prosecuting the litigation. Indeed, according to Class Counsel, three attorneys at the Siprut firm have spent over 2,100 hours *collectively in prosecuting this action* for a total lodestar amount of $1,105,490.00. [Doc. 61, at Page ID#: 344]. This would purportedly result in a lodestar multiplier of 2.53. [*Id.*].

However, there are serious problems with Class Counsel's representations, justifying a drastic reduction in Class Counsel's extraordinary request. Most notably, Ms. Price referenced above another class action filed by Mr. Siprut's law firm – *Douglas v. Pandora Media, Inc.,* No. 1:14-cv-01315 (N.D. Ill. Feb. 21, 2014). There, Mr. Siprut represented Mr. Douglas in yet another TCPA class action. A review of the Siprut firm's summary of time records here [Doc. 61-1, at Page ID#: 515] reveals substantial and egregious duplication of work charged to this litigation and to the *Pandora Media* litigation. Specifically, under the generalized task described as

> "Correspondence with client and counsel of record in this matter ***and Pandora Media, Inc.*** (See Case No. 14-cv-1315 (N.D. Ill.)) and review of documents and investigation of information provided by counsel for Pandora Media, Inc." [Doc. 61-1, at Page ID#: 515] (emphasis added),

Mr. Siprut lists 689.4 total hours of time at hourly rates ranging from $150 to $650, for total fees of $349,800 for that task, and 32% of the total time spent on the case. Yet, there is not a word by Class Counsel to suggest work in *Pandora Media* benefitted this case. Obviously, it did not.

-13-

Accordingly, it appears Class Counsel are padding their lodestar with *Pandora Media* time simply because that case turned out to be a bad case. Neither the Court nor Class members have been provided with information as to *which* attorney worked *what* time at *which* rate on either this case or the *Pandora Media* case. Thus, Class Counsel have failed to satisfy their burden to prove these charges were reasonable or necessary. All of the aforementioned charges should be deducted from Class Counsel's fee request. Even if the Court is not inclined to reduce the requested fee by the full amount of those charges ($349,800), then it should reduce the charges by half ($174,900), representing the portion logically attributed to the *Pandora Media* case. This reduction would take Class Counsel's lodestar down to either $755,690, or $930,590, if only half the charges are deducted.

Other charges are also suspect. For instance, the firm lists 385.5 hours at hourly rates of $350 to $650 for three attorneys for "post-mediation communications and drafting settlement agreement." [Doc. 61-1, at Page ID#: 516]. This totals $214,365 for tasks that are usually not complex. Siprut lists 107.1 hours, totaling $53,235, for research and drafting the motion for preliminary approval [*Id.* at Page ID#: 517], nearly identical to similar motions from case to case; another 179.7 hours, totaling $91,815, for drafting the motion for attorneys' fees [*Id.*],[15] another uncomplicated task; and 80 hours, totaling $43,000 for yet another rote project, drafting the motion for final approval [*Id.*]. These figures, to say the least, are clearly excessive, especially considering the fact that the Siprut firm styles itself as an experienced TCPA class action firm. An appropriate reduction is warranted.

These time entries also show that Mr. Siprut, with the highest hourly rate ($650), happens to have spent more time on practically every listed task than any other attorney, resulting in $771,745

---

[15]This entry also includes "reviewing/responding to objections." However, as of the date Class Counsel filed their fee motion, no objections had even been filed as of yet.

in charges. Mr. Siprut alone devoted well over twice as many hours to the case as the next busiest attorney. Frankly, even if the Court is unwilling to suspect Siprut's time records, it cannot be ignored that the firm routinely disregarded common sense billing efficiencies.[16] The Court should award fees based upon the firm's lodestar, appropriately reduced, as suggested, which will more fairly compensate Class Counsel for their *actual* efforts.[17]

In addition, the Siprut firm's expense records demonstrate, on their face, that the firm is attempting to be reimbursed for expenses completely unrelated to this case. For instance, Siprut seeks reimbursement for $195.00 in service of process fees – incurred in the *Pandora Media* case. [Doc. 61-1, at Page ID#: 520]. The charge is not an isolated mistake, as Siprut also seeks duplicate reimbursements for a $400.00 filing fee. [*Id.*]. Lastly, Siprut also seeks reimbursement of computer research expenses totaling $138.53. [*Id.* at 520-21]. These expenses are not recoverable in a common fund case where the attorneys seek fees based on a percentage of the common fund. *See, e.g., Abrams v. Van Kampen Funds, Inc.*, 2006 U.S. Dist. LEXIS 2129, at *5 (N.D. Ill. Jan. 18, 2006). Accordingly, if the Court awards a percentage of the fund, it should subtract this amount.

### III. CONCLUSION

For these reasons, Ms. Price would ask the Court to reject the proposed settlement and permit the parties to submit a modified settlement resolving the deficiencies of the one here presented.

---

[16]Siprut's efforts to coax excessive attorneys' fees awards has been recognized by other judges. *See, e.g., Grok Lines, Inc. v. Paschall Truck Lines, Inc.*, 2015 U.S. Dist. LEXIS 124812, at *30-32 (N.D. Ill. Sept. 18, 2015).

[17]*See Americana Art China Co., Inc. v. Foxjire Printing and Packaging, Inc.*, 743 F.3d 243 (7th Cir. 2014), the 7th Circuit affirmed a district court's use of a lodestar in determining a reasonable fee in a TCPA class action; and *In re Southwest Airlines Voucher Litigation*, 2015 U.S. App. LEXIS 14601 [slip op.] at 4, 21-22 (7th Cir. Aug. 20, 2015) ( the Seventh Circuit upheld the reduction of a fee award for Siprut PC from $3 million to $1.65 million).

Respectfully submitted, this 20th day of April, 2016.

/s/ W. Allen McDonald
W. Allen McDonald, Esq.
**Lacy, Price & Wagner, PC**
249 N. Peters Road, Suite 101
Knoxville, TN 379234917
Tel: 865-246-0800

Lloyd C. Chatfield, II
**Law Offices Of Lloyd C. Chatfield II**
39W127 Bartelt Road
Geneva, IL 60134
Tel: 888-695-4535

*Counsel for Bethany Carol Price*

**CERTIFICATE OF SERVICE**

I do hereby certify, that on April 20, 2016, a copy of the foregoing was submitted electronically. Notice of this filing will be sent by operation of the Court's electronic filing system to all parties indicated on the electronic filing receipt. Parties may access this filing through the Court's electronic filing system. A copy of the foregoing was served on the following recipients, via U.S. First Class Mail, postage prepaid:

Pamela A. Sweeney, Pro Se
Patrick A. Sweeney, Pro Se
2590 Richardson Street
Madison, WI 53711

This 20th day of April, 2016.

                                              /s/ W. Allen McDonald
                                              W. Allen McDonald