**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| JASON DOUGLAS, individually and on behalf of all others similarly situated, | ) ) ) | |
| Plaintiff, | ) ) | Case No. 14-cv-1741 |
| v. | ) ) | Hon. Gary Feinerman |
| THE WESTERN UNION COMPANY, a Delaware corporation, | ) ) ) | Magistrate Judge Jeffrey Cole |
| Defendant. | ) ) ) | |

---

**RESPONSE OF BETHANY CAROL PRICE TO PLAINTIFF'S "SUPPLEMENTAL FILING" [Doc. 111] REGARDING MOTION FOR FINAL APPROVAL [Doc. 96]**

---

Bethany Carol Price ("Ms. Price"), by her undersigned counsel and by leave of Court [Doc. 110], respectfully submits her Response to Plaintiff's "Supplemental Filing Regarding Plaintiff's Motion for Final Approval of Class Action Settlement" [Doc. 111]:

**TABLE OF CONTENTS**

I.      INTRODUCTION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

II.     LEGAL ARGUMENT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

        A.      The Vague and Ambiguous Class Definition is a Fundamental Defect That Necessarily Requires Rejection of the Proposed Settlement. . . . . . . . . . . . . . . . . . 3

        B.      The Proposed Class Is Severely Limited in Scope and Duration and Even the Named Plaintiff May Not Be a Class Member. . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

        C.      The Parties' Ignorance Of the Important (and Basic) Fact That Western Union's Online System Required New Customers (Like Ms. Price) to Enroll in the My WU Loyalty Program Just In Order to Send Money Is Indicia of Collusion, Making the Proposed Settlement Even More Suspect. . . . . . . . . . . . . 8

        D.      Class Counsel's Proposed Supplemental Notice Is Insufficient to Satisfy Due Process. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

        E.      The Claims Administrator's Process for Rejecting Claims is Defective and Contrary to Class Counsel's Previous Representations to the Court. . . . . . . . . . . 11

        F.      Class Counsel Have Inexplicably Reneged On Their Recent Statement to Pay All Disputed Claims.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

        G.      Class Counsel's Reconstructed Billing Records Require a Percentage Reduction of Their Requested Attorney's Fees. . . . . . . . . . . . . . . . . . . . . . . . . . 13

        H.      Class Counsel's Request for Fees for Future Work Should be Rejected.. . . . . . . 14

III.    CONCLUSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

**I.       INTRODUCTION**

Class Counsel have crafted a settlement fraught with incurable defects, from the unworkably vague Class definition to Class Counsel's undaunted pursuit of every cent of the proposed settlement with which they can possibly abscond.  In opposing Mr. Siprut and Western Union's uncommonly bad deal, Ms. Price has meticulously identified the impediments to the proposed settlement's final approval in her filings.[1]  Many of those same defects – and others – are highlighted by Plaintiff's recent filing offered as a response to the Court's inquiries of April 25, 2016.  [Doc. 111].

On April 25, 2016, the Court entered a Minute Entry requiring the parties to "file a joint brief" by May 16, 2016 addressing eight separate issues . . . ."  [Doc. 102].  Plaintiff submitted a "supplemental filing" in a deficient attempt to respond to the Court's directive for specific information and billing records.  Notably, the submission is not, and does not purport to be, a "joint brief," as the Court ordered.  Instead, Plaintiff states that Western Union "cooperated" with the filing.  [Doc. 111, at Page ID#: 1281]. To be certain, the filing raises more questions than it gives answers, and its contents undeniably validate Ms. Price's concerns.

First, neither the parties nor the Court can escape the now-settled fact that the current Class definition, particularly the material term, "unsolicited," is simply unworkable for the purpose of ascertaining Class membership, resulting in a fundamental defect that ultimately prohibits final approval.  What is more, the poorly-drafted definition cannot now, at this late stage, be modified to

---

[1]*See* Ms. Price's original objection [Doc. 69]; response to Plaintiff's motion for discovery [Doc. 77]; amended objection [Doc. 84]; response to Western Union's motion to extend time to respond [Doc. 90]; response in opposition to Plaintiff's motion for final approval [Doc. 101], her counsel's participation in oral argument during the April 25, 2016 fairness hearing [Doc. 102]; and finally, in Ms. Price's response to Plaintiff's motion to extend time to file the Court-ordered joint supplemental brief [Doc. 109].

include or exclude any Class member. Rather, the presently constituted settlement must stand or fall as a whole. For this and other reasons, it must fall.

