# EXHIBIT A

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| JASON DOUGLAS, individually and on behalf of all others similarly situated, ) ) ) | Case No. 14-cv-1741 |
| Plaintiff, ) ) | Hon. Gary Feinerman |
| v. ) ) | Hon. Jeffrey Cole |
| THE WESTERN UNION COMPANY, ) a Delaware corporation, ) ) | |
| Defendant. ) | |

**DECLARATION OF MICHAEL R. O'CONNOR RE
WILLIAM T. LYONS' CORRESPONDENCE**

I, Michael R. O'Connor, hereby declare and state as follows:

1. I am the Director of Client Services at Epiq Class Actions & Claims Solutions, Inc. ("Epiq"). I am a licensed attorney in Oregon and Washington. Prior to joining Epiq in 2010, I was an owner at the Garvey Schubert Barer law firm in Portland, Oregon, and was engaged in private practice for 13 years. I received my Juris Doctorate from the University of Oregon Law School and my Bachelor of Arts degree from Yale University. I have first-hand knowledge of, and am competent to testify, regarding the matters stated herein.

2. On July 29, 2016, I was made aware of a series of correspondence between Epiq and William T. Lyons, an attorney representing the estate of a member of the settlement class. After reviewing all of the correspondence, I determined that Epiq's handling of Mr. Lyons' situation was not appropriate.

3. In light of that conclusion, I conferred with Epiq's Project Manager for this case, members of our management team, including supervisors for the line-level staff who initially review, code and respond to incoming correspondence, to determine why Mr. Lyons' correspondence and claim were handled in the manner they were. After I had a better

understanding of the errors that occurred in the handling of Mr. Lyons' situation, I conducted a thorough investigation to determine whether there was any reason to believe that other members of the settlement class had a similar experience. I also reviewed Epiq's policies and procedures for addressing correspondence relating to a settlement to assess whether those policies and procedures should be modified in any manner to avoid future issues.

### Investigation Into Mr. Lyons' Claim

4. The initial confusion with Mr. Lyons' claim came from the fact that Mr. Lyons submitted a letter as and for a claim on behalf of the estate of a member of the settlement class, rather than the claim form that was approved by the parties and the Court. Upon receiving the letter, our staff incorrectly coded it as a "correspondence," not as a "claim." The agent who read the letter responded with a routine response we send out when we are notified someone is seeking to act as a personal representative for a deceased class member, asking for documentation of the individual's appointment as the personal representative and a copy of the relevant death certificate. I believe the agent incorrectly assumed a claim form had been filed or was in process, did not recognize that the letter itself was the claim and incorrectly coded it as "correspondence."

5. Once Mr. Lyons' initial letter was incorrectly entered into our database as a "correspondence" instead of as a "claim," it is easier to understand why the subsequent exchange of letters between Mr. Lyons and Epiq occurred. When members of our correspondence staff received subsequent letters from Mr. Lyons, they looked in the database to determine whether Mr. Lyons had filed a claim. Because the initial letter was incorrectly coded, there was no record in the database of a claim having been filed by Mr. Lyons. This is why Epiq's letters informed him on three occasions that we had no record of a claim for him. The staff reviewing Mr. Lyons' subsequent letters did not understand that Mr. Lyons' initial letter was itself a claim.

6. In addition, I also determined that one of our Standard Operating Procedures ("SOPs") was not followed, which contributed to our failure to handle this claim appropriately. Line-level staff, who open our mail and make initial determinations about how to code a document for entry into our database (e.g. as a "correspondence," a "claim," an "opt-out," an "objection," etc.), are trained to identify "sensitive" correspondence. For purposes of the SOP, "sensitive" correspondence include but are not limited to letters from lawyers, letters from government agencies, letters threatening court action, subpoenas and other types of incoming documents where, on their face, the reader should know potential legal issues are being raised. The SOP requires that these types of documents be escalated directly to me, skipping a number of other escalations points along the way.

7. The purpose of the SOP is to ensure that the right level resource is reviewing and responding to documents that may expose the settlement fund, the parties or Epiq to potential liability or risk.

8. Three of Mr. Lyons' letters should have been identified by our staff as "sensitive" documents. All three were letters from a lawyer. In one letter Mr. Lyons strongly indicated he was considering asking the Court to get involved. And in two other letters the Court is copied on his responses to us. These facts should have resulted in the letters being escalated to me. They were not. The staff reviewing the materials made a mistake and have already received additional training on the importance of identifying sensitive documents like Mr. Lyons' letter and escalating them consistent with our SOP.

