UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| JASON DOUGLAS, individually and on behalf of all others similarly situated, | ) ) | |
| | ) | 14 C 1741 |
| Plaintiff, | ) | |
| | ) | Judge Feinerman |
| vs. | ) | |
| | ) | |
| THE WESTERN UNION COMPANY, | ) | |
| | ) | |
| Defendant. | ) | |

### MEMORANDUM OPINION AND ORDER

Jason Douglas filed this suit as a putative class action against The Western Union Company for alleged violations of the Telephone Consumer Protection Act ("TCPA"), 47 U.S.C. § 227. Doc. 1. Western Union answered two months later. Doc. 22. One month after that, and before litigation efforts commenced in earnest, the parties reported that they would engage in a private mediation, Doc. 26; a year later, they reported that they had reached a classwide settlement in principle, Doc. 42. Confirmatory discovery followed, Doc. 43, as did hearings at which the parties reported that they would soon file a preliminary approval motion, Docs. 48-50. Douglas moved for preliminary approval of the class settlement and conditional certification of the settlement class, Doc. 52, which the court granted, Docs. 57-58.

Now before the court are Douglas's motion to certify the settlement class and for approval of the class settlement, Doc. 96, and motion for attorney fees, costs, and incentive award, Doc. 61. As described below, certain matters transpired during the approval process that gave the court great pause, not about the appropriateness of class certification or the size of the class settlement, but rather about the conduct and representations of lead class counsel, Joseph Siprut of Siprut PC. Considering the importance of these matters, the court wished to give the

1

most careful consideration to the record and to Siprut's explanations for his conduct; in addition, the court awaited the opinion in *In re Southwest Airlines Voucher Litigation*, __ F.3d __, 2018 WL 3651028 (7th Cir. Aug. 2, 2018), which from the appeal's outset conceivably could, and ultimately did, address certain questionable conduct by Siprut as lead class counsel in that case, including what the Seventh Circuit described as his "rapacious requests for fees." *Id*. at *4; *see also id*. at *1 ("Siprut made an astonishing request for supplemental fees."); *ibid*. (noting that the district court had "rightly called" the attorney time reported by Siprut "grossly excessive"); *Grok Lines, Inc. v. Paschall Truck Lines, Inc.*, 2015 WL 5544504 (N.D. Ill. Sept. 18, 2015) (rejecting a proposed settlement under which the class would get injunctive relief of little or no value, and Siprut would get the entire settlement fund, save $1,500 for the class representative).

For the following reasons, the motion to approve the class settlement and certify the settlement class is granted, while the motion for attorney fees, costs, and an incentive award is granted in part and denied in part.

## Background

The TCPA prohibits the use of "any automatic telephone dialing system [('ATDS')] or an artificial or prerecorded voice" to call or send text messages to cell phones without prior express consent from the recipient of the calls or messages. 47 U.S.C. § 227(b)(1)(A)(ii). The statute provides a private right of action; for each violation, a consumer may recover $500 in damages and up to $1,500 if a "court finds that the defendant willfully or knowingly violated" the TCPA. *Id*. § 227(b)(3). Douglas alleges that Western Union violated the TCPA by sending unsolicited text messages to him and the putative class. Doc. 1 at ¶ 40. As noted, the parties quickly commenced mediation, reached an agreement, engaged in confirmatory discovery, and obtained preliminary approval.

The proposed class is defined as: "All Persons in the United States who received one or more unsolicited text messages sent by or on behalf of Western Union between March 12, 2010 and November 10, 2015." Doc. 96 at 15. After obtaining and de-duplicating the relevant records, Epiq Class Action & Claims Solutions, Inc., the settlement administrator, determined that there were 741,800 unique class members. Doc. 96-3 at ¶ 6. Epiq provided notice via U.S. mail to the 741,197 class members for whom physical addresses were available, and via email to the 706,212 class members for whom email addresses were available; there were 603 class members for whom no address was available. *Id.* at ¶¶ 6-8.

The Settlement Agreement, Doc. 96-1, provides for a non-reversionary payment by Western Union of $8.5 million, to be distributed as follows: (1) $5,209,007.64 to the settlement class; (2) $5,000 to Douglas as an incentive award; (3) $2,804,850.27 in attorney fees; and (4) $481,142.09 in notice and administration costs (with a cap of $553,197, with the difference coming from the amount devoted to the settlement class). Doc. 96 at 15. Because 54,315 individuals (approximately 7.3% of the class) submitted timely claims, Doc. 96 at 30; Doc. 96-3 at ¶ 13, each would receive $95.90 if the above-referenced figures held. Doc. 96 at 15. Four class members objected to the proposed settlement. Doc. 96-3 at ¶ 11; Docs. 67, 69, 70, 84. Twenty-two class members opted out of the class. Doc. 96-3 at ¶ 12.

## Discussion

### I. Class Certification

A court's analysis of class certification "is not free-form, but rather has been carefully scripted by the Federal Rules of Civil Procedure." *Chi. Teachers Union, Local No. 1. v. Bd. of Educ. of Chi.*, 797 F.3d 426, 433 (7th Cir. 2015). To be certified, a proposed class must satisfy the four requirements of Rule 23(a): "(1) the class is so numerous that joinder of all members is

impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims and defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a); *see Bell v. PNC Bank, N.A.*, 800 F.3d 360, 373 (7th Cir. 2015). If Rule 23(a) is satisfied, the proposed class must fall within one of the three categories in Rule 23(b), which the Seventh Circuit has described as: "(1) a mandatory class action (either because of the risk of incompatible standards for the party opposing the class or because of the risk that the class adjudication would, as a practical matter, either dispose of the claims of non-parties or substantially impair their interests), (2) an action seeking final injunctive or declaratory relief, or (3) a case in which the common questions predominate and class treatment is superior." *Spano v. Boeing Co.*, 633 F.3d 574, 583 (7th Cir. 2011); *see also Bell*, 800 F.3d at 373. Finally, the class must be "identifiable as a class," meaning that the "class definitions must be definite enough that the class can be ascertained." *Oshana v. Coca-Cola Co.*, 472 F.3d 506, 513 (7th Cir. 2006); *see also Mullins v. Direct Dig., LLC*, 795 F.3d 654, 659-61 (7th Cir. 2015).

"Confronted with a request for settlement-only class certification, a district court need not inquire whether the case, if tried, would present intractable management problems, for the proposal is that there be no trial." *Smith v. Sprint Commc'ns Co., L.P.*, 387 F.3d 612, 614 (7th Cir. 2004) (quoting *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 620 (1997)). "But settlement is not a cure-all: '[The] other specifications of [Rule 23]—those designed to protect absentees by blocking unwarranted or overbroad class definitions—demand undiluted, even heightened, attention in the settlement context.'" *Ibid*. (quoting *Amchem*, 521 U.S. at 620); *see also Ortiz v. Fibreboard Corp.*, 527 U.S. 815, 847 (1999) (noting that "in settlement-only class actions the procedural protections built into [Rule 23] to protect the rights of absent class members during

4

litigation are never invoked in an adversarial setting") (citing *Amchem*, 521 U.S. at 620).
"Failure to meet any one of the requirements of Rule 23 precludes certification of a
class." *Harriston v. Chi. Tribune Co.*, 992 F.2d 697, 703 (7th Cir. 1993).