Second, the Class is not nearly as broad as Class Counsel initially represented, and members of the Settlement Class, perhaps even the named Plaintiff, may have expressly solicited text messages from Western Union. Thus, Plaintiff has failed to meet a basic requirement of Federal Rule of Civil Procedure 23, and the Class, previously conditionally certified on preliminary approval, must therefore be decertified.

Third, throughout the settlement approval process, the parties' have demonstrated a surprising ignorance of basic information, *e.g.*, that after June 2014, Western Union's online system required every new customer, including Ms. Price, to enroll in the My WU loyalty program to be able to send money, which should have been considered when the parties' counsel were negotiating the definition of the Class. Assuming this was a mere innocent lack of knowledge, it nevertheless demonstrates the inadequacy of Class Counsel, who apparently investigated, commenced, and settled this litigation without sufficient knowledge of materially basic facts, which they failed to discover – though confirmatory discovery or otherwise – prior to settling all of the claims of Class members.

Fourth, the proposed supplemental notice via email is insufficient to satisfy due process, as Class Counsel concede that it will reach a maximum of only 75% of Class members.

Fifth, the Claims Administrator's proposed process for rejecting claims is defective and contrary to Class Counsel's previous representations to the Court, as it reveals no effort whatsoever will be undertaken to follow up with Class members who may have had their claims rejected.

Sixth, Class Counsel appear to have inexplicably reneged on their aspiration to pay all claims, which, Ms. Price would suggest, is merely one additional instance of Class Counsel's self-interests in this litigation impairing their duty to safeguard the interests of Class members.

Seventh, Class Counsel now concede that they have completely failed to maintain contemporaneous time or billing records. As a mere afterthought, they have also recklessly provided the Court with "reconstructed" billing records. Indeed, Class Counsel inform the Court that it should not even consider their lodestar and billing records in its consideration of a fee award. All of this mandates a percentage reduction of Class Counsel's requested attorney's fees. Based upon the totality of circumstances surrounding Class Counsel's fee petition, Ms. Price would suggest a 25% reduction in fees.

Eighth, even Class Counsel concede that a 30% fee would provide them a premium on their investment. Notably, this concession does not even begin to factor-in and consider the myriad defects of the proposed settlement.

For these reasons, as well as those previously identified by Ms. Price, the Court should reject the proposed settlement, after which the parties can choose whether to submit a fair and adequate modified settlement or litigate their respective claims and defenses.

## II.     LEGAL ARGUMENT

### A.     The Vague and Ambiguous Class Definition is a Fundamental Defect That Necessarily Requires Rejection of the Proposed Settlement.

The parties have defined the proposed Settlement Class as

> "All Persons in the United States who received one or more unsolicited text messages sent by or on behalf of Western Union between March 12, 2010 and the date of Preliminary Approval."

-3-

Significantly, the Court has determined that the material term "unsolicited" is "open to interpretation." [Transcript, April 25, 2016, at p. 10].

Plaintiff bears the burden of showing, by a preponderance of the evidence, that a proposed class meets the requirements of Federal Rule of Civil Procedure 23. *See Messner v. Northshore Univ. HealthSystem*, 669 F.3d 802, 811 (7th Cir. 2012). An implicit prerequisite to class certification is "ascertainability," "that classes be defined clearly and based on objective criteria." *Mullins v. Direct Digital, LLC*, 795 F.3d 654, 659 (7th Cir. 2015). Plaintiffs will "flunk this requirement" if they define the class too vaguely. *Id*. at 659-61.[2]

Certification will be precluded if the Court cannot identify "who will receive notice, who will share in any recovery, and who will be bound by a judgment." *See Mullins*, at 660. Here, the undefined term, "unsolicited," as the Court has correctly observed, is open to interpretation, rendering the Class definition impermissibly vague and over-broad.[3] This defect in a fundamental and material provision of the proposed settlement – perhaps the most fundamental term of them all – cannot be cured at this late date and by itself, requires that the proposed settlement be rejected.