9. After reviewing Mr. Lyons' correspondence with Epiq, I immediately determined that the right thing to do was: (a) deem Mr. Lyons' initial letter an "approved" claim; (b) write to

Mr. Lyons to apologize for the frustration we had caused; and (c) determine appropriate internal steps at Epiq to significantly decrease the likelihood of this happening again.

10. Accordingly, on August 2, 2016, I wrote to Mr. Lyons and apologized for the manner in which his claim was handled, assured him that his claim had been recorded appropriately and approved, and informed him that I would be investigating his claim to ensure that any appropriate corrective measures would be taken. On August 3, 2016, Mr. Lyons and I spoke for about 30 minutes after he received my August 2, 2016 letter. He indicated he was appreciative of our apology and the explanation I provided about how/why his claim was not appropriately handled.

### Investigation Into The Claim Process Generally

11. In my August 2, 2016 letter, I indicated that I believed that Mr. Lyons' situation was an aberration. This belief was based upon my personal experiences in administering claims for Epiq. For example, though Epiq receives millions of claims across 100 or more cases every year, in my experience it is extremely rare that class members submit claims by letter rather than in the approved claim form. In my six years at Epiq, I only recall one other instance of a claim being submitted in letter format as opposed to on a claim form.

12. In addition, however, I also conducted an investigation into the claims process in this case to confirm that Mr. Lyons' situation was unique. I directed the Project Manager handling the case to review a random sample of 20% of the nearly 300 pieces of written correspondence received in this case to ensure that Epiq had not miscoded other potential claims or overlooked other critical correspondence. That review did not identify any additional "letter claims" or any additional correspondence that may have been inappropriately handled. Indeed, the correspondence reviewed related to routine matters such as the notification of a name change

and/or an address update, general inquiries in response to the mailed notice about class membership/eligibility, general inquiries about the claims process, and questions about when payments would be issued.

13. I also directed the Project Manager to review a sampling of other escalations related to this matter. "Escalations" are a normal part of any case, and can occur when the party-approved scripting for a class member question does not answer a specific question asked. Sometimes escalations could reasonably be characterized as "complaints," but most of the time they are rather ordinary questions. For example, right now, almost all of the incoming questions we get via incoming correspondence are from claimants wanting to know when checks will be issued. When we reviewed escalations for this case, we were unable to find any other instances of a claim being mishandled.

14. I further spoke to members of our management team who oversee our incoming correspondence processing team. They were not aware of any unusual issues or complaints arising out of this matter. They noted that the majority of correspondence in this matter has related to routine matters, such as those discussed in Paragraph 12.

15. Finally, I also confirmed that Epiq has not formally accepted or denied any claims at this time. Once final approval is granted, Epiq will perform a full audit of all claims received and in the event claims are to be denied, Epiq will first consult with the parties regarding the proposed denials and will also allow those whose claims are denied to dispute the denial, minimizing the possibility that valid claims are ultimately denied.

16. I believe that my investigation confirms my initial opinion that Mr. Lyons' situation, while unfortunate, is unique. Consistent with that, of the more than 54,000 claims filed,

other than Mr. Lyons, we are not aware of any other claimant reaching out to the Court or the parties with a complaint about the claims handling process.

17. Epiq would like to assure the Court, however, that despite the fact that we are confident that Mr. Lyons' situation was an aberration, Epiq is willing to conduct any further investigation that the Court may deem appropriate or provide any further information to the Court, and will do so at our expense and not at the expense of the settlement class.

### Further Corrective Measures

18. Although Epiq believes that the errors in handling Mr. Lyons' correspondence were an aberration, we nevertheless view this situation as an opportunity to review and improve our procedures.

19. For example and as I noted above, Epiq has already provided additional training to the appropriate staff on the importance of identifying sensitive documents like Mr. Lyons' letters and escalating them consistent with our SOP.

20. In addition, I have been working with our management team to provide some additional training for line-level staff that should greatly decrease the chances of a situation such as this happening again. We are also working on additions to our SOPs, followed by appropriate training. In short, Epiq is doing everything possible to ensure that such a situation does not occur again.

I declare under penalty of perjury under the laws of the United States and the State of Oregon that the foregoing is true and correct and that this declaration was executed on August 18, 2016 in Washington, DC.

*[signature]*

Michael R. O'Connor