### A. Rule 23(a)

Although no magic number exists for satisfying Rule 23(a)(1) numerosity, the Seventh
Circuit has held that "[e]ven if the class were limited to 40 [members] … that is a sufficiently
large group to satisfy Rule 23(a) where the individual members of the class are widely scattered
and their holdings are generally too small to warrant undertaking individual actions." *Swanson
v. Am. Consumer Indus., Inc.*, 415 F.2d 1326, 1333 n.9 (7th Cir. 1969); *see also Hayes v.
Wal-Mart Stores, Inc.*, 725 F.3d 349, 356 n.5 (3d Cir. 2013) ("While no minimum number of
plaintiffs is required to maintain a suit as a class action … generally if the named plaintiff
demonstrates that the potential number of plaintiffs exceeds 40, the first prong of Rule 23(a) has
been met.") (internal quotation marks omitted). The proposed 741,800-member class easily
meets the numerosity requirement.

Rule 23(a)(2) commonality "requires the plaintiff to demonstrate that the class members
have suffered the same injury" and that "[t]heir claims … depend upon a common contention …
of such a nature that it is capable of classwide resolution—which means that determination of its
truth or falsity will resolve an issue that is central to the validity of each one of the claims in one
stroke." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011) (internal quotation marks
omitted); *see also Chi. Teachers Union*, 797 F.3d at 434. "Rule 23(a)(2) does not demand that
every member of the class have an identical claim," and some degree of factual variation will not
defeat commonality provided that common questions yielding common answers can be
identified. *Spano*, 633 F.3d at 585; *see also Rosario v. Livaditis*, 963 F.2d 1013, 1017-18 (7th

Cir. 1992). Here, each class member suffered roughly the same alleged injury: receipt of at least one text message from Western Union. The claims of all class members depend on the resolution of key common questions, including whether Western Union used an ATDS to send text messages, and whether it had consent to send them.

Rule 23(a)(3) typicality is satisfied when the named plaintiff's claim "arises from the same event or practice or course of conduct that gives rise to the claims of other class members and is based on the same legal theory." *Muro v. Target Corp.*, 580 F.3d 485, 492 (7th Cir. 2009) (alterations and internal quotation marks omitted). Typicality "should be determined with reference to the company's actions, not with respect to particularized defenses it might have against certain class members." *CE Design Ltd. v. King Architectural Metals, Inc.*, 637 F.3d 721, 725 (7th Cir. 2011) ("*CE Design I*"). All class members allegedly received texts messages from Western Union under similar enough circumstances to satisfy typicality.

Rule 23(a)(4) adequacy has two facets: "(1) the adequacy of the named plaintiffs as representatives of the proposed class's myriad members, with their differing and separate interests, and (2) the adequacy of the proposed class counsel." *Gomez v. St. Vincent Health, Inc.*, 649 F.3d 583, 592 (7th Cir. 2011). Douglas's claims are not "antagonistic or conflicting" with those of the absent class members, *Rosario*, 963 F.2d at 1018, and he is not subject to a defense not applicable to the class as a whole, *see CE Design I*, 637 F.3d at 726; *Randall v. Rolls–Royce Corp.*, 637 F.3d 818, 824 (7th Cir. 2011). It follows that Douglas is an adequate class representative. Siprut is adequate in that he is experienced in class actions in general and TCPA suits in particular. Doc. 96-2 at ¶ 17. As noted above, Siprut's conduct here was disquieting in certain significant respects, a matter that will be addressed below in determining an appropriate fee award.

## B.     Rule 23(b)(3)

Although a putative class may satisfy any of the three Rule 23(b) categories, "[w]hen substantial damages have been sought, the most appropriate approach is that of Rule 23(b)(3)." *Jefferson v. Ingersoll Int'l, Inc.*, 195 F.3d 894, 898 (7th Cir. 1999). A proposed class satisfies Rule 23(b)(3) if "the questions of law or fact common to class members predominate over any questions affecting only individual members, and … a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). Pertinent factors include: "(A) the class members' interests in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already begun by or against class members; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and (D) the likely difficulties in managing a class action." *Ibid.* "The Rule 23(b)(3) predominance inquiry tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." *Amchem*, 521 U.S. at 623. "Predominance is satisfied when common questions represent a significant aspect of a case and can be resolved for all members of a class in a single adjudication." *Costello v. BeavEx, Inc.*, 810 F.3d 1045, 1059 (7th Cir. 2016) (alterations and internal quotation marks omitted).

The common questions noted above are the main questions in this case, they can be resolved on a classwide basis without any individual variation, and they predominate over any individual issues. The proposed class satisfies Rule 23(b)(3).

## C.     Ascertainability

As noted, a class definition "must be definite enough that the class can be ascertained." *Oshana*, 472 F.3d at 513; *see also Jamie S. v. Milwaukee Pub. Sch.*, 668 F.3d 481, 495-97 (7th

7

Cir. 2012); 7A Charles Alan Wright et al., *Federal Practice and Procedure* § 1760 (3d ed. 2005) ("[T]he requirement that there be a class will not be deemed satisfied unless the class description is sufficiently definite so that it is administratively feasible for the court to determine whether a particular individual is a member."). "Class definitions have failed this requirement when they were too vague or subjective, or when class membership was defined in terms of success on the merits (so-called 'fail-safe' classes)." *Mullins*, 795 F.3d at 657.

The proposed class definition is: "All Persons in the United States who received one or more unsolicited text messages sent by or on behalf of Western Union between March 12, 2010 and November 10, 2015." Doc. 96 at 15. The term "unsolicited," while bearing a commonsense meaning, is somewhat vague. Douglas and Western Union explain that they understood "unsolicited" to refer to two groups: (1) persons who obtained an online account from Western Union, received a text message, and did *not* enroll in the Western Union loyalty program, which requires the enrollee to consent to receiving text messages; and (2) persons who conducted an online transaction with Western Union, received a text message stating that the recipient did not retrieve the money transfer, and did not authorize Western Union to send a text message. Doc. 93 at 2-3; Doc. 94 at 5-6. The class definition would benefit from clarification along those lines. Accordingly, the definition is amended to read as follows:

> All Persons in the United States who received one or more text messages sent by or on behalf of Western Union between March 12, 2010 and November 10, 2015, so long as that person falls within one or both of these categories: (1) the person obtained a Western Union online account and did *not* enroll in the Western Union loyalty program; and (2) the person conducted an online transaction with Western Union without authorizing Western Union to send a text message, and then received a text message stating that the intended recipient did not retrieve the money transfer.

As discussed below, the amendment warrants limited re-notice to the class.

One objector contends that the class definition is not sufficiently definite because *she* did not receive notice of the proposed class settlement despite having received two unsolicited text messages. Doc. 84 at 5-7. She is incorrect. That a class member fails to receive notice does not render fatally ambiguous an otherwise acceptable class definition, but instead may indicate a problem with class administration or the notice process.

Whether that objector *should* have received notice depends on whether she is, in fact, a class member. The record shows that she is not. The individual enrolled in Western Union's loyalty program; in so doing, she checked a box acknowledging that she was consenting to receive text messages from Western Union. Doc. 94 at 7-8, 15-16 (¶¶ 8-10), 19-34. The individual therefore does not fall within the first category set forth above. As Western Union further demonstrates, the two text messages that she received—which Western Union sent on March 23, 2015, Doc. 77-1 at 4—followed two money transfer orders that were not conducted online and did not involve circumstances where Western Union was informing her that the intended recipient had not yet retrieved the transfer. Doc. 94 at 3 n.3, 8-10, 16-17 (¶¶ 11-14). She therefore does not fall within the second category set forth above.