Significantly, the Court's review of the proposed settlement is binary, *i.e.*, the Court must approve or reject the settlement as written. If the parties wish to revise the settlement to include an

---

[2]Avoiding vagueness is also important "because a court needs to be able to identify who will receive notice, who will share in any recovery, and who will be bound by a judgment." *Mullins*, at 660; *Steimel v. Wernert*, 2016 U.S. App. LEXIS 8592, at *35 (7th Cir. May 10, 2016) (affirming denial of class certification because "the class definition was too vague"). "To avoid vagueness, class definitions generally need to identify a particular group, harmed during a particular time frame, in a particular location, in a particular way." *Mullins*, at 660.

[3]"A plaintiff cannot establish ascertainability simply by asserting that class members can be identified using the defendant's records; the plaintiff must also establish that the records are in fact useful for identification purposes, and that identification will be administratively feasible." *Karhu v. Vital Pharms., Inc.*, 621 Fed. Appx. 945, 948 (11th Cir. 2015).

appropriate Class definition, a new settlement is required, and due process must be provided to

absent Class members.  In other words, the parties must start the process completely anew.

There is, after all, no authority for the proposition that a federal court may modify the terms

of a voluntary settlement agreement between parties before a decree has been entered.  In *Evans v.*

*Jeff D.*, 475 U.S. 717, 106 S. Ct. 1531, 89 L. Ed. 2d 747 (1986), the Supreme Court explained the

role of the district court in reviewing settlements in class actions:

> Rule 23(e) wisely requires court approval of the terms of any
> settlement of a class action, but the power to approve or reject a
> settlement negotiated by the parties before trial does not authorize the
> court to require the parties to accept a settlement to which they have
> not agreed. Although changed circumstances may justify a
> court-ordered modification of a consent decree over the objections of
> a party after the decree has been entered, … Rule 23(e) does not give
> the court the power … to modify a proposed consent decree and order
> its acceptance over either party's objection.

*Id*. at 726-27, 106 S. Ct. at 1537 (footnotes omitted).

Even if the Court is so inclined, it is "not free to delete, modify or substitute certain

provisions of the settlement.  The settlement must stand or fall as a whole." *See, e.g., Brooks v. Ga.*

*State Bd. of Elections*, 59 F.3d 1114, 1119-20 (11th Cir. 1995) (quoting *Cotton v. Hinton*, 559 F.2d

1326, 1331-32 (5th Cir. 1977)).  "[T]he courts have held that their function is not to modify the

terms of a proposed settlement; but rather to approve or disapprove of the  proposed settlement 'as

a whole.'" *Schulte v. Fifth Third Bank*, 805 F. Supp. 2d 560, 591 (N.D. Ill. 2011) (quoting 8

*Newberg on Class Actions,* § 24:126 (4th ed.) (citing Evans, 475 U.S. at 727 ("the power to approve

or reject a settlement negotiated by the parties before trial does not authorize the court to require the

parties to accept a settlement to which they have not agreed."); *see also* 7B Charles Alan Wright,

Arthur R. Miller & Mary Kay Kane, *Federal Practice and Procedure* § 1797.5 & n.9 (3d ed. 2005).

Accordingly, the proposed settlement must fall.

**B.     The Proposed Class Is Severely Limited in Scope and Duration and Even the Named Plaintiff May Not Be a Class Member.**

At the preliminary approval hearing, Class Counsel represented that it had negotiated a recovery for the broadest possible Class:

> When we got into the heart of this case, it became apparent that when you peel away the layers, there were four or five different subclasses, as to which there were numerous defenses and arguments that each of the various subclasses was subjected to. So, in the end, whether some of those messages would have been even actionable or not was one of the issues in dispute. And ultimately, once we got to the price that sort of built in all of those issues, we went for the broadest settlement class possible, which is anyone who has, you know, a potential claim is in.

[Doc. 96-4, at Page ID #:1195].