That objector retorts that if *she* is not a class member, then neither is Douglas. The reason, she asserts, is that the text message that Douglas received—which Western Union sent on February 13, 2014—shows that he, too, had enrolled in Western Union's loyalty program. Doc. 101 at 5-6; Doc. 101-2 at 12. As Douglas and Western Union demonstrate, however, that is impossible, as the loyalty program was not launched online until June 2014, several months *after* Douglas completed an online transaction and received the text message in question, and several months *before* the objector received her text messages. Doc. 1 at ¶ 20; Doc. 94 at 14 (¶ 5); Doc. 101-1; Doc. 111 at 3; Doc. 111-2 at ¶ 3. Accordingly, the record shows that Douglas is a

member of the class, while the objector is not. This explains why the objector did not receive the class notice.

$$* \quad * \quad *$$

In sum, because the proposed class satisfies Rules 23(a) and 23(b)(3) and (with the class definition modified) is ascertainable, class certification is appropriate.

## II.    Settlement Approval

A court may approve a settlement that binds class members only if, after proper notice and a public hearing, the court determines that the proposed settlement is "fair, reasonable, and adequate." Fed. R. Civ. P. 23(e)(1)-(2). Although a district court "consider[s] the facts in the light most favorable to settlement," *Isby v. Bayh*, 75 F.3d 1191, 1199 (7th Cir. 1996) (internal quotation marks omitted), "the law quite rightly requires more than a judicial rubber stamp when the lawsuit that the parties have agreed to settle is a class action." *Redman v. RadioShack Corp.*, 768 F.3d 622, 629 (7th Cir. 2014) (internal quotation marks omitted); *see also Eubank v. Pella Corp.*, 753 F.3d 718, 720 (7th Cir. 2014). Indeed, the Seventh Circuit has "described the district judge as a fiduciary of the class, who is subject therefore to the high duty of care that the law requires of fiduciaries." *Pearson v. NBTY, Inc.*, 772 F.3d 778, 780 (7th Cir. 2014) (internal quotation marks omitted). It follows that "the judge must assess the value of the settlement to the class and the reasonableness of the agreed-upon attorneys' fees for class counsel, bearing in mind that the higher the fees the less compensation will be received by the class members." *Redman*, 768 F.3d at 629. In so doing, the court must be vigilant for evidence of collusion between the defendant, the class representative, and class counsel. *See CE Design, Ltd. v. King Supply Co.*, 791 F.3d 722, 725 (7th Cir. 2015) ("*CE Design II*"); *Eubank*, 753 F.3d at 721.

### A.      Fairness, Reasonableness, and Adequacy

To evaluate a settlement's fairness, the court must consider "the strength of plaintiffs'

case compared to the amount of defendants' settlement offer, an assessment of the likely

complexity, length and expense of the litigation, an evaluation of the amount of opposition to

settlement among affected parties, the opinion of competent counsel, and the stage of the

proceedings and the amount of discovery completed at the time of settlement."  *Synfuel Techs.,*

*Inc. v. DHL Express (USA), Inc.*, 463 F.3d 646, 653 (7th Cir. 2006) (internal quotation marks

omitted).  Applying these factors, the court concludes that the settlement here—which was

reached in a mediation with former District Judge Wayne Andersen, Doc. 96 at 12—is "fair,

reasonable, and adequate," and therefore that it satisfies Rule 23(e)(3).

### 1.      Settlement Amount

"The most important factor" in determining whether a proposed settlement satisfies Rule

23(e) is the "strength of plaintiffs' case on the merits balanced against the amount offered in the

settlement."  *Synfuel*, 463 F.3d at 653 (citations omitted).  Specifically, the court must "estimate

the likely outcome of a trial" to determine the adequacy of a settlement. *Eubank*, 753 F.3d at

727.  As it stands, the settlement requires Western Union to pay $8.5 million into the settlement

fund, from which (after deducting attorney fees, costs, administration expenses, and the incentive

award) all class members who submitted a timely claim will receive their pro rata share.  Doc.

96-1 at 11.  If Douglas's attorney fee motion is granted in full and the number of claimants

remains the same, the recovery per claimant would exceed $95.00.  Doc. 96 at 15.

As some objectors note, Doc. 67 at 3-4; Doc. 69 at 11-13, that recovery is well below the

$500 statutory recovery available for each text, or $1,500 if the violations were willful or

knowing.  *See* 47 U.S.C. § 227(b)(3).  (Although the objector discussed above is not a class

11

member and therefore has no right to object to the proposed settlement, *see Cent. States Se. & Sw. Areas Health & Welfare Fund v. Merck-Medco Managed Care, L.L.C.*, 504 F.3d 229, 244 (2d Cir. 2007); *Gould v. Alleco, Inc.*, 883 F.2d 281, 284 (4th Cir. 1989); *In re Fine Paper Litig. State of Wash.*, 632 F.2d 1081, 1087 (3d Cir. 1980), the court will consider her submissions to provide an additional assurance that the settlement is fair and reasonable.)  However, the recovery falls well within the range of recoveries in other recently approved TCPA class settlements.  *See Gehrich v. Chase Bank, N.A.*, 316 F.R.D. 215, 227-28 (N.D. Ill. 2016) ($52.50); *Ott v. Mortg. Investors Corp. of Ohio, Inc.*, 2016 WL 54678, at *1 (D. Or. Jan. 5, 2016) ($140.86); *Kolinek v. Walgreen Co.*, 311 F.R.D. 483, 493 (N.D. Ill. 2015) ($30); *Wilkins v. HSBC Bank Nev., N.A.*, 2015 WL 890566, at *5 (N.D. Ill. Feb. 27, 2015) ($93.22); *In re Capital One Tel. Consumer Prot. Act Litig.*, 80 F. Supp. 3d 781, 789 (N.D. Ill. 2015) ($34.60); *Rose v. Bank of Am. Corp.*, 2014 WL 4273358, at *10 (N.D. Cal. Aug. 29, 2014) ($20 to $40).  That is a clear indicator of fairness.

By the same token, a settlement need not provide the class with the maximum possible damages to be reasonable.  As the Seventh Circuit has cautioned, a district court should not "reject[]" a settlement "solely because it does not provide a complete victory to the plaintiffs," for "the essence of settlement is compromise."  *Isby*, 75 F.3d at 1200 (internal quotation marks omitted).  A settlement is properly "a bilateral exchange … where both sides gain as well as lose something."  *In re Gen. Motors Corp. Engine Interchange Litig.*, 594 F.2d 1106, 1135 (7th Cir. 1979) (internal quotation marks omitted).  Individual class members receive less than the maximum value of their TCPA claims, but they receive a payout without having suffered anything beyond one or a few unwanted texts, and without the time, expense, and uncertainty of litigation.  Further, the settlement provides that the $95.00 recovery per claimant

will be paid in cash, unlike the coupon-based settlements that the Seventh Circuit has disapproved. *See Redman*, 768 F.3d at 634; *Eubank*, 753 F.3d at 725.