As it turns out, this is hardly the case. During the fairness hearing on April 25, 2016, it was revealed that the Class is actually severely limited, made up predominately of persons who received text messages during a short eight-month period. [Transcript, April 25, 2016, at p. 22]. What is more, even the named Plaintiff, Mr. Douglas, may have solicited text messages from Western Union. Specifically, from the documents submitted, it appears that Mr. Douglas may have checked a specific box (clearly marked as optional) that stated, "Please send me Western Union new and promotion information" via Text Message/SMS. [Doc. 95, at Page ID#: 1073]. If so, Mr. Douglas' action in checking the optional box on this form no less of a solicitation than what Ms. Price did in attempting an online transaction during which she was compelled by Western Union to sign up for My WU loyalty program?[4]

_____

[4]In reviewing the form that Western Union says Mr. Douglas completed [Doc 95, Exhibit A, at Page ID#: 1065-66], it is curious that the security questions are not completed, the

And even if, arguendo, Mr. Douglas did not check the box to receive text messages, it is nevertheless certain that other Class members did. For instance, in an April 4, 2016 supplemental submission, Western Union stated:

> In addition, members of the Settlement Class may have consented to receive text messages in other ways. For example, once customers have registered for an account on westernunion.com, they can consent to receiving SMS messages by navigating to the "Notifications" section on the site, clicking on the "Text/SMS" option and providing their mobile number. The text immediately below the box in which customers provide their mobile numbers clearly informs them that they are consenting to receive text messages:
>
>> By checking the Text/SMS box, you authorize Western Union and its affiliates to text you offers/messages; you may revoke this authorization at any time. Standard message and data rates may apply. Reply HELP for help. Reply STOP to stop.

[Doc. 95, at Page ID#: 1059] (footnote and references omitted).

All of this evokes a question the Court asked the parties' counsel at the fairness hearing:

> THE COURT: Okay. Let's go on to the – another sub issue, which is: Does the line that the parties are drawing, in other words, does having a class where Group 1 and Group 2 are in the class and everybody else is not in the class, does that make sense? And one way of getting into that issue is comparing what Price did to what Douglas did, what consent or solicitation or box-checking that Price did, comparing that to what Douglas did. What's the difference between the two?

[Transcript, April 25, 2016, at p. 24]. Mr. Siprut responded, "[n]o one disputes that if someone checks a box saying, 'Yes, please send me text message advertisements,' that ***that is consent***."

[Transcript of Proceedings, April 25, 2016, at p. 26] (emphasis added). Yet, under the proposed

---

"CAPTCHA" does not match the input letters, and the highlighted box indicating that the person agrees to the terms and conditions is not checked. In short, from this, it is simply impossible to know whether or not this is the form that Mr. Douglass completed.

settlement, some Class members specifically asked for text messages, but will still be paid benefits from the settlement funds, further diluting the settlement fund for deserving Class members.

Surprisingly, Western Union argues that "[d]etermining which members of the Settlement Class agreed through other means to receive text messages would, of course, require individual inquiries that would be utterly inconsistent with class treatment of the proposed class claim, as it would pose enormous manageability problems." [Doc. 95, at Page ID#: 1059, fn. 7] (citing *Wilkins v. HSBC Bank Nevada*, 2015 WL 890566, at *6 (N.D. Ill. 2015)). However, there has already been a significant amount of "individual inquiry" regarding who engaged in certain transactions and who enrolled (or was forced to enroll) in the My WU loyalty program. Western Union has filed multiple declarations of employees involved in data analysis for determining which Class members received notice, but none of those declarants have stated that it would be difficult to determine from Western Union's records whether a Class member checked the box to receive text messages.

In the end, by advocating a Settlement Class which includes persons who voluntarily and expressly requested text messages from Western Union but which excludes persons, such as Ms. Price, who did not, Class Counsel have themselves failed to serve the interests of those persons allegedly injured by Western Union's alleged violations of the TCPA.

> **C.** **The Parties' Ignorance Of the Important (and Basic) Fact That Western Union's Online System Required New Customers (Like Ms. Price) to Enroll in the My WU Loyalty Program Just In Order to Send Money Is Indicia of Collusion, Making the Proposed Settlement Even More Suspect.**

The new information provided in Plaintiff's Supplemental Filing concerning Western Union's "My WU" loyalty program does nothing at all to abate the Court's concerns, serving instead to further amplify the problem with the proposed Settlement Class, easily leading to the conclusion

that Class Counsel cut a quick deal with Western Union for a large attorney's fee. To illustrate this,

in Plaintiff's Supplemental Filing, he states,

> "[a]t the end of June 2014, Western Union launched its My WU
> program online, which allowed its customers, for the first time, to
> enroll in MY WU online . . . . Following the roll-out of the My WU
> program online, however, a new customer who enrolled for a digital
> account with Western Union was and is required to register with My
> WU at the time that he or she enrolls for such an account."