Moreover, absent a settlement, Douglas would have faced significant obstacles in prevailing, either individually or on a classwide basis. As an initial matter, Western Union could have argued that Douglas and the putative class members were required to arbitrate their claims on an individual basis. Doc. 95 at 2-5, 12-21; Doc. 96 at 25-26. Although a motion to arbitrate was never brought and thus never resolved, the record demonstrates that Western Union's argument was colorable and very well could have foreclosed class treatment. Whether the case proceeded in arbitration or in court, Western Union then could have argued that Douglas and other putative class members—despite not having enrolled in the loyalty program, and despite not having given express written consent to receiving texts—had nonetheless consented to receiving texts by knowingly providing Western Union with their mobile numbers. Doc. 95 at 5-8; Doc. 96 at 26. Again, although the matter was not litigated, Western Union's argument was colorable. Finally, when the parties settled, the D.C. Circuit had before it a challenge to FCC regulations addressing the features that telecommunications equipment must have to qualify as an ATDS under the TCPA. Doc. 95 at 8-9; Doc. 96 at 26. The D.C. Circuit has since resolved that challenge in a manner favorable to TCPA defendants, *see ACA Int'l v. FCC*, 885 F.3d 687, 695-98 (D.C. Cir. 2018), and Western Union might have deployed that ruling to provide yet another basis for defeating Douglas's and the putative class's claims. *See Pinkus v. Sirius XM Radio, Inc.*, __ F. Supp. 3d __, 2018 WL 3586186 (N.D. Ill. July 26, 2018).

Western Union's potential defenses and the legal uncertainty concerning whether the TCPA applied to the telecommunications equipment used to send Western Union's texts, as well as the time and expense inherent in litigation, proceeding to trial, and obtaining relief, posed

substantial risks to Douglas and the putative class, and it was possible that they would have recovered nothing. Given all this, the settlement provides fair actual cash value to the class.

### 2. Complexity, Length, and Expense of Litigation

Next, the court must consider the likely complexity, length, and expense of continued litigation. *See Synfuel,* 463 F.3d at 653. This factor strongly favors approval. To proceed with this case, Douglas would have had to engage in significant discovery of Western Union's text message records and the equipment used to send the texts. This likely would have required him to retain one or more experts, analyze an enormous quantity of data, and engage in substantial motion practice. And even if Douglas prevailed, there likely would have been an appeal.

### 3. Opposition

With respect to "the amount of opposition to settlement among affected parties," *Synfuel,* 463 F.3d at 653, only 22 class members opted out of the settlement, Doc. 96-3 at ¶ 12, representing approximately 0.003% of the class. Only four class members objected, *id*. at ¶ 11; Docs. 67, 69, 70, 84, representing approximately 0.00054% of the class. This extremely low percentage of opposition favors a finding that the settlement is fair, reasonable, and adequate. *See Gehrich*, 316 F.R.D. at 230 (holding that a 0.000697% opt-out rate supports the settlement); *Kolinek*, 311 F.R.D. at 495 (same, for 0.0002209%); *In re Capital One*, 80 F. Supp. 3d at 792 (same, for 0.0032%); *In re Sw. Airlines Voucher Litig.*, 2013 WL 4510197, at *7 (N.D. Ill. Aug. 26, 2013) (same, for less than 0.01%), *aff'd and modified on other grounds*, 799 F.3d 701 (7th Cir. 2015); *In re AT&T Mobility Wireless Data Servs. Sales Tax Litig.*, 789 F. Supp. 2d 935, 965 (N.D. Ill. 2011) (same, for less than .01%).

### 4. Opinion of Competent Counsel

Regarding the opinion of competent counsel, *see Synfuel,* 463 F.3d at 653, class counsel are experienced TCPA litigators and strongly support the settlement. Doc. 96-2 at ¶¶ 17, 19-21.

### 5. Stage of Proceedings

Due to the early stage at which settlement negotiations commenced, the parties had not engaged in much, if any, discovery at the time of settlement, but they did exchange "confirmatory discovery" over the course of settlement discussions. Doc. 43. Although this settlement-directed discovery is not identical to the full merits discovery that would have enabled counsel to better "evaluate the merits of plaintiffs' claims," *Armstrong v. Bd. of Sch. Dirs. of Milwaukee*, 616 F.2d 305, 325 (7th Cir. 1980), *overruled on other grounds by Felzen v. Andreas*, 134 F.3d 873, 875 (7th Cir. 1998), extensive formal discovery would have entailed substantial cost and might not have placed the parties in a materially better position than they are now to determine an appropriate settlement value. As a result, the parties have completed a sufficient amount of discovery to be able to place value on their respective positions in this case.

### 6. Absence of Collusion

The Seventh Circuit has emphasized that district judges must be vigilant in uncovering any collusion in class action settlements. *See Pearson*, 772 F.3d at 781-82; *Redman*, 768 F.3d at 637; *Eubank*, 753 F.3d at 721. In class action suits, named plaintiffs typically exercise little control over class counsel, and the class has limited ability to hold accountable either the named plaintiffs or class counsel. *See Eubank*, 753 F.3d at 719. Class counsel and defendants sometimes exploit these dynamics to generate a settlement that extinguishes the claims against the defendant and enriches class counsel and the class representatives with large awards, but that does not provide commensurate or adequate benefit for the class. *See Redman*, 768 F.3d at 629;

15

*Eubank*, 753 F.3d at 720.  The record provides no basis to conclude that the proposed settlement is the result of collusion between or among Western Union, Douglas, and/or class counsel.

### B.      Miscellaneous Objections to the Settlement

The objectors raise several arguments in addition to those addressed above.

First, two objectors complain that each class member's recovery is the same regardless of the number of texts that class member received.  Doc. 67 at 4; Doc. 69 at 14.  It is true that the TCPA provides for statutory damages on a per violation basis, so one individual may have many claims.  *See* 47 U.S.C. § 227(b)(3)(B).  Yet conducting individual inquiries into the number of violations for each class member either would be administratively unmanageable or, if not, would entail vastly increased administrative expenses, reducing the amount available to claimants.  *See In re Capital One*, 80 F. Supp. 3d at 793.  Moreover, because Western Union utilized a single opt-in text message asking the customer to reply to confirm that she wished to receive additional texts, it is unlikely that many class members received two or more texts.  Doc. 94 at 3-5.  Accordingly, giving each class member the same recovery regardless of the number of texts she received is an acceptable approach.  *See Gehrich*, 316 F.R.D. at 231; *Wilkins*, 2015 WL 890566, at *8.

Second, two objectors argue that the proposed settlement does not set forth a *cy pres* procedure.  Doc. 70 at 4.  The settlement does not contemplate a *cy pres* distribution, so the objection is meritless.  That said, because the settlement is non-reversionary, some procedure should be in place if some claimants do not deposit or cash their checks.  Accordingly, within ninety days of the distribution of the checks, the parties shall report to the court the number of settlement checks, if any, that have not been cashed or deposited, and shall propose whether the

16

unredeemed funds should be distributed through a second pro rata distribution or a *cy pres* award. *See generally Gehrich*, 316 F.R.D. at 232-34.

Third, two objectors complain that the claims administration process will lack oversight, accountability, and reporting. Doc. 70 at 2. That argument fails, as the settlement administrator is an agent of the court and, as noted above, is required to report regarding how many checks are distributed and then cashed or deposited. Moreover, the court asked Douglas how the claims administrator would identify fraudulent claims, Doc. 102, and his response provides adequate assurance that the administrator implemented an acceptable procedure for weeding out such claims, Doc. 111 at 7-8; *see also* Doc. 93 at ¶ 13 (noting that the administrator will "send[] letters to persons who submitted incomplete Claim Forms to request additional information"); Doc. 121 (addressing how the administrator handled two disputed claims and describing the remedial steps taken thereafter).