[Doc. 111, at Page ID#: 1182]. However, the transcript of the fairness hearing reveals the following

colloquy between the Court, Class Counsel, and Western Union's counsel:

> THE COURT: And the second question I was going to ask was – of
> the parties' counsel pertains to Mr. McDonald's argument that the
> online system, if you go online at Western Union and send money, it
> won't let you do that unless you get a My WU loyalty number and
> join the program.
>
> MS. LALLY: As far as I know, your Honor, that's not true. And the
> records that we submitted with – at least when Ms. Price did it, it was
> a distinct sign-up process; and certainly when Mr. Douglas did it, as
> I said, I don't even believe it was an option at that time . . . .
>
> MR. SIPRUT: . . . I don't think anyone has any reason to doubt a
> single thing that Ms. Lally is representing as of today because she is
> in the best position to be in communication with her client about
> these issues as they evolve in real time. . . .

[Transcript, April 25, 2016, at pp. 29-30].

In other words, despite the ostensible importance of the My WU program, both Class Counsel

and Western Union's counsel were altogether unaware that, after the rollout of the My WU program

online in June 2014, Western Union's online system required every new customer, including Ms.

Price, to enroll in My WU in order to send money. Their ignorance of this basic but essential

information, which obviously should have been considered when drawing up or otherwise

negotiating the definition of the Class, is yet another mark against Class Counsel in their quest to convince the Court that there is any merit to the parties' much-maligned settlement.

What is evident is that Class Counsel embarked upon this litigation and negotiated and entered into a proposed settlement without sufficient knowledge of important, pertinent, and basic facts, and did not attempt to learn such facts – through confirmatory discovery or otherwise – prior to entering into their proposed settlement. In the final analysis, the evidence has grown and is mounting still that Class Counsel commenced this class litigation – and quickly settled it – not for the purpose of vindicating the claims and injuries of hundreds of thousands of Class members, but as a vehicle to line their own pockets.

**D.** **Class Counsel's Proposed Supplemental Notice Is Insufficient to Satisfy Due Process.**

Federal Rule of Civil Procedure 23(c)(2)(B) requires: the best notice practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort. Fed. R. Civ. P. 23(c)(2)(B). To satisfy due process requirements, the notice must also be "'reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections.'" *Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 811-12 (1985) (quoting *Mullane v. Cent. Hanover Bank & Trust Co.*, 339 U.S. 306, 314 (1950).[5]

---

[5]As the case law makes clear, the propriety of email notice turns on the totality of the notice program and whether the defendant has valid email addresses for the class members and communicates with them through email. *See In re Sony Corp. SXRD Rear Projection Telev. Mktg, Sales Practices & Prods. Liab. Litig.*, 2010 U.S. Dist. LEXIS 49565, 2010 WL 1993817, at *5 (S.D. N.Y. May 19, 2010). Here, other than a reference to possibly modifying the settlement website, there is no evidence before the Court concerning the sufficiency of the totality of the proposed notice program.

Class Counsel's proposal to send only email notice to Class members is plainly not sufficient notice to satisfy due process requirements, as email notice will only reach 75% of Class members. [Doc. 111, at Page ID #:1284].

**E.      The Claims Administrator's Process for Rejecting Claims is Defective and Contrary to Class Counsel's Previous Representations to the Court.**

In Plaintiff's filing, Class Counsel walks through the process through which they propose Class members' claims may be rejected.  However, none of the information supplied indicates that the Claims Administrator will make any effort to follow up with Class members who may have submitted claims subject to rejection.  [Doc. 111, at Page ID#: 1285-86].  This proposed approach contradicts Class Counsel's earlier vow that the Claims Administrator would do so:

> The Settlement Administrator will continue to work with counsel for the Parties to finalize the list of persons who will receive cash awards by, among other things: . . .  (c) sending letters to persons who submitted incomplete Claim Forms to request additional information.

[Doc. 93, at Page ID#: 959, at ¶ 13].