Fourth, two objectors argue that there is no timeframe for distributing the checks. Doc. 70 at 3. That argument is meritless, as the settlement agreement provides that the administrator will send checks to class members within thirty days of the expiration of the time to appeal the final approval order or, if there is an appeal, within thirty days of appellate review having concluded. Doc. 52-1 at 13, 28-29.

Fifth, one objector complains that the objection procedures were unduly burdensome. Doc. 69 at 22. That objection is overruled, as the objector fails to say what precisely was wrong with the procedures. Moreover, the court has considered each of the submitted objections, Docs. 67, 69, 70, 84, including those from the individual who is not even a member of the class and thus not entitled to object in the first place.

Sixth, the same individual complains that class notice was inadequate, as evidenced by her failure to receive notice. Doc. 84 at 7-9. As explained above, the fact that she did not receive notice is of no moment; because she is not a class member, she was not entitled to notice. In any event, the class notice procedures were adequate. For Rule 23(b)(3) classes, class counsel must provide the "best notice that is practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort." Fed. R. Civ. P. 23(c)(2)(B). When class members can be identified through reasonable effort, they are entitled to individual notice. *See Mullins*, 795 F.3d at 665; *Hughes*, 731 F.3d at 676-77. Here, the notice was well-tailored to reach the maximum number of class members through direct mail and email. *See Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 812 (1985) ("We think that the procedure followed by Kansas, where a fully descriptive notice is sent first-class mail to each class member … satisfies due process."); *Mullins*, 795 F.3d at 665 ("When class members' names and addresses are known or knowable with reasonable effort, notice can be accomplished by first-class mail."); *In re Online DVD-Rental Antitrust Litig.*, 779 F.3d 934, 946 (9th Cir. 2015) ("The notice provided in this settlement, in both mail and email form, was sufficient under the Constitution and Rule 23(e)."). Approximately 97.9% of the class were sent direct notice via U.S. mail and/or email, a level that confirms the adequacy of the notice procedure. *See Kaufman v. Am. Express Travel Related Servs. Co., Inc.*, 877 F.3d 276, 287 (7th Cir. 2017) ("[N]otice was provided to this massive class in a reasonable and effective manner, reaching approximately 70% of the members."); *In re NCAA Student-Athlete Concussion Injury Litig.*, 314 F.R.D. 580, 603 (N.D. Ill. 2016) ("This multi-faceted notice plan is conservatively estimated to reach eighty percent of the settlement class, which is well within an acceptable range for class actions.").

Still, notice was deficient in one respect: Due to the vagueness of the term "unsolicited," there is a risk that persons receiving notice might not have understood that they were members of the class. That risk is insubstantial. True, under the heading "Who is included in the Settlement?", the class notice simply repeated the proposed class definition. Doc. 52-5. However, under the heading that followed, "What if I am not sure whether I am included in the Settlement?", the class notice said: "If you are not sure whether you are in the Settlement Class, or have any other questions about the Settlement, visit the settlement website at [website address] or call the toll free number, [number]. You also may send questions to the Settlement Administrator at Epiq Systems, Inc., Settlement Administrator, [address]." *Ibid*. Douglas reports that only two claimants contacted the administrator to ask about the term "unsolicited." Doc. 111 at 5 n.2; Doc. 111-4 at ¶ 6.

Under these circumstances, the court will order the administrator to send additional email notice, with the appropriate class definition, to those individuals on the class list who did not submit a claim and for whom an email address is available. The opt-out and objection period should not be reopened, but those receiving the supplemental class notice should be given another opportunity to submit a claim. The supplemental class notice otherwise should mirror the initial class notice.

When email notice was sent after preliminary approval, it reached 75% of the class list. Doc. 96-3 at ¶ 8. That success rate ordinarily is adequate. *See* Judges Class Action Notice and Claims Process Checklist & Plain Language Guide 3 (FJC 2010) ("It is reasonable to reach between 70-95%."). It certainly is adequate at this stage; given that the class notice encouraged class members to contact the administrator if they were unsure that they were class members, and given the vanishingly small number of inquiries the administrator received regarding the term

19

"unsolicited," it is unlikely that many recipients of the class notice failed to submit claims because they were confused as to whether they were class members. Re-notice via U.S. mail is not required; it would be expensive, would materially cut into the class recovery, and would be unlikely to yield much, if any, additional benefit.

### C. Douglas's Incentive Award

Douglas moves for approval of an incentive award of $5,000 to reward him for his participation as the named plaintiff in this suit. Doc. 61 at 18-19. "Incentive awards are justified when necessary to induce individuals to become named representatives." *In re Synthroid Mktg. Litig.*, 264 F.3d 712, 722 (7th Cir. 2001); *see also Espenscheid v. DirectSat USA, LLC*, 688 F.3d 872, 875 (7th Cir. 2012). In deciding whether an incentive award is proper and, if so, in what amount, "relevant factors include the actions the plaintiff has taken to protect the interests of the class, the degree to which the class has benefitted from those actions, and the amount of time and effort the plaintiff expended in pursuing the litigation." *Cook v. Niedert,* 142 F.3d 1004, 1016 (7th Cir. 1998).

This case did not proceed very far before it settled. Still, Douglas attached his name to the suit, thereby subjecting himself to the risk of discovery and a cost award were judgment entered against him. *See Espenscheid*, 688 F.3d at 876-77 ("[A] class action plaintiff assumes a risk; should the suit fail, he may find himself liable for the defendant's costs or even, if the suit is held to have been frivolous, for the defendant's attorneys' fees. … The incentive reward is designed to compensate him for bearing these risks."). Courts in this District have granted $5,000 incentive awards to named plaintiffs in TCPA cases. *See*, *e.g.*, *Kolinek*, 311 F.R.D. at 503; *In re Capital One*, 80 F. Supp. 3d at 809. The court therefore grants Douglas's request for a $5,000 incentive award.

### D.    Attorney Fees

All objectors take issue with class counsel's attorney fee request.  Doc. 67 at 2, 4-5; Doc.

69 at 4-5, 14-15; Doc. 70 at 3.  "In a certified class action, the court may award reasonable

attorney's fees … that are authorized by law or by the parties' agreement."  Fed. R. Civ. P.

23(h).  Because Western Union is paying a specific sum to all class members in exchange for

release of liability, equitable principles permit the court to "determine[] the amount of attorney's

fees that plaintiffs' counsel may recover" from the fund "based on the notion that not one

plaintiff, but all those who have benefitted from litigation should share its costs."  *Florin v.

Nationsbank of Ga., N.A.*, 34 F.3d 560, 563 (7th Cir. 1994) (internal quotation marks omitted).

Under ordinary circumstances, the standards governing fee awards are as follows.

"[A]ttorneys' fees in class actions should approximate the market rate that prevails between

willing buyers and willing sellers of legal services."  *Silverman v. Motorola Sols., Inc.*, 739 F.3d

956, 957 (7th Cir. 2013).  As part of this inquiry, "the judge must assess the value of the

settlement to the class and the reasonableness of the agreed-upon attorneys' fees for class

counsel, bearing in mind that the higher the fees the less compensation will be received by the

class members."  *Redman*, 768 F.3d at 629.  "The central consideration is what class counsel

achieved for the members of the class rather than how much effort class counsel invested in the

litigation."  *Id*. at 633.