Accordingly, before any Class member's claim is rejected, Epiq should be required to perform follow-up with claimants, as Class Counsel have previously represented would be done.

**F.      Class Counsel Have Inexplicably Reneged On Their Recent Statement to Pay All Disputed Claims.**

In addition to this, Class Counsel appear to have now concocted a plan to deal with claimants who submit claim forms with incomplete information that is diametrically opposite to the plan they originally pitched to the Court.  On April 1, 2016, Class Counsel represented that 21,420 claims were submitted without a unique identifying number and did not match two qualifying criteria, *i.e.*, first name, last name, email address, address, zip code, and phone number.  Nevertheless, Class Counsel

represented to the Court at that time that it was considering accepting "all of the claims." [Doc. 93,

at Page ID#: 959, at ¶ 13].  Indeed, at the fairness hearing on April 25, 2016, Class Counsel,

scrambling to salvage the proposed settlement from a torrent of arguments of unfairness and

inadequacy, announced that their preference was to pay "all" of the claims:

> Mr. SIPRUT:  And this will also tie in to your Honor's question, I
> think, about what we're going to do about the 20,000 who didn't put
> the claim number in.  This sort of maybe brings us full circle on that.
> I haven't spoken to Miss Lally about that specific issue, but I think
> our position would be carving out at most only a small subset of those
> that turn out to be just outright fraudulent, if there are any.  I'd like to
> honor all 20,000, even if they don't technically comply with the
> requirements, as long as we can satisfy ourself that it's not an outright
> fraudulent claim and it just seems to be somebody who, you know,
> didn't put on the number, and we can – you know, if they missed the
> deadline, whatever else, I think we can live with that.  I'd like to see
> all the claims get paid.

[Transcript, April 25, 2016, at p. 12].  Later, Mr. Siprut said:

> [I]t wouldn't surprise me if by the time all was said and done, we end
> up finding a few fraudulent [claims] here.  Hopefully not.  And I'm
> sure  that if that were to happen, it would be a very slim percentage
> of the 20,000, or whatever number it is, that's at issue now…  again,
> I can't already take back what I've said, which is I'd like to pay as
> many as possible.

[Transcript, April 25, 2016, at p. 36].

Less than a month later, Class Counsel has inexplicably taken a 180-degree turn, maintaining

that 25,114 claims are "most likely fraudulent" and will be summarily denied without any follow-up

communication from Class Counsel or Epiq.  [Doc. 111, at Page ID#: 1285].  This turnaround is

troubling for many reasons, not the least of which is that it is emblematic of Class Counsel's overall

treatment of the rights of potential Class members throughout the litigation.  A possible explanation

for this sudden reversal by Class Counsel is that Epiq's total costs for notice and administration were

capped at $553,197 (assuming a claims' rate less than 10% of the Settlement Class) [Doc. 96-3, Dec.

of Ricky Borges, ¶ 16], and Class Counsel merely have no desire to have to pay for additional work

required to follow-up with over 25,000 claimants. If, indeed, this is the reason for Class Counsel's

turnaround, it is but yet another example of Class Counsel's self-interests in this litigation, ignoring

their obligation to safeguard the rights of Class members they are bound to protect.

**G.      Class Counsel's Reconstructed Billing Records Require a Percentage Reduction of Their Requested Attorney's Fees.**

The reliability of such reconstructed billing records is inherently suspect. *Lehr v. City of*

*Sacramento*, 2013 U.S. Dist. LEXIS 42014, at *29 (E.D. Cal. Mar. 22, 2013). Contrary to what they

previously represented, Class Counsel now inform the Court that they have no "detailed time

records" for this case. [Doc. 111, at Page ID#: 1288]. Reconstructed time records are only

acceptable to the extent they satisfactorily document the attorneys' time and that the time expended

was reasonable in the context of the litigation. *MacDissi v. Valmont Industries, Inc.*, 856 F.2d 1054

(8th Cir. 1988). Plainly, Class Counsel have not met that burden.