The Seventh Circuit has held that district courts "must set a fee by approximating the

terms that would have been agreed to *ex ante*, had negotiations occurred."  *Americana Art China

Co., Inc. v. Foxfire Printing & Packaging, Inc.*, 743 F.3d 243, 246-47 (7th Cir. 2014); *see also

Camp Drug Store, Inc. v. Cochran Wholesale Pharm., Inc.*, 897 F.3d 825, 832 (7th Cir. 2018)

("[D]istrict courts must do their best to award counsel the market price for legal services, in light

of the risk of nonpayment and the normal rate of compensation in the market at the time.")
(internal quotation marks omitted). "Such estimation is inherently conjectural," *In re Trans
Union Corp. Privacy Litig.*, 629 F.3d 741, 744 (7th Cir. 2011), and there is no prescribed method
of calculation, so "in common fund cases, the decision whether to use a percentage method or a
lodestar method remains in the discretion of the district court." *Americana Art*, 743 F.3d at 247.
"The simple and obvious way for the judge to correct an excessive attorney's fee for a class
action lawyer is to increase the share of the settlement received by the class, at the expense of
class counsel." *Pearson*, 772 F.3d at 786 (internal quotation marks omitted).

Siprut requests attorney fees and costs in the amount of $2,804,850.27. Doc. 96 at 15.
Of the $8.5 million common fund, and accounting for $481,142.09 in administrative expenses
and the $5,000 incentive award, that would leave class members with $5,209,007.64. "The ratio
that is relevant to assessing the reasonableness of the attorneys' fees that the parties agreed to is
the ratio of (1) the fee to (2) the fee plus what the class members received." *Redman*, 768 F.3d at
630; *see also Camp Drug Store*, 897 F.3d at 833 n.25; *Pearson*, 772 F.3d at 781. Here, the
requested award is 35% of the net settlement fund. "[I]n consumer class actions," the Seventh
Circuit has established a "presumption" that "attorneys' fees awarded to class counsel should not
exceed a third or at most a half of the total amount of money going to class members and their
counsel," *Pearson*, 772 F.3d at 782, a range in which the requested fees fall.

Were this an ordinary case, the court would proceed to address, among other things,
whether to adopt the lodestar method or the percentage method, whether to adopt a sliding scale
or a straight percentage approach if the percentage method were adopted, and whether to employ
a lodestar cross-check on the amount derived from the percentage method. *See generally In re*

*Akorn, Inc. Sec. Litig.*, 2018 WL 2688877, at *1-4 (N.D. Ill. June 5, 2018); *Gehrich*, 316 F.R.D.

at 234-39. But due to Siprut's conduct in this matter, this is not an ordinary case.

Siprut started off on the wrong foot at the outset of the final approval process. After

objections were filed, Siprut moved for leave to take discovery from the objectors. Doc. 72. As

to one objector, the motion said this:

> [B]ased on Class Counsel's investigation, it appears that [the objector] was
> involved in several crimes, including possession of cocaine with the intent to
> distribute … . If any crimes committed by [the objector] go towards [his/her]
> credibility, then Class Counsel should be permitted to introduce that
> information as evidence to challenge [the objector's] declaration. *See*, *e.g.*,
> *United States v. Smith*, 181 F. Supp. 2d 904, 909 (N.D. Ill. 2002) (Kennelly,
> J.) ("Federal Rule of Evidence 609(a) provides that evidence … that any
> witness has been convicted of a crime involving dishonesty or false statement
> is admissible without regard to its prejudicial effect.").

*Id*. at 3. Given the citation to Evidence Rule 609, which applies *only* where there has been a

conviction, what Siprut necessarily meant in saying that "it appears that [the objector] was

involved" in "possession of cocaine with the intent to distribute" was that he/she had been

*convicted* of that crime. The objector in his/her opposition brief denied having been convicted of

a cocaine offense, Doc. 77 at 11, and at the next hearing, the court asked class counsel to address

in a reply brief the basis for the assertion that he/she had such a conviction, Doc. 86-1 at 6-7.

Siprut's reply brief explained that he had obtained information regarding the objector's

criminal history from Westlaw PeopleMap. Doc. 86 at 2-3. The trouble with this explanation is

that Westlaw PeopleMap very clearly reports that the objector had *not* been convicted of any

cocaine offense. *Id*. at 3; Doc. 86-1 at 44. The only appropriate step for Siprut at that point was

to acknowledge his error and apologize for publicly filing a court document that falsely accused

a litigation opponent of a felony, conduct that the Seventh Circuit had recently found

sanctionable. *See Egan v. Pineda*, 808 F.3d 1180 (7th Cir. 2015). Instead, Siprut doubled down,

filing a reply brief that tried to justify his approach and that again cited Rule 609 for the

23

proposition that "[c]ourts routinely consider convictions when weighing a witness' (sic) credibility," Doc. 86 at 3—this despite the fact that he had been forced to acknowledge by that point that the objector had not been convicted of any cocaine offense. Only after the court further pressed the matter at the next hearing, and only after he and his co-counsel spent several minutes continuing to defend his conduct, did Siprut apologize, Doc. 93-1 at 15-22—though, in both tone (which is not apparent from the transcript) and substance (which is), it was more of a "Mistakes were made" apology than a "Gosh, I'm really sorry" apology, *id*. at 22 ("That's not to say, though, that a mistake wasn't made, because I think a mistake was made. And on that basis, we would apologize to [the objector].").

If that were the extent of Siprut's missteps, and because it is a rare attorney who does not occasionally have a bad day (or two), this would have remained an ordinary case as far as attorney fees are concerned. But it was not. To support his $2.8 million attorney fee request, Siprut argued that he and his colleagues had performed "substantial work," expending "2,164.4 hours" on the case. Doc. 61 at 8. After maintaining that the court should use the percentage method of calculating the fee award, *id*. at 10-16, Siprut added that the $2.8 million request also would be appropriate under the lodestar method, *id*. at 16-18. To support that argument, Siprut again asserted that he and class counsel "spent 2,164.4 hours collectively," *id*. at 17, and submitted an affidavit averring that he spent 1,187.3 hours on the matter, that two other attorneys spent 503.2 hours and 432.7 hours, respectively, and that two non-lawyer professionals spent 2.6 hours and 38.6 hours, respectively, Doc. 61-1 at 6-7 (¶¶ 19-23). Siprut also attached a chart further breaking down each timekeeper's hours, again in six-minute increments, into fifteen categories: "Pre-filing research, drafting, filing, coordinating service of process and client meetings"; "Correspondence with client and counsel of record in this matter and Pandora Media,

24

Inc. (*See* Case No. 14-cv-1315 (N.D. Ill.)) and review of documents and investigation of information provided by counsel for Pandora Media, Inc."; "Review of filings, court orders, Western Union's motions for extensions, and answer"; "Drafting renewed motion for class certification"; "Researching and Drafting: motion to strike affirmative defenses; joint 26(f) report; and additional status reports"; "Preparation for and attendance at hearings"; "Drafting of mediation statement and attendance at multiple mediation sessions"; "Post-mediation communications and drafting settlement agreement"; "Confirmatory discovery; drafting requests; review of documents; and communications with counsel of record"; "Researching and drafting motion for preliminary approval"; "Preparation for and attendance at preliminary approval hearing"; "Researching and drafting petition for attorneys' fees and incentive award; (Estimated) Objections: reviewing objections; researching issues; drafting responses"; "Researching and drafting motion for final approval"; "Preparation for and attendance at final approval hearing"; and "Communications with Class Members and Settlement Administrator." Doc. 61-1 at 168-70. Siprut's own hours for the fifteen categories were: 11.5; 366.1; 12.4; 2.2; 26.1; 12.2; 197.2; 264.8; 68.2; 52.5; 5.2; 96.4; 50.0; 10.0; and 12.5. *Ibid*. The other four timekeepers' hours in each category were likewise reported to the tenth of an hour. *Ibid*.