Although Class Counsel's failure to keep proper and contemporaneous records does not

warrant denying them all of their claimed attorney's fees for the period at issue, a significant

reduction in the amount of the overall award is warranted. *See Moreno v. City of Sacramento*, 534

F.3d 1106, 1112 (9th Cir.2008) (a district court may impose a 10% reduction in the amount of the

attorney's fee award "based on its exercise of discretion and without a more specific explanation"

as to which fees were duplicative or unreasonable). The reconstruction of billing records is

particularly troubling here, as Class Counsel previously represented to the Court that they had

maintained detailed billing records in this case:

> Attorneys at my firm keep regular records of their time. In computing the total compensable time, attorneys at my firm exercised their billing judgment by reducing or eliminating time entries that we deemed redundant.

[Doc. 61-1, at Page ID #:353, Affidavit of Joseph J. Siprut, at ¶ 18].

Mindful that Class Counsel knew that this was a class action and that notice of any attorney's fee award would have to be given to Class members and subsequently approved by the Court, it is difficult to accept such reconstructed hours. This knowledge should have compelled Class Counsel to record their time, yet it did not. In response, Class Counsel brazenly suggest that their billing records are "entirely irrelevant" to the propriety of their requested fee. [Doc. 111, at Page ID#: 1290]. However, in complex litigation such as this, it is incumbent upon plaintiff's counsel to keep careful time records and the failure to do so simply cannot be brushed aside. After all, recollection even though well-intentioned is often faulty.

Class Counsel bear the risk of such mistakes. *See, e.g., Harper v. City of Chicago Heights*, No. 87 C 5112, 2002 U.S. Dist. LEXIS 16803, at *3 (N.D. Ill. Sept. 6, 2002) (reducing compensable hours by 10%); *Dupuy v. McEwen*, 648 F. Supp. 2d 1007, 1025 (N.D. Ill. 2009) (deducting half of the time claimed for trial preparation for non-contemporaneous block-billing).

**H.     Class Counsel's Request for Fees for Future Work Should be Rejected.**

Class Counsel allocated 318 total attorney hours for time "to be worked," purportedly attributable to anticipated time spent dealing with objectors, preparing the motion for final approval, preparing for and attending the fairness hearing, "anything and everything else that would require time on this case at the district court level." [Doc. 111, at Page ID#: 1286]. They proclaim that adding "future" time is "a standard practice" [Doc. 111, at Page ID#: 1286] and that "it is only fair

-14-

and sensible to include all the work in those calculations" [Doc. 111, at Page ID#: 1287], yet they cannot cite to a single case attesting to that proposition from the Northern District of Illinois, much less the Seventh Circuit. Since filing their fee petition, however, Class Counsel have spent a total of 261.6 hours working on the case, nearly 60 hours less than they initially "allocated." [Doc. 111, at Page ID#: 1287].[6] Obviously, no fees should be awarded for time not yet worked.

## III. CONCLUSION

For all of this, and other reasons identified by Ms. Price, Plaintiff's motion for final approval should be denied. However, if the proposed settlement is approved, Class Counsel's fee should be based on their lodestar, as Ms. Price has previously advocated, with a minimum 25% reduction for their inexplicable failure to maintain contemporaneous billing records, and a further reduction of 60 hours for time not worked.

Respectfully submitted, this 3rd day of June, 2016.

/s/ W. Allen McDonald
W. Allen McDonald, Esq.
**Lacy, Price & Wagner, PC**
249 N. Peters Road, Suite 101
Knoxville, TN 379234917
Tel: 865-246-0800

Lloyd C. Chatfield, II
**Law Offices Of Lloyd C. Chatfield II**
39W127 Bartelt Road
Geneva, IL 60134
Tel: 888-695-4535

*Counsel for Bethany Carol Price*

---

[6]As they must, even without considering the myriad defects of the proposed settlement, Class Counsel still readily concede that a fee of 30% would be a premium return on their investment in this case. [Doc. 111, at Page ID#: 1291].

**CERTIFICATE OF SERVICE**

I do hereby certify that a copy of the foregoing was submitted electronically. Notice of this filing will be sent by operation of the Court's electronic filing system to all parties indicated on the electronic filing receipt. Parties may access this filing through the Court's electronic filing system. A copy of the foregoing was served on the following recipients, via U.S. First Class Mail, postage prepaid:

Pamela A. Sweeney, Pro Se
Patrick A. Sweeney, Pro Se
2590 Richardson Street
Madison, WI 53711

This 3rd day of June, 2016.

/s/ W. Allen McDonald
W. Allen McDonald