The message conveyed by Siprut's affidavit and chart was unmistakable: By reporting total hours in six-minute increments, and by further dividing those hours into fifteen finely-honed categories, Siprut plainly intended to convey the impression that he and his team had kept reasonably close track of their time. And that was an important impression to make, given the possibility under Seventh Circuit precedent that the court would use the lodestar method to calculate attorney fees or, at a minimum, deploy a lodestar cross-check as part of the percentage method. *See*, *e.g.*, *Americana Art*, 743 F.3d at 247. After all, under either method, the more

25

hours reported, the higher the lodestar; the higher the lodestar, the better off counsel is; and the more credible the reported hours, the more likely the court will accept counsel's representations as to those hours.

Missing from Siprut's submissions, however, were any actual time records (other than the affidavit and chart referenced above). Given this, the court asked Siprut for "detailed attorney time records for this case." Doc. 102. And because the reported hours seemed excessive for a case that was barely litigated before going to mediation, the court asked Western Union's counsel to report how many hours *they* billed on the case. *Ibid*.

The responses were disquieting in two respects. First, Western Union's outside counsel reported that they had billed 830 hours—meaning that Siprut and his colleagues reported 2.6 times as many hours as Western Union's outside counsel. Doc. 111 at 9-10. Even if the hours expended by Western Union's inside counsel were considered, Doc. 113 (ninety recorded hours, plus an unspecified number of other hours), Siprut and his colleagues reported more than twice the number of hours expended by defense counsel. Second, Siprut stated that he "wishe[d] to clarify that there are no 'detailed time records' for this particular matter (other than what has previously been submitted) and apologizes to the Court to the extent there is any confusion on this point." *Id*. at 10.

There was no "confusion." Confusion is what happens when somebody writes something that reasonably could mean X or Y, and when the reader understands it to mean X even though the writer intended to say Y. That is not what happened here. When a lawyer reports hours in six-minute increments and then divides those hours into fifteen categories, and when those hours were accrued over the course of two years, the only reasonable conclusion is that detailed and relatively contemporaneous time records had been maintained. Otherwise, how could Siprut

possibly have averred under oath that he spent, over a two-year period, 366.1 hours on

"Correspondence with client and counsel of record in this matter and Pandora Media, Inc. (*See*

Case No. 14-cv-1315 (N.D. Ill.)) and review of documents and investigation of information

provided by counsel for Pandora Media, Inc."; 68.2 hours on "Confirmatory discovery; drafting

requests; review of documents; and communications with counsel of record"; or 264.8 hours on

"Post-mediation communications and drafting settlement agreement"?

> As Siprut explained it, this is how:

>> [I]ndividual attorneys may not keep contemporaneous time records, and instead may derive or "reconstruct" their time at some later point when it becomes necessary or appropriate to do so.  (This may end-up being monthly in certain class action cases, such as when co-counsel agree to exchange time; or when defense counsel requests it and Class Counsel agrees to provide it; or, perhaps, not until the very end of a successful case when a fee petition is submitted for a class settlement.)  The records relied upon include review of attorney calendars, emails, and legal research records, among other things, which is an appropriate method for determining lodestar figures.  *Rudolph v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, No. 83 C 3303, 1990 WL 7168, at *2 n.2 (N.D. Ill. Jan. 18, 1990) (court approving lodestar in class settlement where attorneys' time was reconstructed rather than based on records created contemporaneously).  This is the method used by Class Counsel for lodestar on this case.

Doc. 111 at 10-11 (footnote omitted).  If Siprut and his colleagues had "reconstructed" their

hours on a "monthly" basis, he surely would have said so.  Given his silence, the only reasonable

conclusion is that they "reconstructed" their time at "the very end" of this case, based on a

"review of [two years' worth of] attorney calendars, emails, and legal research records," *none* of

which were submitted for the court's consideration.  *Id*. at 10.  That is hardly the kind of

"reasonably accurate" and "substantial[] reconstruct[ion]" that the district court in *Rudolph*

approved for one of several attorneys who sought fees there.  1990 WL 7168, at *2 n.2.

> This is not to say that keeping contemporaneous time records is mandatory; while doing

so is "the preferred practice," *Webb v. Bd. of Educ. of Dyer Cnty., Tenn.*, 471 U.S. 234, 238 n.6

27

(1985), it is not required, *see Harper v. City of Chicago Heights*, 223 F.3d 593, 605 (7th Cir. 2000). Still, "it is within a district court's power to reduce a fee award because the petition was not supported by contemporaneous time records," *ibid.*, particularly if the reconstructed time records lack support and/or are fishy or untrustworthy in other respects. *See Camp Drug Store*, 897 F.3d at 829, 832-34 (affirming a fee award below the lodestar where the case settled after very little litigation, counsel's reported time was suspiciously high, and "counsel had provided only a summary of the number of hours spent on the case," but no "details or documentation regarding how the $156,000 in fees had accumulated given how little work was done on the case"); *Matter of Chi., Milwaukee, St. Paul and Pac. R. Co.*, 840 F.2d 1308, 1317 n.7 (7th Cir. 1988) (holding that an attorney's "attempt to reconstruct his time records was completely unavailing, and … [his] devotion of more than 2,000 hours of time to this matter in over two years undoubtedly could not be sustained even if adequate time records existed") (internal quotation marks omitted); *Frank Music Corp. v. Metro-Goldwyn-Mayer, Inc.*, 886 F.2d 1545, 1557 (9th Cir. 1989) ("The lack of contemporaneous records does not justify an automatic reduction in the hours claimed, but such hours should be credited only if reasonable under the circumstances and supported by other evidence such as testimony or secondary documentation."); *Grendel's Den, Inc. v. Larkin*, 749 F.2d 945, 950 (1st Cir. 1984) (concluding that a fee award warranted greater scrutiny in light of "[t]he absence of contemporary time records, in conjunction with extraordinarily high hourly rates and claims for time spent in the most punctilious appellate research and preparation"); *cf. Carter v. Sedgwick Cnty.*, 929 F.2d 1501, 1506 (10th Cir. 1991) (accepting reconstructed time record where individual time entries "contained a detailed description of what was done at that time").

The reconstructed time records here lack support and are highly suspect. For one, Siprut claims that he and his colleagues expended 2,164.4 hours, over the course of two years, on a relatively straightforward TCPA case that was barely litigated before going to mediation. That is an enormous figure; as noted, it is over twice the number of hours expended by Western Union's counsel, including inside counsel. As in the *Southwest Airlines Voucher* case, Siprut's reported hours here are "grossly excessive." 2018 WL 3651028, at *1. For another, Siprut did not provide the court with any of the materials (attorney calendars, emails, and legal research records) upon which he avers the time records were reconstructed. There accordingly is no indication as to how much time Siprut and his colleagues spent on any particular task at any particular juncture, and therefore no way to evaluate whether the time recorded (or, rather, conjured months or years after the fact) was reasonable.

Other than the written work product filed on the docket, Siprut did not provide the court with copies of any of the work that he and his colleagues prepared. As an example, Siprut's chart asserts that he and his colleagues spent 289.2 hours (of which 197.2 hours were his) on "Drafting of mediation statement and attendance at multiple mediation sessions." Doc. 61-1 at 169. Yet Siprut failed to provide the court a copy of the mediation statement, thus leaving the court unable to assess whether the hours claimed for drafting the statement (289.3 hours minus the hours spent at the two days of mediation, Doc. 61 at 9) were reasonable. Likewise, Siprut's chart asserts that he and his colleagues spent 385.5 hours (of which 264.8 hours were his) on "Post-mediation communications and drafting settlement agreement." Doc. 61-1 at 169. Yet no written post-mediation communications were provided, nor were any estimates of the time spent on oral post-mediation communications. And while the settlement agreement is in the record, Doc. 96-1, it is largely boilerplate and cannot have taken much time to retrofit to reflect the

terms agreed upon at the mediation. It is simply impossible that Siprut and his colleagues spent anywhere near 385 hours on those tasks; and in the extremely unlikely event that they did, the time they spent was wholly unreasonable.

Siprut's chart asserts that he and his colleagues spent 59.1 hours (26.1 hours of which were his) on "Researching and Drafting: motion to strike affirmative defenses; joint 26(f) report; and additional status reports." Those hours are impossible to credit. The initial status report is largely boilerplate, Doc. 20, and the other status reports were one-pagers (if that) that largely repeated themselves in briefly reporting on the mediation or settlement, Docs. 28, 30, 32, 36, 39, 41. The motion to strike affirmative defenses is fifteen pages and heavily cited, Doc. 24, which at first blush might appear to have been a time-intensive project. But a review of this District's docket reveals that the motion to strike that Siprut filed in this case was largely a cut-and-paste job from motions to strike he had previously filed in other cases; it follows that the motion in this case could not have required much drafting or much (if any) research. *See Al & Po Corp. v. Cleanis, Inc.*, No. 14 C 1225, Dkt. 27 (N.D. Ill. May 14, 2014); *Al & Po Corp. v. Am-Med Diabetic Supplies, Inc.*, No. 14 C 1808, Dkt. 13 (N.D. Ill. Apr. 30, 2014); *Douglas v. Wynnpharm, Inc.*, No. 13 C 7156, Dkt. 28 (N.D. Ill. March 3, 2014); *Windows Plus, Inc. v. Premier Indus. Supply, Inc.*, No. 13 C 7070, Dkt. 28 (N.D. Ill. Jan. 14, 2014). That Siprut would report 59 hours for those tasks reflects both the complete unreliability of his reconstructed time records and the utter disconnect between the tasks performed and the hours reported.

Given all this, the court would be well within its rights to deny Siprut's fee request in its entirety. *See Vocca v. Playboy Hotel of Chi., Inc.*, 686 F.2d 605, 608 (7th Cir. 1982) ("District courts, entrusted with the task of ordering an unsuccessful litigant to pay the reasonable attorney's fees of his opponent, may properly demand that a claim for such fees be fully

supported by accurate and detailed records. When it is not, the request may be denied."); *Brown v. Stackler*, 612 F.2d 1057, 1059 (7th Cir. 1980) ("The District Court, finding appellants' claim outrageously excessive, denied fees entirely. Such denial is an entirely appropriate, and hopefully effective, means of encouraging counsel to maintain adequate records and submit reasonable, carefully calculated, and conscientiously measured claims when seeking statutory counsel fees."); *Mallinson-Montague v. Pocrnick*, 224 F.3d 1224, 1236 (10th Cir. 2000) ("[T]he district court … would have operated well within its sphere of discretion in denying the fee request on the ground that it was not supported by adequate documentation."); *Matter of Evangeline Refining Co.*, 890 F.2d 1312, 1325 (5th Cir. 1989) (requiring the bankruptcy court to deny "all fees" if it found that the attorney "made misrepresentations in his fee applications or in the related proceedings with knowledge of their falsity and intent to deceive"). Instead, given the good result he obtained for the class and the fact that he is responsible for covering additional administrative expenses, the court will award Siprut $425,000 in attorney fees and costs, which is five percent of the settlement fund.

This reduction reflects in part that Siprut failed to keep contemporaneous time records and, compounding the problem, failed to provide any support (other than his own say-so) for his reconstructed time calculations. *See Harper*, 223 F.3d at 605 ("[I]t is within a district court's power to reduce a fee award because the petition was not supported by contemporaneous time records."); *Serin v. N. Leasing Sys., Inc.*, 501 F. App'x 39, 41 (2d Cir. 2012) (holding that it was proper to substantially reduce the attorney's hours "in part due to the lack of contemporaneous records"); *Mallinson-Montague*, 224 F.3d at 1235 (same). The reduction also reflects in part the undeniable fact that Siprut, having failed to either maintain reasonably contemporaneous time records or provide support for his reconstructed records, proceeded to greatly inflate the hours he

31

reported, just as he did in the *Southwest Airlines Voucher* case. 2018 WL 3651028, at *4. Finally, the reduction reflects in part that Siprut's reporting his and his colleagues' hours in six-minute increments, and his allocation of those hours across fifteen categories, was designed to create the impression of precision and reasonableness, when in fact the hours reported were wholly imprecise and unreasonable. *See Litton Sys., Inc. v. AT&T Co.*, 700 F.2d 785, 827 (2d Cir. 1983) (affirming a district court's denial of fees to which attorneys were otherwise entitled, reasoning "there is no doubt that attorneys as officers of the court must operate on an honor system, and must be appropriately disciplined to provide both specific and general deterrence").

This substantial reduction is warranted in light of the uniquely distressing circumstances of this case. The difference between Siprut's requested fees and costs, and the fees and costs awarded, will revert to the class.

## Conclusion

For the foregoing reasons, the motions for approval of the settlement, class certification, and incentive awards are granted, while the motion for attorney fees is granted in part and denied in part. The court modifies the settlement such that the distribution of the $8.5 million common fund is as follows: (1) class member claims in the amount of $7,516,803; (2) settlement administration expenses of $553,197 (the cap is likely to be reached given the supplemental notice), with class counsel covering any costs incurred above that amount; (3) an incentive award to Douglas of $5,000; and (4) attorney fees and costs to class counsel of $425,000.

The settlement administrator shall re-send notice as described above. After the new claims period expires, the administrator shall file a status report indicating the number of notices that bounced back, the number of additional valid claims, and the re-calculated recovery per claimant. Then, ninety days after the settlement checks are distributed, the parties shall file a

status report indicating the amount of unredeemed funds and proposing whether those funds should be distributed through a second pro rata distribution or a *cy pres* award. In deciding whether to seek fees or take other action, counsel for the objector who is not a class member should seriously consider whether it is proper for a non-class member's attorney to further burden the parties and the judiciary with additional filings.

August 31, 2018

_____
United States District Judge